UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )
    )
        Plaintiff,    )
    )
    vs.    )   CASE NO. 3:19-cr-00114-SLG-MMS
    )
REY JOEL SOTO-LOPEZ,    )
    )
        Defendant.    )
_____)


TRANSCRIPT OF EVIDENTIARY HEARING ON
MOTION TO SUPPRESS EVIDENCE (DKT 17)
BEFORE THE HONORABLE MATTHEW M. SCOBLE, MAGISTRATE JUDGE
January 28, 2020; 9:43 a.m.
Anchorage, Alaska


**FOR THE GOVERNMENT:**
    Office of the United States Attorney
    BY: ALLISON M. O'LEARY
    222 West 7th Avenue, #9
    Anchorage, Alaska  99513
    907-271-5071

**FOR THE DEFENDANT:**
    Office of the Federal Public Defender
    BY: GARY G. COLBATH
    601 West 5th Avenue, Suite 800
    Anchorage, Alaska  99501
    907-646-3400

R. JOY STANCEL, RMR-CRR
Federal Official Realtime Reporter
222 West 7th Avenue, #4
Anchorage, Alaska  99513
Proceedings Recorded by Digital Recording
Transcript Produced by Computer

```
                    I N D E X

              January 28, 2020


Government's
Witnesses:           Direct   Cross   Redirect   Recross

Eileen Farrar            6      28        41        45

Trevor Howard           47      98    123/132      129

Ira Beck               134     145       146

                     - - - - -




              E X H I B I T   I N D E X

Exhibit                                              Page

Government 1     Case Updates from Parole              20

Government 2     Discretionary Parole Conditions       14

Government 3     Photo                                 77

Government 4     Photo                                 76

Government 5     Photo                                 83

Government 6     Video CD                              50

                     - - - - -
```

```
 1                (Call to Order of the Court at 9:43:55 a.m.)
 2                DEPUTY CLERK:  All rise.  His Honor, the Court, the
 3    United States District Court for the District of Alaska is now
 4    in session, with the Honorable Matthew M. Scoble presiding.
 5                Please be seated.
 6                Your Honor, we're on record in Case
 7    Number 3:19-CR-114, United States of America versus Rey Joel
 8    Soto-Lopez.
 9                Will counsel please state your appearances for the
10    record?
11                MS. O'LEARY:  Allison O'Leary for the United States.
12                MR. COLBATH:  And Gary Colbath for Mr. Soto-Lopez.
13                THE COURT:  All right.  Good morning, counsel.  Good
14    morning to you, Mr. Soto-Lopez.
15                All right.  So we're on today for an evidentiary
16    hearing on the defense's motion to suppress.  I've read all the
17    pleadings.  I think the parties seem to agree that the burden
18    is on the Government in this case, this was a warrantless
19    search.  So Ms. O'Leary, do you want to start?
20                MS. O'LEARY:  I can, Your Honor.  The Government has
21    two witnesses, PO Eileen Farrar, who will be very brief, and
22    then Trevor Howard, a trooper, who I think will take a bit
23    longer.
24                THE COURT:  Okay.
25                MS. O'LEARY:  I guess there's one other issue I
```

wonder if we want to take up now.  I don't know if it still is.
I actually haven't checked with Mr. Colbath, but the defense
has subpoenaed another witness, Ira Beck, who -- and I was not
at this hearing, so I'm just informed of this -- said he wanted
his subpoena quashed at a status hearing last week.  So I don't
know if that is still the case.  I know Mr. Beck is here.  So I
don't know if that's something we want to take up first.

THE COURT:  So I -- thank you.  You can have a seat.

I saw that referenced in the minutes from a hearing
that I wasn't at either.  I think it was in front of the
District Judge, and my understanding was that a motion to quash
would be forthcoming.  I've reviewed the docket.  There's been
no such motion filed.  So as far as I'm concerned, it's not
before the Court.  And if Mr. Beck is here, apparently, he's
complied with the subpoena.  So I don't see it as an issue, but
if somebody wants to raise it, then they're welcome to do so.

MS. O'LEARY:  Okay.

THE COURT:  All right?

MR. COLBATH:  Your Honor, my understanding -- I have
an investigator with me who issued the subpoena or caused the
service of the subpoena, and he asked Mr. Beck.  Mr. Beck
apparently has decided to just comply and testify.

THE COURT:  Great.

MR. COLBATH:  So he's waiting outside with the other
witnesses.

```
 1              THE COURT:  Okay.
 2              MR. COLBATH:  And we'll proceed when the Government's
 3    done.
 4              THE COURT:  Very good.  Any witnesses we need to
 5    exclude from the courtroom?
 6              MR. COLBATH:  No, Your Honor.
 7              MS. O'LEARY:  None of our witnesses are in here.
 8              MR. COLBATH:  I think everybody is either from my
 9    office or Ms. O'Leary's.
10              THE COURT:  Very good.  All right, then.
11    Ms. O'Leary?
12              MS. O'LEARY:  All right, thank you.  Your Honor, as a
13    housekeeping, the defense and the Court, and there's one on the
14    witness stand, should all have a binder.
15              THE COURT:  Beautiful.
16              MS. O'LEARY:  Has numbers of 1 through 5.  Those have
17    5 of the 6 Government exhibits we'll be admitting today.  The
18    sixth, just as a forewarning, is a video that -- it's the same
19    video that was already submitted as an attachment just to the
20    United States' opposition, but without DEPS in here, my
21    computer could not talk to that TV.  So the Court's IT has
22    provided us a computer, but it's sitting over there.  So if the
23    Court is okay with that, I spoke to Madam Clerk, I can use the
24    portable microphone so that I can run that computer when
25    Trooper Howard is testifying.
```

1      THE COURT:  That's absolutely fine.  Whatever works

2  for you.  Obviously, this is a relatively informal setting.  So

3  whatever you need to do to present your evidence, I'm fine.

4      MS. O'LEARY:  Okay, great.  Thank you.  Then the

5  United States calls Eileen Farrar.

6      THE COURT:  All right.  Officer Farrar, if you could

7  please step up to the witness stand, just remain standing, and

8  be sworn.

9      DEPUTY CLERK:  Please raise your right hand.

10      (Oath administered to the witness)

11      DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

12  into the microphone at all times.  Please state your full name,

13  and spell your full name.

14      THE WITNESS:  Eileen Farrar, E-I-L-E-E-N,

15  F-A-R-R-A-R.

16      DEPUTY CLERK:  Thank you.

17      THE COURT:  All right.

18      MS. O'LEARY:  Thank you.

19       EILEEN FARRAR, GOVERNMENT WITNESS, SWORN

20               DIRECT EXAMINATION

21  BY MS. O'LEARY:

22  Q   Good morning, PO Farrar.  Would you mind telling us where

23  it is that you work?

24  A   I work for the State of Alaska, Department of Corrections,

25  Probation Parole -- sorry, Pretrial Probation Parole.  The name

FARRAR - DIRECT

1   just changed.

2   Q    And what part of the state do you work in?

3   A    I've worked 16 years in Anchorage.  I'm currently assigned

4   to Kenai, and going to be transferring back to Anchorage.

5   Q    When did you move to the Kenai?

6   A    June 1st.

7   Q    Of 2019?

8   A    Yes.

9   Q    Okay.  So in March of 2019, what office were you working

10  out of?

11  A    In the Anchorage Probation Parole office.

12  Q    Probation and Parole.  So not Pretrial, but Probation and

13  Parole?

14  A    No, it wasn't merged then.  No, it was just the Probation

15  Parole office at 800 A Street.

16  Q    Do you know the defendant here, Rey Soto-Lopez?

17  A    Yes, I do.

18  Q    How do you know him?

19  A    I was his first parole officer when he first released from

20  prison.

21  Q    And do you know when it was that he released from prison?

22  A    Without looking at my notes, I believe it was around 2018.

23  Q    And as part of the supervision of Mr. Soto-Lopez, would

24  you have reviewed any parole or probation conditions with him?

25  A    Absolutely.

FARRAR - DIRECT

1   Q    And was he released to Parole or released to Probation?

2   A    He was released to both.  He was released to discretionary

3   parole and probation because he had probation in his case.  I

4   believe he still has approximately 25 years of suspended time.

5   Q    And what was his underlying conviction that he was now on

6   parole or probation for?

7   A    Murder 1, and I think there was an assault in there,

8   and -- I'm not sure exactly.  I just know the Murder 1 -- or

9   Murder 2.

10  Q    Murder 2, so that's a State of Alaska conviction?

11  A    Yes.

12  Q    And are you familiar with a term being "on call" as a

13  probation officer in Anchorage?

14  A    Yes, I am.

15  Q    What does that mean?

16  A    "On call" is basically in -- it's a probation officer

17  that's handed a State cell phone, along with a State computer,

18  and we basically answer any law enforcement calls or any after

19  hours, what we would call after hours.  The State hours are

20  from 8 to 4:30, and so -- and then on weekends and holidays, we

21  answer any calls.  Normally, what happens is that if a law

22  enforcement comes in contact with somebody, they run what's

23  called APSIN.  There's what we call "locate" in there, giving

24  conditions, and they are asked to call us if they come in

25  contact or have any issues with a person that's listed as on

1   probation or parole.

2   Q    And APSIN, that's the Alaska Public Safety Information

3   Network?

4   A    Yes.

5   Q    And what sort of info is stored in there?

6   A    What Probation Parole puts in there will be a list of the

7   conditions.  We call them "critical conditions" on that side of

8   the house, and there -- it will map out if the person's

9   hostile, assaultive, mental health, any kind of critical

10  contact information.

11          In addition, then, below that, it will be -- there's

12  a -- it's a page of them, and it goes -- we basically, as a

13  probation officer, you check off the boxes that pertain to

14  either judgment and/or parole conditions.  So if there's a

15  combination, you put both.  So it will have whether there's

16  alcohol restrictions, drug restrictions, whether they're

17  assaultive, whether they can have contact with certain people,

18  whether there's location restrictions, such as region and

19  residence.

20          There's also any other pertinent information, plus it

21  will list out search conditions.  So if someone is -- has drug

22  and alcohol conditions, you'll mark the box what they cannot

23  have.  Or if they're a sex offender, they'll have where they

24  can't have certain contact with minors, and stuff like that.

25  So it lists out, and those conditions are kind of condensed and

1  put into APSIN so that if somebody has contact, the dispatchers

2  usually can read that to an officer and say, "Hey, they're on

3  supervision, they have these conditions."

4  Q    So the dispatchers for, like, the Alaska State Troopers,

5  for example, have access to APSIN?

6  A    Yes.  Most of the police departments that I'm aware of

7  have access to APSIN, or they have some kind of dispatch center

8  that will have access to it.

9  Q    And if you get a call when you are on call as a probation

10  officer, do you have any standard process in the Department of

11  Corrections for recording the fact of such a call?

12  A    Basically, it's the officer's notes.  The State does not

13  give us recording devices for the DOC side.  We don't have

14  recording devices.  It's basically me taking notes, and it

15  depends how often -- I'm one of the -- I was one of the

16  officers that was on call multiple times in a year, sometimes

17  up to 10 or 15 times in a year, and so you take notes.  You

18  write it down, you're logging in.  I mean, you log into what's

19  called ACOMS.  It's Alaska Corrections Offender System, I

20  believe it's called.  Just known as ACOMS.  That's where we

21  have all our information.  It's our computer system like APSIN

22  is for law enforcement.  It's for DOC.  So we would log in and

23  use that.  Plus, then, we take notes and type into those

24  systems.

25  Q    So you type into the ACOMS system?

1  A    Yes.

2  Q    And I mean, do you wind up typing up notes, then, about

3  phone calls?

4  A    Yes.  We type up notes.  You'll take notes while you're on

5  call.  You'll be looking stuff up, and then at the end of it,

6  you basically summarize what the -- what the call was about,

7  what you authorized, any call-back information, whether you

8  arrested the person, or anything that somebody else would know.

9  Like, if I told them to report the next day, next business day

10  at 10 a.m., that would be in there, because if I wasn't

11  working, whoever's in the office would be able to pull his

12  information up and say, "Oh, he had law enforcement contact,

13  this is what we need to discuss with him."

14  Q    Okay.  What is that sort of note called?  Does it have a

15  name?

16  A    In the Anchorage Probation Office, there's two --

17  different offices put it in the system differently.  So in

18  Anchorage Probation, they put it under what's called "Case

19  Update".  That's where all law enforcement contacts are listed.

20  So for my contact in this case, would be listed under what's

21  called Case Update.

22        Otherwise, if I had direct access or direct

23  communication with the offender, then it goes under

24  "Supervision Contact".  So there might be two different

25  locations that you would need to look for at the information

1    of.

2    Q    Okay.  And if you wouldn't mind looking in the binder in

3    front of you at the tab that's marked Number 2, there's a

4    several page document, says Alaska Board of Parole at the top?

5    A    Yes.

6    Q    Do you know what this document is?

7    A    Yes.  This is a cover sheet that is sent out to whoever

8    the probation or parole officer that has the parolee at the

9    time, and it's just a cover sheet explaining what needs to

10   go -- what needs to happen with the parole conditions that are

11   attached to it, normally.

12   Q    Okay.  And if we go to the second page, then, what are we

13   looking at?  Do you recognize this?

14   A    Yes, I do.

15   Q    And what is it?

16   A    Those are -- it's an order of discretionary parole, and

17   these are the conditions that the Parole Board placed on --

18   this is the -- the first page is the general conditions,

19   normally.  Everybody gets 1 through 12.

20   Q    And who is this for?

21   A    This is for Rey Joel Soto-Lopez?

22   Q    So the defendant in this case?

23   A    Yes.

24   Q    Can you tell from looking at the top of this document in

25   the left when Mr. Soto-Lopez began his parole and probation

1   supervision?

2   A    He was released on March 14th, 2018.

3   Q    Okay.  And then so there are several more pages of this

4   document.  We were on Page 2 of the exhibit, the first page of

5   this (Indiscernible - garbled speech) parole.  If we go to the

6   second and third pages, what are these additional numbered

7   paragraphs?

8   A    Actually, because of the way these are written, these are

9   discretionary.  Discretionary is different from the mandatory

10  parole systems.  So the Parole Board has imposed these

11  conditions specifically to the parolee's history, criminal

12  history, and his conviction.  So when they placed these

13  conditions on -- when they look at somebody for discretionary

14  parole, they look at their entire history of criminal

15  activities or behaviors, and then they impose conditions that

16  are based on his -- that are specific to him.  So these would

17  have been imposed by the Parole Board directly related to his

18  criminal history and conviction.

19  Q    Are you talking about all of these conditions, or just

20  some?

21  A    Most -- let's see.  It would start, usually -- they've

22  actually changed some of them.  Let's see.  18 through 27 would

23  be most -- most of those are, I would say, directly imposed on

24  his -- on his history.

25  Q    Okay.  Would it be fair to say that Exhibit 2, all four of

1  these pages are the cover sheet and then conditions of parole

2  for Mr. Soto-Lopez?

3  A    Yes.

4  Q    And then this is in relation to that murder case that you

5  supervised him in?

6  A    Yes.

7          MS. O'LEARY:  I'd like to admit Exhibit 2.

8          THE COURT:  Mr. Colbath, any objection?

9          MR. COLBATH:  No.

10         THE COURT:  All right.  Without objection, Government

11 Exhibit 2 will be admitted.

12         (Government Exhibit 2 admitted)

13 BY MS. O'LEARY:

14 Q    And PO Farrar, if you would look at the second page of the

15 exhibit, so the first page of Order of Discretionary Parole,

16 about condition 12.  What is that condition?

17 A    Condition 12 is cannot leave area.  Otherwise, on the

18 Probation side, would be region of residence restriction.

19 Q    Okay.  And what does that mean, "cannot leave area"?

20 A    "Cannot leave area", it's based on cannot leave the region

21 in which you are assigned.  In the Probation -- in the

22 Anchorage Probation Office, that would mean you can't go past

23 into Sutton, you can't go past into Houston, and you can't go

24 past the Portage cutoff.  So that's your region of residence

25 where you're confined.  If you go past those perimeters, then

1  you have to get PO approval.  Sometimes that can be verbal and,

2  which would then be documented in ACOMS, or it would be an

3  actual written, printed out pass that they have to come in and

4  sign for.

5  Q    And when you met Mr. Soto-Lopez, did you review these

6  conditions with him?

7  A    They are reviewed once he releases to our office.  But

8  discretionary parole is handled differently than mandatory

9  parole.  So the person on Page 1, and also the signed

10  authorization, the printed name of the witness, she's a

11  probation and parole officer with EM, and before discretionary

12  parolees can be released, they absolutely have to sign, and

13  these conditions have to be gone over with them because if

14  they -- under discretionary parole, if they refuse to sign the

15  conditions, they are not released.

16  Q    Because it's not a mandatory release?

17  A    Because it's not a mandatory release.  So they would have

18  been gone over with him for the very first time when he signed

19  them and they were imposed on him, and then they would have

20  been gone over when he met with me.

21  Q    Does that include explaining the bounds of a regional

22  restriction?

23  A    Yes.  Everybody that releases to the Anchorage office

24  attends what's called "orientation" and in there, they

25  discuss -- they go over, basically, all the general conditions,

1  and the region of residence is explained specifically of where

2  you can go and what you cannot do.

3  Q   Okay.  Moving on to the last page of Exhibit 2, to

4  Paragraph 25, it says no alcohol consumption and possession,

5  alcohol testing (Indiscernible).  Can you explain what this

6  condition is about?

7  A   This is restricted to the person.  Even though, obviously,

8  alcohol is legal if you're over the correct age, the Parole

9  Board has imposed a condition where it says he's not allowed to

10 have any of that.  He's not allowed to be in establishments

11 where that's the primary item for sale.  He's not allowed to

12 have it in his car.  And it also talks -- they've modified the

13 conditions, and it actually is specific about taking

14 over-the-counter any item or any product that has alcohol

15 contained in it, and he will submit to testing at the direction

16 of a parole officer or upon request of a parole officer at a

17 reasonable -- any reasonable time, they'll submit to search of

18 their person, personal property, vehicle, residence, and any

19 vehicle which they have under their control, for alcoholic

20 beverages.

21 Q   And under this condition, are parolees allowed to have

22 small quantities of alcohol?

23 A   Absolutely not.

24 Q   All right.  Moving on to Paragraph 26, can you explain

25 what this condition is about -- that starts "no drug

1  possession"?

2  A    This is conditions also imposed on individuals that have

3  any involvement with drugs or illegal drugs.  Basically, it

4  says the same thing that the alcohol does.  It's just regarding

5  drug testing, and it regards paraphernalia, as well.  So like

6  if you have needles, scales, baggies, all that stuff, you

7  cannot possess that in your -- have that in your possession in

8  the same personal property, residence, vehicle or vehicle which

9  you have under your control, and you cannot associate with

10 people who use or sell illegal drugs, as well.  You cannot

11 remain in places where it's a known drug house, or obviously,

12 if there's a known area where people go to use drugs, you're

13 not allowed to hang out in that area, either.  It basically

14 says you need to remove yourself from all that activity.

15 Q    And is there some exception for small amounts of drugs?

16 A    Absolutely not.

17 Q    And the search condition here, is that -- I'm

18 understanding it's just at the request of a parole officer or

19 their request to law enforcement; is that how this operates?

20 A    Um, yes.  Normally, what will happen is if I -- when I'm

21 contacted by a law enforcement agency, I will give that

22 instruction.  I've got a pretty regimented thing, been doing

23 this for so many years, that I will say.  There's certain

24 things, but I'll go over that, that they can't have any -- if

25 they're a passenger, I'll explain that, where they can search

1    and all that stuff.  I'll explain all that.

2    Q    What do you mean if they're a passenger?  Of a car or --

3    A    If they're a passenger in a vehicle and if the car is not

4    under their control.  A lot of times, that -- we'll explain

5    that to whoever is calling us so that they know where to --

6    where the parolee can -- it's basically within reach of the

7    parolee.  But if they're the driver of the vehicle, that kind

8    of changes it, because now it's under their control.

9    Q    And you already testified, I believe, that you were

10   working in the Anchorage office on March 24th of 2019?

11   A    Yes.

12   Q    And were you on call that day?

13   A    I was on call that week, yes.

14   Q    That week.  Did you get a call from the Alaska State

15   Troopers dispatcher out of Soldotna about Mr. Soto-Lopez?

16   A    Yes, I did.

17   Q    Was that in the afternoon?

18   A    I believe so, yes.

19   Q    What information was the Soldotna dispatcher relaying to

20   you?

21   A    They were -- they explained to me that they had him pulled

22   over.  I immediately recognized his name, and I immediately put

23   a -- I made a statement about, "Hey, he's on for a murder case.

24   Please warn the trooper that it's -- he's not a low-risk

25   offender."

1   Q    Why did you immediately recognize his name?

2   A    Because I had -- I was originally his original PO.

3   Q    Were you still his PO at this time?

4   A    No, I was not.  He had been transferred off to another

5   case.

6   Q    Okay.  And you said you thought he had started in -- or

7   that it showed on his condition he had been released in 2018?

8   A    Yes.

9   Q    Okay.  So about a year after his release?

10  A    Yes.

11  Q    And what -- I think I interrupted you.  What did the

12  Soldotna dispatcher say was the reason they were calling about

13  Mr. Soto-Lopez?

14  A     It was a traffic stop, and he was the driver and sole

15  occupant of the vehicle, and they were calling because they had

16  contact with him.

17  Q    Okay.  And did they tell you any circumstances about who

18  else was in the vehicle?

19  A    What I recall is there was nobody in the vehicle.  He was

20  the only one.

21  Q    And did you make any notes about this phone call that

22  would have been recorded in that, that Case Update system?

23  A    Yes.

24  Q    Would you look at Exhibit 1 in that binder?  Do you

25  recognize what this document is?

1    A    Yes.  This is my entry notes into the ACOMS system under

2    Case Update with regards to the contact that I had that day --

3    or the day -- that day and the next day.

4    Q    Okay.  And is the two dates, are those differentiated just

5    by those effective dates on the left?

6    A    Yes.

7            MS. O'LEARY:  All right.  I move to admit Exhibit 1.

8            THE COURT:  Mr. Colbath?

9            MR. COLBATH:  I have no objection.

10           THE COURT:  All right.  Without objection, Exhibit 1

11   will be admitted.

12           (Government Exhibit 1 admitted)

13   BY MS. O'LEARY:

14   Q    And so is that that -- what you just testified to, that

15   they contacted you about a stop, is that reflected in your note

16   from this 3/24 Case Update entry?

17   A    Yes, it is.

18   Q    What part?

19   A    Of the initial contact?  I wrote down that at

20   approximately 1435, Alaska dispatch contacted me, PO Farrar,

21   the on-call PO, regarding a traffic stop where the defendant

22   was the driver and sole occupant of the vehicle.  No TP, which

23   is a travel permit, so shorthand, was issued -- was showing in

24   ACOMS.  PO Farrar requested a search per the defendant's

25   conditions.

1   Q     And what's the significance of no travel permit showing in

2   ACOMS?

3   A     Basically, that means that region that I had described

4   with the Portage cutoff, Houston, and Sutton means that they

5   were -- if -- if somebody's authorized to go outside that, they

6   would have been issued a travel permit -- that's what we call

7   it -- to go wherever they're going to go.  That would show in a

8   separate category in ACOMS under travel permits if it -- if

9   they got a hard copy.  If the hard copy is not done, under Case

10  Update, it would have shown travel permit authorized or TP

11  authorized, and then it would explain they're stuck on the

12  Slope, they had a -- stuck and delayed for weather, whatever.

13  There would have been notes of why they had permission to be --

14  Q     Of why they --

15  A     Why they had permission to be where they're at without a

16  physical piece of paper.

17  Q     And is your usual practice, when you were on call, if you

18  got a call about a probationer, to look for those sorts of

19  notes?

20  A     Absolutely.

21  Q     Is that what you did in this case for Mr. Soto-Lopez?

22  A     Yes.

23  Q     Did he have any notes about permission to be out, I guess,

24  past the -- you said the Portage cutoff?

25  A     Portage cutoff.  There was no notes -- there was no notes

1    for the travel pass, there was nothing under travel passes.

2    There was also, under the supervision contact, it wasn't like

3    there was explanation of why he would be outside the region of

4    residence.  There was no additional notes under the Case Update

5    of explaining why he would be outside that norm.

6    Q    And when you made the notes saying requested a search per

7    defendant's conditions, what -- what does that mean to you?

8    A    That means that I had pulled up his conditions in ACOMS

9    under "document" tab.  We -- those parole conditions that

10   Exhibit 2, you said, that are in Exhibit 2, they're under the

11   documents tab.  So you can pull them up and you can review

12   them.  So I would have looked them up, read them to the

13   dispatcher, and said, "Hey, these are the parameters."  I can

14   give that speech, because I have it down, but, "Hey, you can

15   search and conduct a search based on this information."

16   Q    And you said you'd been a parole or probation officer for

17   16 years?

18   A    Yes.

19   Q    So 15 years when this happened?

20   A    Yes.

21   Q    Do you usually request only some conditions or do you

22   request --

23   A    All.

24   Q    -- and let me clarify that; of the search conditions

25   applicable?

1 A    I would have -- when I pulled up the parole conditions, I

2 would have went down anything that says subject to search for.

3 So I would have asked for -- I would have said, you can search

4 for weapons, any object that can cause bodily harm.  You can

5 search for drugs, drug paraphernalia, that includes, you know,

6 scales, et cetera.  You can search for alcohol and including --

7 because it has the parameters for over-the-counter products or

8 any product that would contain alcohol.  So I would have read

9 that really quickly to the dispatchers, and then I would have

10 prefaced that with if they find evidence of a new crime, they

11 have to stop my -- the probation search and they have to start

12 their new crimes procedures.

13         Being that we deal with -- in Anchorage, we deal with

14 a lot of different law enforcement agencies.  They all have

15 their own protocols, so I usually preface it is with, "You need

16 to follow your own protocol for once you find evidence --

17 enough evidence for a new crime."  If that means search

18 warrant, that's what they have to go get.

19 Q    And in this contact with the dispatcher from Soldotna for

20 the troopers, did you have contact with the dispatcher more

21 than one time on this same date, March 24th, 2019?

22 A    Yes.

23 Q    And I guess what -- I guess how many times did you have

24 contact?

25 A    I believe there was -- there was a total of two with the

1    dispatch and then one with -- there was an issue with, like,

2    the remand slip being sent down to the Seward jail.

3    Q    And is that all reflected in that Case Update note that's

4    on Exhibit 1?

5    A    Yes.  Because I actually thought they were going to a

6    different jail, so I sent it to the wrong jail.  So I had to

7    re-send the remand slip, so yes, it was.

8    Q    And what was your understanding of what trooper -- the

9    troopers had found on Mr. Soto-Lopez?

10   A    The first call was -- I gave the instructions, and then I

11   got a second call back and I received a call back saying that

12   there was heroin and a scale located in the vehicle.  And then

13   there was also an issue with the black Mercedes that kept

14   driving by.

15   Q    And is it unusual that you would have a note about another

16   vehicle that's driving by?

17   A    It is.  There's a lot of going -- there's a lot going on

18   on calls.  I don't -- you know, you get information, it doesn't

19   seem important, but this was -- it really stood out because the

20   trooper noticed a car that kept by -- continuing to drive by,

21   kept driving past.  When they conveyed that to me, that was one

22   of the things I said, "Please make sure you're getting another

23   trooper there," because of the nature of his crime.  And just

24   knowing how the troopers operate, they're usually quite a ways

25   out on the peninsula for their backup.  In the comment, I had

1  asked if there's any way to stop the vehicle, because my

2  concern was if that person was another felon who was what we

3  call "on paper", meaning they're on some kind of supervision,

4  whether it's probation or parole, that's important for us to

5  know because that could lead to their arrest for more

6  violations.  So I asked if there's any way to FI the -- field

7  investigate the -- interview the driver of that other vehicle.

8  Q    Okay.  And when you gave directions for doing a search on

9  Mr. Soto-Lopez, was that for just his person or just his

10 vehicle, or both, or what were your instructions?

11 A    The instructions would be he could search the person, the

12 vehicle, and any property that's inside the vehicle.

13 Q    Okay.  And do you actually remember giving that

14 instruction?

15 A    I do.  Some of these stand out.  This really stood out

16 because of that vehicle that kept passing by.  It was so much

17 so that I actually noted -- noted it in my notes.  Normally,

18 it's just -- you know, would have been on my handwritten note

19 and I wouldn't have transposed that into the ACOMS system, but

20 because I actually wrote it here, it really was a big issue of

21 this vehicle that kept driving by, because the dispatchers kept

22 saying, "Oh, the vehicle drove by again."  And I was really

23 concerned about what was -- he was out of his region of

24 residence, what was really going on.

25          As being on parole, you're not allowed to associate

1  with other parolees without PO approval, and I wasn't seeing --

2  I mean, I knew some of the people he had approval for, so I

3  wanted to know, is it someone like that, or what was going on.

4  Q    Who's in this other vehicle?

5  A    Who was in the other vehicle.

6  Q    Okay.  And you've mentioned a few times that because of

7  the nature of Mr. Soto-Lopez's underlying offense, you were

8  more concerned about him being out of location.  Do you

9  remember or do you know any of the details about his underlying

10  offense?

11          MR. COLBATH:  Your Honor, I'm going to object as to

12  relevance.

13          THE COURT:  What is the relevance, for purposes of

14  this motion?

15          MS. O'LEARY:  For the purposes of this motion, for

16  explaining why this probation officer would actually remember

17  this stop and why another person being around would be

18  significant.  I expect the answer is going to be about drug

19  involvement, which would make the situation that she's hearing

20  about here seem more connected to his past behavior.

21          THE COURT:  I mean, I think she does remember the

22  stop.  She's testified credibly that she has a good

23  recollection of it.  I don't think that matter's in

24  controversy.  So the objection is sustained.

25          MS. O'LEARY:  Your Honor, would you mind if we just

1  put that in the record?  I guess my point is, we're at an

2  evidentiary hearing.  There are not actually evidence rules

3  under 104(a), and I think it is relevant, and I don't want to

4  waste the Court's time, but I would like -- I would like that

5  in the record.  I have requested to do a surreply, I haven't

6  heard a response on, and I think these facts will matter.  And

7  given that the Court certainly can decide whether to consider

8  it or not, I'd ask that she be allowed to testify.

9          THE COURT:  Sure.  So obviously, I'll make the final

10  decision about what I see as relevant or not.  So as long as

11  the answer is brief and you return to a line of questions that

12  addresses the matter at hand, that's fine.  I'll allow the

13  answer.

14          MS. O'LEARY:  Thank you.

15  BY MS. O'LEARY:

16  Q    So what do you remember of Mr. Soto-Lopez's underlying

17  conviction?

18  A    It was a drug-related murder.  The exact specifics, I

19  wouldn't be, but that was one of the things that I recall, that

20  it was drug-related and it was obviously a murder that took

21  place, so...

22  Q    Just wasn't some domestic violence incident?

23  A    No, it wasn't.  It was just some random thing, or -- it

24  was definitely connected with drugs and stuff like that.

25          MS. O'LEARY:  Okay.  Thank you.  I don't have any

1    further questions for this witness.

2            THE COURT:  All right.  Thank you very much.

3            Mr. Colbath, cross examination?

4                    CROSS EXAMINATION

5    BY MR. COLBATH:

6    Q    Ms. Rose [SIC], I understand that you didn't have any

7    contact with Mr. Soto-Lopez on March 24th?

8    A    No.  It was all through telephone.

9    Q    You didn't have any contact with him on the 25th?

10   A    No, again.

11   Q    You hadn't had any contact with him in the weeks or even

12   months leading up to March 24th, 2019?

13   A    Passing at the office, general, probably, conversations,

14   because he was seeing somebody, one of my -- so I kind of had,

15   you know, contact with him, but not -- nothing that was noted.

16   Q    Nothing that you remember today that stands out, or at the

17   time that stood out?

18   A    No.

19   Q    And you don't have a specific recollection of going over

20   the conditions, Exhibit Number 2, going over and discussing

21   anything in particular about those with him, other than you

22   know that when you initially got him on probation, you would

23   have went through those with him?

24   A    I would have done -- I would have went through everything

25   with him, and it would be documented under that section called

1  "Supervision Contact".  If you look at the -- after

2  orientation, when somebody's -- when somebody comes in for

3  orientation, what happens is anybody that has a serious charge,

4  I would immediately see them right after orientation, I

5  wouldn't send them out, and I would have went specifically over

6  all of them.

7  Q    Right.  And that's my question, is, you've testified a lot

8  about what you normally do and what you usually do and what you

9  routinely do and what you tend to do, but my question was, you

10 don't specifically remember any discussion between you and

11 Mr. Soto-Lopez, about any one of these given conditions?

12 A    If I -- if anybody has a copy of the -- his, what would be

13 called Cronos, I would be able to look back at that date and

14 tell you exactly what I went over.  So my field file is

15 upstairs.

16 Q    Okay.  I'm not asking you what you documented that you did

17 in the past.  I'm asking you today to tell us about today.  You

18 don't remember any specific conversations with Mr. Soto-Lopez,

19 you just know you went over the conditions, just as a starting

20 point; right?

21 A    Correct.

22 Q    Okay.  And so the same is true with respect to your

23 instructions to dispatch on March 24th, the first call.  Okay,

24 the first call, when you were alerted as an on-call parole

25 officer that there was a traffic stop, you don't remember the

1  specific conversation you had with dispatch?

2  A    Yes, I do.

3  Q    So when you described what you would have done or what you

4  usually do or your routine speech that you have memorized, you

5  weren't referring to a general practice?

6  A    Correct.

7  Q    You're telling -- your testimony in this case is exactly

8  what you told the dispatcher?

9  A    Soon as she said the name.  I didn't have to look him up;

10  I knew what his conditions were.

11  Q    Okay.

12  A    And I started telling her what they were and I said, "But

13  again, I recognize his name."  I knew what his underlying

14  offense was, and I -- it would be very unheard of for a parole

15  board to discretionary parole somebody without putting any drug

16  conditions on somebody that it was a drug-related murder.  So I

17  knew right away that there was absolutely conditions.  I

18  said -- I told him, "You're going to be -- there's going to be

19  drugs and obviously weapons search conditions."  I would

20  have -- if I remember right, I believe I might have been

21  driving when I first got the initial call, and I pulled off to

22  the side of the road, and I then would have went into the

23  computer system, into ACOMS, pulled it all up, and then I would

24  have read to them what it is, and then I would have said my

25  normal, which is, "If you find evidence of a new crime, you

1   need to stop my search and start the protocol that is for new

2   crimes under that department, under your agency."

3   Q    Okay.  So I want to be clear, because it sounds to me like

4   from your answers, you keep saying what you would have done.

5   And I understand you do this a lot, you're on call multiple

6   weeks a year, that this was over a year ago, and so this is a

7   pretty routine thing for you to get a call about a parole

8   person.  But I don't want to know what the normal practice is.

9   I want to know today what you specifically remember telling the

10  dispatcher, number one, about Mr. Soto-Lopez's conditions.

11  What did you say to her about "he has these conditions" if you

12  can remember any of the specific conversation?

13  A    And I do remember, and the thing is is that when somebody

14  is assigned to me, I know them really well, even if they get

15  transferred off.  So, again, as soon as I heard the name, I

16  immediately said, "He's a Murder 1."  I thought he was a

17  Murder 1.  It's a Murder 2 conviction.  I said, "He's a

18  murderer, he's released, he's out on parole, and he's going to

19  have search conditions for drugs and weapons.  Let me pull up

20  his conditions, I'll read them to you."  I may -- if it is

21  correct that I was driving, I would have asked her to read

22  what's listed in APSIN and then I would have given those

23  things, but I would have pulled over and then I would have

24  said, "Yes, he's got all these conditions, this is what can be

25  searched."

1    A lot of times, what happens is as you start talking,

2  dispatch will say, "Hold on a second," because they're typing.

3  They would have told me to wait, then they would have typed

4  out, and then they would have relayed it back to the trooper,

5  and we would have went back that way.

6  Q    So in this case --

7  A    In this case, I do remember, because again, I knew him.  I

8  recognized the name immediately.

9  Q    Okay.  Were you driving?

10 A    I -- I want to say yes, just because of the -- it

11 triggered my memory was seeing the Seward jail where sending

12 the remand slip to the wrong time frame.  So it might have a

13 couple hours later, but I do remember giving the specifics, and

14 I do remember pulling up his information and then giving even

15 more specifics.

16 Q    What questions did the dispatcher ask you about the

17 condition information that you conveyed?

18 A    Well, she asked what the conditions were, what

19 instructions she was to give to the trooper, they were to give

20 to the trooper.

21 Q    And what did you tell her in response to that?

22 A    If he's the sole driver -- I would have asked, "Is he the

23 driver of the vehicle?  Is the vehicle his?"  And they said

24 yes.  And I said, "Okay.  If he's the sole person, the entire

25 vehicle can be searched, and the stuff in the vehicle, because

1  it's under his control."

2  Q    Okay.  And what did you tell them -- what did you tell the

3  dispatcher about what they should search for?

4  A    It would have been drugs, alcohol, and weapons, including

5  drug paraphernalia.

6  Q    When you kept -- with regard to Exhibit 1, that's your

7  case updates, the notes you make, when were -- when are those

8  inputted?  Let's first deal with the one, the Case Update for

9  March 24th, 2019, the day of the traffic stop.  There's three

10 notes there; an initial call, a second call, and a remand slip

11 email.  When was that information -- when would it have been

12 put into the computer?

13 A    When you're on call, it might be immediately.  Depending

14 what your situation is, it might not be.  In this case, if you

15 look at where it says on the left-hand side, it says 3/24/2019,

16 says Case Update, scroll across, you'll see to the right side,

17 you'll see "EH Farrar", and then you see a date.  That's the

18 date it was entered.  So the date on the far right is the date

19 that it was entered.  So it was entered the same day that the

20 call came in.

21 Q    Okay.  And manually, how are they entered?

22 A    I --

23 Q    Do you have a laptop with you?  Do you have to go to your

24 office and sit at a desk?  Can you -- do you dictate them into

25 something?  How did these get put in?

1  A    No, we -- like I said earlier, we -- when you're on

2  on-call, you get assigned -- you get a laptop, you get a phone,

3  and there used to be a MyFi, I don't think they use anymore.

4  So that would be your Internet, secured Internet.  If not, you

5  hot spot it off your -- if you're not in your office, you would

6  hot spot it off the State cell phone to get the Internet

7  access, and you can either do it one of two ways.  You can

8  enter it from the laptop, or you can -- if you're in the

9  office, which a lot of times on a Saturday or Sunday, in the

10  morning you will be in the office, and you could enter it in my

11  work computer, which is a secured system where you have to log

12  into.  So at this point, I couldn't tell you, because this is

13  just a photocopy.  I don't know if it was on the laptop or if

14  it was in -- from my work station in my office.

15  Q    Okay.  So my questions, just going forward here, so that

16  we can get to the point, all my questions are specifically not

17  about what generally happens, but about the facts of this case.

18  Here, when you entered Note 1 about the first call, was that

19  after you had received the second call, or before, or do you

20  know?

21            MS. O'LEARY:  I'm sorry, can you clarify what

22  "Note 1" is?

23            MR. COLBATH:  We're still talking about the

24  March 24th notations.

25            THE COURT:  This is Exhibit 1?

1            MR. COLBATH:  Yep.

2   BY MR. COLBATH:

3   Q    And there's three notes, right, on March 24th, a first

4   call, a second call, and an email?

5   A    In order --

6   Q    Was --

7   A    In order, to put them under that date, it would all have

8   been entered at one time.  But that log note is -- stays open

9   for 24 hours.  So I could have -- and I honestly don't

10  remember, if I entered the first paragraph then hours later

11  when I got -- or couple hours, I'm not sure, depending on the

12  time frame, after I got the second call, because that -- that

13  note is not locked, I can go back in, add additional

14  information to it.  So it's open for 24 hours.

15           So when you put in a Case Update, as soon as you put

16  the date in, it locks it.  After that, if I got substantial

17  calls, which you can see that there's, as you said, three

18  entries, if that's what you're calling Note 1, and then Note 2,

19  I'm assuming is the second paragraph, I could go back and enter

20  that for 24 hours.

21  Q    So the answer is you don't remember?

22  A    I don't know.  I could have entered the first paragraph

23  and then went back and entered the second one.  It's possible

24  to do it that way, yes.  I don't, because I --

25  Q    You don't remember?

1  A    A lot's happened since, in a year.

2  Q    Sure.  No -- no criticism.  I'm just trying to understand

3  what you remember and what you don't.

4  A    I just know that -- if you're saying that I had to enter

5  it all after, at one time, no, not if it's on the same day.

6  The same day, you can keep adding to those notes.  You can go

7  back and correct it.  Like, say, if you type something in, you

8  can go back and change it.

9  Q    At the time of the first telephone call, the one that is

10 described in the paragraph on 3/24/19 at approximately 1435 --

11 A    Yes.

12 Q    -- you were not aware, during that first telephone call,

13 of this black Mercedes that kept driving back and forth by the

14 traffic stop; were you?

15 A    No.

16 Q    So the fact that this black car may have been involved or

17 may have been related, that did not play into, at all, your

18 thought process or your instructions to the dispatcher about

19 searching Mr. Soto-Lopez's car or person?

20 A    I'm -- say that again?

21 Q    Sure.  Because you didn't know there was a black car that

22 drove by the location at the time of the first telephone call,

23 that didn't have anything to do with causing -- with the

24 instructions you gave to the dispatcher, because you didn't

25 know about it?

1    A    No, no.

2    Q    Okay.  And by the time you received the second call and

3    learned about the black car that had driven back and forth,

4    Mr. Soto-Lopez -- the car had already been searched, heroin and

5    scales had already been found, because that's -- that's when

6    you -- you learned both that heroin and the scales were found

7    and that there was this black car.  You learned all of that in

8    the second call?

9    A    Again, these are summaries of what my handwritten would

10   be.  Without my handwritten, I'm going to say yes, because

11   that's where it shows on here.

12   Q    Okay.  During the first call, were you aware that

13   Mr. Soto-Lopez had already told Trooper Howard, "Hey, I'm on

14   parole for murder"?

15   A    I wouldn't -- I wouldn't know that, no.

16   Q    Were you aware that because he told Trooper Howard that,

17   that Trooper Howard had already put Mr. Soto-Lopez in handcuffs

18   and had him staged in his patrol car, secure, when he

19   communicated with dispatch about -- about his conditions?

20   A    I would have not known that.

21   Q    Were you aware that -- your note reflects no TP was

22   showing in ACOMS.  Were you aware that Mr. Soto-Lopez had

23   already told trooper Howard, "I'm out of my area and my PO

24   doesn't know about that, I don't have a travel pass to be down

25   here"?  "Down here" meaning in the Kenai.

1   A    Would I have known that?  No.  I didn't --

2   (Indiscernible - garbled speech).

3   Q    Nobody told you any of those things during the -- during

4   the call?

5   A    I don't recall them saying it.  I mean --

6   Q    Okay.  Do you have any explanation why dispatch, after

7   talking to you and having this conversation about

8   Mr. Soto-Lopez's search conditions and getting instructions

9   from you, why dispatch would have told Trooper Howard to search

10  Mr. Soto-Lopez for alcohol?

11  A    That would have been the -- that would have been one of

12  the items -- well, that would have been the -- when someone

13  has -- like I say, when somebody has all those items that are

14  searchable, I will tell them to search for all of those.  I

15  don't just pick one thing.  I would have told them to search

16  for all of it.

17  Q    But obviously, you weren't on the phone or a part of

18  dispatch conveying the information to the officer in the field?

19  A    I don't have control over that.

20  Q    And you never spoke to Trooper Howard that day or had

21  direct communication with him to either make him understand

22  these conditions, or give him specific instructions at the

23  scene?  I understand you may have talked to him later, but --

24  A    Correct.

25  Q    Okay.  And Mr. Soto-Lopez's conditions, as far as you're

1  aware, were not accessible at the scene by Trooper Howard?

2  A    Correct.

3          MR. COLBATH:  All right.  I don't have anything

4  further for her.

5          THE COURT:  Thank you, Mr. Colbath.

6          Ms. O'Leary, before you redirect, just a quick

7  question, just so I understand.

8          Officer Farrar, I'm looking at Government 1, and for

9  example, the -- the note from March 24th --

10          THE WITNESS:  Yes.

11          THE COURT:  -- there -- it's basically three

12  paragraphs; right?

13          THE WITNESS:  Correct.

14          THE COURT:  And the fact that it's broken into three

15  paragraphs, does that mean those were entered on three separate

16  times, even if it's just a few minutes separating them?

17          THE WITNESS:  It can, yes.  You can hit -- it's kind

18  of like a -- it's kind of like a Word document on this page.

19          THE COURT:  Sure.

20          THE WITNESS:  You can hit, and then hit enter, and

21  keep going down.  I just happened to separate them out.  That's

22  why, looking at this, I couldn't tell you whether I entered

23  them all at one shot or not.

24          THE COURT:  I understand.

25          THE WITNESS:  Yeah, you have to kind of treat it like

1    a Word document.

2              THE COURT:  I get it.

3              THE WITNESS:  A blank page.

4              THE COURT:  And had you -- had you not entered them

5    all at one shot, would a paragraph added later, would that go

6    to the top or to the bottom, or is it up to you?

7              THE WITNESS:  It's up to -- it would be up to me.

8              THE COURT:  Okay.

9              THE WITNESS:  It's up to me.  And like I said, it's

10   only open for a 24-hour window under the Case Update part.  As

11   soon as you put the date in, that locks it.  You can't change

12   that.

13             THE COURT:  Understood.

14             THE WITNESS:  And then the body of the paragraph,

15   where you can enter it, is only open for 24 hours.  If you --

16   and I want to say if it goes past midnight, which sometimes

17   during the night you miss calls, it locks it so you actually

18   would, under Case Update, would absolutely have to start

19   another date.

20             THE COURT:  Understood.

21             THE WITNESS:  You couldn't do -- you couldn't

22   continue it.

23             THE COURT:  Okay.  Thank you very much.

24             All right, Ms. O'Leary, for redirect, of course, any

25   of counsel's questions on cross would be fair game, as well as

1    the Court's questions.

2              MS. O'LEARY:  Thank you.

3                          REDIRECT EXAMINATION

4    BY MS. O'LEARY:

5    Q    PO Farrar, you just testified in response to one of

6    Mr. Colbath's questions that Trooper Howard would not have had

7    access to any of Mr. Soto-Lopez's conditions.  But isn't it

8    true, from what you said earlier, that conditions, the sort of

9    critical conditions, would have been entered into APSIN; right?

10   A    Yes.  What -- when a person releases to Probation Parole,

11   we -- we call them (Indiscernible - garbled speech) conditions.

12   What it is is you basically summarize all of their conditions,

13   and it's on a sheet, and it's kind of condensed down on what

14   their search conditions would be.  All that gets entered into

15   ACOMS -- or, I'm sorry, into APSIN.  So the dispatchers would

16   have been immediately able to say to them, he's on

17   conditions -- or he's on parole, he's got conditions of -- and

18   it would have -- it's listed in APSIN, drug, drug

19   paraphernalia, alcohol, and weapons.  There would -- they would

20   have seen it.  So it's my understanding APSIN, they have to hit

21   F9 for those conditions to display.  So as long as he had

22   computer access in his vehicle, he would have been able to --

23   if he would have been able to pull it up, he would have been

24   able to easily -- he can look at it, the conditions, himself,

25   but it's my understanding that dispatchers usually normally

1  read them over the air as well.  So they -- they would have had

2  access to the condensed version, and then I would have gone

3  into details about what drug paraphernalia and where to search.

4  Q    So all it takes to get access to those sort of condensed

5  conditions is a computer and access -- and access to APSIN?

6  A    Correct.

7  Q    But then ACOMS is where you're storing the formal

8  conditions as we've got in Exhibit 2?

9  A    Yes, that's where the copies of them are that you can pull

10 up the different documents, yes.

11 Q    And then Mr. Colbath asked you a question about whether

12 you spoke to Trooper Howard and your answer was, "I'm going to

13 say yes, but I don't remember."  So I guess, can you clarify

14 that?  Are you -- are you confident that you didn't speak to

15 Trooper Howard?

16 A    I know I spoke to him.  I just don't -- I believe his

17 question was, when he was at the scene.  I don't know where

18 Trooper Howard was when I spoke to him, because I remember, if

19 I -- about the jail issue and about me saying about the Seward

20 jail.

21 Q    Oh, about the remand slip?

22 A    About the remand slip.  So I don't know if he was still

23 sitting on the side of the road when he called me.  I know I

24 spoke to him, I believe, twice.  The one -- the day of the

25 incident and then the next day what the results were.  So I did

1  speak to him.  I think his question was, did I speak to him

2  while he was at the scene, and I don't -- I don't know where he

3  was when I spoke to him.

4  Q    Is the only time you spoke to him on the 24th, the time

5  when you were talking about the remand slip?

6  A    Directly, I believe that's when it was.  I can't say for

7  sure.

8  Q    And then I'm still just a little unclear on the Case

9  Update.  I see in Exhibit 1 there's a section that says

10 3/25/2019 Case Update, and then I go down, it says 3/24/2019

11 Case Update, and there are three paragraphs, and then an Alaska

12 State Trooper case number.  Those sort of three paragraphs and

13 an extra line, are those all from a single sort of document

14 that is edited however you choose to edit it?

15 A    It's actually a second section in ACOMS.  It's not like

16 it's -- I just use that as the blank screen, paper part of, you

17 know, you can put things where you want.  But it's contained in

18 ACOMS under what's -- the tab called "Case Update".  So, like,

19 when you hit "add an entry", it'll pop up with a date and then

20 it has this little blank box where you can do all your typing

21 and you can space it however you want.

22 Q    Okay.  So there's nothing automatic about -- within that

23 box, the way things are arranged?

24 A    No.

25 Q    This is just you typing it?

1   A     Yeah.

2   Q     And do you remember whether you entered all of the

3   3/24/2019 Case Update at once, or if you did this in -- at

4   different times in that 24-hour period?

5   A     I don't recall whether it was -- I can honestly tell you

6   it was absolutely on the same day, within a 24-hour period.  I

7   just don't know if I went back and entered a second call or

8   not.

9   Q     And you're certain of that because the system locks you

10  out --

11  A     Yes.

12  Q     -- after that day?

13  A     Yes.

14  Q     Okay.  And then one last clarifying question.  On

15  Exhibit 2, the last page, you've mentioned a few times that

16  your request was for his conditions, and his search conditions

17  are alcohol, drugs, and weapons.  Is Paragraph 27 where the

18  weapon search condition comes from?

19  A     Yes.

20  Q     And is this also they're Mr. Soto-Lopez's person, his

21  property, a residence, his vehicle or a vehicle under his

22  control?

23  A     Yes.

24  Q     And that's, again, one of those that I guess it's Jamie

25  Ball (phonetic) would have gone over with him?

1  A    She would have served him initially, and he would have had

2  to agree to them in order to be released.  That's why his

3  signature would be at the bottom, and her signature up

4  (Indiscernible - away from microphone).  If he hadn't signed,

5  it would have said "refused" and he wouldn't have been

6  released.  That is discretionary.

7  Q    And then you also reviewed conditions with him --

8  A    Yes.

9  Q    -- when he started on --

10 A    Yes.

11 Q    But you weren't his PO during this stop; you were just on

12 call?

13 A    No, he had been transferred to a different case worker.

14        MS. O'LEARY:  All right.  Thank you.  No further

15 questions.

16        THE COURT:  Thank you.

17        Mr. Colbath, recross?

18        MR. COLBATH:  Just one, Your Honor.

19        THE COURT:  All right.

20                    RECROSS EXAMINATION

21 BY MR. COLBATH:

22 Q    Where did you tell the dispatcher to have Trooper Howard

23 search Mr. Soto-Lopez?

24 A    I would have said his person, the vehicle, any items that

25 are in the vehicle.  Because he's the only person there, and he

1    had control of the vehicle, so it opens the whole entire

2    vehicle open to the search of his conditions --

3    Q    That's what --

4    A    -- and his person.

5    Q    You remember telling the dispatcher, have -- tell the

6    trooper to search his person, the vehicle, containers within

7    the vehicle, anything related to the vehicle?

8    A    Yes, because I was told he was the sole occupant and

9    control -- and the vehicle was under his control.

10           MR. COLBATH:  That's all I have.

11           THE COURT:  All right.  Thank you very much.  I'll

12   give you one last chance.  Any further redirect?

13           MS. O'LEARY:  No, Your Honor.

14           THE COURT:  All right.

15           Thanks so much, officer.  You can step down.  Does

16   either side wish this witness subject to recall?

17           MS. O'LEARY:  She doesn't need to be for the United

18   States.

19           MR. COLBATH:  No, Your Honor.

20           THE COURT:  Thank you very much, ma'am.  You can

21   return to your duties.

22           THE WITNESS:  Thanks.

23           (Witness excused)

24           THE COURT:  Your next witness?

25           MS. O'LEARY:  The United States calls Trooper Trevor

1    Howard.  And this is the witness where, for much of the time,

2    I'm going to be trying to make that work.

3              THE COURT:  Very good, all right.  We'll see how it

4    goes.

5              (Pause)

6              (Indiscernible comment by unidentified speaker).

7              THE COURT:  Trooper Howard, if you could step up to

8    the witness stand, just remain standing and be sworn, please.

9              THE WITNESS:  All right.

10             DEPUTY CLERK:  Please raise your right hand.

11             (Oath administered to the witness)

12             DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

13   into the microphone at all times.  Please state and spell your

14   full name.

15             THE WITNESS:  Trevor Howard, T-R-E-V-O-R,

16   H-O-W-A-R-D.

17             DEPUTY CLERK:  Thank you.

18             THE COURT:  All right.  Ms. O'Leary, you may inquire.

19             MS. O'LEARY:  Thank you, Your Honor.

20                  TREVOR HOWARD, GOVERNMENT WITNESS, SWORN

21                           DIRECT EXAMINATION

22   BY MS. O'LEARY:

23   Q    Trooper Howard, where is it that you work?

24   A    Seward.

25   Q    Seward, the Seward trooper post or --

1    A    Correct, yeah.

2    Q    And how long have you worked for the troopers?

3    A    Coming up on five years.

4    Q    Have you been stationed at the Seward post that whole

5    time?

6    A    No, I have not.

7    Q    Where else have you been stationed?

8    A    I was stationed in Fairbanks from July 2017 to -- excuse

9    me, July 2015 to July 2017, and then I moved to Seward.

10   Q    Okay.  So you've been in Seward since you left Fairbanks?

11   A    Correct.

12   Q    And what are your duties out of the Seward trooper post?

13   A    I -- I'm kind of a little bit of everything.  I'm an

14   investigator, highway Patrol, respond to 911s, search and

15   rescues.  Kind of everything.

16   Q    What area of the state does the Seward trooper post cover?

17   A    It covers all the way from about Mile 3 of the Seward

18   Highway, which is where Nash Road is, to 75 Mile of the Seward

19   Highway, which is Ingram Creek, and then all of Cooper Landing

20   up to Mile 62.

21   Q    And that's on the -- is that the Sterling Highway, then?

22   A    Yes.

23   Q    Okay.  And were you on duty on March 24th of 2019?

24   A    I was.

25   Q    What were you doing that day?

1  A    Conducting traffic enforcement.

2  Q    What highway were you on?

3  A    The Sterling Highway.

4  Q    Did you wind up stopping a blue Pilot SUV sort of vehicle?

5  A    I did.

6  Q    What time of day, approximately, was that?

7  A    Afternoon.  It was in the afternoon sometime.

8  Q    And what was the -- do you remember anything about the

9  weather that day?

10  A    It was --

11  Q    Was it remarkable?

12  A    It was normal.

13  Q    Just a normal day, okay.

14  A    Just a normal day.

15  Q    And who was the driver of that vehicle, that Pilot you

16  stopped?

17  A    That was the defendant here today, Rey Soto-Lopez.

18  Q    Rey Soto-Lopez?  And why did you stop him?

19  A    For speed.

20  Q    Do you remember what he was speeding?

21  A    He was going, I believe it was 81 miles per hour in a

22  posted 55.

23  Q    Okay.  And do you have -- or did you have, on March 24th,

24  in-car video in your patrol vehicle?

25  A    I did.

HOWARD - DIRECT

1  Q    Was it working that day?

2  A    It was.

3  Q    Were you able to review your in-car video prior to

4  testifying this morning?

5  A    I was, yes.

6  Q    And you know, I'd like to -- was that marked as Exhibit 6

7  on a CD that you reviewed back at the U.S. Attorney's Office?

8  A    I can't -- I don't recall what exhibit it was.

9           MS. O'LEARY:  Okay.  So Your Honor, I guess I'm

10  wondering if the defense has authentication concerns or if we

11  can just leave the -- this CD in there.

12           THE COURT:  Mr. Colbath, can we stipulate to

13  foundation?

14           MR. COLBATH:  I do, Your Honor.  I'll join in the

15  admission.  She can move to admit it and we can go.

16           THE COURT:  All right.  Moving to admit it?

17           MS. O'LEARY:  Admit, and it's marked as 6.

18           THE COURT:  Without objection, 6 will be admitted.

19           (Government Exhibit 6 admitted)

20           MS. O'LEARY:  And I'm going to try and publish it.

21           THE COURT:  Okay.  Good luck.

22           MS. O'LEARY:  Is Mr. Lor available?

23           DEPUTY CLERK:  He's right here.

24           THE COURT:  Right there.

25           MS. O'LEARY:  Okay.  Oh, I'm sorry.

1          (Pause)

2          MS. O'LEARY:  And can everyone see around me if I

3     stand here?  Yes, looks like it.  Okay.

4          (Pause)

5          MS. O'LEARY:  Is it -- it's working?  Okay.  Great.

6     BY MS. O'LEARY:

7     Q    So I'm pressing "play", and Trooper Howard, what are we

8     looking at in this video right now?

9     A    So this is the dash cam of my patrol car, facing

10    southbound towards Soldotna.  That's the direction I'm facing.

11    So I'm on the southbound side of the highway.  They were doing

12    construction here at the time.  That's why there's gravel.

13    It's now four lanes, if you're familiar with the Jim's Landing

14    area.

15    Q    And I've stopped the video at 36 seconds in.  Trooper

16    Howard, do you recognize the vehicle we can see coming by right

17    now?

18    A    I do.

19    Q    What is that vehicle?

20    A    It's a black Mercedes.

21    Q    Do you know who was driving it?

22    A    I -- I identified the driver later.

23    Q    Who was driving that vehicle?

24    A    His name was Rolando Sims-Perez.

25    Q    And did you wind up speaking to Mr. Sims-Perez this day,

1    March 24th of 2019?

2    A    I did not.  Another trooper did, however.

3    Q    And I'm resuming at 36 seconds.

4          (Pause)

5          And I've stopped at a minute and two seconds.

6    Trooper Howard, we can see another vehicle here.  Do you know

7    what vehicle that is?

8    A    Yeah, that's the Honda Pilot that I stopped.

9    Q    So that's Mr. Soto-Lopez's vehicle?

10   A    Correct.

11   Q    Am I right that there were no other vehicles in between

12   that black Mercedes and Mr. Soto-Lopez's vehicle?

13   A    Correct.

14   Q    And is this when Mr. Soto-Lopez was speeding?

15   A    I'm sorry?

16   Q    Is this when Mr. Soto-Lopez was speeding?

17   A    Yes.

18   Q    Okay.  I've resumed.

19          (Pause)

20          So I've stopped at 1:13.  What's going on now,

21   Trooper Howard?

22   A    I activate my overhead lights.  I'm trying to catch up to

23   the vehicle.

24   Q    That Honda Pilot?

25   A    Yes.

1  Q    And why are you trying to catch up to it?

2  A    To conduct a traffic stop.

3  Q    I'm resuming.

4         (Pause, indiscernible voices away from microphone)

5         I've just stopped at 1:57.  Can you tell us -- is

6  that you, we're looking at here?

7  A    Yes.

8  Q    And I'm resuming.

9         (Pause, indiscernible voices)

10        I've paused at 2:24.  It's a little bit difficult to

11 see -- hear the audio, at least in the courtroom setting.  Do

12 you know what you're talking about?

13 A    Um, I was explaining to him why I pulled him over, and I

14 believe this is -- like, this is the part where he told me he

15 was on parole.

16 Q    Did he tell you what he was on parole for?

17 A    Yes, he did.

18 Q    What was that?

19 A    Murder, robbery, and assault.

20 Q    Resuming at 2:20 -- well actually, first, is that a common

21 thing that you'd pull someone over who's on parole for murder

22 and robbery and assault?

23 A    No.

24 Q    Had that happened any other times on March 24th of 2019?

25 A    Where I pulled somebody over?

1    Q    And they were on parole for murder?

2    A    No.

3    Q    Is that something that happens once a month?

4    A    No.

5    Q    Once a year?

6    A    Very rarely.

7    Q    Thank you.  I'm resuming at 2:24.

8              (Pause, indiscernible voices)

9              All right.  I've stopped at 3:05.  We could hear some

10   of what you're discussing, but just to clarify for the record,

11   what were you and Mr. Soto-Lopez talking about in this last 45

12   seconds?

13   A    We are discussing him coming from Soldotna and him being

14   on parole in Anchorage.  I just know from training and

15   experience, if you're going to -- people who are on parole or

16   probation on the peninsula, they have to have a travel pass

17   past Hope cutoff.  And I'm assuming -- I assumed it was the

18   same for Anchorage, needing to have a travel pass to leave the

19   municipality, or whatnot.

20   Q    So you guys were discussing whether Mr. Soto-Lopez had a

21   travel pass?

22   A    Correct.

23   Q    Did he say whether he had one or not?

24   A    He said he did not have one.

25   Q    Okay.  Did he say why he'd been in Soldotna?

1    A    For work.

2    Q    And so you've opened his door.  Why did you do that?

3    A    So I was going to have him exit the vehicle and just put

4    him in the back of my patrol car, verify whether he needed a

5    travel pass.

6    Q    How would you go about verifying whether he needed a

7    travel pass?

8    A    Contacting his parole officer.

9    Q    Do you do that directly?  Do you go through your

10   dispatcher?

11   A    It depends.  So in this section of the highway, there's no

12   cell phone reception, so I requested my dispatch contact the

13   on-call parole officer.  I believe it was on-call.  I can't

14   remember what day of the week this was.  They might have just

15   called the Anchorage office.  I can't remember.

16   Q    And you can contact your dispatcher why?  Like, if you

17   don't have cell service, is this on the radio?

18   A    Through radio, yeah.

19   Q    I'm going to move forward -- well actually, I guess, did

20   you, in fact, handcuff Mr. Soto-Lopez and put him in the back

21   of your vehicle?

22   A    I did.

23   Q    And did you contact your dispatch about finding out if he

24   had needed a travel pass?

25   A    I did, yes.

1  Q    Okay.  I'm going to move up to 5:25.  And the whole

2  exhibit is admitted, but there are some specific parts I want

3  to draw to everyone's attention.  So that's at 5:5.

4           (Pause, indiscernible voices)

5           I stopped at 5:52.  That was your voice we heard,

6  Trooper Howard?

7  A    Yes.

8  Q    And I'm going to go back a little bit before then, to

9  5:25 -- well, try for 5:25.  5:22.

10          (Pause)

11          And I stopped at 5:29.  We can see another vehicle

12 that had passed.  What is this vehicle, Trooper Howard?

13 A    It's the same vehicle that was driving in front of

14 Mr. Lopez's vehicle going northbound previously.

15 Q    So this vehicle has turned around and come back?

16 A    Correct.

17 Q    And this is the vehicle you saw immediately before

18 Mr. Soto-Lopez's vehicle?

19 A    Correct.

20 Q    Did that -- anything about that strike you as unusual?

21 A    Yeah.  So I was on the side of the highway conducting

22 speed enforcement.  I happened to just notice this black

23 Mercedes (Indiscernible) because it was the only other car on

24 the road at the time, driving well under the speed limit and

25 even had a taillight out.  Just kind of -- I mean, the roads

1  are not dangerous.  You can see they're fairly dry.  So the
2  fact that he was driving slow and the taillight, it was almost
3  like I felt almost ployed.
4  Q    You felt almost -- what was that?
5  A    Like, ployed.
6  Q    Ployed?
7  A    Ployed to stop it.  So I didn't, and then behind this
8  Mercedes comes this car, and I thought nothing of it at the
9  time, but then I noticed the Mercedes come back.
10 Q    So to clarify, which -- when you said you felt almost
11 ployed to stop this Mercedes, are you talking about right now,
12 5 minutes and 25 seconds into the video, or when we started at
13 the beginning?
14 A    At the beginning, at the beginning.
15 Q    Okay.  So when the vehicle -- when the Mercedes first went
16 by you, is that when it was slow with the taillight out?
17 A    Well, that's why it caught my eye, because thousands of
18 vehicles drive past me, and I don't pay attention.  But it was
19 just something about that car.  It -- the taillight out, it's a
20 nice car, and it was driving well under the speed limit.  It
21 was just a little suspicious.
22 Q    So you had noticed it that first time it went by?
23 A    Yeah.
24 Q    And then you noticed it again when it went by this time?
25 A    Correct.

HOWARD - DIRECT

1  Q    Is that why then at 5:45 you then asked Mr. Soto-Lopez

2  about that?

3  A    Correct.

4  Q    All right.  I'd like to continue.  We're at 5:29.

5           (Pause, indiscernible voices)

6           That was hard to hear.  I stopped it at 6:01.  But do

7  you know what Mr. Soto-Lopez said there?

8  A    I -- I couldn't hear him.

9  Q    Do you remember if he said whether he knew the person in

10 the Mercedes?

11 A    I can't -- he said that he was traveling from work and

12 that other people were heading home.  I remember him saying

13 that.

14 Q    He didn't specifically say, "Oh, I know -- yes, I know

15 that person"?

16 A    Correct.

17 Q    I'm starting it again at 6:01.

18           (Pause)

19           I just stopped.  What did you hear -- what was that

20 that you just said at 6:23?

21 A    I'm having a hard time hearing it, to be honest with you.

22 Is that the max volume?

23 Q    It is max volume.  I'll go back to 6:04.

24           (Pause)

25           THE COURT:  Ms. O'Leary, is it coming out of the

1  speaker on the laptop?

2          MS. O'LEARY:  No, it's coming out of the speaker on

3  the TV.

4          THE COURT:  Trooper, I don't have any problem if you

5  want to step up to the jury box, here, if that will help you

6  hear.

7          THE WITNESS:  Okay.

8          THE COURT:  There's no microphone there.  Do we have

9  another portable microphone for the witness?

10         DEPUTY CLERK:  No.  We have -- there's a lapel mic

11 over there that could probably -- (Indiscernible - multiple

12 voices).

13         THE COURT:  Why don't we try that, and then maybe,

14 Trooper, you could stand close to the TV and we could still

15 pick up your answers.  I think that would be fine.  We're

16 making do with less, doing more with less.

17         MR. COLBATH:  We could just turn the TV up.

18         THE COURT:  Okay.  So, sure, there's that solution.

19         MS. O'LEARY:  (Indiscernible - away from microphone)

20         (Indiscernible - multiple speakers).

21         THE COURT:  There's my way and there's the easy way.

22         MR. COLBATH:  That doesn't count against me; right?

23         THE COURT:  Yeah, it's on you.

24         MS. O'LEARY:  So I'll go back to 6 (Indiscernible -

25 away from microphone).  We'll start there.

1          (Pause, indiscernible comments)

2   BY MS. O'LEARY:

3   Q    Trooper Howard, was that your voice?

4   A    Yes.

5   Q    And what were you saying?

6   A    I was requesting my dispatch to contact his parole

7   officer.

8   Q    And why do that?

9   A    That's common practice when we come into contact with

10  anyone who's on Probation Parole to contact their -- their PO.

11  Q    Are you checking to see if there are search conditions?

12  A    I'm just letting them know that I'm in contact with them,

13  and they can decide what they want.

14  Q    And by this time when you made that request, that Mercedes

15  had driven by at least twice; is that right?

16  A    Yes.

17  Q    And continuing.

18          (Pause, indiscernible voices)

19          I stopped it at 7:09.  There's just several beeps.

20  What were those, Trooper Howard?

21  A    I think I was trying to scan his ID or the registration,

22  or something, into my computer.

23  Q    So you have a scanner in your vehicle?

24  A    Yeah, I do.

25  Q    You have a computer in your vehicle?

1    A    I do.

2    Q    Are you able to pull up APSIN in your vehicle?

3    A    Sometimes, if I have --

4    Q    Do you need cell phone service for that?

5    A    Right.

6    Q    So were you able to do that in this stop?

7    A    No.

8    Q    Continuing, then, at 7 -- (Indiscernible - away from

9    microphone).

10            (Pause, indiscernible voices)

11            I stopped at 7:44.  What were you talking about where

12    you said 0-6?

13    A    That was what Mr. Lopez had said.  He told me it was a

14    2006.

15    Q    Are you talking about his vehicle?

16    A    Yeah.

17    Q    So he told you this was his vehicle?

18    A    Yes.

19            (Pause, indiscernible voices)

20    Q    That's that vehicle that just goes by again.  I stopped it

21    at 8:08.

22    A    That was the same Mercedes.

23    Q    I can play that again, go back to 7:59.  I think we'll

24    catch it.

25            (Pause)

1          There, I stopped at 8:06.  You can see it.  Is this
2    that same Mercedes?
3    A    It is.
4    Q    This was now the third time this vehicle had gone by?
5    A    Correct.
6    Q    And this is before you heard back from Parole or Probation
7    Office; is that right?
8          MR. COLBATH:  Your Honor, I'm going to object to
9    the -- I mean, I know we're at an evidentiary hearing, but
10   there's continual leading.  I guess I trust the Court to sort
11   out the trooper's testimony from -- from the questions, but at
12   least on our important points, I object.
13         THE COURT:  Well, he is your witness, and some of
14   these questions are arguably (Indiscernible - away from
15   microphone) leading.
16         MS. O'LEARY:  All right.
17   BY MS. O'LEARY:
18   Q    Just continue at 8:06.
19         (Pause, indiscernible voices)
20         I stopped at 8:19.  Who is asking the question here?
21   A    I was.
22   Q    And who was that giving an answer, saying, "Rolando"?
23   A    Mr. Lopez.
24   Q    Why were you asking the question?
25   A    I was curious.  It was because I had already asked him if

1  he was traveling with somebody, and I already told him it was

2  the black Mercedes, and he said he had to see it.  So as soon

3  as it drove by, I was like, "That one right there," and he

4  said, "Yeah, that's Rolando."

5  Q    Was that the same answer he'd given you when you asked

6  before?

7  A    No.

8  Q    How is it different?

9  A    He didn't -- he wasn't traveling with anybody or didn't

10  know who the person was initially.

11  Q    Did he initially acknowledge knowing anyone in a Mercedes?

12  A    No.

13  Q    But now in this -- in this second set of questioning,

14  close to 8:19, he did say he knew someone in a Mercedes?

15  A    Correct.

16  Q    Starting at 8:09.

17          (Pause, indiscernible voices)

18          I stopped at 9.  We just heard your voice.  What were

19  you talking about, Trooper Howard?

20  A    I was requesting dispatch -- Mr. Lopez said he thought his

21  last name was Sims, so I was requesting dispatch run that

22  person.

23  Q    You thought whose last name -- or he thought whose last

24  name was Sims?

25  A    Rolando's.

1   Q    The black Mercedes driver?

2   A    Correct.

3   Q    Starting again.

4            (Pause, indiscernible voices)

5            Stopped at 9:25.  I'm going to jump ahead to about

6   11:20 -- 11:17.

7            (Pause, indiscernible voices)

8            Stopped at 11:25.  Trooper Howard, who are the voices

9   we just heard?

10  A    That's myself and my dispatcher.

11  Q    And what was the dispatcher talking to you about?

12  A    He was letting me know that that PO requested a search of

13  the vehicle for alcohol.

14  Q    And let me go play that again, going to 11:14.

15           (Pause, indiscernible voices)

16           Stopped at 11:26.  So did the dispatcher tell you to

17  search just his person for alcohol?

18  A    No.

19  Q    What was their request then?

20  A    Search the vehicle.

21  Q    And is that the exact -- did the dispatcher say the word

22  "vehicle"?

23  A    Yes.

24  Q    I'm going to let you listen to this one more time.

25  A    Okay.  Maybe I misheard.

1  Q    We're at 11:17.

2         (Pause, indiscernible voices)

3         All right.  I stopped at 11:28.  What was the exact

4  request from dispatch?

5  A    Search for alcohol.

6  Q    All right.  What does that mean, in the context of a

7  traffic stop?  What are you supposed to search?

8  A    The vehicle --

9  Q    And --

10 A    -- and his person.

11 Q     -- how do you know that?

12 A    Just from -- I've done several probation searches, and

13 there are conditions that usually say search the person or any

14 vehicle they're occupied in.

15 Q    And if your dispatcher meant you to only search

16 Mr. Soto-Lopez's person, what would you expect the dispatcher

17 to have said?

18        MR. COLBATH:  Your Honor, I'll object as to -- it

19 calls for speculation.

20        MS. O'LEARY:  This is (Indiscernible) hearing.

21        THE COURT:  Well, I think based on his training and

22 experience, he could testify generally about how that

23 information would be communicated by dispatch to troopers, so

24 you can answer the question, sir.

25        THE WITNESS:  Okay.  Can you repeat the question?

1    BY MS. O'LEARY:

2    Q    Yes.  My question was, how would dispatch have relayed

3    information to you if all that was requested was a search of

4    Mr. Soto-Lopez's person?

5    A    They would just let me know that the PO requested a search

6    only for his person.

7    Q    So they'd have specified in the context of a traffic stop,

8    they only meant the person?

9    A    Correct.

10   Q    Have you gotten this -- other than this incident, have you

11   had other times where your dispatch asks for parole searches on

12   a traffic stop?

13   A    Yes.

14   Q    Do they always say the word "vehicle" when they mean

15   vehicle?

16   A    No.

17   Q    If they only -- if they mean something not including the

18   vehicle on a traffic stop, do they specify that?

19   A    Yes.

20   Q    So was your understanding that you were supposed to search

21   the vehicle, based on a request from parole?

22   A    Yes.

23   Q    Playing 11:28.

24            (Pause, indiscernible voices)

25            I stopped at 11:38.  What were you just talking

1  about, Trooper Howard?

2  A   I was talking to the other Seward trooper, and I wasn't

3  sure what his location was at the time.  I think he was still

4  somewhere near Moose Pass.  We have a big area.  But usually,

5  when we're on a stop like this or we're doing searches or

6  something, we'll try and back each other up, if we can.  So I

7  figured he was already on his way, and if he happened to see

8  this black Mercedes that kept driving by, stop him and contact

9  and identify the driver.

10 Q   Why did you make that request?

11 A   Just on the abnormal behavior, the driving back and forth.

12 It's just -- it's not normal.

13 Q   All right.  Continuing at 11:38.

14         (Pause, indiscernible voices)

15         I stopped at 12:01.  What was that little

16 conversation about?

17 A   The dispatcher was relaying to me that the PO wanted to

18 know which direction he was traveling.

19 Q   Oh, okay.  So that you were explaining -- what was your --

20 what were you explaining?

21 A   I was explaining that he was traveling back towards

22 Anchorage from Soldotna.

23 Q   And I'm going to go up to minute 14, 13:55.

24         (Pause, indiscernible voices)

25         So I stopped at 14:41.  We could just see, it looks

1   like you on the radio.  What were you discussing?

2   A    Dispatch was relaying to me that the PO wanted me to issue

3   the citation for speed and to have him report to their office.

4   Q    Did they give you any additional instructions about if you

5   found other things?

6   A    Yes.  If I -- if I found a locate of any alcohol, it would

7   be arrestable.

8   Q    Did they -- so let me play a section again.  Let me go

9   back to close to 14, 14:03.

10          (Pause, indiscernible voices)

11          Stopped at 14:42.  What did you just say there,

12  Trooper Howard?

13  A    I asked about marijuana.

14  Q    Why did you do that?

15  A    Because I believe I located a little baggie, like hash,

16  hash oil.  I wasn't sure at the time.  I didn't test it or

17  anything, but just based off its looks.

18  Q    And we're generally -- as I went forward from about 12 or

19  13 minutes to 14, what is it that you're doing now?

20  A    I'm searching the vehicle.

21  Q    And what are you searching for?

22  A    Alcohol.

23  Q    Okay.  What areas did you look for --

24          THE COURT:  Ms. O'Leary, if now is an okay time,

25  we'll take a ten-minute break.

1          MS. O'LEARY:  Sure.

2          THE COURT:  So we'll be in recess for 10 minutes.

3          DEPUTY CLERK:  All rise.  This court stands in recess

4   for 10 minutes.

5          (Recess from 11:10:37 a.m. to 11:25:51 a.m.)

6          THE COURT:  Ms. O'Leary, I'm not trying to rush you

7   at all, but roughly how much time do you have left with this

8   witness?

9          MS. O'LEARY:  I probably have about a half an hour

10  worth of questions.  It's just a few more specific parts of

11  video, and two photo exhibits.

12         THE COURT:  Okay.  Absolutely fine.  So it's almost

13  11:30 right now, and I have some court business that I have to

14  take care of starting at noon.  So we can -- I will probably be

15  tied up until about 2 or 2:30.  I can come back later this

16  afternoon.  We can all come back later this afternoon, or if we

17  want to pick a date and time later this week to finish the

18  hearing, I'm happy to do that, too.  Either way.  What are the

19  parties thinking for this afternoon?

20         MR. COLBATH:  Your Honor, just so everyone's aware, I

21  leave the district at 6 tomorrow morning, and I'm gone till

22  Sunday.  So if we're going to continue, I would need to

23  continue, now, next week.  For me, I will move whatever I have

24  to move, say, Monday through Thursday.  Any time next week, I

25  could do it.  I know Trooper Howard's traveled up here from --

1          THE COURT:  Seward.

2          MR. COLBATH:  Yeah, from the peninsula.  So I don't

3   know about him coming back, and I don't know how long he has to

4   be here, but my preference would be to do it this afternoon, if

5   we can do it, or I'm going to have to do it next Monday through

6   Thursday.

7          MS. O'LEARY:  The Government's available this

8   afternoon, after -- should be after 1 p.m.

9          THE COURT:  All right.  Let's try and get it done

10  this afternoon.  And if the parties -- if the parties can be

11  available by 2, if I'm available, I'll shoot out emails to

12  everybody and we can convene at 2, and if not, we'll say 2:30,

13  no later than 2:30.  Does that work?

14         MS. O'LEARY:  Yes.

15         THE COURT:  All right.  With that out of the way,

16  Ms. O'Leary.

17  BY MS. O'LEARY:

18  Q    Trooper Howard, when we left off -- (Indiscernible

19  comments).  Is it on now?

20         DEPUTY CLERK:  It is.

21         MS. O'LEARY:  Okay.

22  BY MS. O'LEARY:

23  Q    Trooper Howard, when we left off, we'd been looking at

24  this video.  We'd stopped at 14:42, and I'm going to continue

25  it right there -- or sorry -- yeah, I'll continue it right

1    there.

2              (Pause, indiscernible voices)

3              Stopped at 14:58.  Trooper Howard, where is it you're

4    searching in the portion of the video we've just watched?

5    A    The left console there.

6    Q    The center console?

7    A    Yes.

8    Q    What did you find in there?

9    A    The scale, and then some heroin.

10   Q    When you say "some heroin", what are you talking about?

11   A    Just a little -- little baggie of heroin.

12   Q    A plastic bag, a Ziploc?

13   A    Yeah, a little dime bag.

14   Q    Okay.  And if you would turn to Exhibit 4 -- no,

15   Exhibit 3, excuse me, in the booklet to your left --

16             THE COURT:  I'm sorry, you said Exhibit 4?

17             MS. O'LEARY:  Exhibit 4.

18   BY MS. O'LEARY:

19   Q    There's a photograph there.  Do you recognize that

20   photograph?

21   A    The one of the steering wheel and the car keys?

22   Q    It should say Government Exhibit 4 in the bottom left.

23   A    Yeah (indiscernible - background noise).

24   Q    Okay.  Do you recognize that photograph?

25   A    Yeah, that's the inside of that car.

1   Q    When you say "that car", what car?

2   A    The Pilot, Honda Pilot.

3   Q    Okay.  Mr. Soto-Lopez's vehicle?

4   A    Yes.

5   Q    And did you take this photograph?

6   A    Yes.

7   Q    When did you take it?

8   A    At the time of the search.

9   Q    And how did -- like, what device did you have to take it?

10  Is this a phone or --

11  A    IPhone.

12  Q    So this is just your iPhone camera, okay.  And what are we

13  looking at, other than, I guess, you know, the obvious, the

14  steering wheel?

15  A    We're looking at basically where the center console is,

16  and just kind of taking a overall photo right now.

17  Q    In the background in front of it, looks like the passenger

18  seat, there's some sort of blue or teal and red and white item.

19  Do you recognize that?

20  A    Yeah.

21  Q    What is that?

22  A    That's a tote.

23  Q    That's a tote bag?

24  A    A tote bag.

25  Q    Did you find anything in there while you were searching

1    Mr. Soto-Lopez's vehicle?

2    A    Yes.

3    Q    What did you find in there?

4    A    Some syringes.

5    Q    Some syringes, and --

6    A    New, new syringes.

7    Q    New syringes, is that what you said?

8    A    Yeah.

9    Q    When you say "new", do you mean like unused or --

10   A    Unused.

11   Q    Okay.  Those two items in the center of the picture, sort

12   of in the -- in front of the padded part of the center console,

13   what are those?

14   A    Those are the syringes.

15   Q    Oh, okay.  So do you -- were those syringes in that

16   location when you first found them?

17   A    I can't remember if I had pulled them out of the bag at

18   that time, or if they were there.

19              THE COURT:  You're still referring to Exhibit 4?

20              MS. O'LEARY:  Yes.

21   BY MS. O'LEARY:

22   Q    So you're not -- you don't remember now whether you found

23   syringes there and in the bag, or if you'd removed the syringes

24   from the bag?

25   A    I know that I found syringes in the bag.  I can't remember

1    if there were some just right there, though, or if I had put

2    them there after I had located them.

3    Q    And that padded center console area, is that the area that

4    you were searching in the bit of video we just watched that

5    stopped at 14:58?

6    A    Yes.

7         MS. O'LEARY:  All right.  The United States moves to

8    admit Government Exhibit 4.

9         THE COURT:  Mr. Colbath?

10        MR. COLBATH:  Your Honor, could I ask a few

11   questions?

12        THE COURT:  Certainly.

13        MR. COLBATH:  For purposes of --

14        THE COURT:  Voir diring the exhibit?

15        MR. COLBATH:  Yeah, yeah.

16        THE COURT:  Certainly.

17        MR. COLBATH:  Trooper, at the time you searched the

18   car at the scene, the car was still running; wasn't it?

19        THE WITNESS:  Yes.

20        MR. COLBATH:  And so the key was in it?

21        THE WITNESS:  Correct.

22        MR. COLBATH:  And so the key wasn't on the seat.  The

23   vehicle was running.  So this wouldn't have been taken during

24   your search or at the time -- in fact, this photo was taken

25   back at the trooper post, after the car had been brought

1    ultimately later that day back to the trooper post prior to a

2    second search of the car; wasn't it?

3              THE WITNESS:  I don't believe so.

4              MR. COLBATH:  Well, you'd agree with me that the key

5    to the car is not in the ignition and the car likely is not

6    running at this -- when this photo's taken, because we can see

7    the key on the seat.

8              THE WITNESS:  You're absolutely correct, and then

9    later in the video, I actually turned the vehicle off.  So I'm

10   assuming I put the key there and then took this photo.

11             MR. COLBATH:  After --

12             THE WITNESS:  After the search.

13             MR. COLBATH:  Okay.  So during the search, you took

14   things and moved them around, then later took this photo?

15             THE WITNESS:  Correct.

16             MR. COLBATH:  Okay.  So what we see here are things

17   not as they existed at the beginning -- I just want to clarify

18   the timing.  This is not the beginning of the search, this is

19   the end of the search?

20             THE WITNESS:  Correct.

21             MR. COLBATH:  Okay.  I guess with that clarification,

22   Your Honor, if that's his testimony, I don't have any

23   objection.  I don't think that's when the photo was taken, but

24   that's his testimony, so I don't have any objection, with that

25   clarification.

1          THE COURT:  Well, you're certainly free to cross

2    examine on that, without question.

3          MR. COLBATH:  Sure.

4          THE COURT:  But what I hear you saying is you don't

5    have any objection to admitting the exhibit.  So without

6    objection, the exhibit's admitted.

7          (Government Exhibit 4 admitted)

8    BY MS. O'LEARY:

9    Q    And then Trooper Howard, if you'd look to Government

10   Exhibit 3, this other one, should say Government Exhibit 3 on

11   the bottom right; do you recognize this item?

12   A    Yes.

13   Q    What is this?

14   A    This is the scale, the baggies with residue, the syringes,

15   and another overall photo of everything I located.

16   Q    And did you take this photograph?

17   A    I did.

18   Q    When did you take it?

19   A    After the search was completed.

20          MS. O'LEARY:  Okay.  I move to admit Government

21   Exhibit 3.

22          THE COURT:  Mr. Colbath, Government 3?

23          MR. COLBATH:  No objection.

24          THE COURT:  All right.  Without objection, Government

25   3 is admitted.

1          (Government Exhibit 3 admitted)

2    BY MS. O'LEARY:

3    Q    And Trooper Howard, when we watched Government Exhibit 6,

4    the video, you said you were searching in the center console.

5    In Government Exhibit 3, can we see the area where you were

6    searching when you refer to searching in the center console?

7    A    Yes.

8    Q    Where is it?

9    A    It's the open section of the console.

10   Q    So that plastic centerpiece behind -- looks like there's a

11   water or a thermos of some sort?

12   A    Yeah.  Looks like a change holder.

13   Q    The change holder, those are those the rounded plastic

14   things at the front?

15   A    Yeah.

16   Q    Okay.  And the items on the seat, were they there when you

17   began your search?

18   A    No.

19   Q    Where did you find the scale that's now on that seat?

20   A    I believe I found it in the center console.  I'd have to

21   look -- look back at my report to verify.

22   Q    Let me replay Exhibit 16 [SIC] at -- starting at --

23            THE COURT:  Ms. O'Leary, you said "16".

24            MS. O'LEARY:  Exhibit 6, excuse me, not 16.

25            THE COURT:  That's all right.

1          MS. O'LEARY:  We're not getting that high.

2     BY MS. O'LEARY:

3     Q    13:46.

4          (Pause, indiscernible voices)

5          All right.  I stopped at 15:03.  Having re-watched

6     that portion of your search, do you remember now where you

7     found the scale?

8     A    Yeah, it would have been in the center console.

9     Q    Where did you find some heroin?

10    A    In the center console.

11    Q    In Exhibit 3, Government Exhibit 3, can you see the heroin

12    that you found?

13    A    Yes.

14    Q    Where is it?

15    A    It's in one of those Ziploc bags that are pictured, the

16    little dime bags.

17    Q    Can you actually see a little piece of heroin in the

18    picture?

19    A    You can.

20    Q    Can you describe which -- which of the -- there's several

21    plastic bags.  Which plastic bag you can see the heroin in?

22    A    It's the mostly clear one, centered, right under the

23    syringes to the right of the scale.

24    Q    Okay.  Is it the bag that looks like it's folded,

25    partially?

1   A    Yes.

2   Q    And you said "the syringes".  Are those in the bigger bag

3   that's orange and bluish?

4   A    Yes.

5   Q    Okay.  Now that amount of heroin, are you -- do you see

6   heroin occasionally in your work with the troopers?

7   A    All the time.

8   Q    Did that amount of heroin look to you like a user amount

9   of heroin?

10  A    It did.

11  Q    Okay.  Having found the heroin and scales and the

12  syringes, did you think there were any more parole violations

13  than just being out of a travel pass area for Mr. Soto-Lopez?

14  A    Yes.

15  Q    If you'd turn now to Government Exhibit 5, and do you

16  recognize this item?

17  A    Yeah.  This was, I think -- I believe this was the

18  console, the center console.

19  Q    Of Mr. Soto-Lopez's vehicle?

20  A    Yes.

21  Q    All right.  And is this what it looked like when you

22  searched it?

23  A    This would have been after.

24  Q    Okay.  When you started searching that center console,

25  what was in it?

1    A    The scale, the baggies.

2    Q    Okay.  I'm going to turn your attention back to Government

3    Exhibit 3, and if you look at, in Exhibit 3, in the center

4    console, do you see any other items in there?

5    A    Yes.

6    Q    What is that yellow and black item?

7    A    I -- I can't recall.  It looks like a thermos or a cup, or

8    something.

9    Q    Okay.  And on the chair in Government Exhibit 3, there's

10   a -- it looks like a hard-sided plastic container.  Do you see

11   what I'm looking at?

12   A    On the passenger's side?

13   Q    No, on the driver's side.

14   A    That's the lid to the scale.

15   Q    Oh, that's a lid to the scale, okay.  Was that in the

16   center console when you began searching the center console?

17   A    Yeah.

18   Q    And when you began searching the center console, could you

19   immediately see the scale?

20   A    I believe it was right on top.

21   Q    Could you immediately see the heroin?

22   A    Without moving the scale, could I see the heroin?

23   Q    Yeah.

24   A    I -- I don't know.  I remember seeing the scale.

25   Obviously, that caught my attention, so I picked it up.  And

1  then I could see all the dime baggies.

2  Q    You could see the dime baggies once you moved the scale?

3  A    Correct.

4  Q    And other than the dime baggies and the scale, was there

5  anything else -- and whatever that black and yellow item is,

6  was there anything else in the center console?

7  A    There may have been some miscellaneous things.

8  Q    Are any of those other items sitting on the driver's seat

9  in Exhibit 3, were any of those in the center console?

10 A    It looks like, yeah, there's a pair of headphones, maybe,

11 and something black.  I don't remember what that is.

12 Q    Something black, you're talking about there's a -- maybe a

13 black plasticky item on top of the white cord?

14 A    Yeah.

15 Q    And that was in the center console.

16 A    Yeah, I'm assuming so.

17 Q    Why do you say "assuming so"?

18 A    Just because I can't remember taking -- I don't remember

19 taking headphones and stuff out of the center console.

20 Q    And Trooper Howard, have you ever seen little small

21 alcohol bottles, like you'd get on an airplane?

22 A    Yeah.

23 Q    Are you aware that those contain alcohol?

24 A    Yeah.

25 Q    If you do a search of a vehicle for alcohol, are you going

1   to be looking for items that small?

2   A    Yeah, sure.

3   Q    Are you going to look for even smaller items that might

4   contain alcohol?

5   A    Uh-huh.

6   Q    Are you aware of any --

7            THE COURT:  Sir, please answer yes or no.

8            THE WITNESS:  Oh -- yes.

9   BY MS. O'LEARY:

10  Q    Are you aware of any smaller containers than these little

11  alcohol airport bottles that you've experienced in your work as

12  a trooper that had alcohol in them?

13  A    Yeah.  I mean, alcohol's a liquid.  You can put it in

14  anything as small as you want to.

15  Q    Is that something you've experienced, though, in your work

16  as a trooper?

17  A    Not regularly, no.

18  Q    Okay.  Do you seize the little airplane-size bottles?

19  A    Yes.

20  Q    Okay.  So when you're looking in a search for alcohol, are

21  you going to be looking in areas where something as small as a

22  bottle that's maybe three inches high could be located?

23  A    Yes.

24  Q    Do you regularly look in center consoles when you're

25  searching for alcohol?

1    A    Yes.

2    Q    Do you regularly have to empty center consoles, or at

3    least -- let me rephrase that.

4             Do you have to partially empty center consoles to see

5    if there's alcohol in them?

6    A    Yes.

7             MS. O'LEARY:  And -- all right.  So the United States

8    moves to admit Exhibit 5.

9             THE COURT:  Mr. Colbath, Exhibit 5?

10            MR. COLBATH:  Yeah, I have no objection.

11            THE COURT:  All right.  Without objection, Exhibit 5

12   is admitted.

13            (Government Exhibit 5 admitted)

14   BY MS. O'LEARY:

15   Q    And then going back briefly to Exhibit 3, Trooper Howard,

16   you said you took this photograph; right?

17   A    Yes.

18   Q    If you look at the area just above the Government

19   Exhibit 3, sort of next to the vehicle, do you see the surface

20   there that we're looking at, the ground?

21   A    The ground?

22   Q    On Exhibit 3.

23   A    Yes, I can see the ground.

24   Q    Okay.  Is that the same surface we're looking at in

25   Exhibit 6, the -- your in-car video?

1    A    Yes.

2    Q    Okay.  What is this?  Is this a gravel area or what --

3    what are we looking at?

4    A    Yes, that's gravel.

5    Q    All right.  So after you found the scale and the small

6    pieces of heroin, did you continue searching Mr. Soto-Lopez's

7    vehicle?

8    A    Yes.

9    Q    Did you continue searching for quite a while?

10   A    Yes.

11   Q    Did you look in the passenger side?

12   A    Yes.

13   Q    Did you look in the back seat?

14   A    Yes.

15   Q    Did you look in the trunk area?

16   A    Yes.

17   Q    Did you open containers in the trunk?

18   A    I don't think so.

19   Q    Did anything else happen that was unusual while you were

20   continuing the search?  I guess, for example, did any other

21   vehicles drive by?

22   A    Yes.

23   Q    All right.  So I'm going to advance to 18:20, or close to

24   there, or 18:15.

25              (Pause)

1        Stopped at 18:23.  There was another vehicle going

2   by.  Do you recognize that vehicle?

3   A    Yep.

4   Q    What vehicle is that?

5   A    That's the same Mercedes that was -- that's been driving

6   by the entire duration of the traffic stop.

7   Q    And continuing at 18:23.

8        (Pause, indiscernible voices)

9        I'm going to advance to 31:15.  So we're at 31:11,

10  but before I hit "play" during this whole period I've advanced

11  from, we've gone through about 18 minutes to 31 minutes, what

12  were you doing during that time?

13  A    I believe I was testing the heroin.

14  Q    When you say "testing", what do you mean?

15  A    Like a field test.  You put a little sample in a little

16  packet and break some ampules and it will change color whether

17  or not it indicates presumptive positive if it is heroin.

18  Q    So you did a field test on that heroin.  Is that the

19  heroin you found in the center console?

20  A    Yes.

21  Q    Did you continue searching in the vehicle?

22  A    After I tested it?

23  Q    Uh-huh.

24  A    I don't believe so.

25  Q    I'm going to continue, then, at 31:11.

1          (Pause)

2          I stopped at 31:19.  Did that -- did you recognize

3  any vehicles again?

4  A    That's not the Mercedes.

5  Q    Not the Mercedes, okay.

6  A    No.

7          (Pause)

8  Q    I stopped at 31:28, going up to 36:30.  We're at 36:28,

9  actually.

10          (Pause, indiscernible voices)

11          I stopped at 36:40.  What were you talking to your

12  dispatcher about?

13  A    I wanted them to relay to Probation that I had -- the

14  items I located.

15  Q    Okay.  And when you say "items" you located, what are you

16  talking about?

17  A    The scale, the heroin, the syringes.

18  Q    And then I'm going to go up to 38:25 -- or 38:20.

19          (Pause, indiscernible voices)

20          So I stopped at 38:42.  Whose voices are we hearing

21  right now?

22  A    Mine and Mr. Lopez's.

23  Q    What were you two talking about?

24  A    Drug use.

25  Q    And what did he -- did he give an explanation for why he

1  had syringes?

2  A    Yes.

3  Q    What was that?

4  A    For the girls.

5  Q    And what did you understand that to mean?

6  A    I assumed that he provides the heroin for the females to

7  shoot up.

8  Q    And I'm going to minute 40.  40:01.

9          (Pause, indiscernible voices)

10         All right.  I've stopped at 40:22.  Trooper Howard,

11  what was just being discussed?

12  A    I was talking to the other trooper that has made contact

13  with that black Mercedes and conducted a traffic stop on it.

14  The driver had told Trooper Keen (phonetic) that Mr. Lopez was,

15  in fact, following him because of his taillight being out.

16  Q    Did you ask Mr. Soto-Lopez if that was true after hearing

17  this from Trooper Keen.

18  A    Yes.

19  Q    What did Mr. Soto-Lopez say?

20  A    He agreed.

21  Q    So he acknowledged now, 40 minutes into the stop, that he

22  knew the person driving the Mercedes?

23  A    Correct.

24  Q    All right.  So during this stop, you found these drugs,

25  the small amount of drugs and the drug paraphernalia.  What did

1  you decide to do with Mr. Soto-Lopez?

2  A    Well, I had -- you know, possession of heroin's a crime,

3  so he was under arrest at that point.  He was going to be under

4  arrest.

5  Q    Was he also under arrest for parole violations?

6  A    Yes.  His parole officer wanted him remanded for that.

7  Q    Okay.  And what was the plan for the vehicle?

8  A    To be impounded.

9  Q    Okay.  I'm going to go to 46.  45:59, maybe.

10          (Pause)

11          Let's see if it starts.  It did a second ago.

12          THE COURT:  It's probably buffering.

13          MS. O'LEARY:  I'll try to pause, then.  I moved it to

14  45:56, but it's still not playing.

15          It looks like this isn't playing right now.  We have

16  a few minutes left, so if Your Honor doesn't mind, could I ask

17  just a few questions that I was going to do after the last bit

18  of video?

19          THE COURT:  And then just circle back to where you're

20  at?

21          MS. O'LEARY:  And circle back, yeah.

22          THE COURT:  That's absolutely fine, yeah.

23  BY MS. O'LEARY:

24  Q    So Trooper Howard, you said you were going to have

25  Mr. Soto-Lopez's vehicle impounded; is that right?

1  A    Correct.

2  Q    And what does it mean to have a vehicle impounded to you?

3  A    Remove it from the roadway.

4  Q    By whom?

5  A    By tow truck.

6  Q    A tow truck owned by the troopers or a private company?

7  A    Private company.

8  Q    Okay.  Now, was your plan to take Mr. Soto-Lopez's vehicle

9  back to the trooper's lot, or something else?

10 A    Something else.

11 Q    What was the plan?

12 A    The plan was to take it back just to the tow yard.  So

13 when we impound vehicles, we can either have an investigative

14 impound to the trooper post and apply for a search warrant, or

15 we can just have it impounded to the tow yard.

16 Q    Okay.  And did you see Mr. Soto-Lopez's vehicle towed

17 anywhere during this stop?

18 A    Did I see it towed?

19 Q    Right.

20 A    No.

21 Q    And why is that?

22 A    Because I had Trooper Keen respond to relieve me because I

23 had to drive to Seward.

24 Q    Why did you have to drive to Seward?

25 A    To take Mr. Lopez into custody.

1  Q    So another trooper responded, Trooper Keen?

2  A    To set up -- to stay with the vehicle.

3  Q    Until when?

4  A    Until the tow truck driver arrived.

5  Q    Okay.  And if you take the driver of a vehicle into

6  custody out on this part of the Sterling Highway, do you

7  usually leave their vehicles just at the side of the road?

8  A    No.

9  Q    Why not?

10 A    Because it can become more responsibility, you know, if it

11 gets vandalized.  I don't -- you know, if I don't have the

12 vehicle removed, myself, or there's no other people we can

13 contact to have the vehicle removed, the likelihood of it

14 getting vandalized on the side of the Sterling or Seward

15 Highway is very high.

16 Q    Are there lots of other towns around this area?

17 A    No.

18 Q    Are there lots of people sort of walking around, watching,

19 in this area?

20 A    No.

21 Q    Is this a very rural part of the Sterling Highway?

22 A    Yes.

23 Q    Is that why you have concerns about vandalism?

24 A    Yes.

25 Q    Do you have any concerns about safety of cars that are on

1  the side of the road?

2  A    Yes.

3  Q    Why?

4  A    It's -- it can be collided with, um --

5  Q    What is this area that Mr. Soto-Lopez's vehicle was pulled

6  off into?  Did you say this was construction?

7  A    Yeah.  So it's right at the -- right near Jim's Landing.

8  If you're coming towards -- or excuse me, if you're going

9  towards Soldotna, I don't know if the Court's familiar with it,

10  but as you pass Jim's Landing, it's going to be on your left

11  side, and that's where people exit the Kenai River.  But

12  anyways, the roadway goes down into a dip, and this is right on

13  top of the northbound side of that dip in the roadway.  So

14  Jim's Landing is right, maybe, a quarter of a mile or more.

15  Q    North of where you stopped Mr. Soto-Lopez?

16  A    Correct.

17  Q    Was there anyone else who had stopped with Mr. Soto-Lopez,

18  meaning was there another vehicle that stopped with him?

19  A    No.

20  Q    So it was just him and his vehicle?

21  A    Yes.

22  Q    And did you have cell phone service out there?

23  A    No.

24  Q    So did you have a way to call someone else to come pick up

25  the vehicle?

1   A    No.

2   Q    So you couldn't let Mr. Soto-Lopez place a call through

3   your phone; is that right?

4            MR. COLBATH:  Your Honor, I'm going to object to the

5   leading.

6            THE COURT:  They are leading questions.

7            MS. O'LEARY:  I can rephrase.

8            THE COURT:  Please rephrase.

9   BY MS. O'LEARY:

10  Q    Could you have let Mr. Soto-Lopez use your phone to call?

11  A    No.

12  Q    Why not?

13  A    There's no cell phone service.

14           MS. O'LEARY:  Thank you.  Other than playing a couple

15  more clips, those are the only questions I have, Your Honor.

16           THE COURT:  Okay, very good.  We'll break at this

17  time.  As soon as I can be ready to come back on the bench,

18  I'll let the parties know, but no later than 2:30.  Okay?

19           Any other quick matters we can take care of before we

20  break?

21           MR. COLBATH:  No, Your Honor.

22           MS. O'LEARY:  No, Your Honor.

23           THE COURT:  Trooper, thank you so much for your time.

24  You're not to discuss your testimony with either party while

25  we're on our break.  See you no later than 2:30.

1    DEPUTY CLERK:  All rise.  Court stands in recess

2  subject to call.

3    (Proceedings recessed from 11:56:58 a.m. to

4  2:37:50 p.m.)

5    DEPUTY CLERK:  All rise.  His Honor, the Court, this

6  United States District Court is again in session.

7    Please be seated.

8    THE COURT:  All right.  Thank you for your patience.

9  We're back on a continued evidentiary hearing.  Trooper Howard

10  is still on the stand.  Trooper Howard, you're still under

11  oath.

12    And Ms. O'Leary, I think you were finishing up.

13    MS. O'LEARY:  That's right, Your Honor.  If I could

14  return over there, we just have a little bit more video.

15    THE COURT:  By all means.

16    MS. O'LEARY:  And I'm going to try and go to minute

17  46.  I've got 45:59 -- that's not good.

18    No, it looks like we're having the same problem with

19  buffering.  It's doing like a run and give up cycle.

20    You know what, I don't actually think we need to play

21  this right now.  I can ask my questions for Trooper Howard.

22  The Court has this exhibit, and the exhibit I was able to run

23  successfully this morning, so I think --

24    THE COURT:  So it should play for me, okay.

25    MS. O'LEARY:   -- it should play for, yeah, the

```
 1   Court.
 2           THE COURT:  I'm happy to review it in chambers, but I
 3   also -- I understand these things happen and if you need some
 4   more time to make this work, I'm not going to pressure you
 5   about that.  So if you need to take a few minutes and see if
 6   you can get it to play the way you want it to, by all means.
 7           MS. O'LEARY:  Well, it just doesn't -- there doesn't
 8   seem to be anything wrong.  It just isn't playing.  Let me try
 9   just reopening it once.
10           THE COURT:  Sure.
11           (Pause)
12           MS. O'LEARY:  We're going backwards, not forwards.
13           THE COURT:  It's getting worse.
14           MS. O'LEARY:  I think I'll leave this for here and I
15   can just ask him a few questions that I was going to have about
16   it to the trooper without that aid.
17           THE COURT:  Okay.
18   BY MS. O'LEARY:
19   Q   So Trooper Howard, my last few questions with you, were
20   just to clarify about what happened to Mr. Soto-Lopez's vehicle
21   after you took him to jail.  So was his vehicle still at the
22   side of the road when you left?
23   A   The video is playing.
24           THE COURT:  It's starting from the beginning.  I
25   think that was your problem.
```

1          MS. O'LEARY:  What do you mean?

2          THE COURT:  I mean, it's not at minute 45.

3          MS. O'LEARY:  Right, right.

4          THE COURT:  But if you want to try to advance it,

5    then --

6          MS. O'LEARY:  I can try it again.

7          THE COURT:   -- give it a go.

8          (Pause)

9          MS. O'LEARY:  Let me try it -- this is 44:29, and see

10   if we can get through from here to 46.

11         (Pause)

12         No, we have now frozen at 44:50.  Although, like I

13   said, I was able to play the end of this video earlier today,

14   but it's clearly -- I'm worrying now if it's been scratched.

15   So I guess with the Court's leave, could I submit a new copy of

16   this?

17         THE COURT:  That would be fine.

18         MS. O'LEARY:  And we'll just deal with it that way.

19         THE COURT:  Mr. Colbath, no objection to swapping out

20   Exhibit 6 for one that --

21         MR. COLBATH:  No.  I need the Court to look at it, so

22   that's okay.

23         THE COURT:  That will be fine.

24   BY MS. O'LEARY:

25   Q   When you were with Mr. Soto-Lopez, did you discuss

1  impounding his vehicle with Mr. Soto-Lopez?

2  A    I believe so, yes.

3  Q    And did he want to have someone come pick up the vehicle

4  for him?

5  A    I cannot remember.

6  Q    You don't remember, okay.  Did your -- did you have your

7  dash camera going during this conversation with --

8  A    Yes.

9  Q    -- Mr. Soto-Lopez?

10  A    Yes.

11  Q    Okay.  Do the troopers sort of give directions to tow

12  companies when you have a driver who's no longer going to be

13  able to be with their vehicle, and so the impound is called?

14  Do you give instructions to the tow company on what to do with

15  the vehicle?

16  A    Yes.

17  Q    What are those instructions?

18  A    They either go to the trooper post for an investigative

19  Torrey impound, or they just go to the tow -- tow yard.

20  Q    Of that towing company?

21  A    Yes.

22  Q    Where was Mr. Soto-Lopez's vehicle going?

23  A    To the tow yard.

24  Q    So not to the trooper -- trooper post.

25  A    Correct.

1  Q    Once the vehicle is headed off with a towing company to

2  the towing company's lot, do the troopers have more

3  instructions for the tow company on what happens to the

4  vehicle?

5  A    No.

6  Q    Is that your understanding of what happened to

7  Mr. Soto-Lopez's vehicle?

8  A    That's my understanding.

9            MS. O'LEARY:  Okay.  Thank you.  No other questions.

10           THE COURT:  Thank you, Ms. O'Leary.

11           Mr. Colbath, cross examination?

12           MR. COLBATH:  Your Honor, I'm going to try to do this

13  without the video, and we'll see what Trooper Howard remembers.

14  And I have a number of, I guess, time stamps noted that I can

15  alert the Court to that I'm questioning about that obviously I

16  would -- I would play if I had a video that was operable.  So

17  that I'll just refer the Court to --

18           THE COURT:  Well, the current exhibit seems to work

19  up to about minute 44, so if you want to try --

20           MR. COLBATH:  Some of it we don't need to go back

21  through.  I mean, I'll refer to -- I mean, I presume the whole

22  video is in evidence, and I presume that the Court is going to

23  rely on the entirety of the video and incorporate the relevant

24  parts into its findings.

25           THE COURT:  Certainly.

 1            MR. COLBATH:  Okay.  Then I think I can just ask some

 2   questions and refer to it, which also may speed us along.

 3            THE COURT:  Okay.

 4            MR. COLBATH:  All right.

 5                         CROSS EXAMINATION

 6   BY MR. COLBATH:

 7   Q    Trooper, when you initially pulled Mr. Lopez over,

 8   Mr. Soto-Lopez over, almost immediately after your discussion

 9   of how fast he was going, why you had stopped him, he

10   spontaneously informed you that he was -- you should know he

11   was on parole; right?

12   A    Right.

13   Q    And you asked him for what, and he immediately answered

14   your question with, "For a murder charge, a robbery charge and

15   assault charge"?

16   A    Correct.

17   Q    And those things both turned out to be true; didn't they?

18   A    Yes.

19   Q    And that information led you almost immediately to ask him

20   about whether or not he had a travel pass to be in the location

21   where he was, because you recognized he was from Anchorage, but

22   you were stopping him at this location on the Sterling Highway?

23   A    Right.

24   Q    And he also truthfully told you he didn't have a travel

25   pass, although the parole people may be aware, because he was

1  down there for work, may be aware, but may not be aware that he

2  was traveling?

3  A    That's correct.

4  Q    And it's that discussion, that's what caused you to want

5  to detain Mr. Lopez separate from the speeding citation, to

6  check with Probation about his status and travel pass issue?

7  A    Correct.

8  Q    Mr. -- Mr. Soto-Lopez, at no time during your interaction

9  with him did he appear to you to be under the influence of

10 alcohol, drugs?  He wasn't impaired, to your observation; was

11 he?

12 A    He didn't, no, no.  You are correct.

13 Q    So that wasn't a concern at any time during this stop --

14 A    Right.

15 Q    -- of yours?

16 A    Yes.

17 Q    Okay.  And you testified that at this location, you didn't

18 have cell service, which, number one, made it impossible for

19 you to make telephone calls, like to the PO; right?

20 A    Correct.

21 Q    Also prohibited or limited your ability to access APSIN

22 through your computer program?

23 A    Right.

24 Q    But you had the ability to do both of those things through

25 your radio through your dispatch?

1  A     Yes.

2  Q     All right.  And with respect to the first of those two

3  concerns, checking out the travel pass issue, you communicated

4  with dispatch to verify he was on probation or parole, and to

5  check with the PO about a travel pass issue, number one; right?

6  A     Right.

7  Q     And number two, to see if Probation or Parole had any

8  further instructions for you, generally?

9  A     Correct.

10  Q     At that point, you didn't have any intention to do

11  anything with Mr. Soto-Lopez, other than issue him a speeding

12  ticket, unless Probation gave you further instructions?

13  A     That's correct, yeah.  I can't ask Probation for --

14  Q     Permission to search or anything else like that?

15  A     Right.

16  Q     And at that point, other than he's going 81 in a 55, you

17  hadn't observed anything about him or the vehicle that gave you

18  reasonable suspicion or probable cause to search the car; it

19  was just a speeding ticket stop at that point?

20  A     At that point.

21  Q     Okay.  And then you got communication back from -- back

22  from your dispatch -- well, first of all -- strike that.

23        Before hearing back from dispatch, you told

24  Mr. Soto-Lopez that you were going to secure him and put him in

25  your patrol vehicle, and that was because of the -- I guess the

1  serious nature of the -- why he was on parole that he had

2  communicated to you?  I suppose that was, what, officer safety?

3  A    Officer safety.

4  Q    And when you informed him of that, his response was,

5  "Sure, no problem," and he -- he easily complied with being

6  cuffed and walked back to the car, got in the car.  All that

7  was compliant and no issues there?

8  A    Yeah, I had no issues with Mr. Soto-Lopez.

9            THE COURT:  Mr. Colbath, I'm sorry to interrupt.  Can

10  you just kind of stay close to the microphone?

11            MR. COLBATH:  Sure, sure.

12            Then it was after -- I know you can hear, Your Honor,

13  but I forget that we're recording.

14            THE COURT:  Exactly.  I understand.

15            MR. COLBATH:  I apologize.

16            THE COURT:  Not a problem at all.

17  BY MR. COLBATH:

18  Q    It was after having Mr. Soto-Lopez secured in the -- in

19  your patrol vehicle, you heard back from dispatch in two

20  respects.  First, they gave you instructions about the travel

21  pass; right?  Do you recall that?

22  A    That he did not have one.

23  Q    Okay.  They told you he didn't have one, and they told you

24  that you were to instruct Mr. Soto-Lopez that he should -- you

25  could go ahead and give him the speeding ticket and that with

1    regard to the travel pass, he needed to report to their office

2    Tuesday morning?

3    A    Correct.

4    Q    Do you -- I think you said you don't recall the day of the

5    week, but if I told you that at least the calendar shows

6    March 24th of 2019 was a Sunday, would you have any reason to

7    believe that it wasn't?

8    A    I'll trust you.

9    Q    Okay.  And the report -- you authored a report related to

10   this stop; right?

11   A    Right.

12   Q    And the report says the traffic stop was effectuated at

13   approximately 1435, so that's 2:35 in the afternoon.  Any

14   reason to think that that's an error?

15   A    Nope.

16   Q    And the video -- certainly, in March, it's not long days

17   during that time.  It looks -- it's overcast, but it's

18   certainly during the daytime?

19   A    Right.

20   Q    So this is a Sunday afternoon.  Probation's telling you,

21   "Hey, tell the guy to report Tuesday morning to our office"?

22   A    Uh-huh -- or yes.

23   Q    They did not ask you to detain him or do any other thing

24   relative to the travel pass?

25   A    They did not ask me to detain him, no.

1   Q    The second instruction, then, was dispatch said Probation

2   or Parole would like you to search for alcohol?

3   A    Correct.

4   Q    And you said that when you got -- now, first of all, you

5   said when you got that direction, you assumed that that meant

6   not only search Mr. Soto-Lopez, himself, but to search the

7   vehicle?

8   A    Yes.

9   Q    And you said on -- when Ms. O'Leary was questioning you,

10  that the reason that -- the reason that you believed that that

11  was an instruction to not only search his person but also the

12  vehicle, is that your experience is the search condition

13  normally covers that broad range, and if they wanted it to be

14  limited more than what the condition normally covers, they'd

15  give you some limitation, but without the limitation, it covers

16  both him and the vehicle?

17  A    Correct.

18  Q    Did I -- did I get that -- did I understand what you said?

19  A    Yes.

20  Q    All right.  Now, so that issue deals with what you were

21  going to search.  You were going to search Mr. Soto-Lopez and

22  you were going to search the vehicle for alcohol; right?

23  A    Right.

24  Q    Now, even though we know now Exhibit -- we have an exhibit

25  that -- Exhibit 2 contains -- that's his conditions of parole.

1   That has search conditions for a number of things -- alcohol,

2   drugs, drug paraphernalia, weapons.  You didn't know that as

3   you stood there on the roadside with Mr. Soto-Lopez.  You

4   didn't know what his search conditions were; did you?

5   A    I did not.

6   Q    Okay.  And we've already talked about you couldn't access

7   APSIN or your computer to look them -- look them up for

8   yourself?

9   A    Right.

10  Q    And so when you got this direction through dispatch from

11  Parole, they gave a general instruction about where to search.

12  Search for alcohol, which you took to mean him, the vehicle,

13  everything you could search; right?

14  A    Right.

15  Q    But they were specific into what you were searching for.

16  In other words, they put a limitation on it, search for

17  alcohol, not search just generally; right?

18  A    Right.

19  Q    They didn't say search for weapons?

20  A    Huh-uh.

21  Q    Didn't say search for -- that's no; right?

22  A    No.  Correct.

23  Q    They didn't say search -- I do the same thing, so --

24  A    Yeah.

25  Q    They didn't say search for drugs?

1   A    No, they did not.

2   Q    They didn't say search for drug paraphernalia?

3   A    No.

4   Q    In fact, on the video -- and Ms. O'Leary played this part,

5   if you remember it, and His Honor might remember, but there's a

6   point right after you give that -- you give that instruction

7   and you start searching the car, you're leaning into the

8   vehicle, and you say on your radio to dispatch, "Did they say

9   anything about marijuana?"

10  A    Right.

11  Q    And dispatch's response was, "No, why?"  Right?

12  A    Right.

13  Q    In fact, the dispatcher hadn't been told by Parole to look

14  for drugs.  They didn't say anything about marijuana.  And when

15  they asked you why, you said, "I didn't find any, I'm just

16  curious," were your words, "just curious"?

17  A    That's correct.

18  Q    Okay.  If you had been told to search for not only alcohol

19  but drugs, you may have done something different, or searched

20  more extensively, maybe?

21  A    What do you mean?

22  Q    Well, when you started the search, you were -- I guess

23  it's probably hard to answer, but when you started the search,

24  you were looking for alcohol.  So I assume you were going to

25  look in any place you reasonably thought alcohol could be

1    found?

2    A    Certainly.

3    Q    Let's say instead of that instruction, "search for

4    alcohol", they said, go ahead and -- they want you to search

5    for alcohol and/or drugs, would you have looked anywhere

6    different?

7    A    No, not necessarily.

8    Q    Okay.  And as it turns out, you started by looking, if we

9    look at Exhibit 4 -- you still have your book there; right?

10   A    Yeah.

11   Q    So look at the picture that's Exhibit 4.  You looked in

12   the front seat first, starting on the driver's side; right?

13   A    Right.

14   Q    And at first observation, there, you didn't see

15   anything -- any alcohol, alcohol containers, anything that led

16   you to believe initially there was alcohol in the car; did you?

17   A    Right, yeah.  No, there was nothing in plain view.

18   Q    Okay.  Let's go back to Number 3.  Now, this is after

19   you -- most of the things laying on the driver's seat depicted

20   in Exhibit 3, you pulled out of the center console?

21   A    Correct.

22   Q    And that was done while you were on your search for

23   alcohol?

24   A    Correct.

25   Q    Now, in the center console, there's two containers that I

1  want to ask you about. Number one, inside the console with the

2  lid flipped up, we can see a yellow can.

3  A    Right.

4  Q    Right? And it's got a hose coming off it. So it looks

5  like a can of Fix-a-flat to me. That little hose is something

6  you attach to a tire. Are you familiar with Fix-a-flat?

7  A    I am.

8  Q    Okay. Does that appear to be -- or do you recall that

9  that's what that is?

10 A    I don't recall honestly, but I know what you're talking

11 about. The Fix-a-flat does have a tube like that.

12 Q    But suffice it to say, that is some sort of large

13 cylindrical container?

14 A    Yes.

15 Q    You didn't look in that to see if there was alcohol, or

16 smell it or search in that container for alcohol?

17 A    No. I don't think you can open Fix-a-flat.

18 Q    Okay. You didn't see if it had a false bottom or was --

19 A    I didn't. I didn't see if it had a false bottom.

20 Q    Okay. And then in front of the console, we see another --

21 a large cylindrical container that looks like a cup or a

22 thermos to me, of some kind, because I can see it has a green

23 cap, and it looks like it's camouflage. Do you see that?

24 A    Yes, I do.

25 Q    Did you open that or did you look in there to see if it

1    was -- had alcohol in it?

2    A    I don't believe so.

3    Q    Okay.  Those would have been pretty obvious containers

4    that could have contained alcohol?

5    A    Yeah, yes, certainly.  I guess in my mind I was looking

6    for bottles and beer cans and whatnot.

7    Q    Sure.  And just from the size of the console, when you

8    opened it and certainly lifted up the scale, there wasn't any

9    beer bottles or beer cans in there, fifths of whiskey, any big

10   alcohol containers?

11   A    That's correct.

12   Q    Okay.  But at the point that you saw baggies, you

13   switched -- I mean, that was a drug -- it became a drug search

14   at that point?

15   A    Yes.

16   Q    Unrelated to the conditions of -- or the direction from

17   Probation, it became a search for drugs or drug paraphernalia

18   based on what you had found?

19   A    Yeah.  I saw the drugs, so I grabbed them.

20   Q    Okay.  And so as the -- as the context, then, of your

21   search changed from a search for -- a Parole search for alcohol

22   to a more of a probable cause search for drugs, about -- well,

23   first thing you did, I guess, was not very long after finding

24   that stuff that we see depicted in Exhibit 3 was you called

25   into dispatch that you had located a scale and drugs, and

1    wanted them to inform Parole about that?

2    A    Correct.

3    Q    Okay.  And while they were informing parole about that,

4    you continued to search?

5    A    I did.

6    Q    You went around to the passenger side?

7    A    Yes.

8    Q    You opened -- at one point in the -- in the process, and I

9    might have it not sequentially correct, but you opened both the

10   passenger rear door and the driver's side rear door -- in other

11   words, to the back seat?

12   A    Yes.

13   Q    And you were moving things around, looking under the

14   seats, looking on the floorboards, looking anywhere you needed

15   to look to further search for drugs and alcohol, because now

16   you had two things to search for?

17   A    Yes.

18   Q    Okay.  Or I suppose anything that you would have

19   considered contraband?

20   A    Right.

21   Q    Paraphernalia, anything else?

22   A    Yeah.

23   Q    Okay.  And then at some point, you went around and you

24   opened the hatch.  The Honda Pilot has a rear hatchback.  So

25   you opened that, and there was a lot of things back there?

1        MS. O'LEARY:  Your Honor, objection to relevance.

2   I'm not sure what any of this has to do with the suppression

3   motion.

4        THE COURT:  Well, I think both parties have gone

5   somewhat far afield.  So I understand that -- I take

6   Mr. Colbath's questions to be laying the ground work for

7   something that goes directly to the question of suppression.

8   So I appreciate you've got to set the context, but let's keep

9   it moving forward.

10        MR. COLBATH:  Sure, okay.

11  BY MR. COLBATH:

12  Q    You searched the back and the rear of the vehicle,

13  whatever.  That's depicted on the -- on the video as well?

14  A    Yes.

15  Q    Okay.  And after this search that the Court can watch and

16  see go on, at around the 32-minute mark on the video, you come

17  back to the car and you gave Mr. Lopez his Miranda rights;

18  right?

19  A    Yes.

20  Q    Prior to that, I want to ask you some questions, follow up

21  on what Ms. O'Leary asked you about the black Mercedes; okay?

22  Initially, when you first asked about the black Mercedes,

23  Mr. Soto-Lopez told you that he was traveling alone, but there

24  were some of his co-workers also traveling up to Anchorage?

25  A    Right.

1  Q    Okay.  That discussion's heard on the -- on the video;

2  right?

3  A    Yes.

4  Q    And that is -- that was his initial response, it's before

5  the 14-minute mark of the -- or it's early on in your encounter

6  with him?

7  A    Correct.

8  Q    You recall that?  And I think you testified to when you

9  asked him who it was, his first response was, "I don't know.

10 I'd have to see it."  Do you remember him --

11 A    I -- I remember that.

12 Q    And then Ms. O'Leary played the clip where the car went

13 back by, and she stopped it and you asked him a second time,

14 "That one, that Mercedes right there, who's that?"  Do you

15 recall that?

16 A    Yes.

17 Q    And his response to you was, "Oh, that's Rolando," or,

18 "That's a coworker," and he gave you the name "Rolando";

19 correct?

20 A    He did.

21 Q    Now, you learned later that that was, in fact, the exact

22 person who -- there was a person driving that black Mercedes

23 named Rolando?

24 A    Yes.

25 Q    And you asked him for a last name, and he said Sims.

1  A    I -- I believe so.

2  Q    Okay.  Do you recall what the -- the last name of the

3  person that was stopped was?

4  A    Sims-Perez.

5  Q    Okay.  So again, that was correct, or half correct.

6  A    Right.

7  Q    It wasn't hyphenated, but --

8  A    I can't remember if Mr. Lopez did tell me his last name.

9  Q    Okay.  And again, that whole discussion is on the audio,

10  so the Judge can listen to it.

11  A    Uh-huh.  It was Rolando.  It was.

12  Q    Okay.  And ultimately, at around the 39-minute mark on the

13  audio, on the -- on the stop, you get a call from the other

14  trooper who stopped the black Mercedes, and he tells you it's

15  Rolando -- if this is the right name, it's Rolando Sims-Perez,

16  says that he was -- says that Lopez was following him, and

17  otherwise, there's no reason to detain or stop or keep

18  Mr. Sims-Perez; right?

19         MS. O'LEARY:  Objection, compound.  I'm not sure what

20  we're even asking.

21         THE COURT:  That is a few questions all in one.

22         MR. COLBATH:  Okay.

23         THE COURT:  Let's break it down.

24         MR. COLBATH:  Sure.

25

1   BY MR. COLBATH:

2   Q    You had a trooper stop the black Mercedes?

3   A    Yes.

4   Q    And you learned that that trooper contacted the driver,

5   and the driver was Rolando Sims-Perez?

6   A    Yes.

7   Q    And you learned from the other trooper that his contact

8   did not result in any law violations being discovered or any

9   problems with Mr. Sims-Perez?

10  A    Correct.

11  Q    Mr. Sims-Perez wasn't detained for any reason.  He was

12  released after whatever him and the other trooper --

13  communication they had?

14  A    Right.

15  Q    And that other trooper asked you, "Hey, have you

16  discovered anything that looks like these guys are trafficking

17  drugs together?"  That trooper asked you that; right?

18  A    He did.

19  Q    And your response to him was, "No, I just found a little

20  user quantity here, I got nothing else"?

21  A    Right.

22  Q    Okay.  And that conversation occurred, I'll just tell you,

23  at about 39 minutes into the -- into the stop.  Prior to that

24  conversation with the other trooper, you had already made,

25  number one, the decision to arrest Mr. Soto-Lopez, based on the

1    drugs you found?

2    A    Yes.

3    Q    And parole conditions?

4    A    Right.

5    Q    And you had already called dispatch to have them locate

6    and get a tow truck to impound Mr. Soto-Lopez's vehicle;

7    correct?

8    A    Yes.

9    Q    Okay.  And at the time you made that call to dispatch to

10   get a tow truck to impound the car, up until that point, you

11   hadn't discussed the car or what was going to happen to the car

12   with Mr. Soto-Lopez; had you?

13   A    I don't believe so.

14   Q    In other words, once you decided he was going into

15   custody, "he" being Mr. Soto-Lopez, and was not going to be

16   able to drive away with the car --

17   A    Right.

18   Q    -- you didn't consult him or confer with him about what

19   should happen or could happen to the car.  You made the

20   decision to call impound?

21   A    Yes.

22   Q    All right.  And again, because you couldn't personally do

23   it, you had dispatch look for a tow truck?

24   A    Right.

25   Q    But because you were done searching the vehicle, and had

1    Mr. Soto-Lopez in custody, you were not seizing the vehicle for
2    any further investigatory purposes; right?
3    A    Correct.
4    Q    And the vehicle was essentially -- you know, could be
5    returned to Mr. Soto-Lopez's custody, other than you couldn't
6    give it to him because he was going to jail, so it had to be --
7    in your estimation, had to be impounded?
8    A    Right.
9    Q    But if he got bonded out in an hour, he could go to the
10   tow truck place and pick it up?  It was his property.  AST, the
11   troopers, were done with it at that point?
12   A    Right.
13   Q    Now, after you called -- after you called dispatch, and
14   then had the conversation with your other trooper about
15   Mr. Sims-Perez, dispatch called you back and said they were
16   able to locate Asap Towing was the only people they could find,
17   and it would be an hour for the tow truck to get out there.  Do
18   you recall dispatch telling you that?
19   A    I -- I'm -- I believe so.
20   Q    Okay.  And now just for the Court's reference, at about
21   exactly minute 41, dispatch says, "Asap Towing is available, be
22   more -- it's going to be an hour."
23          And would that be consistent -- do you know where
24   Asap Towing is located?
25   A    It's in Soldotna.

1  Q    And mobilizing somebody in Soldotna and getting them out

2  to the scene where you all were, that made sense to you that it

3  could have been an hour?

4  A    Correct.

5  Q    Especially if they were out on another call or the truck

6  wasn't right at the impound lot?

7  A    Yes.

8  Q    Okay.  Now, while I'm thinking about it, this location

9  where Mr. Soto-Lopez's car was sitting, he was well off the

10 roadway.  We can see on the video, he pulled onto a gravel pad

11 next to the road?

12 A    Right.

13 Q    So he was not only not on or near the white line on the --

14 on the right-hand side edge of the driving lane, but he was not

15 even on the asphalt.  He was fully over onto the gravel?

16 A    Correct.

17 Q    Okay.  And as I watched the video, the area where he was

18 pulled off the road -- so he was not blocking traffic?

19 A    Yeah, it's not a -- not blocking traffic.

20 Q    Okay.  And it was quite a large pad because it looked like

21 there was kind of a little roadway, or maybe it was a

22 construction thing that was created, but before the area that

23 he pulled up, there was a roadway that led up to that gravel

24 pad there.  Do you recall seeing that?

25 A    Yes.

1    Q    Okay.  And you testified about this being near some --

2    some dip, or whatnot, but on the video, it shows where you're

3    sitting.  You pulled out and you followed him on quite a long

4    straight-away, like a quarter mile straight-away before you

5    pulled over; right?

6    A    Yeah, that's us going down the dip and then back up

7    towards the top there.

8    Q    Okay.  But certainly where the vehicle was, there was no

9    danger that it was going to be -- unless somebody veered off

10   the roadway, they weren't going to hit it or anything?

11   A    Correct.

12   Q    All right.

13   A    But we would want to prevent that in the first place.

14   Q    I'm sorry?

15   A    We would want to prevent that from even happening in the

16   first place.

17   Q    Sure.  If it had been in danger of somebody hitting it or

18   had it been obstructing traffic, or even marginally obstructing

19   traffic, you would have moved it or caused it to be moved, or

20   at least left a patrol car there until it was moved?

21   A    Correct.

22   Q    Okay.

23   A    Yes.

24   Q    After you learned from dispatch that it was going to be an

25   hour for a tow truck to get out there, you communicated then

1  again with the other trooper that was in the area and asked if

2  he could come to your location and wait with the vehicle?

3  A    Yes.

4  Q    And he did that?

5  A    Yes.

6  Q    Was that a trooper from a different patrol area or -- or

7  another person in the same patrol area as you?

8  A    Same as me.

9  Q    Also on duty that day?

10 A    Yes.

11 Q    Didn't have, obviously, a suspect or a -- anybody in his

12 car?

13 A    Nobody in his car.

14 Q    All right.  And you don't know whether Mr. Sims-Perez had

15 anybody in his car, any other passengers in his car; do you?

16 A    I didn't see anybody else in his car.

17 Q    Okay.  Shortly after dispatch told you it would be an

18 hour, it's about -- it's about three minutes later on the

19 video, it's sometime around the 46-minute mark, it's right

20 where we froze up there, Mr. Soto-Lopez asked you what was

21 going to happen to his car; do you recall that?  If you don't,

22 that's fine.

23 A    Yeah (indiscernible response).

24 Q    Okay.  And you informed him, though, it's going to be

25 impounded?  At some point, you told him it's going to be

1   impounded?

2   A    Yes.

3   Q    And I don't know if you recall, but do you recall him

4   asking, "Down here or up in Anchorage?"  He was concerned about

5   where it was going to be?

6   A    Yes.

7   Q    Okay.  And he asked you, "Well, can I just have somebody

8   pick it up from here, not -- don't impound it.  Can I just have

9   somebody get it?"  Do you recall that?

10   A    I believe so.

11   Q    Okay.  You told him you didn't have time to wait.  Do you

12   recall that?

13   A    I can't -- I can't remember this whole conversation.

14   Q    And that's -- that's fine.  I apologize.  I mean, I would

15   have played this two or three minutes of the video.  And just

16   so the Court's aware, this is all between about 46 and 49.

17         In fact, there was somebody that -- that ended up

18   waiting there for almost an hour for the tow truck to come;

19   right?

20   A    Yeah, the other trooper.

21   Q    And when you told Mr. Lopez that you couldn't wait, he

22   asked, "Well, can somebody from right here around Kenai come

23   get the car?"  Do you recall that?  If you don't, that's fine.

24   A    I don't.

25   Q    All right.  The truth of all of it is, though, you had

1     already ordered a tow truck, and even if somebody had been a

2     mile down the road, you had made the decision to have it

3     impounded.  You wouldn't have let somebody come get the car;

4     right?

5             MS. O'LEARY:  Objection, relevance.  Who cares what

6     he might have done in a different setting?  The only question

7     for suppression is whether what he did do was reasonable under

8     the circumstances.

9             THE COURT:  Well --

10            MR. COLBATH:  Can I respond, Your Honor?

11            THE COURT:  Yes.

12            MR. COLBATH:  The entire issue for the Court, as

13    outlined in my brief, which is conveniently ignored by the

14    Government, but the entire issue is there's -- there's an

15    Alaska state statute that directs this man specifically what to

16    do when he's impounding a car, which he followed none of, and

17    that's exactly what these questions relate to, and also, the

18    exact issue for whether --

19            THE COURT:  Mr. Colbath --

20            MR. COLBATH:   -- our position, the exact issue for

21    whether this Court decides the vehicle was illegally taken,

22    given to the towing company, or not illegally given to the

23    towing company.  And that's exactly what the questions I'm

24    asking about go to, and I'd reference Page 10 of my memorandum

25    in support of my motion.

1         THE COURT:  I think it is worth it for the Court to

2    listen to testimony regarding other options that AST may have

3    had apart from impounding the vehicle.  So the objection's

4    overruled.

5    BY MR. COLBATH:

6    Q    You wouldn't have let somebody else take the car because

7    you would already -- Asap was already on the way?

8    A    If I had already called an impound?

9    Q    Yes.

10   A    In another situation?

11   Q    In this situation.

12   A    In this situation?  In this situation, since I called an

13   impound --

14   Q    Right?

15   A    -- I wasn't going to have somebody come pick it up.

16   Q    Okay.

17   A    Is that what you're asking me?

18   Q    Yes.

19   A    Yes.

20   Q    And prior to calling impound or when Mr. Soto-Lopez asked

21   you, "Is it going to be impounded down here," you didn't give

22   Mr. Soto-Lopez the option of picking who was going to -- where

23   the vehicle was going to be towed, where it would be impounded

24   to?

25   A    No, I didn't give -- we have a list that we go off of for

1    impounds.

2    Q    Okay.  And that's the Alaska State Trooper's list, not

3    anything consulted with the -- the vehicle owner, I guess would

4    be --

5    A    Right.

6            MR. COLBATH:  Okay, okay.  If I can have just one

7    minute, Your Honor?

8            THE COURT:  Take your time.

9            (Pause)

10   BY MR. COLBATH:

11   Q    Were you familiar with Asap Towing?

12   A    Am I familiar with them?

13   Q    Were you familiar with them prior to this incident?  Were

14   you familiar with the tow company that was going to come out

15   and get the car?

16   A    My -- my area never usually uses Asap Towing.

17   Q    So you hadn't had prior experience with the driver, Ira

18   Beck, that came and got the car, or that company, how to handle

19   things?

20   A    No.

21           MR. COLBATH:  Okay.  That's all I have for --

22           THE COURT:  All right.  Thank you, sir.

23           Redirect?

24           MS. O'LEARY:  Thank you, Your Honor.

25

1                        REDIRECT EXAMINATION

2     BY MS. O'LEARY:

3     Q    Mr. Colbath asked you a question about earlier on in this

4     search on Mr. Soto-Lopez's vehicle, when you asked the

5     dispatcher if the Probation Office said anything about searches

6     for marijuana, and you testified they said no.  And you said

7     that you said, "I didn't find any; I'm just curious."  Why were

8     you curious?

9     A    Because a legal -- it's a legal substance now, but I'm

10    aware sometimes where conditions do state that a probationer

11    cannot consume or possess marijuana.

12    Q    Okay.  But you hadn't found marijuana in the vehicle when

13    you asked those questions?

14    A    I had not found any marijuana.

15    Q    This is just when you were looking for alcohol?

16    A    Yes.

17    Q    And you also testified that you wouldn't have looked

18    anywhere different if you were looking for drugs rather than

19    just alcohol; is that right?

20    A    Yes.

21    Q    Why is it that you wouldn't have looked anywhere different

22    if you were looking for drugs in addition to alcohol?

23    A    That if somebody's not supposed to have something, they're

24    probably going to hide it in -- hide it anywhere else they

25    would hide drugs.  If I wasn't supposed to have alcohol --

1   well, I guess I can't say that, but, um --

2   Q    What do you mean you can't say that?

3   A    I think I can't -- I can't put myself in -- can I use

4   myself as an example?

5   Q    Sure.

6   A    Okay.  Thought there was rules against that, but --

7              THE COURT:  I think she's asking you essentially a

8   hypothetical question.

9              THE WITNESS:  Yeah, okay.  So, like, if I was not

10  supposed to have alcohol, I would want to hide it; right?  So

11  why wouldn't I hide it where I hide my drugs?

12  BY MS. O'LEARY:

13  Q    So you could hide alcohol and drugs in the same location?

14  A    Right.

15  Q    Is that your point?  And when you were looking for

16  alcohol, just to make this very abundantly clear, you were

17  looking for bottles smaller than fifths of alcohol; right?

18  A    I was looking for any kind of alcohol.

19  Q    So including the little airplane --

20  A    Yes.

21  Q    -- two-, three-inchers, yeah.

22             When on cross examination you agreed with Mr. Colbath

23  that you read Miranda rights at 32 minutes into your video, I

24  want to break that down a bit.  Are -- did you read Miranda

25  rights to Mr. Soto-Lopez at some point?

1    A    I did.

2    Q    Was that during this stop that was in the video exhibit?

3    A    It was during the stop.

4    Q    Do you know what minute it was when you read Miranda

5    rights?

6    A    I don't know what minute it was.

7    Q    And then you also said, "I believe so," in response to a

8    question from Mr. Colbath about it taking an hour for Asap

9    Towing to come at minute 41.  My clarifying question is, did

10   you actually -- do you actually know that that was at minute

11   41?

12   A    I don't.

13   Q    Okay.  And in this stop here, this -- I believe you've

14   testified you noted in your report was about 2:30 in the

15   afternoon; is that right?

16   A    Right.

17   Q    In March, March 24th; right?

18   A    Yeah.

19   Q    Do you have any idea when it got dark then?

20   A    I don't.  I don't know.

21   Q    Was it, you know, after 10 p.m. or before 10 p.m. in

22   March?

23   A    Before 10 p.m.

24   Q    What about 8 p.m.?

25   A    Before 8 p.m.

1   Q    Okay.  So we're not talking about hours and hours from

2   when you left this scene to when it gets dark; right?

3   A    Right.

4   Q    Is that fact something that plays into impound decisions,

5   the fact --

6   A    The time of day?

7   Q    Yes.

8   A    No.

9   Q    No?  Why not?

10  A    It has nothing to do with whether or not I'm going to

11  impound a vehicle.  I -- weather plays no role in it.

12  Q    What goes -- what plays into your decisions to impound a

13  vehicle?

14  A    Whether or not somebody can come pick up the vehicle,

15  whether or not an impound can even come.  I know there's a lot

16  of times where no impound, no tows will even respond.  There

17  are just a few in that area that I'm at.  Depends on if it's a

18  traffic hazard.  It depends on if it's abandoned.

19  Q    What do you mean by "abandoned"?

20  A    It's unoccupied and it's been abandoned for days or weeks.

21  Q    Okay.  Do you make arrests on people for drunk driving?

22  A    All the time.

23  Q    When they don't have passengers, when they're the only

24  person in the car, what do you do with their vehicles?

25  A    Impound them.

1  Q    And when you say "impound them", what do you mean?

2  A    Have a tow truck driver come get it, whether it's a -- or

3  excuse me, come get the vehicle whether the RO wants to choose

4  a tow company or I have one respond.

5  Q    And how do you decide whether the owner picks or you pick?

6  A    I, like, offer it.  I mean, I'll offer it, you know.

7  Like, if I have my cell phone, I'll be like, "Here, here's my

8  phone if you want to call somebody or call a tow, here you go."

9  Q    Do you go through your dispatcher to try and find --

10  A    I don't.

11  Q    -- a different one for people?

12  A    I don't.

13  Q    Okay.  But you impound their vehicles if you, like, arrest

14  a DUI person and they're the only person in their car?

15  A    Yes.

16  Q    And just to clarify, did you say you didn't see anyone in

17  Orlando Sims-Perez's [SIC] vehicle, that black Mercedes, other

18  than the driver?

19  A    Oh, I thought I was asked if I was -- if I had seen

20  anybody in Mr. Lopez's vehicle.

21  Q    Oh, okay.  So let's break those up, then.

22  A    Okay.

23  Q    How many people did you see in Mr. Soto-Lopez's vehicle?

24  A    Just Mr. Lopez.

25  Q    Did you see how many people were in the black Mercedes?

1  A    I only saw the driver.

2  Q    Did you see anyone else?

3  A    I did not see anyone, no.

4  Q    Did Trooper Keen say anything on the radio to you about if

5  anyone else was in that vehicle?

6  A    He did not.

7  Q    He didn't say anything or he didn't -- he said there

8  wasn't anyone?

9  A    I didn't ask if there was anybody else, but he never

10 mentioned that there was anybody else.  And when we stop a car,

11 we usually run people, whoever's in the vehicle.

12 Q    Okay.  Just another clarifier.  You said in response to a

13 question from Mr. Colbath that at minute 46 in the video, you

14 said, "I'm going to believe you," about you asking the

15 defendant what's going to happen to his vehicle.  Do you know

16 that that was at minute 46?

17 A    I don't.

18 Q    Did you ask Mr. Soto-Lopez -- or excuse me.  Did

19 Mr. Soto-Lopez ask you about what was going to happen to his

20 vehicle?

21 A    Like I said, I can't -- I can't recall that.

22 Q    Were you aware of any other towing companies that were

23 available out in this area of the Sterling Highway?

24 A    No.

25 Q    So did you -- the only one you knew of was Asap?

1  A    The one that we usually use is called Midnight Sun Towing,

2  and it's right near the Seward -- Seward/Sterling Y.  But

3  whenever we call him, it's kind of hit or miss, because he's

4  the only guy who works it.  So if he's out in Anchorage or

5  Seward or something, usually we just go to the next rotation.

6  Q    What do you mean "next rotation"?

7  A    Someone that can respond then, so we're not sitting out

8  there.

9         MS. O'LEARY:  So you're not waiting for the Midnight

10 Sun person; got it.  All right, I don't have any other

11 questions.

12        THE COURT:  Thank you.  Recross?

13        MR. COLBATH:  Briefly, Your Honor.  Couple of things.

14                        RECROSS EXAMINATION

15 BY MR. COLBATH:

16 Q    To follow up where Ms. O'Leary just left off, first of

17 all, you didn't do anything to look for a tow company other

18 than call dispatch and advise them you needed an impound?

19 A    Right.

20 Q    So you didn't seek to find anybody, that was the

21 dispatcher's job?

22 A    Right, right.

23 Q    And I think you've already answered that you didn't ask or

24 offer or have any conversation with Mr. Soto-Lopez about

25 whether he knew of a tow company that could come get it, or

1   anything like that?

2   A    Right.

3   Q    In -- in DWI situations that you were asked about, you

4   certainly had communications with people that you were

5   arresting about if they had a preference?

6   A    Right.

7   Q    That just wasn't the case here?

8   A    Right.

9   Q    Would you have any reason to disagree with me if I told

10  you that on March 24th, 2019, sundown on the Kenai Peninsula

11  was 8:31?

12          MS. O'LEARY:  Objection.  What is 8:31?

13          MR. COLBATH:  8:31 at night.

14  BY MR. COLBATH:

15  Q    She asked you, well, sun -- was it dark at 10:00 and you

16  said no.  Do you recall that question?

17  A    Yes.

18  Q    You -- she said, "How about 8:00, was it dark at 8:00,"

19  and you said yes.  Do you recall that question?

20  A    I -- I guess.

21  Q    Okay.  Well, if I -- if I told you that I believed, if you

22  went and looked, that sundown was 8:30, and in fact it was

23  light hours -- five hours after this stop, would you disagree

24  with that?

25  A    If you told me sundown was at --

1    Q    8:30 at night.

2    A    Okay.

3    Q    On March 24th, 2019, the day you arrested Mr. Soto-Lopez.

4    A    Okay.

5    Q    Do you have any reason to dispute that?

6    A    No.

7    Q    Okay.  So in fact, had you driven away from that scene,

8    the car was -- and left the car there, it would have been

9    daylight for another four or five hours?

10   A    Right.

11   Q    Before it even got dark that night?

12   A    Right.

13   Q    Which would have been enough time for somebody to come all

14   the way from Anchorage and go get the car, even before dark?

15   A    Right.

16   Q    Okay.  But I think you testified that wasn't really one of

17   the considerations in deciding whether or not you were going to

18   remove the car, anyway.  Your concern is no not have it sit

19   there for several days to get vandalized, or something?

20   A    Yeah.  You drive the Seward Highway, you'll see cars

21   abandoned on the side of the highway forever, you know.  Get

22   vandalized, tires stolen, windows broken out of.  I mean, you

23   name it, and they're abandoned there.

24   Q    Okay.  And the point was to try to avoid that?

25   A    Right.

1   Q    It sitting there for several days?

2   A    Right, because of the charge.

3        MR. COLBATH:  Sure, all right.  I don't -- I don't

4   have any other questions, Your Honor.

5        THE COURT:  Thank you.

6        Redirect?

7        MS. O'LEARY:  Thank you, Your Honor.

8                   FURTHER DIRECT EXAMINATION

9   BY MS. O'LEARY:

10  Q    Trooper Howard, do you know what time sundown was on

11  March 24th, 2019?

12  A    No, I do not.

13  Q    Okay.  So at some point, it was going to get dark; right?

14  A    Yes.

15  Q    And is a few hours of a car being at the side of the road

16  enough time for it to be vandalized?

17  A    Yes.

18  Q    Is it enough time to expose the troopers to a lawsuit if

19  they're the ones who left it there?

20  A    Yeah.

21       MS. O'LEARY:  All right.  No further questions.

22       THE COURT:  All right.  Brief recross based on those

23  questions?

24       MR. COLBATH:  No.

25       THE COURT:  All right.  May this witness be excused?

1          MS. O'LEARY:  Yes, sir.

2          THE COURT:  Trooper, thank you so much for coming in.

3     You can return to your regular duties.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          THE COURT:  All right.  Ms. O'Leary, any further

7     witnesses or evidence?

8          MS. O'LEARY:  No, Your Honor.

9          THE COURT:  Mr. Colbath, I believe you have a

10    witness?

11         MR. COLBATH:  I do, I think, Your Honor.  I'll call

12    Ira Beck to the stand.

13         THE COURT:  Very good.

14         MR. COLBATH:  Assume he -- I didn't see him after our

15    break, come back, but I --

16         THE COURT:  I believe -- I believe he's out there.

17    We can help.

18         (Pause)

19         THE COURT:  Mr. Beck, if you could please come

20    forward.  Go ahead and take your hat off for me, sir.  Please

21    come forward, step up to the witness stand, remain standing and

22    be sworn.

23         DEPUTY CLERK:  Please raise your right hand.

24         (Oath administered to the witness)

25         DEPUTY CLERK:  Thank you.  Please have a seat.  Speak

1  into the microphone at all times.  Please state and spell your

2  full name.

3         THE WITNESS:  Ira Lee Morris Beck.  I-R-A, B-E-C-K.

4         DEPUTY CLERK:  Thank you.

5         THE COURT:  Mr. Colbath?

6         MR. COLBATH:  Thank you.  I apologize for our delay,

7  Mr. Beck.  Court doesn't always go on the time schedule that we

8  plan.  So I appreciate your patience, okay?  We'll try to get

9  your questions asked and get you on your way.

10                  IRA BECK, DEFENSE WITNESS, SWORN

11                      DIRECT EXAMINATION

12  BY MR. COLBATH:

13  Q    Sir, where do you live?  Just what community?

14  A    Sterling.

15  Q    And how long have you generally resided there?

16  A    Since '04.

17  Q    Where do you work?

18  A    Asap Towing.

19  Q    And back on March 24th of last year, 2019, were you

20  working at Asap Towing?

21  A    Yes, sir.

22  Q    What's your general job duties?

23  A    Towing vehicles.

24  Q    Are you an employee of the company, are you the owner of

25  the company, the manager?  Kind of, what's your position?

1   A    I'm self-employed.

2   Q    So Asap Towing is your business?

3   A    It's not my business.  I am an independent contractor.

4   Q    Okay.  Do you own your own tow truck that you contract to

5   the company, or do they supply you a vehicle?

6   A    He supplies the vehicle.

7   Q    All right.  And "he" is who?

8   A    Pat Mize.

9   Q    Do you know whether or not Asap Towing has any kind of

10  formal arrangement or agreement with the Alaska State Troopers

11  to tow vehicles?

12  A    They do.

13  Q    And was that anything you were involved in setting up or

14  negotiating, or whatever, or was the -- the gentleman you just

15  told me about, was that his doing?

16  A    He's the owner.  He's the one that set that up.

17  Q    All right.  And you, as a contractor for them, are you

18  given any specific instructions or are there -- is there any

19  regular thing you're supposed to do when impounding a vehicle

20  at the direction or at the request of the troopers?

21  A    No.

22  Q    All right.  And so in this case, where were you when you

23  got notification that you were to go out onto the Sterling

24  Highway and retrieve the -- the Honda Pilot that was involved

25  in this case?

1 A     Sterling.

2 Q     And where's the business located, again?

3 A     Soldotna.

4 Q     Okay.  And do you recall how long it took you to get --

5 did you have the tow truck with you?

6 A     Yeah.

7 Q     Do you recall how long it took you to get to the location

8 of the tow?

9 A     30 or 45.  I usually always say 45 minutes when it's the

10 troopers.

11 Q     All right.  You would have -- when they called you, you

12 would have advised -- they ask you how long or where you are

13 and how long it's going to be, and you give them a general

14 advisement of about how long it's going to take?

15 A     Yeah.

16 Q     You don't recall specifically in this case whether it took

17 you 30 minutes or 50 minutes, you just advise --

18         MS. O'LEARY:  Objection, leading.

19         THE COURT:  It is your witness.

20 BY MR. COLBATH:

21 Q     But you don't -- do you recall the specific amount of

22 time.

23 A     (No audible response).

24 Q     Okay.  When you got to the scene, do you recall who was

25 there?

1   A    A trooper.

2   Q    Alone?

3   A    Yeah.

4   Q    So the -- there were no civilian people there, as far as

5   the owner of the vehicle, passengers, or anybody; is that

6   right?

7   A    Not that I know of.

8   Q    Okay.  And what instructions, if any, were you given about

9   the status of the vehicle?  In other words, number one, where

10  were you to -- where were you to take it?

11  A    My lot.

12  Q    And whose custody was it going to be in?

13  A    Mine.

14  Q    And did the troopers give you any other -- either the

15  trooper on scene or the dispatch that talked to you, give you

16  any other instructions about what you were to do with the

17  vehicle?

18  A    Take it to the lot, impound it to my lot.

19  Q    Okay.  And so were you informed by either the trooper on

20  the scene or the dispatch that the troopers had any further

21  business with the car or any further need to have the car?

22  A    No.

23  Q    And after -- at the scene of the -- the location where you

24  picked the car up, what did you do to secure it to your truck?

25  A    We got four straps -- I actually drove the vehicle onto

1  the back of the truck.

2  Q    So you had a flatbed?

3  A    Yes, it's a flatbed.

4  Q    Okay.

5  A    So drove the vehicle onto the back of the truck, secured

6  it with four straps, all four corners, put the bed back flat,

7  and took off toward Soldotna.

8  Q    All right.  Other than to get in to drive it onto the

9  vehicle, did you do anything with the vehicle or any of its

10  belongings, make any notations, move or look at anything

11  really, other than to drive it on?

12  A    Not on scene, no.

13  Q    All right.  Once you got back to the tow yard, what did

14  you do?

15  A    I parked the tow truck in the middle of the yard, and I

16  started doing some stuff around the yard.

17  Q    Okay.  At -- with the vehicle still on the flatbed?

18  A    Yes.

19  Q    Okay.  And after you got -- at some point, you removed the

20  vehicle from the flatbed?

21  A    I went to remove the vehicle from the flatbed.  That's

22  when I noticed the contraband in the back seat.

23  Q    How was it that you came to notice that?

24  A    Well, I got in the vehicle.  I unsecured the vehicle.  I

25  put the deck back.  Everything is unhooked at this point.  The

1    vehicle's in park.  I got in the vehicle, was going to back it

2    off the truck, put my arm behind the passenger's seat, looked

3    in the back.  There's a case in the back seat, probably a

4    two-inch triangle sticking out of it, corner of a plastic bag.

5    Had meth in it.  That's when I got out of the vehicle, relocked

6    the vehicle down to the bed.  Called the troopers and said it

7    was coming their way.

8    Q    So you weren't doing any kind of search or anything?

9    A    (No audible response).

10   Q    I'm sorry?

11   A    No.

12   Q    And describe the container that you saw.

13   A    Open case, probably six inches by 12 inches, blue.  That's

14   about all I seen.  I did -- when I seen the case, it had a --

15   like I said, a corner of a triangle-shaped --

16   Q    Piece of Ziploc bag?

17   A    It was a sandwich bag.

18   Q    Okay.

19   A    And there was obvious meth in that corner.  I opened the

20   case, shut the case, put the car back on the truck, called the

21   troopers, let them know it was coming their way.

22   Q    The case was closed -- apparently, the case could close

23   and close over the top of this bag to allow part of it to be

24   out?

25   A    Yes.

1   Q    Okay.

2   A    And it was a zipper case, if I remember correctly.  It

3   wasn't zipped, if I remember correctly.

4   Q    All right.  And you know what meth is, to recognize it?

5   A    For sure.

6   Q    Okay.  And how's that?

7   A    I'm in the towing business.  You see a lot of it.

8   Everything we pick up is -- 90 percent of the stuff we pick up

9   these days is drug-related.

10  Q    Okay.

11  A    To --

12  Q    When you picked this up, did you know why you were picking

13  it up?  In other words, did you know what the driver had been

14  arrested for?

15  A    No, sir.

16  Q    You didn't have any information?  You didn't know if it

17  was a DUI, or a -- you didn't know what it was?

18  A    No.

19  Q    Okay.  But what you could see of the Ziploc bag, it was

20  not only a bag, but it was actual drugs sticking out that you

21  could see?

22  A    Yes, sir.

23  Q    And then -- and that was just laying in plain view on the

24  back seat.

25  A    Plain view, back seat.

1  Q    And you said you opened it and closed it?

2  A    Uh-huh.

3  Q    And then you went and called the troopers?

4  A    Yes.  I put -- I actually got out of that car, shut it

5  down, put it back up on the tow truck because it's on the tow

6  truck at an angle.

7  Q    Right.

8  A    So I brought the bed back, called the troopers, let them

9  know it was coming.  I reattached all four corners, and took it

10  to them.

11  Q    So as far as to move that container, all you did was open

12  it and look at it, and leave it right there on the seat?

13  A    Yes, sir.

14  Q    And go right back to the --

15  A    Yes, sir.

16  Q    When you got to the trooper post, then, did you have

17  anything more to do with the vehicle, other than unloading it?

18  A    I unloaded it -- that was it -- into their bay.  They

19  actually have a garage bay that I unloaded it into.

20  Q    And that's, I assume, a place you'd been before or --

21  A    I've unloaded vehicles there before.  Not usually do they

22  go there.  They usually go in the back lot.  But I unloaded one

23  there last night.  So it's -- sometimes it happens; sometimes

24  it doesn't.

25  Q    Okay.  And did -- do you recall any discussions you had

1   with the troopers there unloading it, or whatnot?

2   A    Told them it was in plain view on the back seat.

3   Q    Pointed it out to them?  Did you point it out to them?

4   A    I did not.  I told them it was in plain view in the back

5   seat.

6   Q    You assumed they could find it?

7   A    Yes.

8   Q    With that much instruction?

9   A    Yes.

10  Q    Okay.  Do you recall when you called the troopers after

11  finding this, seeing this on the back seat, I guess, did you --

12  do you recall anything about the discussion with the troopers,

13  what you were -- what they told you when you called?

14  A    They asked me if I wanted to keep it at my yard, and I

15  said no.  And I said, "It needs to come to your guys's yard."

16  I think that was pretty much how -- as far as it went.  They

17  wanted it to stay there, which I didn't want.  That's -- I

18  pretty much told them, "That's possession.  I know it's here.

19  It needs to come to your yard."

20  Q    Okay.  So you wanted it off your property or off the

21  business property?

22  A    Yes.

23  Q    All right.  Had you had prior interactions with either

24  Trooper Howard or the trooper that was at the scene?

25  A    I'm sure I have.  I've had interaction with most of the

1    troopers.

2    Q    You didn't know either of them like on a first-name basis

3    or regular basis of any kind?

4    A    No.  There's a few that I do.  But Howard is the one that

5    was on scene, no, I didn't.

6    Q    Okay.  After you unloaded the vehicle into the trooper

7    bay, did you have any more involvement with it or this case?

8    A    No.

9    Q    Up till now, I mean?

10   A    No.

11   Q    Did they interview you while you were there?

12   A    No.

13   Q    Okay.  Later?

14   A    No.

15   Q    All right.  Besides observing this case and opening and

16   closing it on the back seat, did you move anything else in the

17   vehicle or look or search anything else in the vehicle?

18   A    We kind of just take a scan of what's in the vehicle when

19   we get in and out of them.  So if there's -- we call it

20   low-hanging fruit.  If there's like an iPad sitting in the

21   seat, or something like that, we kind of try to take that stuff

22   and lock it away.  We do have a secure place to lock stuff up

23   like that.  But we don't really search them.  We just -- if

24   there's low-hanging fruit, we're going to kind of grab that up

25   and put it under lock and key, but no, we don't search

1  vehicles.

2  Q    Okay.  And in this case, you didn't -- there was no

3  apparent, what you call, low-hanging fruit there?

4  A    No, there wasn't.  It looked like a soccer mom's car, man.

5  It was a Honda Pilot.  I mean, you don't see -- it actually

6  looked fairly clean, from what I seen when I got in it.

7  Q    And you didn't even get far enough to get it off the

8  truck, it sounds like, so you certainly didn't secure anything

9  or remove anything?

10  A    No.

11  Q    All right.  Last question; I know from the -- at some

12  point in the process, I believe I'm aware that the rear window

13  of the vehicle got broke out.  Do you know how that happened?

14  A    That happened, I'm sure, on the way back.  There was a

15  generator or a power washer or something in the back, very

16  back.  It -- load shifted, man, it took the window out.  Took

17  one pole straight in the middle of the window.

18  Q    Okay.  That was -- it wasn't that condition when you

19  loaded it, but then --

20  A    No, it was not.

21  Q    -- later, after the travel, somehow it had broke?

22  A    Yes.

23        MR. COLBATH:  That's all the questions I have a for

24  Mr. Beck.

25        THE COURT:  All right.  Thank you, sir.

1           Ms. O'Leary, cross examination?

2           MS. O'LEARY:  Thank you.

3                      CROSS EXAMINATION

4    BY MS. O'LEARY:

5    Q    Mr. Beck, you testified in response to one of

6    Mr. Colbath's questions that you hadn't had any involvement

7    with this case after you dropped the Pilot vehicle off with the

8    troopers; right?

9    A    Yes.

10   Q    You didn't have any involvement with the troopers, but did

11   you have involvement in the form of an interview with an ATF

12   agent?

13   A    An ATF agent did call me.  We talked on the phone, yes.

14   Q    Okay.  Have you been interviewed by anyone else about this

15   case since then?

16   A    Nope.  He's called me a couple times, though.

17   Q    When you say "he", what do you mean?

18   A    The ATF agent.

19           MS. O'LEARY:  Oh, the ATF agent has called you; okay.

20   Thank you.  No further questions.

21           THE COURT:  All right.  Mr. Colbath, any further

22   redirect?

23           MR. COLBATH:  Just about that last answer.

24

25

1          REDIRECT EXAMINATION

2  BY MR. COLBATH:

3  Q    Mr. Beck, those were similar to the first contact, the ATF

4  just called you on the phone?  That's been your only

5  communications with them?

6  A    Yes.

7          MR. COLBATH:  All right.  Your Honor, I thought I

8  understood that.  That's all I have, Your Honor.

9          THE COURT:  All right.  Mr. Beck, thank you so much

10  for coming in.  I know it's been a long day of waiting around.

11  I really appreciate your time, so thank you very much.  You're

12  excused.

13          MR. COLBATH:  He can be released, Your Honor, from

14  our subpoena.

15          THE COURT:  You're free to return to your regular

16  life.

17          THE WITNESS:  Thank you.

18          (Witness excused)

19          THE COURT:  All right.

20          MR. COLBATH:  Your Honor, I do not have any other

21  witnesses.

22          THE COURT:  Okay.  Any other evidence to present?

23          MR. COLBATH:  No other evidence to present.

24          THE COURT:  Any rebuttal witnesses or evidence?

25          MS. O'LEARY:  No, Your Honor.

 1          THE COURT:  All right.  So what I'm inclined to do

 2    is -- the Government had moved to file a surreply, and I

 3    believe the Court has not acted on that yet.  What I'm inclined

 4    to do is grant the Government's request for surreply, and give

 5    you a week to do that.  Is that enough time?

 6          MS. O'LEARY:  That's fine, Your Honor.

 7          THE COURT:  Okay.  So I'm also going to order a

 8    transcript of today's hearing, and the matter will be taken

 9    under advisement.  When the Court receives the final -- the

10    latter of those two things, either the Government's surreply,

11    or the transcript of today's hearing, whichever comes last,

12    that will be the measuring date for when this motion will be

13    taken under advisement.  Is that clear enough?

14          MS. O'LEARY:  Yes.

15          THE COURT:  All right.  Anything else that we can do

16    today, from the Government?

17          MS. O'LEARY:  Your Honor, can we argue briefly?

18    There's just sort of one underlying thing that I think will

19    help.

20          THE COURT:  Sure, sure.  If you want to do written

21    argument, too, that -- or instead, that's fine, too.  However

22    you want to handle it.

23          MS. O'LEARY:  I just have some brief remarks and I'd

24    just like to sort of --

25          THE COURT:  Brief works.  Let's hear it.

1          MS. O'LEARY:  Yes.  The whole argument for

2    suppression here is an unlawful seizure, essentially.  There's

3    no argument that Asap Towing was in any way a Government actor.

4    That is nowhere in the pleadings.  That's not alleged.  So

5    this -- the moment Mr. Soto-Lopez's vehicle leaves the scene

6    with the towing company, there's nothing about that that's

7    actually challenged.

8          So the only question is, was it lawful for the

9    trooper to search it when -- in the ways he did on scene,

10   Trooper Howard, and then to have it impounded and call that

11   towing company.  And I think it's pretty clear from the

12   testimony today, and as the United States put in its briefing,

13   that this was a search of the vehicle for alcohol that was

14   authorized by the on-call parole officer, that the trooper

15   heard that and understood that and carried that out, and that

16   very early on in that search, uncovered user amounts of drugs

17   that then gave -- brought the automobile exception into play,

18   authorizing the rest of the search that occurred on that

19   vehicle at the scene.

20         So then the only real question after that, even

21   remotely remaining, is about the authority of the trooper to

22   seize the vehicle, to call a towing company, and that -- that

23   is clearly authorized under the Community Caretaker Doctrine.

24   This is a trooper with a vehicle at the side of the road, no

25   one else is with it, and the driver's being arrested out in the

middle of nowhere on the Sterling Highway.  If this isn't a
situation where, as a caretaker, the troopers can impound a
vehicle, they're in between a rock and a hard place, because
the other option is to leave it or use their staff to sit
around and wait to see if somehow they can get someone to drive
out from a different city to pick it up.  That's not
reasonable, and that's all that's required for the Community
Caretaker Doctrine.

So given that situation, where the troopers do not
have a to expose themselves for lawsuits for abandoning
someone's car, everything that happened in this search was not
in violation of the Fourth Amendment, and everything about
Alaska state impound laws are a red herring.  The question for
suppression in a federal case is was it a Fourth Amendment
violation, and that's answered under the Community Caretaker
Doctrine.

THE COURT:  Thank you very much.  Mr. Colbath, do you
wish to make argument?

MR. COLBATH:  My request would be -- and before
Ms. O'Leary asked to make brief comment, I was going to -- when
it was my turn, anything further from the defense, my request
was going to be, now that I am aware of what the actual
evidence of record is, I was going to be asking the Court to
also give me the same one-week deadline.  We can do it
simultaneous.  I don't need to wait to see her surreply and

then have a reply or response to that.  I was just going to

ask, can I have the same week to submit written argument to the

Court, now that I'm aware of what the actual evidence is, point

out some of the facts that are before the Court.  So I'd rather

submit my comments in writing, if I could.

THE COURT:  Yeah, so --

MR. COLBATH:  And I -- I'm sorry to interrupt, Your

Honor.  I would limit it to -- I have the local rule on like

replies, and those things, limits additional briefing to five

pages.  I'm not going to submit, you know, a transcript or

diatribe or anything.  I'll limit it to the five-page rule

that -- or less, that would be normally applicable to a reply.

But it would make more logical sense, I think, number one, for

me to do it in writing, and number two, I think it would be

more meaningful to the Court perhaps to have the argument at

the same time you're considering the transcript so that you

could refer, oh, he says this was a fact or that was a fact,

yes, in fact it is, or no, in fact, it's not --

THE COURT:  I understand.

MR. COLBATH:  -- was my thought.

THE COURT:  I take your point.  All right.  So, yes,

your request for written argument, post hearing briefing

argument is granted, limited to five pages.

Ms. O'Leary, if you want to do post hearing argument

in conjunction with your surreply, that's granted as well.

```
 1    It's completely up to you.  You've made your comments.  I
 2    appreciate your comments.  If you feel like you've made your
 3    point, that's fine.  I'm not trying to suggest that you need to
 4    do additional briefing, but I'm giving the defense the option,
 5    so I'll extend the same to you.
 6             MS. O'LEARY:  Thank you.
 7             THE COURT:  And yeah, the deadline for any further
 8    briefings will be one week from today.
 9             Does that work?
10             MR. COLBATH:  That's Tuesday, the 4th, Your Honor?
11             THE COURT:  Yes, that would make sense.  Well, you're
12    out of town all next week.
13             MR. COLBATH:  I'm out of town the rest of this week,
14    but I'm back on Sunday.
15             THE COURT:  Okay.  I mean, if you --
16             MR. COLBATH:  I'll get it in.
17             THE COURT:  Okay, all right.  So that will be the
18    order.
19             So anything else we can do today from anybody?  We
20    covered it?
21             MS. O'LEARY:  Not from the Government, Your Honor.
22             MR. COLBATH:  Not from us.
23             THE COURT:  Mr. Soto-Lopez, any questions, comments,
24    or concerns?
25             THE DEFENDANT:  No, Your Honor.
```

1          THE COURT:  All right.  Thank you --

2          MS. O'LEARY:  I'm sorry, I'm wondering -- just

3   housekeeping.

4          THE COURT:  Yes, ma'am.

5          MS. O'LEARY:  While submitting the new copy, would

6   you just -- how would you like that to go?  Should we file a

7   notice of conventional filing?

8          THE COURT:  Just file a notice of conventional filing

9   and have it dropped off at chambers.  That's fine.

10         MS. O'LEARY:  Okay.

11         THE COURT:  I want to thank both parties for their

12  thorough, focused, and organized presentations today.  It was

13  very helpful for the Court.  Thank you all very much.  We're in

14  recess.

15         DEPUTY CLERK:  All rise.  This matter is now

16  adjourned.  This court now stands adjourned subject to call.

17         (Proceedings concluded at 3:49:54 p.m.)

18

19                        CERTIFICATE

20         I, R. Joy Stancel, Federal Official Realtime Court
    Reporter in and for the United States District Court for the
21  District of Alaska, do hereby certify that the foregoing
    transcript is a true and accurate transcript from the digital
22  record in the above-entitled matter and that the transcript
    page format is in conformance with the regulations of the
23  Judicial Conference of the United States.
           Dated this 11th day of February, 2020.

24
                            /s/ R. Joy Stancel
25                    _____
                          R. JOY STANCEL, RMR-CRR

1    FEDERAL OFFICIAL COURT REPORTER