UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA


UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
vs.                       )        CASE NO. 3:19-cr-00114-JMK
                          )
REY JOEL SOTO-LOPEZ,      )
                          )
        Defendant.        )
_____)


TRANSCRIPT OF HEARING ON MOTION TO
SUPPRESS/FRANKS HEARING
**BEFORE THE HONORABLE MATTHEW M. SCOBLE, U.S. MAGISTRATE**
May 20, 2021; 2:16 p.m.
Anchorage, Alaska


**FOR THE GOVERNMENT:**
        Office of the United States Attorney
        BY:  GAILON MICHAEL EBELL
        222 West 7th Avenue, #9
        Anchorage, Alaska 99513
        (907) 271-5071


**FOR THE DEFENDANT:**
        Office of the Federal Public Defender
        BY:  GARY GEORGE COLBATH
        425 G Street, Suite 800
        Anchorage, Alaska 99501
        (907) 646-3400

_____

**SONJA L. REEVES, RMR-CRR**
Federal Official Court Reporter
222 West 7th Avenue, #4
Anchorage, Alaska 99513
Transcript Produced from the Digital Recording

1                     I N D E X

2                 May 20, 2021

3

4    Witnesses:        Direct    Cross    Redirect      Recross

5    Trevor Howard      8         64        98           --

6

7

8

9                 E X H I B I T   I N D E X

10   Exhibit                                          Page

11   1              Map                               72

12   2              Photo                             92

13   D-1            Search Warrant Request            38

14   D-6            Video                             11

15   D-7            (No description by clerk)         109

16

17

18

19

20

21

22

23

24

25

1         (Call to Order of the Court at 2:16 p.m.)

2         DEPUTY CLERK:  All rise.  His Honor, the Court,

3  the United States District Court for the District of

4  Alaska is now in session, the Honorable Matthew M.

5  Scoble presiding.

6         Please be seated.

7         Your Honor, we're on record in *United States of*

8  *America versus Rey Joel Soto-Lopez*, Case

9  3:19-criminal-114-JMK-MMS.

10         Counsel, please identify yourselves for the

11  record.

12         MR. EBELL:  Michael Ebell with the government.

13         MR. COLBATH:  Gary Colbath for Mr. Soto-Lopez.

14         THE COURT:  All right.  Good afternoon,

15  Mr. Ebell.  Good afternoon, Mr. Colbath.  Good afternoon

16  to you, Mr. Soto-Lopez.

17         Okay.  We're on today for a *Franks* hearing.

18  And as I understand it, there have been maybe a few

19  hiccups just logistically speaking with getting

20  witnesses available and how they are going to appear and

21  so forth.  So maybe just start off with some

22  housekeeping matters.

23         Mr. Ebell, where are we at on your witnesses?

24         MR. EBELL:  We should be fine.  Defense counsel

25  has agreed to allow two telephonic witnesses.  There was

1    -- I think the hiccup was just figuring out whether they

2    are calling or we're calling, but the clerk has their

3    phone numbers.  They are standing by and they should be

4    ready.  I believe the other two witnesses the government

5    called are probably going to be called by the defense

6    prior to that and they are here in person, so there

7    should be no issues.

8         THE COURT:  Okay.  Mr. Colbath, where are we at

9    on your witnesses?

10        MR. COLBATH:  Housekeeping-wise, Your Honor,

11   the first two witnesses I think are sort of mutual

12   witnesses and they are live witnesses.  I then have two

13   witnesses, two additional fact witnesses.  They had

14   intended to appear virtually if we had a link or we were

15   set up for that.

16        It appears we don't, and so they are on standby

17   as well and we can call them telephonically I guess and

18   proceed in that fashion just when we get to that point

19   as we're progressing.

20        Madam Clerk has the number for the first one,

21   and we'll alert him.  He's on standby when -- he would

22   be witness number three.  And then the next one I might

23   need a few minute break to give a heads-up and get

24   numbers turned around.  And so I would have four

25   witnesses, and then it appears that the government would

1  have two additional, assuming the first two will cover

2  the ground there.

3         THE COURT:  Realistically, do the parties

4  anticipate we'll be able to get through all of --

5  everybody's evidence this afternoon?  No wrong answer.

6  I just want to get a sense of it.

7         MR. COLBATH:  I think that's a long shot, but

8  possible.

9         MR. EBELL:  I would agree.  It seems feasible,

10  Your Honor, but there is -- one of the exhibits is an

11  hour long video, so I think it depends on how much and

12  how long it takes of going through that with witnesses.

13  Both parts will really have a big swing.

14         THE COURT:  Okay.  Well, we'll just take it as

15  it comes.

16         Mr. Colbath?

17         MR. COLBATH:  Right now, we only have one

18  witness in the courtroom, and I understand our

19  telephonic witnesses are obviously going to be called

20  one at a time, but to the extent it's appropriate, I

21  would request that witness sequestration apply so that

22  we don't have multiple people listening in or we don't

23  have multiple people in the courtroom.

24         THE COURT:  I think that's appropriate.  The

25  one witness that you presently have in the courtroom,

1  will that be your first witness?

2          MR. COLBATH:  Yes, sir.

3          THE COURT:  All right.  I don't know who that

4  person is, but they can remain.  And there are no other

5  witnesses in the courtroom for either of you?

6  Mr. Ebell?

7          MR. EBELL:  No.

8          THE COURT:  So witnesses will be excluded, and

9  I'll just rely on both parties to be mindful of when you

10  may have witnesses who are not presently testifying in

11  the courtroom and either just ask them to leave or ask

12  the Court to ask them to leave.

13          Okay.  Any other housekeeping?

14          MR. COLBATH:  Your Honor, I would ask the Court

15  -- this is obviously the second evidentiary type hearing

16  held before Your Honor.  There was a previous

17  evidentiary hearing held January 28, 2020.  The

18  transcript of that -- that transcript of that hearing is

19  found at Docket 52.

20          And the first two witnesses here today provided

21  previous testimony.  They were the only two witnesses in

22  that hearing, and I would ask the Court to take notice

23  of that or incorporate, to the extent it's relevant,

24  that prior testimony into this record.

25          THE COURT:  I think that's appropriate.  I

certainly think the Court can take judicial notice of a

prior transcript.

Mr. Ebell, any objection to that?

MR. EBELL: No, Your Honor.

THE COURT: That will be the order.

MR. COLBATH: Your Honor, I, at this time,

would call Trevor Howard to the witness stand. And I

would ask if during examination to keep me close to a

microphone and also sort of keep my germs, if you will,

on my area, if I could stay seated and at counsel table

during all of the examination.

THE COURT: That's absolutely fine.

Mr. Howard, sir, if you could come on up to the

witness stand, just remain standing and be sworn.

MR. EBELL: I would just move to be able to

make objections while seated for the same reasons.

THE COURT: Absolutely. Yes.

(Oath administered to the witness)

DEPUTY CLERK: For the record, can you please

state your full name and then spell your full name.

THE WITNESS: Trevor Howard, T-r-e-v-o-r,

H-o-w-a-r-d.

DEPUTY CLERK: Thank you.

THE COURT: All right. Mr. Colbath, you may

inquire.

            MR. COLBATH:  Thank you, Your Honor.

         TREVOR HOWARD, DEFENSE WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. COLBATH:

    Q.  Good afternoon, Mr. Howard.

    A.  Good afternoon.

    Q.  You are the same Trevor Howard that testified

previous in this matter on January 28th of last year; is

that right?

    A.  That's correct.

    Q.  And you recall being here and that testimony?

    A.  Yes.

    Q.  At the time you were employed by the Alaska State

Troopers.  You're not employed by them any longer; is

that correct?

    A.  That is correct.

    Q.  You resigned on December 21st of last year, 2020?

    A.  Yes.

    Q.  And prior to the last time you were scheduled to

testify, and then as you testified, did you meet with

either Mr. Ebell or somebody from the U.S. Attorney's

Office to sort of prepare and go over questioning for

that hearing?

    A.  For today?

    Q.  No, for your prior testimony.

1    A.   Yes.

2    Q.   And then that was my next question.  For today,

3  did you do the same thing, either earlier today or

4  sometime prior to today, did you again meet with the

5  U.S. Attorney's Office to prepare for the hearing?

6    A.   Yes.

7         MR. COLBATH:  And, Your Honor, I guess to the

8  extent necessary, I would request that the Court allow

9  me under Rule 611 of the Rules of Evidence and under

10 Rule 12 of Criminal Procedure to, as necessary, have

11 some leeway to ask questions in the form of cross

12 examination, given Mr. Howard's affiliation with the

13 government and his former law enforcement status.

14         THE COURT:  I understand the request.  I tend

15 to take a pretty, I guess, conservative approach to

16 that.  If Mr. Howard begins being deliberately difficult

17 or obstructionist in responding to your questions, I

18 would certainly consider such a request, but from what I

19 have seen so far, I have no reason to think that he will

20 act in such a way.

21         MR. COLBATH:  Sure.

22         THE COURT:  At this time, I would deny the

23 request without prejudice.

24         MR. COLBATH:  Okay.  And to the extent -- I

25 obviously recognize the Court needs to have the evidence

firsthand from the witness's mouth, so I'm not intending
to do a strict cross examination. Just to move us
along, we don't have a jury or anybody else, and so I
just made the request based on his affiliation.

THE COURT: Understood. And just to clarify my
earlier comments, I am all in favor of efficiency and
moving us along. So take that for what it's worth.

MR. COLBATH: Thank you, Your Honor.

BY MR. COLBATH:

Q. So Mr. Howard, I think at the time of your last
testimony, you were not only a trooper, but you were
living down on the Kenai Peninsula where you currently
reside in what community?

A. Currently?

Q. Yes.

A. Kenai.

Q. And are you employed?

A. I am not.

Q. I want to just jump in, because the focus of this
hearing is a little bit narrower and different than the
the last hearing we had, and so you recall the traffic
stop that gives rise to this case, right?

A. Yes.

Q. And that was a traffic stop you made?

A. Yes.

1    Q.  And there was -- was there a video recording of

2  that through the video technology in your patrol

3  vehicle?

4    A.  Yes.

5    Q.  And you have looked at that -- have you looked at

6  that video relatively recently?

7    A.  Yes.

8       MR. COLBATH:  Your Honor, I'm going to offer

9  for purposes of this hearing Defendant's Exhibit D-6,

10  which is the video.  It was a previous exhibit as well,

11  a government exhibit at the last hearing, but I'm going

12  to offer D-6.  That is a CD that contains the entire

13  video, although I'll only be playing and questioning a

14  portion of it with Mr. Howard.

15       THE COURT:  Okay.  So that's the in-car camera

16  video.

17       MR. COLBATH:  That is the in-car camera video

18  and it's for this hearing been submitted and marked as

19  D-6, Exhibit D-6.

20       THE COURT:  Mr. Ebell, any objection to D-6?

21       MR. EBELL:  No, Your Honor.

22       THE COURT:  Without objection, D-6 is admitted.

23       (Exhibit No. D-6 admitted.)

24       MR. COLBATH:  Thank you.

25  BY MR. COLBATH:

1    Q.  If we could cue that video up, D-6, and jump

2  forward to about 1430.  And then just stop it when you

3  get it running there.

4        While he's pulling that up, Mr. Howard, during

5  the initial part of the traffic stop, did you learn that

6  Mr. Soto-Lopez was on parole?

7    A.  Yes.

8    Q.  And did you have occasion to call his parole

9  officer or contact somebody with parole services?

10   A.  Yeah, I had my dispatch center conduct that phone

11 call.

12   Q.  And was some type of parole search requested or

13 authorized for you to do?

14   A.  Yes.

15   Q.  And you did that?

16   A.  Correct.

17   Q.  Okay.  We're going to try to pull this up and get

18 us to 1430 or so, and I'll just -- when it pulls up, I'm

19 going to let it play for a second or two and then have

20 it stopped, and see if you can identify about where we

21 are during the traffic stop.

22        I think it is you're doing the parole search, but

23 I just want you to see if you can identify that.

24        (Exhibit D-6 playing in open court.)

25 BY MR. COLBATH:

1      Q.  Stop that there.

2          So can you identify about where we are in the

3  process here?

4      A.  Yes.

5      Q.  And where are we?

6      A.  The beginning of the probation search.

7      Q.  Okay.  And where is Mr. Soto-Lopez at this time?

8      A.  Detained in the rear of my patrol vehicle.

9      Q.  And by "detained," you mean he's handcuffed and

10 seated inside your vehicle?

11     A.  Correct.

12          MR. COLBATH:  Can you just run this.

13          (Exhibit D-6 continues playing in open court.)

14 BY MR. COLBATH:

15     Q.  And what are you doing here?

16     A.  What's that?

17     Q.  What are you doing here?

18     A.  I'm conducting the search.

19     Q.  Where are you looking?

20     A.  In the front of the vehicle, looks like the

21 center console.

22     Q.  And what are you looking for?

23     A.  The alcohol, I believe it was.

24     Q.  Okay.

25          (Exhibit D-6 continues playing in open court.)

BY MR. COLBATH:

Q.  Are you looking for other things other than alcohol?

A.  What's that?

Q.  Are you looking for other things other than alcohol?

A.  I believe it was just the alcohol that probations requested.

Q.  Okay.

(Exhibit D-6 playing in open court.)

BY MR. COLBATH:

Q.  In the course of searching the front seat, did you find any alcohol?

THE COURT:  Mr. Colbath, I'm sorry, hang on just a second.  My fear is that there is a fair amount of traffic noise in this video, and I appreciate that you want to just let it run because there is a lot of fairly insignificant footage, but I'm afraid that we won't be able to pick up what the witnesses are saying if the video is running while witnesses are talking.  So we probably need to pause the video if you're going to inquire or if a witness is going to answer.

MR. COLBATH:  Very well, Your Honor.  Leave it paused there, if you would.

BY MR. COLBATH:

1    Q.  Do you ever end up finding any alcohol?

2    A.  No.

3    Q.  While you're searching the front seat, both

4  driver's side and passenger's side, do you find any

5  illegal items that you do end up seizing, not finding

6  any alcohol?

7    A.  Yes.

8    Q.  What do you find?

9    A.  There was suspected heroin that I located.

10   Q.  Okay.  Drug paraphernalia, anything in that

11  regard?

12   A.  Yes.

13        (Exhibit D-6 continues playing in open court.)

14  BY MR. COLBATH:

15   Q.  So we're at about 17 minutes on the video and

16  you're on the passenger side of the car.  You have

17  already discovered the suspected heroin, correct?

18   A.  Correct.

19   Q.  You had found that when you were searching from

20  the driver's side?

21   A.  Yes.

22   Q.  And where?

23   A.  Center console.

24   Q.  And when you found it, or shortly after, did you

25  notify anybody that you had found what you suspected to

be illegal drugs?

A.   I don't recall.

Q.   Okay.  I saw at around -- right at around the 15 mark, so a couple minutes -- as you switched sides of the vehicle, were you wearing a microphone or a radio?

A.   A radio.

Q.   I saw you reach to your shoulder and talk on the radio as you left one side and went to the other side. Would that have been you calling to dispatch?

A.   Yeah.

        MR. COLBATH:  You can let that run.

        (Exhibit D-6 continues playing in open court.)

        MR. COLBATH:  Stop that right there.

BY MR. COLBATH:

Q.   You're continuing your search here in the back seat.  Are you continuing to look for alcohol?

A.   Correct.

Q.   Given that you have now found what you suspect to be heroin, which would be a controlled substance, that would have been evidence of a crime?

A.   Yes.

Q.   Separate from the parole search at that point?

A.   Correct.

Q.   As you go in the back seat here, would you now be looking still just for alcohol, or would you be looking

1    for other things as well?

2        A.   Well, I haven't found any alcohol yet, so I'm

3    still looking for a probation violation, obviously.

4        Q.   Okay.

5        A.   So --

6        Q.   And did the discovery in the front seat of heroin

7    change the scope or expand the scope at all of your

8    search as you moved to other areas of the vehicle?

9        A.   Yes.

10       Q.   How so?

11       A.   There could have been more controlled substances

12   in the vehicle.

13       Q.   So once you found heroin in the front seat, you

14   were on the lookout for more drugs because you had now

15   been alerted to that?

16       A.   Yeah.  I mean obviously it was going to be in the

17   back of my mind.

18            MR. COLBATH:  Let that run, please.

19            (Exhibit D-6 continues playing in open court.)

20            MR. COLBATH:  Stop that there, if you would.

21   BY MR. COLBATH:

22       Q.   Do you recall what it is you're searching there?

23       A.   I don't recall.  It looks like a plastic bag

24   maybe.

25       Q.   Do you recall generally that -- and we may be

able to see it once you move -- that there was some

cases and a backpack and a plastic bag, a number of

containers, I guess, if you will, in the rear of the

vehicle?

    A.  Yes.  There was a lot in there.

    Q.  And are you continuing to search for alcohol,

watching out for more drugs at this point as well?

    A.  Yes.

    Q.  Okay.

       (Exhibit D-6 continues playing in open court.)

       MR. COLBATH:  Stop that there.

BY MR. COLBATH:

    Q.  You see the orange backpack next to the generator

that your hand is on there?

    A.  Yes.

    Q.  And then there is -- it's hard to see with the

picture, but there is items behind the white paper bag

and the orange backpack as well, isn't there?

    A.  Yes.

       MR. COLBATH:  Go ahead.  Thank you.

       (Exhibit D-6 continues playing in open court.)

BY MR. COLBATH:

    Q.  I did not see you remove or find any drugs or

alcohol or anything during that, looking in the rear of

the vehicle at that point; is that true?

1      A.   That's true.

2      Q.   Okay.  And when you go back to the back seat

3    here, when you first open that rear passenger door and

4    looked on the back seat, was the back -- did the back

5    seat contain a lot of items, or was it fairly open?

6      A.   I don't recall.

7      Q.   Okay.

8      A.   I cannot remember.

9      Q.   Now, Mr. Soto-Lopez was alone in this car, right?

10   There was never another person you dealt with here?

11     A.   Mr. Lopez was alone.

12     Q.   Okay.  And the back seat of the car was not

13   folded down or otherwise -- it was in its normal

14   passenger position, if you will?  Is that how you found

15   it?

16     A.   Yes.

17          MR. COLBATH:  Go ahead.

18          (Exhibit D-6 continues playing in open court.)

19          MR. COLBATH:  Can you stop that.

20   BY MR. COLBATH:

21     Q.   Could you hear any of that, Mr. Howard, any of

22   what you said there to dispatch or whoever it was you

23   were radioing?

24     A.   I was mentioning the black Mercedes driving by.

25     Q.   What was significant about a black Mercedes going

1  by?

2      A.  It was the same one going back and forth the

3  entire traffic stop.

4      Q.  It had passed you -- you noticed it pass your

5  location prior to that?

6      A.  I noticed it prior to the traffic stop as well.

7      Q.  Okay.

8          MR. COLBATH:  Go ahead and run that, please.

9          (Exhibit D-6 continues playing in open court.)

10         MR. COLBATH:  Stop us right there, if you

11  would.

12  BY MR. COLBATH:

13     Q.  When you searched the areas of the car, the front

14  seat, the back seat, and the rear, as you encountered

15  bags or containers or a compartment in the car, you

16  looked inside those areas looking for alcohol and then

17  later drugs, right?

18         MR. EBELL:  Objection; leading.

19     Q.  Did you look in the --

20         MR. COLBATH:  I can rephrase that, Your Honor.

21         THE COURT:  Just rephrase it.

22  BY MR. COLBATH:

23     Q.  As you encountered, say, the center console of

24  the car or there was a fanny pack on the front seat,

25  there was bags we talked about in the back seat, as you

1    encountered things, how many of them did you look into

2    looking for alcohol or drugs?

3        A.  I can't remember how many bags I opened.  I did

4    search the vehicle for -- at probation's request, but I

5    can't remember how many items I looked through.

6        Q.  Did you open some of them?

7        A.  I imagine, yeah.  The video showed it.

8        Q.  Okay.  And did you find -- ever find any alcohol?

9        A.  I did not.

10       Q.  Did you seize all of the drugs that you observed

11   or found or all of the drug paraphernalia that you

12   observed or found?

13       A.  That I located.

14       Q.  Okay.

15           MR. COLBATH:  You can let that run.

16           (Exhibit D-6 continues playing in open court.)

17           MR. COLBATH:  Can you stop there.

18   BY MR. COLBATH:

19       Q.  What are you doing here, Mr. Howard?

20       A.  Taking photographs.

21       Q.  Of what?

22       A.  Of the vehicle, the license plate and the items

23   that I located.

24       Q.  Do you have those items where they were found or

25   have you moved them for taking of pictures?

1    A.  I would have to look at the photographs.  I don't

2  remember.

3    Q.  Okay.

4         MR. COLBATH:  Go ahead and play that.

5         (Exhibit D-6 continues playing in open court.)

6         MR. COLBATH:  Can you stop that there?

7  BY MR. COLBATH:

8    Q.  Do you know what you did during that -- I didn't

9  hear you speaking, but you were obviously at your patrol

10  vehicle.  Do you know what you did during that time you

11  were off camera?

12   A.  I was grabbing a field test kit for the suspected

13  heroin.

14   Q.  Okay.  And as you opened the passenger door here

15  and deal with things there, is that where you ran the

16  field test?

17   A.  Correct.

18   Q.  And how did it come back?

19   A.  Positive.

20   Q.  For?

21   A.  Heroin.

22   Q.  All right.  Is your search concluded at this

23  point?

24   A.  Yes.

25         (Exhibit D-6 continues playing in open court.)

1          MR. COLBATH:  Can you stop there and show me

2     what time we're at.  Could you jump about three minutes

3     forward.  That's good.

4     BY MR. COLBATH:

5        Q.  And you're running the field test right now,

6     correct?

7        A.  (No audible response).

8             (Exhibit D-6 continues playing in open court.)

9             MR. COLBATH:  Can you stop that and show me

10    what time we're at.

11    BY MR. COLBATH:

12       Q.  Mr. Howard, do you know at what point in this you

13    requested dispatch to locate or call a tow truck?

14       A.  I don't recall.

15       Q.  Do you recall at what point you had -- would have

16    made the decision that Mr. Soto-Lopez was going to be

17    under arrest and that you were going to need a tow

18    truck?

19       A.  Yes, after the heroin tested presumptive

20    positive.

21       Q.  So at some point right in the area where we're

22    watching is where you would be talking about?  Once you

23    knew it was heroin, your intention would have been to

24    arrest him then; is that what you're saying?

25       A.  Correct.

1    Q.   And then you'd know you needed a tow truck?

2    A.   Correct.

3         MR. COLBATH:  If you could jump forward to

4    about three minutes, about 28-ish something.  That's

5    fine.  That's fine.

6         (Exhibit D-6 continues playing in open court.)

7         MR. COLBATH:  Can you stop there.

8    BY MR. COLBATH:

9    Q.   Was that the field test kit that was in your --

10   that you were carrying when you went one side to the

11   other?

12   A.   Yes.

13   Q.   Did you only conduct one field test or was there

14   any other things that you tested?

15   A.   I just conducted one.

16   Q.   Okay.

17        MR. COLBATH:  Go ahead.

18        (Exhibit D-6 continues playing in open court.)

19        MR. COLBATH:  Can you stop there.

20   BY MR. COLBATH:

21   Q.   Could you tell what items you were carrying in

22   your hand as you walked back to your patrol vehicle?  We

23   can back that up, too, if we want, just a hair.

24   A.   Yeah, if you don't mind.

25        (Exhibit D-6 continues playing in open court.)

1    A.   Looks like the baggies, test kit, and something

2    else.

3    Q.   Okay.  Do you recall seizing the scale?

4    A.   Oh, a scale, that's what it was.

5    Q.   Okay.

6         MR. COLBATH:  You can run that for a minute.

7         (Exhibit D-6 continues playing in open court.)

8         MR. COLBATH:  Okay.  Go ahead and stop there.

9    BY MR. COLBATH:

10   Q.   Mr. Howard, I'm not going to ask you about any

11   more of the remainder of the video other than this:  At

12   this point, am I right that -- I think you said the

13   searching -- your search of the vehicle is completed at

14   this point?  You don't go back and search any more after

15   this, that you recall?

16   A.   I don't believe so.

17   Q.   Okay.  And I saw you take photographs of items on

18   the front driver's side and passenger's side, but no

19   photographs inside the back seat or inside the rear of

20   the vehicle.  Your photographing is done at this point?

21   A.   Yes.

22   Q.   And then you told me you ran the field test of

23   the one suspected heroin you had and you carried some

24   items from the car back.  That's all the evidence you

25   collected from the car, right?

1      A.   Yes.

2      Q.   And so your interactions or dealings with the

3  inside of the vehicle concluded at this point?

4  Everything past this was you dealing with

5  Mr. Soto-Lopez?

6      A.   Yes.

7      Q.   On this -- at the scene?

8      A.   Right.

9      Q.   And ultimately, did you clear the vehicle?

10     A.   Clear it?

11     Q.   Yes.

12     A.   You mean -- I guess I'm confused by the question.

13     Q.   My recollection is at some point I hear you on

14  the radio say the vehicle is cleared for tow, and that

15  was a term you used, "the vehicle is cleared."

16     A.   I don't recall if I said that or not.  If it's on

17  the video --

18     Q.   If you said that, what would you have meant by

19  that?

20     A.   The vehicle is cleared?  I usually only say that

21  if there is no one else in the vehicle.  If we're doing

22  like a felony stop or something, you got to clear a

23  vehicle out.

24     Q.   Okay.  Who selected the tow company?

25     A.   I believe it was dispatch.

1    Q.  All right.  And do you recall that it was ASAP

2    Towing that was ultimately dispatched out to the scene

3    and a driver named Ira Beck?

4    A.  Yes.

5    Q.  Okay.  Were you familiar with ASAP Towing prior

6    to this incident?

7    A.  No, I was not.

8    Q.  Do you know who an individual named Patrick or

9    Pat Mize, M-i-z-e, is?

10    A.  No.

11    Q.  How about Mr. Beck, Ira Beck, did you know him

12    prior to this incident?

13    A.  I did not.

14    Q.  Had you had, to your knowledge, any interaction

15    with Mr. Beck prior to this?

16    A.  No.

17    Q.  Were you there when Mr. Beck arrived on this day,

18    March 24th, or had you already left the scene?

19    A.  I had already left the scene.

20    Q.  Okay.  When you left the scene, was there another

21    officer that waited with the vehicle?

22    A.  Yes.

23    Q.  And when you asked dispatch to order a tow, was

24    it your intention that the vehicle would be seized for

25    further searches or law enforcement investigation, or

1    was it your intention to -- that the vehicle would be

2    turned over to the tow company to hold for the owner?

3        A.  To hold for the owner.

4        Q.  So your legal purposes at this point, when we see

5    you now back in your patrol car, you were done with the

6    Honda Pilot?

7        A.  Yes.

8        Q.  And you were -- were you a trooper -- this was

9    March 24th of 2019.  Were you a trooper on the Peninsula

10    in that area on January 18th of 2019, so about two,

11    three months before this?

12        A.  Yes.

13        Q.  Did you have any involvement in an incident that

14    gave rise to a bunch of charges against Mr. Beck?  Was

15    that an arrest you made or an investigation that you

16    were involved in, that you're aware of?

17        A.  No.

18        Q.  Okay.  And had you heard either on this day or

19    the next day, March 24th or 25th, from any of the other

20    troopers, any information about Ira Beck?

21        A.  No.

22        Q.  When did you -- so what did you do after this?

23        A.  I waited for Trooper King to respond to stay with

24    the vehicle.

25        Q.  Once he responded, where did you ultimately go?

1 A. To Seward, the Seward jail.

2 Q. And after -- that was to secure Mr. Soto-Lopez at

3 the jail?

4 A. Yes.

5 Q. And then where was your post at?

6 A. It's in Seward.

7 Q. In Seward?  I'm sorry.

8 A. Yes, in Seward.

9 Q. And after going to the jail, where did you go?

10 Are those the same place?

11 A. It's just a block away.

12 Q. Okay.  Did you go back to post after the jail?

13 A. I did.

14 Q. And did you learn at some point that Mr. Beck or

15 that somebody from the tow company had contacted

16 dispatch further about the vehicle?

17 A. Yes.

18 Q. When did you learn that?

19 A. It was later that day, a couple hours later, I

20 believe.

21 Q. You were still on shift, working?

22 A. Yes.

23 Q. And so that would have been the evening of

24 March 24th or late afternoon or early evening of

25 March 24th?

1  A. Correct.

2  Q. And when you learned that, do you recall what

3 information you learned initially?

4  A. Yes.

5  Q. What was it?

6  A. That Mr. Beck had located what he believed to be

7 methamphetamine in the vehicle.

8  Q. Okay. And what did you do when you learned that?

9  A. I contacted the on-duty sergeant in Soldotna just

10 to get more clarification on what I should do. I had

11 never ran into that situation, so --

12  Q. What do you mean by "that situation"?

13  A. Where a tow company had located additional

14 narcotics inside a vehicle that I had impounded.

15  Q. Were you surprised or suspicious, or how did you

16 feel about that given that you had just searched the

17 vehicle before you turned it over to them?

18  A. I was upset.

19  Q. Upset, you said?

20  A. Yes.

21  Q. Say more about that. Upset why?

22  A. Because I missed it.

23  Q. That was your assumption, was they had been there

24 all along and you missed it?

25  A. Yeah.

1    Q.   Okay.  So what did you do -- you called your

2  sergeant and what happened then?

3    A.   He wasn't my sergeant.  He's just the on-duty

4  sergeant for the Peninsula.  And I went to him for

5  clarification, and he said I needed to type up a search

6  warrant to seize those drugs.

7    Q.   Okay.  And did you -- what did you do after you

8  talked to the sergeant?

9    A.   I ended up writing a search warrant.  I don't

10  remember if that was that day or the following day, but

11  it was one of those two days.

12    Q.   Okay.  We'll look at that.  Before we get to

13  that, did you talk to your dispatch about Mr. Beck's

14  report, get any of the specifics about his report to

15  dispatch, that is Beck's report to dispatch?

16    A.   Yeah, I believe dispatch notified me that Beck

17  had notified them.

18    Q.   Okay.  And was there a time while you were still

19  on shift on March 24th that you actually reached out and

20  called Mr. Beck to get more information?

21    A.   Yes.

22    Q.   Would that have been after you talked to the

23  sergeant?

24    A.   I don't recall if it was before or after.

25    Q.   Certainly it was before you wrote the search

warrant, because you referred to it in the search

warrant affidavit?

    A.   Correct.

    Q.   Other than to call Mr. Beck, and we'll talk about

that -- well, let's talk about that first.

        Tell the Court everything that you can recall

about your phone conversation with Mr. Beck.

    A.   He had said he located what he believed to be

methamphetamine about the size of his fist in a small,

like an oval container in the rear of the vehicle.

    Q.   That's what you remember of the conversation?

    A.   Yes.

    Q.   You didn't ask him -- did you ask him how he knew

this was methamphetamine?

    A.   I did not ask him how he knew that.

    Q.   Okay.  Now, before you -- did you call Mr. Beck

from the post, from the trooper post?

    A.   Yes.

    Q.   And so you had access to a recorder, you could

record the conversation if you chose to?

    A.   Yes.

    Q.   You did not record it?

    A.   It was not recorded.

    Q.   Okay.  And you had access to a computer and

dispatch at the post?

1    A.  Yes.

2    Q.  Dispatch by radio, or are they located in the

3  same building?

4    A.  By radio.

5    Q.  And from the computer that you have at post, you

6  have access to the ACCOMS system and other research-type

7  programs that you utilize as a trooper?

8    A.  I personally have never used ACCOMS.  We use

9  APSIN.

10    Q.  Maybe I misspoke.  APSIN.  Okay.  And you would

11  have had access to APSIN then from the post?

12    A.  Yes.

13    Q.  And other than to get Mr. Beck's contact

14  information from dispatch, did you ask dispatch for any

15  other information relative to Mr. Beck, that you recall?

16    A.  I'm sorry.  Can you repeat that question?

17    Q.  Sure.  Well, first of all, how did you know how

18  to get ahold of Mr. Beck?

19    A.  Through dispatch.

20    Q.  Other than to get the phone number or the contact

21  information from dispatch, they had already told you he

22  had called, correct?

23    A.  Correct.

24    Q.  Other than those two pieces of information, did

25  dispatch give you any more detail about Mr. Beck that

1    you recall?

2        A.   No.

3        Q.   Did you ask them to do any investigative things

4    or ask dispatch to get you any more information about

5    Mr. Beck?

6        A.   No, I did not.

7        Q.   Instead you called him directly?

8        A.   Correct.

9        Q.   And that was a conversation you just told us

10   about, he found this oval case?

11       A.   Yes.

12       Q.   And did you ask Mr. Beck anything about his

13   familiarity with controlled substances specifically with

14   meth, because that's what he said he found?

15       A.   I did not.

16       Q.   Okay.  Were you aware of whether or not Mr. Beck

17   had ever provided this type of informant-type

18   information to the police on prior occasions?

19       A.   This is the first time I ever dealt with

20   Mr. Beck.

21       Q.   Okay.  And you didn't have any collateral

22   information then that he was known to law enforcement or

23   otherwise had or had not provided information?

24       A.   No.

25       Q.   And I assume then, did you not -- you didn't ask

1  him whether he had done that at all?

2  A.  No.

3  Q.  Did you take handwritten notes or any form of

4  notes, typed or handwritten, of your conversation with

5  Mr. Beck?

6  A.  I don't recall if I did.

7  Q.  If you had, what would you have done -- would

8  they have been handwritten or would it have been

9  something that you as a matter of practice typed into a

10  computer or typed on the note section of your phone or

11  something?

12  A.  Handwritten in my notebook.

13  Q.  You kept a trooper notebook in your vehicle that

14  logged your work activities?

15  A.  Yeah, in my pocket.

16  Q.  Okay.  And if you had taken notes of your

17  conversation with Mr. Beck, where would they be?

18  A.  In my notebook.

19  Q.  And is that something, a record or a document or

20  an item that the troopers, in your experience, retained

21  or kept?

22  A.  Yes.

23  Q.  Do you have any knowledge of whether in fact --

24  you said you don't remember whether you took notes.

25  Have you ever seen notes from that conversation or

reviewed your notebook to see if they were there?

    A.   I have not reviewed it.

    Q.   Okay.  Do you remember how long your conversation
was with Mr. Beck?

    A.   I believe it was pretty brief.

    Q.   Okay.  Did you -- prior to talking to Mr. Beck,
did you review the dispatch logs relating to their
contact with Mr. Beck?

    A.   Prior to ever speaking with Mr. Beck on the
phone?

    Q.   Yes.

    A.   Have I reviewed their dispatch logs?

    Q.   Yes.

    A.   No.

    Q.   After you spoke with Mr. Beck on late afternoon,
early evening of March 24th, do you know when it was
that you would have authored the search warrant request?

    A.   After my conversation, I would have authored it.

    Q.   Okay.

         MR. COLBATH:  Can we show him Defendant's
Exhibit No. 1?  And, Your Honor, for the record, I would
move the admission of Defendant's Exhibit No. 1.

         For clarification purposes, when I originally
filed this motion, this second motion to suppress, I had
attached an Exhibit No. 1, and it was a multipage search

warrant document. I did not have Trooper -- I learned
later in the process I did not have Trooper Howard's
actual search warrant request; I had a combination of
subsequent requests.

So this document, Exhibit No. 1, is a five -- I
believe five pages. Document D-1 for our hearing is
different than Exhibit No. 1 to my motion and should
replace it.

I subsequently was provided by Ms. O'Leary the
actual relevant search warrant, and so I didn't want
there to be confusion. Here in Exhibit D-1 is
Mr. Howard's search warrant request and I would move its
admission.

MR. EBELL: No objection.

THE COURT: All right. Thank you, Mr. Ebell.
I just want to make sure the record is clear. So this
D-1, it was not an attachment to any of your prior
motions practice; is that right?

MR. COLBATH: No, Your Honor, it was not.
Prior to the -- when we had this hearing scheduled
before, by then, I had discovered the mistake, and I
think we marked it as Exhibit No. 1 at that time and
intending it to be a hearing exhibit.

But in the motions practice, if there is a
search warrant or a series of search warrants that are

Exhibit No. 1, those were in error and this intends to

replace those.

THE COURT:  Thank you.  I think that's clear

enough.  Without objection, Defense Exhibit D-1 is

admitted.

(Exhibit No. D-1 admitted.)

BY MR. COLBATH:

Q.  So can you go -- first of all, Mr. Howard, do you

recognize this?

A.  Yes.

Q.  And is that -- is the form -- do you physically

when you make -- when you used to make search warrant

requests, do you have to type every word like we see

here on page one, or is there some kind of form you had

access to as a trooper to make these requests on?

A.  We use templates like this.

Q.  And do you recognize this template?

A.  Yes.

Q.  Can you go to the back page of it, which I think

is page five.

Do you remember how long your shift or what shift

you were working on March 24th?  I think the traffic

stop was at like 2:45 in the afternoon.

A.  I worked two different shifts during the week.  I

couldn't tell you what shift I was on that day.

1    Q.  Okay.  So we have on the screen the last page of

2  Exhibit D-1.  There is no timestamp, if you will, that I

3  can see, but do you recognize your signature here on the

4  final page?

5    A.  Yes.

6    Q.  And where you have signed, that's swearing it

7  under oath, correct?

8    A.  Correct.

9    Q.  And can you see the date there?  It appears to me

10  to be 25th day of March 2019.

11    A.  That's the date that the fax came through.  I

12  don't recall if I wrote it on that day or not.  Every

13  fax is timestamped like that, so --

14    Q.  Okay.  Look at the signature block.  Right above

15  your signature block where you -- you would have signed

16  it before you sent it off, correct?  When you submitted

17  the request, you sign it under oath and then submit it,

18  correct?

19    A.  Correct.

20    Q.  And do you see right above your signature is your

21  printed name and right above that is 25 day of

22  March 2019?

23    A.  Oh, yes, I do see it.

24    Q.  So would I be right in assuming that you wrote

25  this the day following -- at some point after midnight

1  on the day of the traffic stop?

2      A.  Yes.

3      Q.  And do you know whether you in fact wrote it the

4  actual next day or just after midnight?

5      A.  The actual next day.

6      Q.  Okay.  So it would have been --

7      A.  Either 8:00 a.m. or 2:00 p.m. is when my shift

8  started.

9      Q.  Okay.  It looks like the fax transmittal came

10  back to the trooper post at 9:24 in the morning.

11     A.  Yeah, so it was most likely that morning.

12     Q.  So you wrote it sometime after 8:00, faxed it

13  off.  Was it your experience that you -- it was possible

14  to get this back within an hour or so, hour and a half?

15     A.  Yes.

16     Q.  So that makes sense to you that you wrote it the

17  morning of March 25th, faxed it off, and within an hour

18  and a half, received a fax back authorizing the search

19  warrant?

20     A.  Yes.

21     Q.  Can you back up to page one of the exhibit.

22         You see the eight items listed there, Mr. Howard?

23     A.  Yes.

24     Q.  Now, as you wrote this search warrant and made

25  this request, you knew that the Honda Pilot, the car

that had been towed was taken to ASAP Towing, right?

A.  Yes.

Q.  When you were on the phone with Mr. Beck at the conclusion of the phone call, did you instruct him to bring the vehicle to trooper post?

A.  I believe it was my sergeant who requested that. Well, not my sergeant, the sergeant on duty that day, the day prior.

Q.  So somebody told Mr. Beck, either you or another -- somebody above you to bring the vehicle to the trooper post?

A.  Correct.

Q.  And that would have been obviously before this search warrant request, because this was written the next day?

A.  Yes.

Q.  And from the time you put him in the car until you booked him into the jail and thereafter, Mr. Soto-Lopez had no access to the Honda Pilot, he was in jail?

A.  That is correct.

Q.  And he had a probation or parole hold as well as new charges?

A.  Yes.

Q.  And probation or parole would have been a no bond

situation until he appears in front of parole?  Were you

aware of that?

    A.   Correct.  That is correct.

    Q.   Were you at -- still at post the evening of the

traffic stop, so the 24th?  Were you still at post when

Mr. Beck brought the vehicle in?

    A.   I worked out of Seward post.

    Q.   Okay.  And where did he take the vehicle?

    A.   Soldotna.

    Q.   Okay.  So on the day of the 24th, the day you

arrested Mr. Soto-Lopez and searched the vehicle, did

you see the vehicle again that day?

    A.   I did not.

    Q.   Okay.  The next morning, March 25th, you came to

work, you think at 8:00, and you would have authored

this search warrant request.  Had you seen the vehicle

since you left the scene of the traffic stop when you

authored Defendant's Exhibit No. 1?

    A.   No.

    Q.   Do you know whether anyone questioned Mr. Beck

further at the Soldotna post when he brought the vehicle

to them on the 24th?

    A.   I don't know.

    Q.   Okay.  Do you know if any investigation was done

related to the vehicle by officers on the 24th at the

1  Soldotna post?

2      A.  I'm not aware.

3      Q.  Have you been provided any more information about

4  statements from Mr. Beck or investigation done by other

5  officers when you wrote the search warrant request?

6      A.  No.

7      Q.  Do you know, was there a reason you didn't write

8  this the evening of the 24th right after you talked to

9  Mr. Beck and waited until the next morning?

10     A.  If I would have gotten off -- if I would have

11 been working from 8:00, I get off at 6:00, and I believe

12 that's around the time that I spoke with Mr. Beck.

13         And the vehicle was being transported from

14 Mr. Beck's impound yard to the Soldotna trooper post at

15 a secured location, so it wasn't necessary for me to

16 conduct the search warrant immediately.

17     Q.  Because the vehicle had already been seized?

18     A.  Yes.

19     Q.  Had you drafted a request for search warrants

20 prior to this one?

21     A.  Yes.

22     Q.  And using the same template?

23     A.  Yes.

24     Q.  And were you familiar with the eight items listed

25 there on the page one of Defendant's Exhibit No. 1 that

outlines the information suggested that the search

warrant should contain?

A.  Yes.

Q.  If you look -- do you have a way, Mr. Vang, to

blow up number four there, center of the page?  There,

we can see that a little better.

If we look at number four, Mr. Howard, as you

read that or review that, that would have been

information here in our -- in your case, information

coming from Mr. Beck?

A.  Yes.

Q.  And you would agree with me that you did not

provide -- your search warrant request did not have any

information regarding why you or the magistrate should

rely on Mr. Beck's information?

A.  Why we should rely on it?

Q.  Yes.  Number four says, "Reasons for" -- you

should list, "reasons for relying on the informant's

information should be set out."

You did not list any reasons in your request why

the informant's information should be relied on,

correct?

A.  No, I did not.

Q.  Relative to your training and experience, the

only training you listed relative to drug investigations

1  was your general training that you had received at the

2  trooper academy, correct?

3      A.  Yes.

4      Q.  Okay.  And that's because at that point in your

5  career, you were about four years in, three years in?

6      A.  Four.

7      Q.  And you had not -- beyond the academy, you had

8  not received any other drug investigation specific

9  training?

10     A.  That is correct.

11     Q.  When you talked to Mr. Beck, did you ask him if

12  he himself had any either pending criminal charges or

13  past criminal drug convictions?

14     A.  I did not.

15     Q.  And so you would agree with me then obviously you

16  didn't report -- if any of those things existed, you did

17  not put them in your search warrant request?

18     A.  Correct.

19     Q.  And you did not -- prior to putting this request

20  together or while you were putting it together, you did

21  not run an APSIN report or do any investigation

22  regarding Mr. Beck to include good or bad in the

23  request?

24     A.  I did not.

25     Q.  You had access to the facilities to run such a

1   request, you just didn't?

2       A.  Correct.

3       Q.  Now -- you can take that down.

4           This information, one through eight, it indicates

5   that in number two you should provide a sequence of

6   events, and you generally did that, correct?  You

7   describe the flow of the traffic stop for the

8   magistrate, correct?

9       A.  Yes.

10      Q.  And can we look at the next page, Mr. Vang?  I'm

11  sorry.  Go one more page.  It would be page three of

12  Defendant's Exhibit No. 1.

13          Now, you didn't -- you've testified that the

14  drugs that you found were in the front console and front

15  passenger -- or front passenger side of the car,

16  correct?

17      A.  Yes.

18      Q.  And you related that to the magistrate judge

19  here, correct?

20      A.  Yes.

21      Q.  You did not tell the magistrate court in your

22  search warrant request that you had searched both the

23  back seat as well as the rear of the vehicle, did you?

24      A.  No, I did not.

25      Q.  Instead after -- can you blow up the middle front

right there from about during the search?  Keep going

down.  Keep going.  Right there.  Just blow that up.

So in the narrative here it describes during your

search you found Ziploc baggies of heroin, and that you

took photos of those things.  But then the 12 to

15 minutes of video we watched while you searched the

other part of the car and found nothing, you left that

part out, because the next thing described here is the

Nick (phonetic) test.  Do you see that?

MR. EBELL:  Objection, Your Honor.  I think the

document speaks for itself and asking for, I suppose,

the witness to draw a legal conclusion of what was left

out of an exhibit that's here.

THE COURT:  I don't think it's a legal

conclusion.  The witness wrote the affidavit, so he has

familiarity with facts that are not included in the

affidavit.  He can certainly testify that they are not

there.  That's a factual statement.

So on that basis, the objection is overruled.

Go ahead, sir.

BY MR. COLBATH:

Q.  You left out the additional searches before the

Nick test, correct?

A.  The search of the back seat and the rear of the

vehicle, yes.

1    Q.  And did you have a specific reason not to tell

2    the magistrate that you searched those areas?

3    A.  Not a specific reason.  I have never had an issue

4    with it in any other search warrant affidavit.

5    Q.  Okay.  And you described then going back to the

6    vehicle to read Rey his *Miranda* rights.  You see that?

7    A.  Yes.

8    Q.  And that's about where we stopped the tape,

9    right?

10   A.  Yes.

11   Q.  And then down at the bottom you see ASAP Towing

12   responded to take possession of the vehicle?

13   A.  Yes.

14   Q.  Did you tell the magistrate in your request or

15   include anywhere in your request that your conclusion

16   after searching the car was that it could be released to

17   the owner and only user quantities of drugs were

18   discovered?

19   A.  Did I include that in the search warrant

20   affidavit?

21   Q.  Yes.

22   A.  No.

23   Q.  Okay.  Can you drop out of that and go to the

24   bottom at approximately 1600 hours.  You see that at the

25   very bottom, bottom five lines?  There you go.

1      We're still on page three of Exhibit D-1,

2  Mr. Howard.  This is the portion of your narrative in

3  your affidavit request where you begin telling the

4  magistrate about the information you learned from

5  Mr. Beck, correct?

6      A.  Correct.

7      Q.  And read that last line for me there.

8      A.  "Ira advised while doing their own inventory of

9  the vehicle, he located a blue-ish color oval."

10     Q.  Did you talk to Mr. -- to anyone other than

11 Mr. Beck?

12     A.  Where, at the --

13     Q.  Right, from the tow company.

14     A.  No, only Mr. Beck.

15     Q.  And do you know who the "their" you're referring

16 to is, or is that just --

17     A.  The company.  I'm just referring to the company.

18     Q.  Okay.  And in fact, that statement is not true,

19 is it?  Mr. Beck never told you anything about an

20 inventory search?  He didn't use that term?

21     A.  I couldn't answer that question.  I don't know

22 what he said.  It wasn't recorded.

23     Q.  It wasn't recorded, right?

24     A.  It was not recorded.

25     Q.  And you don't know whether you took notes?

1  A.  Correct.

2  Q.  And you didn't write this until the next day?

3  A.  Yep.

4  Q.  And ASAP Towing doesn't do inventory searches; do

5  you know that?

6  A.  I did not know that.  I have no idea.

7  Q.  Okay.  Would the reason -- you're familiar with

8  the legal term "inventory search," correct?

9  A.  Correct.

10  Q.  That would have been something you heard -- would

11  that have been something you heard about or learned

12  about in your police training?

13  A.  Yes.

14  Q.  And the reason that you said these drugs were

15  found as -- was the reason you said these drugs were

16  found during an inventory search is to try to make it

17  look like it was done during some legal process or give

18  it more indicia of being legal?

19  A.  That was not my -- that was not my prerogative.

20  Q.  Well, if it turns out that Mr. Beck did not tell

21  you he did an inventory search so that this is false,

22  what was your reason for providing something false to

23  the magistrate?

24  A.  I don't know if Ira said that.

25  Q.  Okay.

1    A.   I can't be 100 percent sure that he did not say

2  that.

3    Q.   Okay.  Can we look at the next page?  So that

4  would be page four of defendant's exhibit.  Pull that

5  up.  This is -- the first paragraph, the top paragraph

6  there is the continuation and the complete -- completion

7  of your description of your conversation with Mr. Beck,

8  right?

9    A.   Yes.

10    Q.   And if you review that first line, where did you

11  tell the magistrate that Mr. Beck reported he found the

12  drugs?

13    A.   In the rear of the vehicle.

14    Q.   Where in the rear?

15    A.   I didn't specify.

16    Q.   You specified they were hidden in the rear,

17  correct?

18    A.   Correct.

19    Q.   But in fact, Mr. Beck did not tell you that they

20  were hidden in the rear of the vehicle, did he?

21        MR. EBELL:  Objection; leading.

22        THE COURT:  That's fine.  The witness can

23  answer.

24    A.   I don't recall the conversation word for word

25  with Mr. Beck.

1    Q.  Well, did you put in your search warrant

2   affidavit that it was reported these were hidden in the

3   rear of the vehicle as a means of covering why you

4   purportedly missed these drugs or why you didn't find

5   them?

6    A.  No, this is not verbatim.  This is not

7   transcribed from anything, so I can't say whether or not

8   Mr. Beck said these specific words word for word.

9        Obviously, I have my own writing style, and this

10  is a -- you know, I talked to him on the phone and I

11  wrote what the conversation was about.

12   Q.  But you understand, Mr. Howard, that a -- first

13  of all, you're swearing to the accuracy of this under

14  oath so you need to kind of get it right.  You

15  understand that?

16   A.  Yes, I understand.

17   Q.  You knew that at the time?

18   A.  Yes.

19   Q.  And you also understood that a judge was relying

20  on this to evaluate whether to give you this search

21  warrant you were requesting?

22   A.  Yes.

23   Q.  And did you understand that the details mattered,

24  getting it specifically right makes a difference?

25   A.  Yes.

Q.   Okay.  And you watched the video here a few
minutes ago.  That's Exhibit D-6 in this case.  And you
saw yourself search both sides of the back seat.  If
this oval container of drugs had been laying on just the
back seat of the car with a bag of methamphetamine
approximately the size of a fist sticking out of it, you
would have saw that laying on the back seat during your
search, correct?

A.   Correct.

Q.   Now, you could have missed it if it was hidden in
the rear, but you wouldn't have missed it on a back
seat.  Do you agree with that?

A.   I agree with that.

Q.   Okay.  And really the last thing you told the
magistrate about Mr. Beck's report or his actions was
that Mr. Beck put the methamphetamine and the case back
inside the vehicle and that's when he contacted police?

A.   Yes.

Q.   Now, in fact that also was not true, because
Mr. Beck did not take the case out of the vehicle.  Did
you know that?

A.   I did not.

Q.   Again, that would have been an explanation that
might have helped explain why you missed it; is that
true?

1    A.  If he didn't take it out of the vehicle?

2    Q.  Right.  Well, you told the magistrate that he

3 did, and the reason you told them that is if it's in a

4 different location, that would explain why you missed

5 it.  That's why you provided that inaccurate

6 information?

7    A.  Okay.

8    Q.  Is that true?

9    A.  Like I said, I don't remember exactly.  This was

10 over two years ago now.  I can't recall whether the

11 conversation -- I don't remember.

12    Q.  When you made this request to the magistrate, do

13 you agree with me that the Honda Pilot was in law

14 enforcement custody at this time?  This is the morning

15 of March 25th.

16    A.  Yes.

17    Q.  And did you later go participate in the search or

18 have you seen the pictures from the search that was

19 done?

20    A.  I saw pictures from the search.  I did not

21 participate.

22    Q.  Do you recall seeing the picture that when the

23 vehicle was brought to the trooper post by Mr. Beck, the

24 blue oval case that you described as being hidden in the

25 rear of the vehicle was lying in the middle of the back

passenger seat?  Do you recall seeing that photo?

A.  I do.

Q.  And you did not tell the magistrate that that's where the drugs, the oval case that you're describing was located?  Do you agree with that?

A.  Yes.  I'm assuming if it was there I would have seen that fist size bag of methamphetamine sitting on the rear of the vehicle under a seat.

Q.  Now, your testimony is that from the time you left the scene of the traffic stop until the time you applied for the search warrant the next morning, you did not see the Honda Pilot, correct?

A.  That is correct.

Q.  And your testimony is that from the time you left the traffic scene until the time you made this request, you did not get any investigative material or have any conversations about more investigation with the troopers from the Soldotna post --

A.  Correct.

Q.  -- about the car?

A.  Yes.

Q.  Your only information was from Mr. Beck?

A.  Yes.

Q.  And Mr. Beck's information was there is drugs in a blue oval case?

1     A.   Yes.

2     Q.   In the last paragraph here though -- strike that.

3          Earlier your testimony when we were watching the

4     video was the car was full of different containers.  We

5     talked about a backpack; you remember that?

6     A.   Yes.

7     Q.   And a white plastic bag?

8     A.   Yeah.

9     Q.   Or a plastic bag.  And some boxes and fanny packs

10    and things in the front seat and the rear, all over the

11    place?

12    A.   Yes.

13    Q.   In the back -- the bottom of exhibit -- the end

14    of Exhibit D-1, where you request the search warrant,

15    you asked to again search the car, correct?

16    A.   Yes.

17    Q.   And its contents, including a safe?

18    A.   Yes.

19    Q.   Now, of all the things in the car, you singled

20    out a safe, but you hadn't seen the car since you left

21    the traffic stop.  How is it you know to single out the

22    safe?

23    A.   You're right.  I guess I forgot.  There was

24    someone -- I don't remember exactly who -- said that

25    there was a safe in the rear of the vehicle.

1    Q.   Someone?

2    A.   Yes.  A trooper.

3    Q.   So someone in law enforcement?

4    A.   Yes.

5    Q.   So before you made this request, somebody else,

6    they had been in the car?

7    A.   They may have seen it from the outside.  I have

8    no idea.

9    Q.   You don't remember?

10   A.   I don't remember.

11   Q.   So think about then -- because that's different

12   than your previous testimony about you didn't get any

13   investigative information.  What else might they have

14   told you or is there anything else you're sure that they

15   may have provided you in addition to there is a safe in

16   the car that you can remember, anything else?

17   A.   No, I can't remember.

18   Q.   And of all the things discussed -- or of all the

19   things located in the car, was that the only thing they

20   drew your attention to?  Whoever this law enforcement

21   trooper was that you talked to, was the safe the only

22   thing they drew your attention to?

23   A.   To write in the search warrant?

24   Q.   Or just told you about.

25   A.   I don't remember everything.  Like I said, I

1  don't recall.  I don't recall.

2  Q.  Would it make sense to you that because the safe

3  is the only container of many containers you know are in

4  the car, the safe is the only one you included, it was

5  the only one they pointed out to you?  If you agree with

6  that, do; and if you don't know, don't, but --

7  A.  I don't know.

8  Q.  All right.  And you know now after the fact, it

9  just so happens that the only container you made

10  reference to, that was where additional drugs and guns

11  were found in the safe?

12  A.  Yes.

13  Q.  And your testimony would be that that was a

14  coincidence?  Of all the things in the car, that was the

15  one thing specifically you included to ask to search?

16  A.  Yes.

17  Q.  Mr. Beck was not the one -- was Mr. Beck the one

18  that had singled out the safe or told you, or are you

19  sure by your memory it would have been somebody in law

20  enforcement?

21  A.  Someone from law enforcement.

22  Q.  You said you resigned from the troopers on

23  December 21st of 2020, correct?

24  A.  Yes.

25  Q.  And prior to that, sometime in the early fall of

1    2020, did you become aware that Alaska State Troopers

2    were conducting an internal investigation regarding your

3    work performance as a trooper?

4        A.   Yes.

5        Q.   And you participated -- did you participate in

6    that investigation?

7        A.   Yes.

8        Q.   Did they interview you?

9        A.   Yes.

10       Q.   Who interviewed you?

11       A.   Bendigo (phonetic) Evans.

12       Q.   I'm sorry?

13       A.   Bendigo Evans.

14       Q.   What position is that or role is that person?

15       A.   He works for the Office of Professional

16   Standards.

17       Q.   Okay.  And ultimately, that investigation was

18   concluded in that office making findings, correct?

19       A.   Correct.

20       Q.   And they cited you for a number of -- they made a

21   number of findings regarding I think what was called

22   policy violations.  Do you recall that?

23       A.   Yes.

24       Q.   What were those?  What policies did they

25   determine you had violated?

1    A.  I would have to see a copy of my administrative

2 investigative findings.

3    Q.  You don't recall any of them?

4    A.  I recall some of them.

5    Q.  Tell me the ones you recall.

6    A.  Well, the main reason was dishonesty.

7    Q.  Okay.  And in fact, you had had a pattern of

8 providing false information or lying to both dispatch

9 and/or supervisors or other people within your

10 employment?

11    A.  To dispatch.

12    Q.  Okay.  Which other ones do you remember?

13    A.  Unbecoming conduct.

14    Q.  And what did they find was unbecoming?

15       MR. EBELL:  Objection, Your Honor.

16       THE COURT:  What's the basis for the objection?

17       MR. EBELL:  I believe this inquiry should

18 remain -- goes to the credibility of the witness and

19 should remain restricted to the findings directly

20 correlated to honesty.

21       THE COURT:  Mr. Colbath?

22       MR. COLBATH:  Your Honor, without knowing -- I

23 mean conduct unbecoming an officer sounds to me like

24 something that the Court could certainly evaluate as

25 drawing into question a witness's credibility.  And so I

don't know the answer to the question, because I wasn't

provided the information.  This is my opportunity to

inquire of it.  And so --

THE COURT:  Essentially, Mr. Colbath, if I

understand you, what you're saying is that conduct

unbecoming is a pretty broad umbrella and it could

subsume all manner of underlying conduct, some of which

could hypothetically go to credibility, other which may

not.

MR. COLBATH:  Much of which I would say could

go to credibility depending on the answer.

THE COURT:  I think it depends on the answer.

What I'll do is I'll overrule the objection subject to

the witness's answer, and I'll certainly consider a

renewed objection depending on what the answer is.  So

go ahead and reask your question and the witness may

answer.

A.  It was completely off-duty conduct.  It was --

it's really personal to me, so I don't know how personal

I need to get.

Q.  You need to tell us what the unbecoming -- the

nature of the unbecoming conduct was, if you could

classify it as a nature or --

MR. EBELL:  I'm going to renew the objection,

Your Honor.  I think the Court has already ruled that

this doesn't go to honesty, Your Honor.

THE COURT: I'm inclined to sustain the objection if it is strictly limited to Mr. Howard's off-duty conduct and there is no nexus with his work, then, yeah, I think it's appropriate to sustain the objection. So next question.

BY MR. COLBATH:

Q. While off duty, you knowingly committed law violations; is that true?

A. It was not -- it was not -- that was not my intention. It was not my intention to do so. I can talk about that.

I thought I was going to get a haircut at somebody's house, and I knocked and no one came to the door. And I rang the doorbell and no one came to the door. So I opened the door and yelled for their name. And they were shocked and I was kind of caught off guard, because I thought I was going to get a haircut and whatnot.

And so I just decided to leave and that was that. So what the troopers found was that I had trespassed.

Q. And albeit off duty, there were other times during your tenure as being employed with the Alaska State Troopers you broke the law?

MR. EBELL: Objection, Your Honor. The

government's position is very strong that this line of
questioning should remain restricted to the honesty
findings and the investigation related to Mr. Howard's
honesty and not a general fishing expedition into any
potential law violations.

THE COURT:  Frankly, I'm inclined to agree.  I
think unless it goes more directly, or at least more
directly to Mr. Howard's tendency to tell the truth,
then I am inclined to see it as just not relevant.

And it does -- I'm never fond of the term
"fishing expedition," but it does sound as though that's
what this is.  So the objection is sustained.

BY MR. COLBATH:

Q.  At the conclusion of the investigation, you were
given a performance evaluation report, correct?

A.  Yes.

Q.  And you saw that.  In fact, you signed it in
January of this year?

A.  Yes.

Q.  And without going through it all, the conclusion
-- the overall rating was unacceptable?

A.  Correct.

Q.  And you were found to not be eligible for rehire?

A.  Yes.

Q.  And you resigned on December 21st, as we have

said, and you have not worked in law enforcement since?

    A.  Correct.

    Q.  And had you not resigned, you knew from the
conclusion of the investigation that the troopers would
have fired you?

    A.  Yes.

            MR. COLBATH:  I have no other questions.

            THE COURT:  Thank you, Mr. Colbath.

            Mr. Ebell, you may inquire.

            MR. EBELL:  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. EBELL:

    Q.  Thank you, Mr. Howard.

        Let's go ahead and start where we just left off.
There was an investigation involving I think dishonesty
between you and dispatch?

    A.  Yes.

    Q.  What was the nature of that?

    A.  Location.

    Q.  What was that?

    A.  My location.

    Q.  Your location.  Why?  Let me just go through
this.  In fact, the investigation was about your
location while you said you were on duty?

    A.  Yes.

1     Q.   You reporting to be on duty when you were still

2   at home?

3     A.   Yes.

4     Q.   And you taking lunch breaks that were overly --

5   that were longer than you were allowed?

6     A.   Correct.

7     Q.   One of the ways that they did this investigation

8   was to -- they could actually look at the location of

9   your trooper-issued vehicle?

10    A.   Correct.

11    Q.   And they had a history of that location of the

12  trooper-issued vehicle going back quite a ways?

13    A.   Right.

14    Q.   Do you know how far back they were able to look

15  at that location?

16    A.   No.

17    Q.   And so by looking at that and looking at your

18  login dates, they were able to find times when your

19  vehicle was at home when you said you were on patrol as

20  a trooper?

21    A.   Yes.

22    Q.   Did they find any dishonesty relating to any

23  investigations?

24    A.   No.

25    Q.   Dishonesty relating to any interviews with

1  witnesses?

2     A.   No.

3     Q.   Any vehicle stops or arrests?

4     A.   No.

5     Q.   Any dishonesty relating to search warrant

6  affidavits or charges that were referred for

7  prosecution?

8     A.   No.

9     Q.   The dishonesty finding related to -- well, to

10 your timecard effectively?  Is that a fair summary?  I

11 mean did you have a timecard as a trooper?  Is that

12 something you kept?

13    A.   No, we don't have timecards.

14    Q.   When you were supposed to start duty at 8:00 in

15 the morning, you would radio dispatch and say, "I'm on

16 duty, I'm ready to go."  Is that fair?

17    A.   Yes.

18    Q.   And then what about when you went on break for

19 lunch, would you say, "Hey, I'm on break," is that what

20 you do?

21    A.   Yes.

22    Q.   So this investigation related to you doing that

23 at times when that wasn't necessarily accurate?

24    A.   Yes.

25    Q.   You said they looked back, they were able to look

1  at the location of your vehicle and find --

2  (indiscernible - fast, distorted speech).

3      When was the earliest date that the troopers

4  found an incident related to the location of your

5  vehicle either for lunch or the start of your shift,

6  that you remember?

7      A.  December of 2019.

8      Q.  2019 -- December of 2019 was the earliest date

9  where they found any incident.  Do you remember what

10  that incident was?

11     A.  39-minute lunch break.

12     Q.  So in December of 2019, they found you took --

13  how long was your lunch break allowed to be?

14     A.  30.

15     Q.  That's approximately nine months after the

16  incident you're here to testify about today, correct?

17     A.  Yes.

18     Q.  Do you know how the government, my office came to

19  be aware of this investigation and this investigation

20  into you?

21         MR. COLBATH:  Your Honor, I'll object as to

22  speculation, calling for speculation.

23         THE COURT:  Well, he just asked if the witness

24  knows, so I think that's not speculative.  He either

25  knows or he doesn't.

1    A.   Yes, I do know.

2         THE COURT:  Clearly the next question would be

3    how he knows.  That may be speculative.

4    BY MR. EBELL:

5    Q.   (Indiscernible - fast, distorted speech).

6         You did -- this hearing that you're here to

7    testify for today was actually scheduled to happen at an

8    earlier date, correct?

9    A.   Correct.

10   Q.   And you met with my colleague, Allison O'Leary,

11   to discuss your testimony in this hearing?

12   A.   Yes.

13   Q.   And during that inquiry, she asked you whether or

14   not there was anything in your history related to --

15   what did she ask you that caused you to -- did you tell

16   her about this investigation?

17   A.   Yes.

18   Q.   Based on your observation of her and her

19   questions, did she appear to know about that

20   investigation before you told her?

21        MR. COLBATH:  Your Honor, I'll object as to

22   relevance and speculation.

23        THE COURT:  It is definitely speculative.

24   Sustained.

25   BY MR. EBELL:

1    Q.   What was her reaction when you told her?

2         MR. COLBATH:   I'll object as to relevance.

3         THE COURT:   What is the relevance of her

4    reaction?

5         MR. EBELL:   I think I'm just establishing that

6    as far as Mr. Howard's credibility is concerned, he is

7    the one who brought this issue forward, both --

8    voluntarily brought this issue forward to our office and

9    the Court before testifying.

10        THE COURT:   Well, whatever Ms. O'Leary's

11   reaction may have been, unless he somehow had knowledge

12   that she wasn't aware of these facts -- I think what

13   you're trying to demonstrate is he was being forthcoming

14   in disclosing something that the U.S. Attorney's Office

15   wouldn't otherwise know about, but there is no

16   foundation that he wasn't aware that the U.S. Attorney's

17   Office didn't know, so it lacks foundation and it is at

18   this point irrelevant.   Sustained.

19        MR. EBELL:   Understood, Your Honor.

20   BY MR. EBELL:

21   Q.   Let me ask you about March 24th.   Well, actually

22   I'll just go ahead -- when you told Ms. O'Leary about

23   this investigation, prior to that, had she indicated, by

24   asking any particular questions, indicated that she had

25   any knowledge of this investigation to you?

1          MR. COLBATH:  Your Honor, again, I'll object as

2     to relevance.  I mean, this is a *Franks* hearing.  I'm

3     not making the argument about some improper disclosure

4     or misconduct by the government.

5          MR. EBELL:  I don't know if I can respond

6     briefly, Your Honor.

7          THE COURT:  Go ahead.

8          MR. EBELL:  I'm just trying to answer the

9     question of the point -- Your Honor is correct.  The

10    question here is whether or not Mr. Howard was being

11    forthcoming.  His forthcomingness comes from whether or

12    not he thought the government already knew this or not.

13    If he subjectively thought the government did or didn't,

14    it affects how forthcoming it was for him to come

15    forward with the information.  That's effectively what

16    my question is.

17         THE COURT:  I mean, insofar as much of the

18    tenor of the direct examination of the witness went to

19    his credibility, his tendency for truth telling,

20    Mr. Ebell's question is to one degree or another an

21    attempt to rehabilitate the witness.

22         If the witness was shown to be less than candid

23    on earlier occasions demonstrating that he was

24    forthcoming on other occasions to some degree is

25    relevant to his rehabilitation, so I will allow limited

questioning in this area. So the objection is
overruled. Go ahead, Mr. Ebell.

BY MR. EBELL:

Q. I'll try to rephrase this, Mr. Howard. When you
told Ms. O'Leary about this investigation, had she
indicated one way or the other whether or not she
already knew about it?

A. No.

Q. Did you at that time think that she already knew
about it?

A. No.

Q. You have been testifying about March 24, 2019,
when you conducted a traffic stop on Mr. Soto-Lopez for
speeding. I'm going to ask you about that now at this
time. Where was that stop?

A. Near Skilak Lake Road, an unmarked entrance.

Q. You were pretty familiar with that area?

A. Yes.

Q. Been a trooper for about four years?

A. Almost six.

Q. Six years. Were all of those years out of
Seward?

A. Two were out of Fairbanks.

Q. Two years in Fairbanks and then almost four years
in Seward?

1    A.  Yes.

2    Q.  Prior to your testimony here today, what did you

3  review prior to your testimony?

4    A.  My report and the video.

5    Q.  And the video.  Did I show you some pictures as

6  well?

7    A.  Yes.

8    Q.  Do you remember one of those is kind of a map of

9  the area of Soldotna?

10    A.  Yes.

11    Q.  Could we --

12        MR. EBELL:  Your Honor, I move to publish

13  what's been marked as Government's Exhibit No. 1 and

14  previously filed for the witness to take a look at and

15  authenticate.  Can we take a look?

16        THE COURT:  All right.  I have that here.

17  Mr. Colbath, any objection?

18        MR. COLBATH:  No, Your Honor.

19        THE COURT:  All right.  Government No. 1

20  without objection will be admitted.

21        (Exhibit No. 1 admitted.)

22  BY MR. EBELL:

23    Q.  Mr. Howard, can you see that, Government 1 in

24  front of you?

25    A.  Yes.

1    Q.  What is that?

2    A.  That is a -- that's directions to Soldotna from

3  the stop, the location of the stop.

4    Q.  So just for record, there is kind of a blue line

5  in the middle of this picture.  You say the location of

6  the stop.  Is that the white dot on the right side of

7  the picture?

8    A.  Yes.

9    Q.  And approximately what does the red flag indicate

10  or the area around the red flag?

11    A.  That's the city of Soldotna.

12    Q.  That's where Soldotna is, but that's not where

13  your station was, right?

14    A.  No, it's not.

15    Q.  Where is your station relative to this picture?

16  Can you describe it?

17    A.  It's downtown Seward.  It's not located on the

18  map.

19    Q.  Which direction is it?

20    A.  Southeast.

21    Q.  About how long of a drive?

22    A.  From Soldotna or the location of the stop?

23    Q.  Location of the stop.

24    A.  Probably about an hour.

25    Q.  And this particular exhibit has this blue line.

1  Are you familiar with about how long that drive is from

2  the location of the stop to just downtown Soldotna?

3      A.   Yes.

4      Q.   About how long is that from your familiarity?

5      A.   About 40 minutes.

6          MR. EBELL:  So I think Your Honor did admit

7  this.  I don't know.  I was just trying to publish it.

8          THE COURT:  It is admitted.

9          MR. EBELL:  Thank you, Your Honor.

10 BY MR. EBELL:

11     Q.   I'd also ask, Mr. Howard, if we could go over the

12 video that you looked at.

13         MR. EBELL:  I guess I would ask to pull up

14 what's marked and labeled as Exhibit No. 5, although I

15 would say that it is identical to Exhibit D-6.  So I'm

16 not going to move to admit it, but just because my

17 support staff, Exhibit No. 5 is what they have ready to

18 go, I'm asking to use Exhibit No. 5 for the

19 demonstrative in court, Your Honor.

20         THE COURT:  Okay.  And Mr. Colbath, do you

21 agree that Government Exhibit No. 5 is identical to

22 Defense D-6?

23         MR. COLBATH:  That's the full video.

24         THE COURT:  The in-car camera.

25         MR. COLBATH:  I agree, and we certainly don't

1    need two in there.

2              THE COURT:  All right.  That's fine.  Thank

3    you, Mr. Ebell.  You may go ahead.

4    BY MR. EBELL:

5        Q.  I'm going to have the same problem as Mr. Colbath

6    of wanting to question while the video is running.  I'll

7    try to have it paused.

8              THE COURT:  It's almost like a white noise

9    effect with the traffic noise in the background, so do

10   try to pause.

11       Q.  Mr. Howard, we're at the beginning of -- I will

12   refer to it as Exhibit D-6 for clarity for the record,

13   since that's the admitted exhibit.

14            The beginning of Exhibit D-6, what are we seeing

15   here?  What's this, Mr. Howard?

16       A.  I'm parked on the side of the road conducting

17   speed enforcement.

18       Q.  Okay.  We can actually go ahead and skip to a

19   minute 1210, or approximately 1210.  Look at that.

20            Go ahead and play here.  Thank you.

21            (Exhibit D-6 playing in open court.)

22   BY MR. EBELL:

23       Q.  It looks like the audio on this is low enough.  I

24   think that will be fine, Your Honor.  I can go ahead and

25   question since there is no audio here.

1      Mr. Howard, we started, we're about 1227 for the

2 record, and then this is where you're beginning your

3 search of the vehicle; is that correct?

4      A.  Correct.

5      Q.  You have gotten relayed through dispatch

6 permission from parole to conduct a search for alcohol?

7      A.  Yes.

8      Q.  And that's what you're doing at this point?

9      A.  Yes.

10      Q.  Go ahead.  We can go ahead and skip to 1720.

11          So you're moving to the back seat; is that right?

12      A.  Yes.

13      Q.  Had you found the suspected heroin at this point,

14 do you remember?

15      A.  Yes.

16      Q.  Go ahead and pause it for a second.

17          About how long do you think you have that back

18 door open there?

19      A.  A few seconds.

20      Q.  You didn't do a very thorough search of that back

21 seat area, did you?

22      A.  No.

23      Q.  You didn't have time to open any containers?

24      A.  No.

25      Q.  Didn't look underneath the back seats?

1    A.  No.

2    Q.  Underneath the front seat from the back?

3    A.  No.

4    Q.  In between cushions or where the seatbelts might

5 be?

6    A.  No.

7    Q.  And at this point, you had already found

8 suspected heroin, and I think you testified that as long

9 as that tested presumptive positive it actually was

10 heroin, your intention at that point would be to arrest

11 Mr. Soto-Lopez?

12    A.  Yes.

13    Q.  What was going on with the Mercedes?

14    A.  It was traffic via back and forth on the traffic

15 stop several times.

16    Q.  Why did that have your attention, if it did?

17 Well, did that have your attention?

18    A.  Yes.

19    Q.  I mean you noticed the Mercedes.  Did you notice

20 -- could you remember any other cars that were driving

21 by during this stop?

22    A.  No.

23    Q.  So why do you remember the Mercedes in

24 particular?

25    A.  Well, right before I stopped Mr. Lopez, it had

gone by at a low rate of speed, well under the speed

limit, and also had a taillight out.  It was the only

car there, so it was kind of -- you know, most cars that

are traveling by themselves typically go the speed

limit, but it was kind of odd that it was going slow.

Q.  Do we see that that you're referring to at any

time in this video?

A.  Yes.

Q.  I'm sorry.  So you saw it drive by before.

Anything else about the Mercedes that kept your

attention?

A.  Not at that time.  So I saw Mr. Lopez going 80.

I pulled him over.  And then I saw the Mercedes come

back and then go back, go northbound and southbound

several times during the traffic stop.

Q.  This is while you're searching the vehicle?

A.  Yes.

Q.  Where is the nearest other trooper at this point?

A.  Ground Point, which is about 30 miles away.

Q.  Did you know what Mr. Soto-Lopez was on parole

for?

A.  Yes.

Q.  What was that?

A.  Murder, robbery and assault.

Q.  To be fair, Mr. Soto-Lopez told you that

initially -- in your initial contact with him, correct?

A. Yes.

Q. So you have someone who is on parole for murder in the back seat of your car and a car driving back and forth. How did you feel about that?

A. Nervous.

Q. Nervous. Did that impact your search of the vehicle?

A. Yes.

Q. We can go ahead and continue playing here. This is actually perfect.

(Exhibit D-6 continues playing in open court.)

BY MR. EBELL:

Q. 1740 you open the back of the vehicle. When you were looking in the back hatch of the vehicle, did you notice the safe at this point, do you remember?

A. No.

Q. I'm sorry. I asked you a compound question. Did you notice the safe at this point?

A. No.

Q. We're watching you. You have opened the back door. Do you remember -- it looks like you're fiddling with the radio on your shoulder. What are you doing there?

A. I think I was trying to run the plate, have

1    dispatch try and locate who the person was, but I don't

2    remember if I had the whole plate or not.

3        Q.   Okay.  So you just saw yourself look around in

4    the back of the vehicle.  That entire time when you had

5    the back hatch open and you went to the back seat, that

6    was about one minute, wasn't it?

7        A.   Yeah.

8        Q.   Is that enough time to open all the containers in

9    the back of that car?

10       A.   No.

11       Q.   Or even lift up or look underneath all the

12   containers?

13       A.   No.

14       Q.   I mean, why not, Mr. Howard, at this point?  I

15   mean, I'm not trying to be belligerent, but why didn't

16   you spend more time with the vehicle?

17       A.   I didn't know why the Mercedes kept driving back

18   and forth.  You know, I'm out here by myself and I have

19   got someone who is convicted for homicide in the back of

20   my car and I have got some drugs in this car, and there

21   is a black Mercedes driving back and forth that's

22   suspicious.

23       Q.   Did you radio for someone to stop that black

24   Mercedes?

25       A.   Yes.

1    Q.  Go ahead.  We can hit play.  I don't think it's

2 worth it to try and skip ahead since these are so close

3 together.

4        (Exhibit D-6 continues playing in open court.)

5 BY MR. EBELL:

6    Q.  So at this point, you're photographing the back

7 of the vehicle?

8    A.  Yes.

9    Q.  And then you're photographing the front seat; is

10 that correct?

11    A.  Yes.

12    Q.  I think you testified on direct that at this

13 point you pretty much considered your search of the

14 vehicle complete?

15    A.  Yes.

16    Q.  So as you testified, your search of the back with

17 the back hatch open was no longer than one minute?

18    A.  Correct.

19    Q.  And you testified that your time looking in the

20 back seat was even less than a minute?

21    A.  Correct.

22    Q.  You conduct a field test for, we saw on direct,

23 for an extended period of time over on the passenger

24 side of the vehicle?

25    A.  Yes.

1    Q.  Did you Mirandize and question Mr. Soto-Lopez?

2    A.  I did.

3    Q.  And did he make some statements about drugs?

4    A.  Yes.

5    Q.  And he said he kind of used recreationally, is

6    that what you remember?

7    A.  Yes.

8    Q.  Did that fit with what you found in the car?

9    A.  Yes.

10   Q.  It was only after that kind of interview was

11   concluded, that's when you contact about getting the tow

12   for the vehicle?

13   A.  Yes.

14   Q.  You have one more time -- I know you reviewed

15   this video, we have seen it here -- one more time when

16   you go back to the Pilot within this video.  Without me

17   going through it, do you remember what you were doing?

18       After you conduct the field test and after you

19   interview Mr. Soto-Lopez, you go back one more time.  Do

20   you remember what that was about?

21   A.  To get the key or to turn the car off and get the

22   scale and baggies and --

23   Q.  Could we go ahead and skip to 4836 -- or 4830,

24   just so we have a little bit of a run-in.  So now at

25   4830 on Exhibit D-6.  I'm just asking you to watch this

1  to see if you can remember exactly what this was about.

2         Go ahead and pause it.

3     A.   It's a cell phone.

4     Q.   There is -- so after having seen that, do you

5  remember what that trip to the car was?

6     A.   Yeah.  I think -- if I remember correctly, he

7  asked me for his cell phone, to take his cell phone with

8  him.

9     Q.   And you went and got it for him?

10    A.   Yes.

11    Q.   Did you, in that brief little instance when

12 you're in the car there, did you conduct any additional

13 searching for anything besides the cell phone?

14    A.   No.

15    Q.   We can go ahead and shut this down.

16         You testified that -- then you waited on the

17 scene for another trooper to arrive to wait with the

18 vehicle?

19    A.   Yes.

20    Q.   And you took Soto-Lopez to Seward?

21    A.   Yes.

22    Q.   Which is your station.  Was the next -- well, and

23 then at some point you spoke with Ira Beck?

24    A.   Yes.

25    Q.   How was that conversation with Ira Beck

1  initiated?

2      A.   Dispatch notified me that Ira Beck had called in

3  saying that he had found additional narcotics.

4      Q.   Okay.  So you talked with -- so dispatch talked

5  to Ira Beck and then dispatch talked to you?

6      A.   Yes.

7      Q.   And then you called Ira Beck?

8      A.   Yes.

9      Q.   And you spoke with him and he told you that he

10 found meth in the car?

11     A.   Yes.

12     Q.   Did you know Ira Beck?

13     A.   No.

14     Q.   Had you worked with ASAP Towing before?

15     A.   No.

16     Q.   And that's because they are based out of Soldotna

17 and you were based out of Seward?

18     A.   Correct.

19     Q.   When Ira Beck told you that he had found

20 something that he thought was meth in the car, did that

21 surprise you?

22     A.   Yes and no.

23     Q.   Yes and no.  Let's break it down.  You just

24 looked through the vehicle on the roadside, correct?

25     A.   Right.

1    Q.  And certainly if you had found meth, you would

2  have taken note of that?

3    A.  Correct.

4    Q.  So you hadn't found any meth?

5    A.  Yes.

6    Q.  Were there containers in that vehicle that you

7  did not look inside?

8    A.  Yes.

9    Q.  Were there places in that vehicle where you did

10  not look?

11    A.  Yes.

12    Q.  So when Ira Beck told you that he had found meth

13  in there, did you think there is no way, I would have

14  found it?

15    A.  No.

16    Q.  Did it seem suspicious at all to you that there

17  was meth found in this vehicle now?

18    A.  No.

19    Q.  Did it seem possible to you that it could be meth

20  in that vehicle that you hadn't found?

21    A.  Yes.

22    Q.  In your six years as a trooper, did you do many

23  -- did you do many drug investigations, whatever that

24  means to you, a drug investigation?

25    A.  Yes.

1    Q.  Did you ever use something -- did you ever have

2 somebody or who you would consider in your mind an

3 informant?

4    A.  No.

5    Q.  In your mind, did you think of Ira Beck as an

6 informant?  Is that a phrase you would have used to

7 refer to him?

8    A.  No.

9    Q.  Why not?

10    A.  Because from my understanding, informants are

11 trying to basically for their own benefit work for law

12 enforcement to get bigger fish, if you will.

13    Q.  Have you ever had members of the public call you

14 as a trooper to report crimes that they observed?

15    A.  Yes.

16    Q.  Would you ever act on that information from

17 members of the public as a trooper?

18    A.  Yes.

19    Q.  Did you ever -- you were a trooper.  Did a lot of

20 your job involve traffic stops?

21    A.  Yes.

22    Q.  Did you ever have people report drunk drivers to

23 you?

24    A.  Yes.

25    Q.  And have you sometimes pulled people over for

potential drunk driving based on the report of someone

calling you and telling you that they looked like they

were driving drunk?

A.   Yes.

Q.   Was it your policy to look at the criminal

history of those witnesses who called you up and

reported these things before taking action?

A.   No.

Q.   Did you ever use the statements of witnesses in

affidavits for warrants?

A.   I'm sorry?

Q.   Did you ever use -- prior to this affidavit, this

case, did you use the statements of witnesses in

affidavits to apply for warrants?

A.   Yes.

Q.   Was it your general practice to look at their

criminal history before putting their statements in a

warrant?

A.   No.

Q.   I say -- you are saying that you have done this

before.  Is there a certain number of times that you

have relied on witness statements to take action as a

trooper?  Can you tell the Court how many times you have

done that?

A.   Hundreds.

1    Q.  Are there times that you can think of that you

2  have looked up the criminal history of a witness before

3  doing that?

4    A.  No.

5    Q.  Did you ever get told that you should?

6    A.  No.

7    Q.  Had you worked with other troopers on

8  investigations or DUIs or traffic responses in these

9  contexts?

10   A.  Yes.

11   Q.  Did you see them looking up criminal history of

12 witnesses prior to taking action as a trooper?

13   A.  No.

14   Q.  Did you -- when Ira Beck called you from ASAP

15 Towing -- well, you called Ira Beck; that's correct?

16   A.  Yes.

17   Q.  So you called ASAP Towing?

18   A.  Yes.

19   Q.  So you knew his name?

20   A.  Yes.

21   Q.  And you knew where he worked?

22   A.  Yes.

23   Q.  And this was a place that the troopers had

24 contacted in order to use them to tow a vehicle for the

25 troopers?

1    A.  Yes.

2    Q.  Did you know whether or not this was someone that

3  Soldotna troopers used with any frequency or not?  Did

4  you have any knowledge of their relationship with him?

5    A.  No.

6    Q.  But you knew where he worked?

7    A.  Yeah, dispatch had told me his name, that he was

8  the tow truck driver that had come and took the vehicle.

9    Q.  Were you suspicious or questioning of what Ira

10  Beck had to tell you?

11    A.  No.

12    Q.  Did he bring up any criminal history to you?

13    A.  No.

14    Q.  Did he suggest that maybe he could get some sort

15  of favor or benefit from the troopers in any way for

16  what he was reporting to you?

17    A.  No.

18    Q.  You were specifically asked about whether or not

19  you put in any reasons to rely on an informant's

20  information in your affidavit.  I think it was number

21  four.  Do you remember that question on direct?

22    A.  Yes.

23    Q.  I think your answer was no, you didn't put in any

24  reasons to rely on the affidavit; is that correct?

25    A.  Correct.

1    Q.  You did put in -- did you put in his name?

2    A.  Yes.

3    Q.  Did you put in ASAP Towing?

4    A.  Yes.

5    Q.  Did you put in the circumstances around his

6  report to the troopers?

7    A.  Yes.

8    Q.  Did you put in that you had already found drugs

9  and drug paraphernalia in the vehicle?

10    A.  Yes.

11    Q.  And you put in that he contacted the troopers to

12  volunteer this information?

13    A.  Yes.

14    Q.  Did you feel that you conducted multiple searches

15  of the vehicle?

16    A.  No.

17    Q.  And you put in your affidavit that you searched

18  the car?

19    A.  Yes.

20    Q.  And you said on direct that you didn't

21  specifically put that you searched the back seat or the

22  back area or what parts of the car you searched.  You

23  just said searched the car; is that correct?

24    A.  Correct.

25    Q.  Do you feel like that excluded any parts of the

1  car in your affidavit?

2      A.  No.

3      Q.  Do you feel like that was incomplete or somehow

4  inaccurate?

5      A.  No.

6      Q.  But sitting here today, having seen the video, do

7  you feel like there is anything inaccurate about the

8  phrase that you searched the car?

9      A.  Yes.

10     Q.  What would you say is inaccurate about that?

11     A.  It was a bad search.  I didn't spend enough time

12 searching the vehicle.

13     Q.  So you feel like now sitting here today that you

14 should have spent more time searching more places of the

15 vehicle?

16     A.  Yes.

17     Q.  Would it be fair to say that the phrase "searched

18 the vehicle," in your mind here today, implies more than

19 what you actually did on the scene?

20     A.  Correct.

21     Q.  Could we go ahead and pull up -- I guess I would

22 move to go ahead and pull up what's been marked as

23 Government Exhibit No. 2, I think previously filed.

24 Defense specifically referenced this, I'm pretty sure,

25 this picture on direct.  So rather than maybe spending

1  time authenticating -- I don't know if there are any

2  objections.  It's the picture of the car from the

3  outside window.

4          THE COURT:  Sure.  Mr. Colbath, any objection

5  to Government 2?

6          MR. EBELL:  I mean I could -- I just have to

7  publish it to the witness for him to authenticate it.

8          MR. COLBATH:  That's fine.  Can I see it, Your

9  Honor?

10         MR. EBELL:  Can we pull up Exhibit No. 2.

11         MR. COLBATH:  Through the window of the back

12  seat?

13         THE COURT:  That's how it looks.

14         MR. EBELL:  I'll pull it up first.  I just

15  didn't want --

16         MR. COLBATH:  That's fine, Your Honor.  I have

17  no objection.

18         THE COURT:  No objection to 2?

19         MR. COLBATH:  No to No. 2.

20         THE COURT:  Government 2, without objection, is

21  admitted.

22         (Exhibit No. 2 admitted.)

23  BY MR. EBELL:

24     Q.  Mr. Howard, you see Government 2 in front of you?

25     A.  Yes.

1    Q.   Do you recognize this picture?

2    A.   Yes, I do.

3    Q.   How do you recognize this picture?

4    A.   I have been shown it a lot.

5    Q.   Who has shown you this picture?

6    A.   The courts and prosecution.

7    Q.   So did I show you a copy of it in my office?

8    A.   Yes.

9    Q.   Did Ms. O'Leary show you a copy of it?

10   A.   Yes.

11   Q.   Did any other troopers show it to you at some

12   point prior to the litigation in this case?

13   A.   No.

14   Q.   Do you see -- do you recognize that container

15   that's in Government's Exhibit No. 2?

16   A.   From during the search?

17   Q.   From any time other than this picture.

18   A.   No.

19   Q.   So you didn't see that when you were looking

20   through the vehicle?

21   A.   No.

22   Q.   And you didn't participate in the search warrant

23   search of this vehicle either?

24   A.   Correct.

25   Q.   So the first time you saw that container with

kind of the long wire off of it was when someone showed
you this picture; is that accurate?

     A.   Correct.

     Q.   Could that have been sitting on the back seat of
the car on the side of the highway when you were
conducting that search?

     A.   Could it have been?  It could have been.

     Q.   It could.  Do you -- as you remember it, you're
looking -- you have told us -- (indiscernible - fast,
distorted speech).

          As you remember it, was -- do you remember it
sitting there on that seat on the side of the road when
you were looking through the car?

     A.   I don't.

     Q.   Do you remember seeing it somewhere else in the
car when you were looking through the car?  Did you
answer that question?  I'm sorry.

     A.   Yeah.  I said no.

     Q.   Thank you.  Thanks.  We can go ahead and put down
Government's Exhibit No. 2.

          When you completed this affidavit for the search
warrant, did you think there was anything unusual about
that application?

     A.   No.

     Q.   Did you feel like you were trying to hide

1  anything from the magistrate?

2      A.  No.

3      Q.  Did you feel like you had information that you

4  didn't include in that affidavit?

5      A.  No.

6      Q.  You talked about on direct examination whether or

7  not you indicated only user quantities of drugs were

8  found, but did you include in the affidavit what you did

9  find?

10     A.  Yes.

11     Q.  And that includes an estimated quantity of heroin

12  that you found?

13     A.  Yes.

14     Q.  You didn't just say you found heroin, you said

15  how much heroin you found?

16     A.  Yes.

17     Q.  You're not an expert in drug use?

18     A.  No.

19     Q.  So would you typically put in an affidavit that

20  you were writing whether or not a quantity was user

21  amount or dealer amount or intended for distribution?

22  Is that something you have been trained to assess?

23     A.  No.

24     Q.  So in fact you just put the quantity that you

25  found?

1    A.   Correct.

2    Q.   Had you ever applied for a search warrant for a

3 vehicle just based on finding some drug paraphernalia in

4 the vehicle?

5    A.   Have I applied for a search warrant just based

6 off of drug paraphernalia?

7    Q.   Drug paraphernalia -- let me just -- yeah, drug

8 paraphernalia to search the rest of the vehicle to find

9 more?

10   A.   Yes.

11   Q.   You made the decision not to do that in this case

12 though, right?

13   A.   Right.

14   Q.   You found heroin and drug scale and syringes and

15 towed the vehicle away rather than trying to a get a

16 warrant at that point based on just that information?

17   A.   Yes.

18   Q.   Is that a quantum of information that you have

19 used to try and get warrants on vehicles in the past

20 prior to this?

21   A.   Yes.

22   Q.   Is it unusual for a safe to be in a car?

23   A.   It is unusual.

24   Q.   Is that something that a trooper conducting a

25 search might take note of?

1    A.  Yes.

2    Q.  In this case, you didn't take note of it when you

3 were looking through the car?

4    A.  No.

5    Q.  But at some point some trooper told you that

6 there was a safe in the car before you wrote the

7 affidavit is your testimony?

8    A.  Correct.

9    Q.  Now, do you -- (indiscernible - fast, distorted

10 speech) -- do you remember that now or are you assuming

11 that that must be true because you wrote "safe" in your

12 affidavit?

13    A.  I recall someone saying that there was a safe in

14 the vehicle.  I don't recall who specifically told me.

15    Q.  Do you know what -- do you know what time or --

16 well, let me -- you have learned a lot about this case.

17    Did you know at the time you were writing your

18 affidavit what time Ira Beck got the vehicle back to

19 ASAP Towing?

20    A.  No.

21    Q.  You knew what time you pulled him over, I guess,

22 and you knew what time he called you to report that he

23 had found this?

24    A.  Yes.

25    Q.  You put those times in your affidavit?

1    A.  Yes.

2    Q.  You testified that it took maybe 40 minutes to

3 drive from the location of the stop to Soldotna?

4    A.  Yes.

5    Q.  But at the time, did you know when that vehicle

6 was picked up?

7    A.  No, I did not.

8    Q.  You could have looked at the CAD to find those

9 exact times, though, to be fair, correct?

10    A.  Yes.

11        MR. EBELL:  I have no further questions for

12 Mr. Howard, Your Honor.

13        THE COURT:  All right.  Thank you, Mr. Ebell.

14        Mr. Colbath, redirect?

15        MR. COLBATH:  Briefly, Your Honor.

16                REDIRECT EXAMINATION

17 BY MR. COLBATH:

18    Q.  Mr. Howard, did I hear you say you had written

19 hundreds of search warrant requests?

20    A.  No.

21    Q.  Okay.  How many would you estimate prior to this

22 one or including this one you had written?

23    A.  In my career, total search warrants?

24    Q.  Yeah, from the start of your career up to

25 March 24th of 2019.

1    A.   That's --

2    Q.   More than ten or less?

3    A.   More.

4    Q.   More than 50 or less?

5    A.   Maybe 50 to 100.

6    Q.   Okay.  And this wasn't a DWI case?

7    A.   No.

8    Q.   And this wasn't -- how many of the 50 to 100

9    search warrant requests do you recall where they

10   involved circumstances where you made an arrest and did

11   a search and then ended up later writing a search

12   warrant request to search the very place you had already

13   searched?

14   A.   This is the first time.

15   Q.   Can we see -- could I just have you, rather than

16   switch controls, could you just pull Government Exhibit

17   No. 2 back up for me, the blue case, the last one we

18   just saw.  I think it's the only exhibit I need to see.

19        Mr. Howard, you recognize this picture as the

20   back seat of the car?

21   A.   Yes.

22   Q.   And you would agree with me that the back seat --

23   this is pretty clear, there is not many items on there?

24   A.   Correct.

25   Q.   And would you agree there is three items on

1  there?

2      A.  Yes.

3      Q.  The water bottle obviously looks like just what

4  it appears, an unopened bottle of water?

5      A.  Yes.

6      Q.  So nothing -- would there have been anything

7  suspicious about that?

8      A.  No.

9      Q.  On the far side, far left-hand side of the

10  picture, what's that look like anyway?

11      A.  Empty water bottle.

12      Q.  No.  On the far, as you look at the picture, far

13  left-hand side I'm referring to what looks to me like a

14  partially -- partial roll of tinfoil.  Is that what it

15  looks like to you?

16      A.  It looks like part of a water bottle to me.  I

17  mean, it could be tinfoil.

18      Q.  Okay.  And of course the case that we're talking

19  about or that's relevant here is right there next to the

20  water bottle?

21      A.  Yes.

22      Q.  And when you opened the -- you would agree with

23  me when you opened the back seat, if the purpose was to

24  look in the back seat of the car, and this case was

25  laying in that location, you would immediately see it?

1    A.  Yes.

2    Q.  And when you searched -- prior to the back seat,

3  when you searched the front seat, you looked in the

4  center console?

5    A.  Yes.

6    Q.  And there was a tote bag on the passenger seat

7  floor, you looked in that?

8    A.  Yes.

9    Q.  And there was a black fanny pack on the front

10  passenger seat and you looked in that?

11    A.  I think -- I'd have to look at my report.

12    Q.  Okay.  And so when you moved to the back seat and

13  opened the door, if this case had been laying in that

14  location, because there is not much else to look at, you

15  would have looked in it or looked at it at least?

16    A.  I would have seen it.

17    Q.  If there was a bag of methamphetamine the size of

18  your fist hanging out of that bag, visible -- or hanging

19  out of that case, visible just like you could see it in

20  this picture, although it's not here, you would have saw

21  that, don't you agree?

22    A.  I agree.

23    Q.  Because moments before you had found drugs in the

24  front seat?

25    A.  Yes.

1    Q.  And other than -- did I understand your testimony

2    that other than being shown this picture well after the

3    fact, you don't recall ever seeing that case?

4    A.  Correct.

5    Q.  So would it be your opinion that at the time you

6    did the search, the case wasn't in that position, it

7    wasn't there on the back seat?

8    A.  Correct.

9    Q.  I guess I understand your testimony to be that

10   your overall search of the vehicle you feel was

11   insufficient.  Is that a fair word?

12   A.  Yes.

13   Q.  Meaning it wasn't thorough enough or it wasn't

14   long enough or what would you mean by that?

15   A.  Both.

16   Q.  Okay.  And do I understand your answer to all the

17   questions about the black Mercedes to be the reason your

18   search was insufficient was because you hurried it too

19   much because of your nervousness about this black

20   Mercedes?

21   A.  Yes.

22   Q.  Did you have any other reason that you would say

23   -- and we'll talk about the black Mercedes in a minute,

24   but before we talk about that, can you tell the Court

25   about any other reason why, having found drugs in the

1  front seat, you would do less than a complete search of

2  the rest of the vehicle?

3      A.  No.

4      Q.  Am I right that once you found drugs and you were

5  going to arrest Mr. Soto-Lopez, you didn't do an

6  incomplete search because you had in your mind, oh, I'm

7  going to request a search warrant and search this car

8  again so I don't need to be complete here at the scene?

9  You never thought anything like that, did you?

10      A.  No.

11      Q.  So with reference to the black Mercedes, about

12  the third time or multiple times it went by, you

13  actually radioed to another trooper to see if somebody

14  could respond to the area and stop that car, didn't you?

15      A.  Yes.

16      Q.  And that happened, didn't it?

17      A.  Yes.

18      Q.  And that trooper communicated to you once he had

19  the vehicle stopped, the black Mercedes stopped, you

20  became aware of that through radio traffic and

21  communication with that trooper?

22      A.  Yes.

23      Q.  And you were still on the scene there with

24  Mr. Soto-Lopez?

25      A.  Yes.

1    Q.  And you learned that the driver of the black

2    Mercedes, they checked out who that was and that he said

3    Mr. Soto-Lopez was following him because of that

4    taillight that was out that you had already observed?

5    A.  Yes.

6    Q.  So I presume that fit in your mind, at least a

7    little bit?  You knew the guy had a taillight out?

8    A.  Yes.

9    Q.  And at that point, that trooper checked out with

10   the Mercedes what he could check out and did not -- fair

11   to say he did not find any law violations or anything to

12   hold or arrest that person?

13   A.  Correct.

14   Q.  And so at least up until -- at the conclusion of

15   that point, if you -- you then had to feel more

16   comfortable about the situation, okay, that's handled,

17   the guy is following because of a taillight, there is

18   nothing else going on there?

19   A.  Yes.

20   Q.  So if you wanted to go back to the Honda Pilot

21   before you left the scene or felt like you got rushed

22   through things, you had every opportunity to go back and

23   do a more thorough search or complete a search or do

24   whatever else you wanted before you left the scene, the

25   tow truck wasn't there yet?

1    A.  Like a second search?

2    Q.  Yeah.

3    A.  I could have, I guess, conducted a second search,

4    yeah.

5    Q.  I mean if you felt, gee, I got rushed through

6    that or I should have took more time but that Mercedes

7    made me nervous, once that Mercedes issue was resolved,

8    you could have searched more?

9    A.  Yeah.  There was multiple factors, I guess.  I

10   mean initially Mr. Lopez said he didn't know who the

11   person was.  During the traffic stop, the trooper came,

12   the driver of the Mercedes said he did know him,

13   Mr. Lopez, so that's suspicious.

14        The fact that the Mercedes keeps driving back and

15   forth multiple times by me while Mr. Lopez is detained

16   in the back of my patrol vehicle kind of makes me

17   nervous as well.

18        There is multiple scenarios going on in my head.

19   I'm not -- I'm concerned more about my life rather than

20   some drugs on the side of the Sterling Highway.

21   Q.  Which is why you had a trooper -- another officer

22   come to the area and stop that car, to make sure it

23   didn't present a danger to you?

24   A.  Right.

25   Q.  And after talking to that trooper, that traffic

stop completed, the stop of the black Mercedes, I

presume your fears were somewhat allayed at that point

or it was addressed?

A.  Yes.

Q.  Okay.  And you were still at the scene of the

stop with Mr. Lopez?

A.  Yes.

Q.  The last thing I want to -- I want to end,

Mr. Howard, where Mr. Ebell began, and that's those

findings of dishonesty and the investigation.  You said

the first verification of your location, misreporting of

your location or whatnot was December of 2019?

A.  That was I took a long lunch break that day.

Q.  Okay.  And you know, did somebody -- do you know

that -- you remember that date specifically because you

looked at the findings or the report?

A.  Yeah, at the findings.

Q.  Did you go through those with Mr. Ebell or did he

show you those or you reviewed those in preparing for

the testimony here?

A.  No, not thoroughly.

Q.  So do you know -- that was December 17, 2019,

right, you said?

A.  Yes.

Q.  And that was then about a little over a month

1  before you testified at the first suppression hearing in

2  this case, that was January 21st of 2020?

3      A.  Yes.

4      Q.  Do you know when the last incident that your

5  former employers were able to verify you had provided

6  false information?  You knew when the first was.  Do you

7  know when the last was?

8      A.  No.

9      Q.  Do you know that there was at least 42 incidents

10  that they were able to verify, the ones they could

11  verify, 42?

12          Let me do this:  If I show you a page from the

13  report that they found that you have seen, would that

14  refresh your recollection?

15      A.  Yes.

16          MR. COLBATH:  Your Honor, may I approach to

17  show him that?

18              THE COURT:  You may, sir.

19          MR. COLBATH:  And Counsel --

20          MR. EBELL:  I appreciate it.  I know what

21  you're referring to.  Thank you.

22  BY MR. COLBATH:

23      Q.  Just when you have reviewed that, Mr. Howard,

24  just let me know.

25      A.  I'm done.

1    Q.  Would you agree that the last date documented,

2 they could document was around the middle of

3 August 2020?

4    A.  Yes, but there is more specific details on that.

5        THE COURT:  Mr. Colbath, it's evident he's not

6 testifying from memory, so if you want to lay the

7 foundation and just admit the document that might be

8 best.

9        MR. COLBATH:  Your Honor, I'm going to mark a

10 single page.  It's reported as page five of ten, and I

11 believe it's the AST investigation report that

12 Mr. Howard has testified to before.  I will submit after

13 today's hearing a single page, although the top of it

14 says page five of ten, a single page that I will mark as

15 D-7, Defendant's Exhibit No. 7, and ask that this be

16 admitted.

17        THE COURT:  Mr. Ebell, any objection to what's

18 been marked for identification as Defendant 7?

19        MR. EBELL:  My concern is protecting -- is

20 sealing it as part of the record.  It's not an encounter

21 I have -- it's not something I have encountered, and so

22 I apologize for not being prepared, but D-7 is protected

23 and restricted from dissemination to the public under

24 the Court's order, and so I just don't want it to be

25 part of a public record.

1    I don't have an objection to the Court

2 considering it as part of its finding for this *Franks*

3 hearing, but I would object to making it part of a

4 public record.

5    THE COURT:  Any objection to having it be

6 sealed?

7    MR. COLBATH:  It should be sealed, Your Honor.

8    THE COURT:  All right.  Mr. Ebell, if D-7 is

9 sealed, any objection?

10    MR. EBELL:  No, Your Honor.

11    THE COURT:  So Mr. Colbath, are you moving to

12 seal D-7?

13    MR. COLBATH:  I will -- when I submit it, I

14 will move it under seal.

15    THE COURT:  With the explicit proviso that D-7

16 will be sealed and not part of the public record, it

17 will be admitted.

18    (Exhibit D-7 admitted.)

19 BY MR. COLBATH:

20   Q.  So Mr. Howard, in addition -- there was 11

21 instances that they were able to verify you took a lunch

22 hour too long?

23   A.  Correct.

24   Q.  Between December 2019 and July of 2020, so over a

25 six- seven-month period, 11 too long lunch hours?

1     A.   Yes.

2     Q.   Ranging from as low as seven minutes too long to

3   almost two hours -- over two hours too long?

4     A.   Yes.

5     Q.   There were three instances where you notified

6   dispatch that you were at the trooper post, but your

7   vehicle had not moved or left your residence?

8         (Audio recording stops, gap in audio)

9   BY MR. COLBATH:

10    Q.   -- on duty, but for at least 25 minutes, your

11  vehicle, at least 25 minutes after your report your

12  vehicle hadn't left your house yet?

13    A.   Correct.

14    Q.   And three instances --

15        DEPUTY CLERK:  I'm sorry, Mr. Colbath, I lost

16  audio.

17        THE COURT:  Stand by one second.  We're having

18  technical issues.

19        (Pause.)

20        DEPUTY CLERK:  Okay.  Go ahead.

21        MR. COLBATH:  We're back on?

22        DEPUTY CLERK:  Okay.

23        MR. COLBATH:  Testing, we're better?

24        DEPUTY CLERK:  Yes.

25  BY MR. COLBATH:

1    Q.   And lastly, my question when I got interrupted

2    there, Mr. Howard, was there was about 25 instances

3    where you had reported being 10-8 or on duty, but for

4    25 minutes the vehicle -- you hadn't left your residence

5    yet?

6    A.   Right.

7    Q.   And then finally, three instances where you

8    provided your location as Seward when in fact your

9    vehicle was at your Benson Street address and had not

10   moved, you weren't in Seward at the post?

11   A.   I wasn't at the post, right.

12   Q.   And so that's about 42 instances that they could

13   verify with some discrepancy in your report compared to

14   what they could verify through your vehicle and other

15   locations over a nine-month period?

16   A.   Right.

17          MR. COLBATH:   Your Honor, that's all the

18   questions I have for Mr. Howard.

19          THE COURT:   All right.   Thank you, Mr. Colbath.

20          Mr. Ebell, we have about 15 minutes left today.

21   Any recross?

22          MR. EBELL:   No, no request for recross, Your

23   Honor.

24          THE COURT:   All right.   Mr. Howard, thank you

25   so much for your time this afternoon.   Does either side

1    need this witness held subject to recall?

2            MR. EBELL:  I have no request for that.

3            MR. COLBATH:  No, Your Honor.  I think

4    Mr. Howard is not -- there is no reason for him to --

5    there is no reason for him to stay today, and we're

6    obviously going to continue this hearing at some point

7    here for another day, and I do not seek at this point --

8            THE COURT:  You don't need to hold him back?

9            MR. COLBATH:  Right.  I don't need him to come

10   back to another part of the hearing.  He can be released

11   from his subpoena.  I think if that would change,

12   Mr. Ebell and I could confer and we would serve him

13   anew.  Otherwise, I think he's free.

14           THE COURT:  That works.  Mr. Howard, thank you

15   so much for your time.  Have a good rest of your day.

16   You may be excused.

17           (Witness excused)

18           THE COURT:  All right.  Gentlemen, we have made

19   it through one witness today.  We have a few minutes

20   left.  If we want to start another witness, I'm okay

21   with that.  If we want to break for the day, I'm okay

22   with that too.

23           MR. COLBATH:  Your Honor, unfortunately, our

24   other live witness has waited all this time, and I know

25   that he's not going to be happy about that, but I also

```
1   know there is entirely no way I could even complete my

2   examination by 5:00, which means he's coming back

3   anyway.  I do anticipate that the entirety of the other

4   five witnesses will take less than what Mr. Howard took.

5          THE COURT:  That's a relief.

6          MR. COLBATH:  For me as well.  I believe that

7   probably in a two-hour block we could complete the

8   witness testimony.  So my request would be to recess for

9   today and find a time where we could have a two-hour

10  time slot with the Court to conclude here.

11         THE COURT:  All right.  Mr. Ebell, how does

12  that all sound to you?

13         MR. EBELL:  I think that all sounds correct to

14  me, Your Honor.  I do think the rest of the witnesses

15  would take less time as a block.

16         THE COURT:  All right.  I have a couple of

17  dates I can offer you.  Let me look at my calendar

18  really quickly.

19         MR. EBELL:  Mr. Colbath and I are going to have

20  to draw straws for who talks to Mr. Beck first.

21         THE COURT:  I will leave that to you gentlemen.

22  Let's say, how is Friday, June 4th from 9:00 a.m. to

23  1:00 p.m.?

24         MR. COLBATH:  Your Honor, I have two previously

25  scheduled in-person hearings in Fairbanks and already
```

1    plane tickets bought.  As the Court knows, I cover the

2    Fairbanks docket.

3          THE COURT:  I understand.  Plan B, I guess

4    we're probably past plan B at this point, would be

5    June 1st from 2:00 to 4:00.  That's a Tuesday.

6    Mr. Colbath?

7          MR. COLBATH:  Mr. Johnson and I are on our

8    third rescheduled trip to Kotzebue and Kivalina to

9    interview 11 witnesses in a sex trafficking case.  Once

10   we didn't get to go because of weather and once they had

11   a conference out there and our lodging fell through.

12   This is our third attempt.  We're gone June 1st.  We're

13   back the night of June -- we go June 1st.  We're back

14   the night of June 3rd, and then I go to Fairbanks at

15   6:00 the next morning.  So that week I am just

16   unavailable.

17         THE COURT:  You're booked that week.  Madam

18   deputy, can we see about the following week?

19         MR. COLBATH:  The following week I will move

20   anything else.

21         THE COURT:  I understand.

22         MR. COLBATH:  I do have a doctor's appointment

23   late in the afternoon on the 7th.

24         THE COURT:  Let's see what else we can do.

25         MR. COLBATH:  Your Honor, while Madam Clerk is

checking for a date, as the Court first picked June 4th
and I looked at my calendar, I see that at 3:00 that
afternoon you did set a bail review hearing on a summons
that was requested to be issued by probation for
Mr. Soto-Lopez and I have that on my calendar.

My in-person appearances in Fairbanks are in
the morning, but the only flight available was 6:00 at
night, so I won't be back until 6:00.  I had intended to
file a motion to request in this case to ask the Court
if Mr. Soto-Lopez can obviously be here in person before
the Court, but I could call into that hearing
telephonically?

THE COURT:  That's fine with me.

(Audio stops recording)

THE COURT:  -- it's not going to make it to the
clerk's office and it's not going to get calendared
correctly.  So that will be granted, but please file
something.

MR. COLBATH:  I learned that earlier that in
order to have telephone and video available, there has
to be that process.

THE COURT:  There's just a lot --

MR. COLBATH:  In case the Court wanted to move
it, I ask now.  If I can appear by phone, then I will.

MR. EBELL:  There is certainly no opposition to

that request if that helps the filing go faster.

THE COURT:  To either move it or --

MR. EBELL:  To his appearance by phone for this hearing.

THE COURT:  Okay.  So the next date I can offer you is the 8th of June at 11:00 a.m.  So we would have until, what, noon or 1:00, Camille?

DEPUTY CLERK:  Yes.

THE COURT:  So 11:00 until 1:00.  The issue is that is a time block that we commonly set aside for new arrests.  If there are no new arrests or relatively few, then we should be fine.  If we get inundated, as we sometimes do, then we might have to sua sponte move that hearing, but with that caveat, is the 8th of June agreeable, Mr. Colbath?

MR. COLBATH:  Yes, Your Honor, it is.

THE COURT:  Mr. Ebell?

MR. EBELL:  Yes, Your Honor.

THE COURT:  Okay.

MR. COLBATH:  To free up a spot on your calendar, our brief -- what I think will be a fairly straightforward brief bond matter the Friday before at 3:00 is in the same case.  I'll be in person with you at 11:00, as will Mr. Soto-Lopez.  I mean does it make sense to address at the front end or the back end of our

hearing here that, or two separate appearances is fine
and I'll file a telephonic motion.

THE COURT: I had the same thought. Mr. Ebell,
any objection to just combining the bail hearing with
the evidentiary hearing on the 8th?

MR. EBELL: No, Your Honor.

THE COURT: All right.

MR. EBELL: I see, so moving from the 4th -- so
the bail hearing on the 4th would now be on the 8th.

THE COURT: We do it as a consolidated hearing
on the 8th.

MR. EBELL: No opposition to that.

THE COURT: That will be the order. Go ahead
and file something. Go ahead and file a request moving
the bail hearing to the 8th to be held in conjunction.

MR. COLBATH: Very well. Thank you for the
accommodation.

THE COURT: Yes, sir. And I'm also going to
request that an expedited transcript be generated by the
court reporters.

MR. COLBATH: For this part of the proceeding
and you will make that request as well on the 8th?

THE COURT: I'll renew the request as well on
the 8th for that hearing. For today's hearing, just so
the record is clear, I am requesting an expedited

1  transcript.

2         Okay.  I think that covers it for today.

3  Mr. Ebell, anything else from the government?

4         MR. EBELL:  No, Your Honor.

5         THE COURT:  All right.  And Mr. Colbath,

6  anything from the defense?

7         MR. COLBATH:  Not at this point, Your Honor.

8         THE COURT:  Mr. Soto-Lopez, any questions,

9  comments or concerns?

10        All right.  Thank you both, Counsel, for your

11 thorough and well presented questioning.  Everybody have

12 a nice evening.  We're in recess.

13        DEPUTY CLERK:  All rise.  This matter is

14 adjourned.  This court now stands adjourned subject to

15 call.

16        (Proceedings recessed at 4:56 p.m.)

17                    CERTIFICATE

18    I, Sonja L. Reeves, Federal Official Court Reporter
   in and for the United States District Court of the
19 District of Alaska, do hereby certify that the foregoing
   transcript is a true and accurate transcript from the
20 digital recording in the above-entitled matter and that
   the transcript page format is in conformance with the
21 regulations of the Judicial Conference of the United
   States.
22
      Dated this 7th day of June, 2021.
23

24
                        /s/ Sonja L. Reeves
25                      SONJA L. REEVES, RMR-CRR
                        FEDERAL OFFICIAL COURT REPORTER