1

2                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA
3

4   UNITED STATES OF AMERICA,      )
                                   )
5        v.                        )   CASE NO. 3:19-CR-114-JMK
                                   )
6   REY JOEL SOTO-LOPEZ,           )
                                   )
7                                  )
         Defendant.                )
8   _____

9                     TRANSCRIPT OF DAY 4
                      EVIDENTIARY HEARING
10        **BEFORE THE HONORABLE MATTHEW M. SCOBLE**
              **UNITED STATES MAGISTRATE JUDGE**
11                      **June 8, 2021**
                     **Anchorage, Alaska**
12

13

              **FOR THE GOVERNMENT:**
14                Office of the United States Attorney
                  BY:  MICHAEL EBELL
15                222 West 7th Avenue
                  Anchorage, Alaska  99513
16

17            **FOR THE DEFENDANT:**
                  Office of the Federal Public Defender
18                BY:  GARY GEORGE COLBATH
                  425 G Street, Suite 800
19                Anchorage, Alaska  99501

20

21

22

23            **TRANSCRIPT PRODUCED FROM THE DIGITAL RECORD**

24

25

1

2                    E X A M I N A T I O N S

3

4    WITNESS                 DIRECT     CROSS     REDIRECT     RECROSS

5    IRA BECK                    6        30

6    PATRICK MIZE               35

7    DEVIN DRAKE                43

8    RONNY SIMMONS              52        68

9    JOHN KING                  74        77

10

11

12                      E X H I B I T S

13

14   DEFENDANT EXHIBIT                        PAGE

15   D-2                                       11

16   D-3                                       25

17   D-4                                       68

18   D-5                                       21

19

20   GOVERNMENT EXHIBIT                        PAGE

21   4                                         59

22

23

24

25

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  His Honor, the Court, the United
 3     States District Court for the District of Alaska, is now in
 4     session, with the Honorable Matthew M. Scoble presiding.
 5           Please be seated.
 6           Your Honor, we are on record in Case
 7     3:19-Criminal-114-JMK-MMS, the United States of America
 8     versus Rey Joel Soto-Lopez.
 9           Counsel, please identify yourselves for the record.
10           MR. EBELL:  Michael Ebell with the government.
11           MR. COLBATH:  Gary Colbath for Mr. Soto-Lopez.
12           THE COURT:  All right.  And Mr. Soto-Lopez is present
13     before the Court.  He's out of custody.
14           Good afternoon, Mr. Ebell.  Good afternoon to you,
15     Mr. Colbath.  And good afternoon -- morning -- good morning,
16     Mr. Ebell.  Good morning, Mr. Colbath.  Good morning,
17     Mr. Soto-Lopez.
18           We are on Day 4 of a continued evidentiary hearing.
19           Let's see, where did we leave off?  Had the
20     government rested?
21           MR. EBELL:  Your Honor --
22           THE COURT:  Were you still presenting?  No --
23           MR. EBELL:  No --
24           THE COURT:  -- Mr. Colbath was.
25           MR. COLBATH:  It's the defense's presentation --
```

```
1              THE COURT:  Yes.

2              MR. COLBATH:  -- and we questioned -- we had just

3    gotten through the first witness, I believe.

4              THE COURT:  That's right.

5              Any housekeeping matters then before you call your

6    next witness, Mr. Colbath?

7              MR. COLBATH:  I don't think so, Your Honor, other

8    than tell the Court that I believe -- I believe all of our

9    witnesses testifying today, both sides, will either be

10   appearing -- well, will be appearing virtually in some

11   fashion, either telephonic or -- and/or --

12             THE COURT:  Okay.  Thank you, sir.

13             Mr. Ebell, any housekeeping matters before we begin

14   evidence?

15             MR. EBELL:  No, Your Honor.

16             THE COURT:  All right.  Then, Mr. Colbath, your first

17   witness.

18             MR. COLBATH:  Thank you, Your Honor.

19             And just to clarify, the Court will continue the

20   sequestration order?

21             I've instructed our witnesses that -- we have the

22   first one on the phone now.  My office will alert the next

23   one to call in as we're wrapping up, and sort of do it in

24   that fashion for the first three, if that's acceptable.

25             THE COURT:  It is acceptable, and the witness
```

1    exclusion will continue to apply.  It's essentially

2    impossible for the Court to track that when everybody is

3    appearing virtually, so I will leave it to counsel and your

4    various support staff to ensure that if two witnesses happen

5    to be in the same room that one leaves and can't listen to

6    the testimony of the testifying witness.

7              MR. EBELL:  Thank you, Your Honor.  Our witnesses are

8    not --

9              MR. COLBATH:  With that, I would call Ira Beck.

10             THE COURT:  All right, Madam Deputy.

11             THE DEPUTY CLERK:  Mr. Beck, would you please raise

12   your right hand and let me know when it's raised.

13             THE WITNESS:  Yes, ma'am.

14                            IRA BECK,

15             having been duly sworn, was examined and testified as

16   follows:

17             THE DEPUTY CLERK:  For the record, would you please

18   state and spell your full name.

19             THE WITNESS:  My name is Ira Lee Moore Beck.  I-R-A

20   B-E-C-K.

21             THE DEPUTY CLERK:  Thank you.

22             THE COURT:  All right.  Thank you, Mr. Beck

23             Mr. Colbath, you may inquire.

24             MR. COLBATH:  Thank you, Your Honor.

25             And given all of our virtual appearances, I assume

1    it's okay to stay right here at the microphone.

2              THE COURT:  Absolutely.

3              MR. COLBATH:  Thank you.

4                    DIRECT EXAMINATION

5         BY MR. COLBATH:

6    Q.      Good morning Mr. Beck.  This is Gary Colbath, and I

7    have some questions for you regarding your involvement in

8    this case.  Okay?

9    A.      Yes.

10   Q.      All right.  If you can't hear me or understand me

11   over our connection, please tell me, so that I can re-ask

12   questions.  Will that work?

13   A.      I hear you great, man.

14   Q.      All right.  You are the same Ira Beck that works for

15   ASAP Towing who testified at a previous hearing in this

16   matter; correct?

17   A.      Yes, sir.

18   Q.      And you recall generally that testimony and your

19   testimony about your involvement in this incident?

20   A.      Generally, that's fair.

21   Q.      Okay.  Back in March, on March 24th of 2019, you had

22   some criminal charges at that time pending with the Alaska

23   State Court down in the Kenai Division; is that correct?

24   A.      Um (indiscernible) probably so.  You're probably

25   right.

1    Q.    Okay.  And I think one or more of those was a felony

2    charge, and one might have been like a misdemeanor for

3    tampering with some cellphone or something, that all later

4    got dismissed.

5    A.    Sounds right --

6    Q.    Okay.  And those charges later got dismissed;

7    correct?

8    A.    They were dismissed, yes.

9         THE COURT:  All right.  Mr. Colbath, hang on a

10   second.

11        You two were talking over each other a little bit.

12   It sounded as though Mr. Beck was contradicting your

13   characterization of what the charges had been, and I just

14   want to make sure I understand whether or not he agrees with

15   you on that.

16        MR. COLBATH:  Sure.

17        BY MR. COLBATH:

18   Q.    Mr. Beck, one or more of those charges was a felony

19   charge; right?

20   A.    Yes.

21   Q.    And one was a misdemeanor charge with tampering with

22   some kind of evidence allegedly?

23   A.    Um, I don't know exactly what the term was.  I would

24   like to note that (indiscernible) before I say that it was

25   something like that.  I don't think that's how it was worded,

1    no.

2    Q.      Okay.  And, of course, you don't have anything in

3    front of you right now to tell what those charges were;

4    correct?

5    A.      Yeah, I'm getting there.

6            (Indiscernible)

7    Q.      And it would have been -- you let me know if you find

8    something, but in the meantime --

9    A.      This was a -- this was a domestic -- this was a

10   domestic thing with me and my wife that was dismissed

11   anyways.  So I don't see how this pertains to anything that

12   we're in court for today, really.

13           THE COURT:  All right.  Mr. Beck, this is Judge

14   Scoble speaking.

15           I appreciate that you may not see how it pertains to

16   anything that we're in court today, but it's important that

17   you just listen to the question and answer the question as

18   best you can.  Okay?

19           THE WITNESS:  All right.  I'm trying to get on court

20   (indiscernible) to give you the exact charge, because I don't

21   think that (indiscernible) how it was actually worded.

22           MR. COLBATH:  And Your Honor, I guess I would

23   ask -- and this is hard, I understand -- we're virtual -- but

24   I would ask that Mr. Beck not be accessing the internet and

25   studying on something else while I'm questioning him.

1          THE COURT:  Yes.  So Mr. Beck, Mr. Colbath is right.

2     It is an unusual situation.

3          You're testifying virtually, by telephone, really as

4     a courtesy and convenience to you, and that's fine.  It's not

5     unusual for witnesses to testify that way.  But it is

6     important that you treat this like you were actually sitting

7     in court.  So when Mr. Colbath is asking you questions, just

8     do your best to answer them.  If you can answer his question,

9     answer it; if you can't answer it, just say you can't answer

10    it, that's fine.  But please don't do any research on the

11    internet or anywhere else while he is asking you questions.

12    And just try to answer the question that he asks you.  Okay?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  All right.  Thank you.

15          THE WITNESS:  All right.  Well, I'll answer the

16    question with -- I'll answer the question with, yes, there

17    were charges against me.  No, I don't think there was charges

18    that he's saying.

19          THE COURT:  All right.  Go ahead, Mr. Colbath.

20          THE WITNESS:  I don't think there's tampering

21    charges.  Yes, there were charges.

22          BY MR. COLBATH:

23    Q.    Mr. Beck, was your -- at the time, were you an

24    employee of ASAP Towing, or were you some type of independent

25    contractor?

1    A.       I'm an independent contractor.

2    Q.       And had you made the owners at ASAP Towing aware of

3    your pending charges?

4    A.       Yes, sir.

5    Q.       Had you made any -- in the employment context, as a

6    tow truck driver, had you alerted the Alaska State Troopers

7    or any other local law enforcement of your pending charges

8    other than obviously the officers involved in the charges

9    coming about?

10   A.       My boss ended up talking with them shortly thereafter

11   the charges, so yeah, I'm pretty sure they did.

12   Q.       Okay.  On March -- I think it was March 24th of 2019,

13   you first became involved in going to the scene to pick up

14   Mr. Soto-Lopez's car how?  How was it that you got involved?

15   A.       Well, after (indiscernible), dispatch.

16            THE DEPUTY CLERK:  Mr. Beck, this is the Clerk.  If

17   you could speak up just a little bit.  We're having

18   difficulty hearing you.

19            THE WITNESS:  Alaska State Troopers, their dispatch.

20            BY MR. COLBATH:

21   Q.       Okay.  And I'm going to play an exhibit for you and

22   then ask you some questions about it, okay, so just listen,

23   if you will.

24            Your Honor, at this time, I'm going to have my

25   investigator -- and I guess I'm going to move, ahead of time,

1    to admit Exhibit DE-2 or D-2, Defense Exhibit 2, which is an

2    audio -- about a one-minute audio excerpt that I received

3    from the government, a dispatch call.

4         THE COURT:  All right.  Mr. Ebell, any objection to

5    Defense Exhibit D-2?

6         MR. EBELL:  No objection.

7         THE COURT:  All right, sir.  Without objection, D-2

8    is admitted.

9         (Defendant D-2 admitted in evidence)

10        MR. COLBATH:  Thank you.

11        And if I could have Mr. Vang play this call.

12        Mr. Beck, listen to this, and then I'll have a

13   question for you.

14        THE DEPUTY CLERK:  Mr. Vang, make sure you're

15   unmuted.

16        (Exhibit D-2 played)

17        BY MR. COLBATH:

18   Q.    Mr. Beck, did you recognize your voice on that phone

19   call?

20   A.    Yes, sir.

21   Q.    That was you who answered on behalf of ASAP, then?

22   A.    Yes, sir.

23   Q.    And prior to going out to the scene and arriving

24   there at around mile post 58 on the Sterling Highway, did you

25   have any more communication with the troopers or with

1    dispatch about that service call?

2    A.       About that service call?  Prior?  No.

3    Q.       So you didn't know any more information about the car

4    or the driver or the stop before you got out there?

5    A.       No.

6    Q.       Okay.  And when you arrived at the scene -- do you

7    know who Trevor Howard is?  I think he was an Alaska State

8    Trooper at the time.  Do you know him?

9    A.       Only from this court stuff.

10   Q.       Okay.

11   A.       I didn't even know him as a trooper.  No, I never met

12   him before, I don't think so.

13   Q.       And was he at the scene when you arrived, or had he

14   already left?

15   A.       I don't know if he was there.  I don't know

16   (indiscernible).

17   Q.       When you got there, how many troopers were there?

18   A.       One.

19   Q.       And was the owner of the vehicle, Mr. Soto-Lopez,

20   there?

21   A.       I don't remember seeing Soto-Lopez there, no.

22   Q.       Okay.  And when you took the car, was it your

23   understanding that you were taking possession of the car for

24   the owner, that is, taking it until the owner picked it up;

25   or were you taking it for possession of the troopers and

1    their further investigation?

2    A.      I was taking it per the troopers.  They usually fill

3    out an impound slip and give me an impound slip, which that's

4    the transfer of control from them to me, and then it goes to

5    my yard.

6    Q.      And did --

7    A.      So I'm pretty sure (indiscernible).  I think I did.

8    Q.      Okay.  So when it goes to your yard, you then are

9    holding it there.  It's now in your custody, and you're

10   holding it for the owner to pick up, not for law enforcement

11   to do anything more.  Do I understand that right?  Is that

12   what you were saying?

13   A.      Yes.

14   Q.      Okay.  And besides giving you this impound slip, did

15   you get any other information from the trooper on scene about

16   the detail -- about Mr. Soto-Lopez?

17   A.      No, sir.

18   Q.      Did you know what he had been arrested for?

19   A.      No, sir.

20   Q.      You had the keys to the car; correct?

21   A.      Yes, sir.

22   Q.      The Honda Pilot, I mean.

23   A.      Yes, sir.

24   Q.      And so at the scene, did you do anything more than

25   drive the vehicle onto your flatbed tow truck?

1       A.      That's exactly what I did, sir.  I started the

2       vehicle up, drove it onto the bed, got out of the vehicle.

3       Put it in park, of course.  And strapped it down and ran the

4       deck forward.  And I was on my way.

5       Q.      Okay.  And did you drive -- where did you go from the

6       scene until you next stopped?

7       A.      I went to my yard.

8       Q.      And where's your yard located?

9       A.      In Soldotna, Southern Boulevard.

10      Q.      And --

11      A.      (Indiscernible)

12      Q.      And just describe generally the yard there or the

13      business setup there.  What is there for buildings or fences

14      or parking location?

15      A.      You got a 6- or 8-foot-high fence with privacy

16      netting all the way around the yard.  You got one building in

17      the back.  You got a conex on one side.  And you probably got

18      seventy, eighty cars in there.  So it's pretty full.  Mostly

19      cars.

20      Q.      And is it a secure lot?  Is there -- is there a gate

21      or a control to the entrance and exit?

22      A.      Yes, there's a gate.

23      Q.      And during business hours, the gate's --

24      A.      Locked.

25      Q.      I'm sorry?

1    A.    With a combination lock.

2    Q.    Okay.  And only the employees or owner have access, I

3    assume.

4    A.    Yes, sir.

5    Q.    And is the -- is the gate generally locked all the

6    time, or is it left open during business hours, or how does

7    that work?

8          MR. EBELL:  Objection, Your Honor.  I'm going to

9    object at this point --

10         THE WITNESS:  Locked --

11         MR. EBELL:  -- to relevance.

12         THE COURT:  All right.  Mr. Beck, hang on a second.

13         The objection is to relevance of whether or not the

14   gate is locked?

15         MR. EBELL:  May I elaborate further on this line of

16   questioning.  I think there's probably some relevance to

17   having some context to Mr. Beck's situation and the tow yard,

18   but the hearing here is about former-Trooper Howard's alleged

19   reckless disregard for the truth in his affidavit.  And

20   Mr. Beck, therefore -- there -- really, the only relevance

21   for Mr. Beck are his interactions with the trooper or

22   perhaps, arguably, things the troopers otherwise know.  But

23   the troopers should be asked those questions.  So what

24   Mr. Beck did or didn't do outside of the sight and sound of

25   the troopers I would object as relevance in this hearing.  It

1    just doesn't go to what the Court's considering for a *Franks*

2    hearing.

3           THE COURT:  All right.  I understand.

4           Mr. Colbath, what is the relevance of the height of

5    the fence and whether or not the gate is locked?

6           MR. COLBATH:  Your Honor, part of my argument is

7    going to be, of course, that the -- the motion generally

8    deals with the search and seizure of the Honda Pilot.  Part

9    of my argument is that the officers searched it even

10   -- excuse me -- seized it illegally before they had a

11   warrant, before they even had the warrant, and then proceeded

12   to search it on the basis of the warrant, which we allege are

13   deficient because of Mr. Howard's report.

14          But I think that -- and I'm -- I only have a couple

15   more questions for Mr. Beck before I get to his interactions

16   with Mr. Howard.  But I think the evidence already is in

17   evidence from Mr. Howard that prior to obtaining the search

18   warrant, either he or another officer ordered Mr. Beck to

19   take it from its location where he had it and bring it to the

20   trooper post, which is, based on the testimony so far, I'd

21   argue, a seizure.  And they did so -- they didn't have --

22   prior to a warrant application, or this warrant application.

23          THE COURT:  All right.  Insofar as the vehicle was in

24   a secured location, behind a fence and a locked gate, it was

25   seized; is that what you're getting at?

1          MR. COLBATH:  It was in Mr. Beck's possession;

2    locked, secured.  There was no urgency, exigency, or other

3    reason the troopers needed to secure it for safekeeping until

4    they could obtain a warrant because it was already in a

5    locked, secured, safe facility.

6          THE COURT:  I see.

7          MR. COLBATH:  And Mr. Soto-Lopez was in jail with no

8    bond.

9          Nevertheless, the trooper seized it without a

10   warrant.

11         THE COURT:  Okay.  All right.  So the vehicle was at

12   a secured tow yard.  I don't think there's any dispute about

13   that.

14         MR. COLBATH:  I can move on.

15         THE COURT:  Yeah, if you've got one or two more

16   questions, that's fine.  I take the government's point.  But,

17   you know, there's no jury here.  So if you have another

18   couple questions, go ahead and ask them, but then move on.

19         MR. COLBATH:  That's okay.

20         BY MR. COLBATH:

21   Q.     Mr. Beck, do you have security cameras or other

22   security besides the combination lock for your yard there?

23   A.     There is.  There is.

24   Q.     Okay.  So when you got back to the yard with

25   Mr. Soto-Lopez's vehicle, what did you do relative to that

1  vehicle?  What did you do with it?

2  A.       I didn't do anything with that vehicle when I got

3  there.  I drove straight into the lot, and I parked the tow

4  truck, and I asked the guard (indiscernible) the yard, moving

5  shit around, cleaning up good and stuff around the yard.  It

6  was probably 30 minutes before I got back to that car and

7  dumped it and found what I found --

8  Q.     Okay --

9  A.       -- called the trooper.

10  Q.     Okay.  In the time that you were -- you were working

11  on other things, did anybody else, to your knowledge, access

12  the Honda Pilot or have anything to do with it while it was

13  waiting there on your truck?

14         MR. EBELL:  Objection.  Relevance.

15         THE WITNESS:  No, sir --

16         THE COURT:  Hang on, Mr. Beck.

17         MR. EBELL:  It's the same relevance argument, Your

18  Honor.  What Mr. Beck's doing with the car isn't relevant to

19  the consideration of Mr. Howard's, you know -- you know,

20  affidavit.

21         THE COURT:  Yeah, I think he's right, Mr. Colbath,

22  unless you've got a proffer as to why it's relevant.

23         MR. COLBATH:  I'll move on.

24         THE COURT:  Okay.  The objection is sustained.

25

1    BY MR. COLBATH:

2    Q.    Mr. Beck, when you did return to the Honda Pilot,

3    describe how -- you said until I found what I found in there.

4    Describe what you did or how you found what you found.

5         MR. EBELL:  Objection, Your Honor.  The same

6    objection.

7         THE COURT:  Well, I mean, I think that -- the

8    circumstances under which Mr. Beck allegedly located the

9    narcotics I think would be relevant, so the witness can

10   answer that question.

11        Do you need to hear the question again, Mr. Beck?

12        THE WITNESS:  No, I got the question.

13        THE COURT:  Okay.  All right.  Go ahead, sir.

14        THE WITNESS:  So I started my tow truck up.  I put it

15   in gear -- put it -- PTO gear.  I dropped the deck down.  So

16   now the truck's sitting there at a 30-degree angle to the

17   ground.  I climbed up on the deck.  I jumped in the front

18   seat of the car.  I put my foot on the brake.  Started it.

19   Put it in reverse.  And I -- I put it in reverse, and I

20   turned around, put my right hand on the -- on the passenger

21   seat and looked behind me, and right in the back seat there

22   was a case sitting there, blue case, and a corner of a

23   sandwich bag with crystals just sticking out right there.  So

24   right at that point I reached back there, I opened the case.

25   That's when I noticed a bag the size of my first.  So I put

1    it back in park.  I got out of the car.  I put the tow truck

2    back forward.  I re-strapped it down as I was calling the

3    troopers.

4    Q.      And the -- when you reached back and opened the case

5    and looked at it, once you -- once you looked at it, did you

6    just close it and put it right back there on the back seat

7    where you found it?

8    A.      Yep.

9    Q.      So you never -- did you ever take it out of the car?

10   A.      No.

11   Q.      Did you do any other type of search of the rest of

12   the vehicle?

13   A.      I looked around the vehicle after that, but no, no

14   real major searching --

15   Q.      And when you say "looked around" --

16   A.      -- eyeballing it.

17   Q.      Okay.  So by "eyeballing," you mean you looked with

18   your eyes.  Did you move any of the items in the car around

19   or physically open any other kind of cases or anything like

20   that?

21   A.      No, sir.

22   Q.      Did you take anything out?

23   A.      No, sir.

24   Q.      Okay.  And then you said, after strapping the tow

25   truck back down, you called dispatch?

1    A.      Yep.

2    Q.      All right.  Again, sir, I'm going to play an exhibit

3    for you, and then I want to ask you a question about it.

4            Your Honor, I'm going to move to admit Defendant's

5    Exhibit D-5, which also is a dispatch recording call that I

6    received from the government in discovery, D-5.

7            MR. EBELL:  No objection, Your Honor.

8            THE COURT:  All right.  Without objection, D-5 is

9    admitted.

10           (D-5 admitted in evidence)

11           THE COURT:  Go ahead, sir.

12           MR. COLBATH:  Thank you.

13           BY MR. COLBATH:

14   Q.      Mr. Beck, I'm going to have Mr. Vang play this here,

15   and you just listen to it, and then I'll ask you a question.

16           (Exhibit D-5 played)

17           MR. COLBATH:  Your Honor, I'm sorry there.  I don't

18   know -- first of all, I heard Madam Clerk --

19           THE COURT:  I can't really understand anything that's

20   being said.  I don't know how it is coming out in the record.

21   But I can't -- I can't make anything out.

22           MR. COLBATH:  Yeah.  I don't -- Madam Clerk was

23   trying to get the Court's attention.  So I guess, first of

24   all, I don't know if we were having an issue there or what

25   the problem was.

1          THE DEPUTY CLERK:  I was just adjusting the audio.

2          THE COURT:  Do we want --

3          MR. COLBATH:  Somebody said, "Judge, Judge, Judge,"

4     like three times.

5          THE COURT:  I think that's because the recording was

6     so garbled.  That's maybe what you heard.

7          MR. COLBATH:  Okay.

8          THE COURT:  Madam Deputy, how's the recording that

9     we're getting on that?

10         THE DEPUTY CLERK:  Not great.

11         THE COURT:  Yeah.  You're welcome to play it,

12    Mr. Colbath, but I just don't know how useful it is.  I can't

13    understand what's being said.

14         MR. COLBATH:  And perhaps if Mr. Vang can log on

15    again, make sure that it's the only thing on his computer,

16    and we can try that one more time.  It's only a minute long.

17         THE DEPUTY CLERK:  Mr. Vang, make sure the audio on

18    your computer is turned all the way up, please.

19         MR. COLBATH:  (Indiscernible)

20         THE COURT:  I'm sorry, sir?

21         MR. COLBATH:  I was thinking -- it wasn't -- was this

22    conventionally filed with the Court?  I mean does the Court

23    have submitted as part of the record of -- I remember -- I

24    mean, we got CDs from the defense that have this audio on

25    it --

1          THE COURT:  If it's been conventionally filed, I can

2     certainly consider it, and that's commonly what I do.  I'll

3     just listen to it in chambers.  But if there is some reason

4     you want to play it on the record, it's not working here.

5          MR. COLBATH:  I'd like to try it one more time.  It

6     has been conventionally submitted --

7          THE COURT:  Okay.

8          MR. COLBATH:  -- so I would ask the Court, obviously,

9     to re-listen to it.

10          THE COURT:  Sure.

11          MR. COLBATH:  It's short.  But if we can try this one

12     more time.

13          THE COURT:  Of course we can.

14          (Exhibit played)

15          BY MR. COLBATH:

16     Q.     Mr. Beck, I know that recording was not good, but

17     again, generally, did you recognize your voice as one of the

18     callers there?

19     A.     Yes, sir.

20     Q.     And you simply reported to dispatch that, unloading

21     the car, you found some drugs on the back seat?

22     A.     Yes, sir.

23     Q.     And also you said the load shifted and it broke

24     something.  What were you describing there?

25     A.     There was a generator, and right at that point, I had

1    just noticed, because like I said, I was walking out to the

2    gate, just to address.  I turned around.  And I was walking

3    back towards the truck, and I noticed the handle of the

4    generator that was in the very back was poking through the

5    glass (indiscernible).

6    Q.        And this was after you already called dispatch?

7    A.        Yes.  I just noticed that after.

8    Q.        So you hadn't -- before calling dispatch back, you

9    hadn't looked in the way rear of the vehicle or noticed that

10   back window partially broke out?

11   A.        You know, I don't know if that broke out on the trip

12   home or that broke out on the -- when I was going to drop

13   that vehicle off at the yard.  You know what I'm saying?

14   When I went to lay it down because I brought it all the way

15   back when I noticed the drugs, when I got in to take it off

16   the truck, so I don't know if it broke on the drive or if it

17   broke right then.  But I noticed it when I was walking

18   towards the tow truck.

19   Q.        Okay.  I'm going to --

20   A.        When I was -- when I was off the phone with dispatch.

21   Q.        Good enough.

22             I'm going to try to play one other recording.  We'll

23   see if this one is any clearer.

24             But Your Honor, I'm going to have Mr. Vang play

25   Exhibit D-3, which is also -- and I'll move to admit

1    D-3 -- which is also a dispatch recording between dispatch

2    and Mr. Beck, I believe.

3              THE COURT:  Okay.  Mr. Ebell, any objection to D-3?

4              MR. EBELL:  No objection.

5              THE COURT:  All right.  Without objection, D-3 is

6    admitted.

7              (D-3 admitted in evidence)

8              THE COURT:  Go ahead, Mr. Colbath.

9              MR. COLBATH:  Again, if Mr. Vang could play that with

10   his volume up but nothing else running.

11             (Exhibit D-3 played)

12             BY MR. COLBATH:

13   Q.       And Mr. Beck, that was also you on the phone?

14   A.       Yes, sir.

15   Q.       And after talking to the female dispatcher there, do

16   you remember talking to a trooper?

17   A.       I do.

18   Q.       And you told them that you found this blue case on

19   the back seat of the car; correct?  That's who you told the

20   trooper you talked to?

21   A.       Yes.

22   Q.       And that just from looking over from the driver's

23   seat, you could see the corner of the bag sticking out, which

24   caused you to open it.  You told the trooper that?

25   A.       Yes, sir.

1    Q.      And that when you opened it, there was a bag of what
2    you thought was drugs the size of your fist?
3    A.      Yes, sir.
4    Q.      And did you tell them you closed it back up or you
5    left it right there where you found it?
6    A.      I don't think I told them anything, but I closed it.
7    Q.      Okay.  You didn't tell the troopers that you talked
8    to that you did an inventory search; did you?
9    A.      No.
10   Q.      And that would be because you don't -- ASAP Towing,
11   if I remember your testimony from the last hearing, you guys
12   don't have a policy to do inventory searches; right?
13   A.      No, sir.
14   Q.      And you --
15   A.      We looked for both (indiscernible).
16   Q.      Well, and in this case, you noticed these drugs,
17   basically this container with the drugs in it, before you
18   even got the truck off your -- off your own truck or before
19   you got the car off your own truck, so you didn't have time
20   to do any search of any kind, really, other than to look at
21   that; right?
22   A.      Yes, sir.
23   Q.      Do you recall, after you talked to this trooper, what
24   he told you to do with the vehicle?
25   A.      Well, they wanted me to keep it at my yard so they

1   could get a search warrant, and I (indiscernible) because I

2   felt like I was in possession of this at this point.  And I

3   wasn't too fond of that.  So I told them, let's bring it to

4   you guys, pretty much.  So I went down.

5   Q.      Okay.  And they agreed that you should bring it to

6   the trooper post then and they would take possession of it?

7   A.      Yes.

8   Q.      And you did that?  You took it to the trooper post?

9   A.      Yes.  Yes.

10  Q.      When you got to the trooper post, do you remember

11  seeing Trevor Howard there or talking to him at the post?

12  A.      I do not think I seen him there.  There was two

13  troopers there.  I don't really remember which troopers they

14  were.  But I don't think he was there.

15  Q.      Okay.  And when you were on the phone, it was

16  with -- it was with Trevor Howard that you were first on the

17  phone, but then you didn't talk to him at the post.  Do I

18  have that right?

19  A.      I don't know if it was Trevor Howard on the phone.  I

20  didn't know -- I was kind of more worried about getting that

21  out of my possession.  I wasn't really worried about what cop

22  I was talking to.  I just wanted them to take this out of my

23  possession because I didn't want it at that point --

24  Q.      Okay.  That's fine.

25  A.      -- that I was a little bit (indiscernible) --

1    Q.       Um --

2    A.       -- with the whole situation.

3    Q.       You -- did you tell any of the -- any of the troopers

4    that you talked to that you had found drugs hidden in the

5    very rear compartment -- where the generator was in the rear

6    of the vehicle, hidden back there in some search you did?

7    A.       No.

8    Q.       And how about, did you tell any of the troopers about

9    drugs being in any other container other than this blue case

10   that you've already told me about that was on the back seat?

11   A.       No.

12   Q.       When you got back to the tow yard and there was two

13   troopers there, did -- did you point out to them in any way

14   the blue case where you -- where you saw the drugs?

15   A.       Wasn't at the tow yard at that point.  I took it to

16   their yard.

17   Q.       Right.  And when you -- when you got there --

18   A.       (Indiscernible)

19   Q.       -- when you got there, did you show either one of the

20   troopers that were there at their yard, hey, here -- you

21   know, here's the case that I saw, here's why I'm bringing

22   this to you guys?  Or did you just drop it off and not have

23   conversation?

24   A.       I dropped the vehicle off.  As soon as I dropped the

25   vehicle off, they take it.  I pointed through the window and

1    showed them what I seen.

2    Q.      Okay.  And did you provide them any other information

3    besides pointing through the window to what -- to what you'd

4    seen?

5    A.      No.

6    Q.      Okay.  And then where did you go?

7    A.      On my (indiscernible).

8    Q.      Okay.  After leaving the trooper yard, I guess what

9    I'm interested in is, after pointing that out and leaving the

10   trooper yard, did you have any more contact with either

11   Trooper Howard or any of the other troopers about this until

12   like much after the -- you know, until you were involved in

13   these motion hearings?

14   A.      No.  No.  I had no conversation with the troopers

15   about that.  I talked to my mom about it.  That was about it.

16   Q.      Okay.

17   A.      That was like right there in those first couple of

18   days.

19   Q.      And your boss would have been who?

20   A.      Pat Mize.

21   Q.      Pat Mize.  Okay.

22           And -- well, that's all the questions I have for you

23   at this point, Mr. Beck.

24           Thank you.

25           I think the government attorney will have some

1      questions for you, so stay on the line here.

2              THE COURT:  All right.  Mr. Ebell, cross-examination.

3              MR. EBELL:  Thank you, Your Honor.

4                           CROSS-EXAMINATION

5              BY MR. EBELL:

6      Q.      Thank you, Mr. Beck.

7              You're telephonic, so it's a little bit awkward.

8      This is -- I'm Michael Ebell.  We met briefly out in the hall

9      when you were here for the last hearing, if you remember,

10     just so you know who you're talking to.  Okay?

11     A.      Yes, sir.

12     Q.      All right.

13     A.      Yes, sir.

14     Q.      I'm not going to try to run over a lot of what you

15     did here.  Let me just ask you, you got this call on

16     March 24, 2019, and we heard, in Exhibit D-2, you estimated

17     that it would take you about an hour to get to the -- to the

18     car they were calling you about that day?

19     A.      Yes, sir.

20     Q.      Did it take you about an hour?

21     A.      It probably took less.

22     Q.      And then what about on the way back, same thing?

23     Nothing special?  It took you less than an hour --

24     A.      Yes.

25     Q.      -- to get back?

1    A.        Yes.  Probably took me closer to that hour to get

2    back because I probably left from -- I left from my house,

3    which is in Sterling, which is a little closer.

4    Q.        About how long do you think --

5    A.        (Indiscernible)

6    Q.        -- how long did it take you to actually load the car

7    up onto the flatbed?

8    A.        It takes me about 15 minutes to load a car.

9    Q.        So from the time you get the dispatch call until the

10   time you arrive at the yard with the Honda, about how long

11   was that, total?

12   A.        I would say two hours, two and a half, about.

13   Q.        You talked a little bit -- you were asked some

14   questions about maybe you having some pending charges at the

15   time.  I'm just going to ask you real quick, did you -- did

16   you mention those charges to any of the troopers during this

17   incident?

18   A.        No.

19   Q.        Did any of the troopers you interacted with at any

20   point bring those up?

21   A.        No.

22   Q.        Were you -- did it cross your mind to try to get any

23   kind of legal benefit in your pending case because you

24   were -- you were helping the troopers out with these drugs

25   you found?

1    A.      No.

2    Q.      After you dropped the drugs off at the trooper

3    station with the trooper -- well, the car, off with the

4    troopers -- what was your personal hope that your involvement

5    with this case would be going forward?

6    A.      Zero involvement.

7    Q.      You said that when you picked it up, you probably got

8    an impound slip from the troopers.  Is that right?

9    A.      Yes.

10   Q.      And that's the -- that's the slip --

11   A.      I would have gotten an impound slip.

12   Q.      Okay.  And that's something you commonly use when

13   you're taking control of a vehicle?

14   A.      Yes.  They -- anytime -- when they take a vehicle out

15   of the hands of the owner and put it in our hands, we get an

16   impound slip.  They're trying to go away from that right now

17   down here, but us tow guys are still trying to fight that

18   because it gives us all the information of the vehicle and

19   the owners, so when the owner comes, we know who owns that

20   vehicle.

21   Q.      So you use that impound slip to --

22   A.      It's an important thing (indiscernible).

23   Q.      Right.  So when you've impounded a vehicle like that

24   as a tow truck driver, how does someone get it back?  What do

25   they need to do to get that car back?

1    A.        Prove -- prove ownership.  So they have to have ID

2    that matched the name on that impound slip.  Because when the

3    trooper fills out the impound slip, they put the registered

4    owners on there.  So it would have his name, and if there's a

5    lienholder on it, it would have the lienholder's name, so I

6    could fill out whoever -- whoever is the owner of the

7    vehicle.  So if someone that gets caught or something goes to

8    jail for 10 years and there's a lienholder on there, I could

9    still get paid out by them, I can get them to pay for the

10   car.  But it's only those two people, you know.  So I get

11   those impound slips so I know who to release the vehicle to.

12   Q.        So if I -- if you towed my car under these rules and

13   I wanted my friend to come pick the car up, could that

14   happen?  Could I make that happen?

15   A.        (Indiscernible) you could make that happen, but you

16   have to go through DMV and do a power of attorney on the

17   vehicle and then have to come with that (indiscernible).

18   Q.        I'd have to basically change -- give them some sort

19   of legal interest in the car, and then they could prove that

20   to you?

21   A.        Yes, sir.

22             MR. EBELL:  No further questions, Your Honor.

23             THE COURT:  All right.  Thank you, Mr. Ebell.

24             Mr. Colbath, any redirect?

25             MR. COLBATH:  I don't think, based on that, Your

1    Honor, I have any redirect of Mr. Beck.

2          THE COURT:  All right.  Mr. Beck, thank you so much

3    for calling in.  You can go ahead and disconnect.

4          THE WITNESS:  All right.  Thank you, sir.

5          THE COURT:  All right.  Thank you.

6          MR. COLBATH:  Your Honor, the next witness that I'm

7    going to call is Patrick Mize.  I've asked my office to have

8    him log on.  I don't know if that's happened yet.

9          THE COURT:  Okay.

10         MR. EBELL:  And Your Honor, I might as well voice it

11    now rather than --

12         THE COURT:  Okay.

13         MR. EBELL:  -- I think I'll object -- from my

14    understanding -- obviously, I don't know the exact

15    questions -- but I object to, again, the relevance of Patrick

16    Mize's testimony in the context of this hearing, where we're

17    assessing the affidavits submitted by then-Trooper Howard and

18    the alleged reckless disregard to the truth by the trooper.

19    What's relevant is the interactions with the trooper, the

20    information known by the trooper.  I don't believe Patrick

21    Mize had any interactions with the troopers around this

22    incident -- maybe I'm incorrect -- but had any interactions

23    with the troopers on this incident.  And I just don't see how

24    his testimony can be relevant to that assessment as opposed

25    to other factual questions around this case.

1          THE COURT:  I appreciate your objection.  You could

2     well be right.  At this point, I don't know because I don't

3     know what he's going to say.  But certainly do feel free to

4     voice that objection again once his testimony begins.

5          THE DEPUTY CLERK:  Mr. Mize, did you just join the

6     call?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  All right.  Madam Deputy, if you would go

9     ahead and swear Mr. Mize.

10          THE DEPUTY CLERK:  Mr. Mize would you please raise

11     your right hand and let me know when it's raised.

12          THE WITNESS:  It's raised.

13                         PATRICK MIZE,

14          having been duly sworn, was examined and testified as

15     follows:

16          THE DEPUTY CLERK:  For the record, would you please

17     state and spell your full name.

18          THE WITNESS:  It's Patrick Allen Mize, P-A-T-R-I-C-K,

19     A-L-L-E-N M-I-Z-E.

20          THE DEPUTY CLERK:  Thank you.

21          THE COURT:  All right.  Mr. Colbath, you may inquire.

22          MR. COLBATH:  Thank you.

23                        DIRECT EXAMINATION

24          BY MR. COLBATH:

25     Q.     Mr. Mize, this is Gary Colbath from the Federal

1    Public Defender's Office.  I don't think you and I have ever

2    actually talked; correct?

3    A.      No, sir.

4    Q.      Okay.  I just wanted you to know that I'm one of the

5    attorneys involved, so you know, because we're telephonic,

6    who you're talking to.  I have a few questions here.

7            Tell the Court just generally what community you live

8    in.  Where are you calling us from?

9    A.      I'm calling from Soldotna, Alaska.

10   Q.      And are you affiliated with ASAP, the business ASAP

11   Towing?

12   A.      Yes, I am.

13   Q.      How so?

14   A.      I'm the owner.

15   Q.      And how long have you owned it?

16   A.      Since March of 2015.

17   Q.      So you were the owner and person in charge in

18   March of 2019; is that correct?

19   A.      Yes, sir.

20   Q.      And where's the business located?  What community?

21   A.      Soldotna.

22   Q.      In March of 2019, did ASAP towing have some type of

23   contract or business relationship with the Alaska State

24   Troopers to provide towing services?

25   A.      We did not have contracts with the state troopers.

1    We are, however, on their call-out list.

2    Q.      And prior to March of 2019, how was it that your

3    business comes to be on the trooper's call-out list?  Do you

4    have to do something affirmative to get on the list?

5    A.      Yes.  You -- what we do is we fill out a packet, and

6    if it's approved, we have the insurance and all the

7    pertinent -- all the pertinent fees to be on that list, to

8    allow us to be on that list.

9    Q.      And you -- do you know when -- immediately before

10   March of 2019, when would have been the last time you

11   provided that information to the troopers, the information

12   they require for you to be on the list?

13   A.      Typically, it's in January.

14   Q.      So it's a year --

15   A.      January, February.  It's a yearly thing.

16   Q.      Okay.  So in March of 2019 or in calendar year 2019,

17   you would have likely provided that information sometime

18   around the beginning of the year, January or February?

19   A.      Yes, sir.

20   Q.      In that time frame, March of 2019, or really the

21   first three months of 2019, did you have an individual

22   working for you named Ira Beck?

23   A.      Yes, I did.

24   Q.      And was Mr. Beck an employee, in your mind, or an

25   independent contractor, or how does that work?

1    A.      He falls under an independent contractor situation.

2    Q.      Okay.  He was, among other things, a tow truck

3    driver, driving trucks in the field for you, or for ASAP

4    Towing?

5    A.      He is a tow truck operator, yes, sir.

6    Q.      And is part of the information that you're required

7    to provide to the Alaska State Troopers information about who

8    your drivers are and -- well, first of all, do you have to

9    report to them who your drivers are?

10   A.      Yes, sir.

11   Q.      And do you have to report to the troopers -- do you

12   have to show verification that those drivers are validly

13   licensed and anything to do with their criminal history or

14   criminal record?

15   A.      We provide them their driving record -- they seek out

16   their driving record.  They just need their driver's license,

17   make sure that it's valid.  And then from there they

18   do -- they investigate us, make sure that we're who we are

19   and that we're legally driving and such.

20   Q.      Okay.  Were you aware that Mr. Beck, in 2019,

21   had -- had convictions from both Alaska and California on his

22   record?

23   A.      I am not, in the record personally, but he has

24   indicated those things to me verbally.

25   Q.      Okay.  Do you know whether those were reported to the

1    Alaska State Troopers in January or February of 2019?

2    A.       We don't report those.  The troopers investigate in

3    their records, as far as I know.

4    Q.       So you simply provide the biographical and driver's

5    license information, enough to allow the troopers to do their

6    own background investigation?

7    A.       Yes, sir.

8    Q.       And did there come a time in 2019 where you or the

9    business or Mr. Beck was removed from the call list?

10   A.       Not that I'm aware of.

11   Q.       And does ASAP Towing have any type of company policy

12   on doing inventory searches of vehicles you take into your

13   possession?

14   A.       We will take into -- yes, we do.  We take in

15   the -- the work might be low-hanging fruit, so to speak.

16   Anything that's out in the open.  We try to secure it as best

17   we can.  And we take a cursory inventory.  Anything of value

18   we want to put in a secure location, so that (indiscernible)

19   taken in.  Part of our -- part of our business practice type

20   of thing.

21   Q.       And that would be done for vehicles if they're

22   off-loaded and kept on your lot?

23   A.       Yes, sir.

24   Q.       Okay.  And just so I'm clear, as I understand it, the

25   employer, the operator, just takes a cursory look, and

1    anything he can see that's obviously valuable from just

2    looking in and at the vehicle, he would take that out to

3    secure it if he was going to secure it in the lot?

4    A.      Yes, he would contact me, and then I would come to

5    help him to arrange to lock it up, yes.

6    Q.      Okay.  But as far as looking inside containers,

7    taking everything out or making a list of everything that is

8    in a vehicle, that's not a function of ASAP Towing; is it?

9    A.      Can you repeat that, please?

10   Q.      Sure.  As far as looking through a vehicle to look in

11   all the containers, look in all the compartments, and make a

12   listing, a true inventory of every single thing that's in the

13   vehicle, that's not something the company does.  You simply,

14   as you said, take the low-hanging fruit, the open and obvious

15   things that appear of value?

16   A.      Yes, sir.

17   Q.      Okay.  Does Mr. Beck still work for ASAP Towing?

18   A.      Yes, sir.

19   Q.      And were you aware of the vehicle in question here, a

20   Honda Pilot, towed to your lot on March 24, 2019, before it

21   actually arrived at the lot?  Were you aware of the service

22   call?

23   A.      No, sir.

24   Q.      When did you first become aware of it?

25           MR. EBELL:  Objection, Your Honor.

1          THE WITNESS:  Ira would have called me --

2          THE COURT:  I'm sorry?

3          MR. COLBATH:  Hold on a second.

4          THE COURT:  Sir, hang on just a second.

5          THE WITNESS:  Sorry.

6          MR. EBELL:  At this point, I think, yeah, I would --

7     I would object, maybe a proffer or just understand.  It's the

8     same objection I voiced before he was called.

9          THE COURT:  Sure.

10         MR. EBELL:  His factual interactions, I don't see the

11    relevance.

12         THE COURT:  I mean if you're just laying the context

13    just for clarity, that's fine.  But exactly when he became

14    aware of the call, I'm not sure that's relevant.

15         MR. COLBATH:  I don't know if he has any relevant

16    information to provide unless I know when he first learned of

17    the call.  If it's after the fact, I don't have any

18    questions.

19         THE COURT:  Okay.  All right.  That's fine.

20         MR. COLBATH:  If it's contemporaneous or he had

21    interaction with the troopers, I will pursue it.

22         THE COURT:  All right.  Fair enough.

23         MR. COLBATH:  It's purely contextual.

24         THE COURT:  All right.  Fair enough.

25         The witness can answer.

```
 1           BY MR. COLBATH:
 2    Q.      Go ahead, Mr. Mize.  When did you become aware of
 3    this service call or issues relative to this call?
 4    A.      It was after everything had transpired.  Ira called
 5    to enlighten me about it all.
 6    Q.      And did you ever talk to the troopers, then, about
 7    the details of the call or anything?
 8    A.      No, sir.
 9           MR. COLBATH:  Okay.  Then, with that, Your Honor, I
10    wouldn't have any more questions for Mr. Mize.
11           THE COURT:  All right.  Mr. Ebell, cross-examination.
12           MR. EBELL:  No, Your Honor, no cross-examination for
13    Mr. Mize.
14           THE COURT:  All right.  Mr. Mize, thank you so much
15    for your time.  Thank you for calling in.  You can go ahead
16    and disconnect.
17           THE WITNESS:  Thank you.  Have a great day.
18           THE COURT:  Yes, sir.
19           All right.  Mr. Colbath, your next witness.
20           MR. COLBATH:  Thank you, Your Honor.
21           We are going to call Devin Drake.
22           And again, I've had Mr. Vang -- is she on the phone?
23           THE DEPUTY CLERK:  No.
24           MR. COLBATH:  My office has communicated to her to
25    call in, Your Honor.
```

```
 1              THE COURT:  All right.

 2              MR. COLBATH:  So I presume -- and she was on standby,

 3       so I presume she'll call.

 4              THE COURT:  Very good.

 5              THE DEPUTY CLERK:  This is Holly with the Clerk's

 6       Office.  Who just joined the line?

 7              THE WITNESS:  Devin Drake.

 8              THE DEPUTY CLERK:  Thank you.

 9         Ms. Drake, would you please raise your right hand and

10       let me know when it's raised.

11              THE WITNESS:  It's raised.

12                            DEVIN DRAKE,

13          having been duly sworn, was examined and testified as

14       follows:

15              THE DEPUTY CLERK:  For the record, would you please

16       state and spell your full name.

17              THE WITNESS:  Devin Drake, D-E-V-I-N D-R-A-K-E.

18              THE DEPUTY CLERK:  Thank you.

19              THE COURT:  All right.  Mr. Colbath, you may inquire.

20              MR. COLBATH:  Thank you, Your Honor.

21                         DIRECT EXAMINATION

22              BY MR. COLBATH:

23       Q.      Ms. Drake, what community do you live in?

24       A.      Seward, Alaska.

25       Q.      And how long have you lived in Seward?
```

1    A.    Since 2012.

2    Q.    And generally, what type of work do you do there in

3    Seward?

4    A.    I work for Providence Health Services.  I'm a finance

5    analyst.

6    Q.    And do you know an individual named Trevor Howard?

7    A.    I do.

8    Q.    And how long have you known Mr. Howard?

9    A.    I became acquainted with him in 2018.

10   Q.    And is the context in which you know him a social or

11   personal context, a business context?  Just describe, first,

12   generally the context.

13   A.    He was my significant other previously.

14   Q.    Okay.  And what -- for what period of time were you

15   and he in a -- was it a dating relationship or a marriage?

16   A.    Dating relationship from 2018, April of 2018 until

17   about August of 2020.

18   Q.    And during the time -- or during parts of the time of

19   your relationship, did you and he cohabitate or live

20   together?

21   A.    We did.

22   Q.    And what, approximately, was the time frame where you

23   were living together?

24   A.    He moved into my home in April of 2019 until we

25   parted ways in August of 2020.

1    Q.      And throughout your relationship with Mr. Howard, was

2    he employed with the Alaska State Troopers?

3    A.      Yes.

4    Q.      And during your relationship did you have occasion to

5    see him daily and interact with him, or was it more or less

6    frequent than that?

7    A.      We interacted in some shape or form daily, yes.

8    Q.      And I'm sorry, what -- you're no longer in a

9    relationship; correct?

10   A.      No.

11   Q.      And when did you say that your relationship with him

12   terminated?

13   A.      August of 2020.

14   Q.      Okay.

15   A.      Late August, September, that time line.

16   Q.      All right.  During your relationship with him, did

17   you become aware of an internal investigation done by AST

18   regarding Mr. Howard?

19           MR. EBELL:  Objection, Your Honor.

20           THE WITNESS:  I did.

21           THE COURT:  What's the objection, sir?

22           MR. EBELL:  Relevance.  I'd assume maybe that this

23   was a witness for credibility purposes at some point, but I

24   think we've gone beyond laying the foundation of her knowing

25   Mr. Howard, getting into her knowledge of the NIA

1    investigation.

2              THE COURT:  Yeah, so, Mr. Colbath, I don't know where

3    you're going.  If she is going to be testifying about the

4    internal investigation, presumably all her information is

5    hearsay, and we've got information about that investigation

6    already in the record.  But I don't want to try to

7    second-guess what road you're going down.

8              So what's your proffer for the relevance of her

9    testimony?

10             MR. COLBATH:  Your Honor, she is a credibility

11   witness.

12             THE COURT:  Okay.

13             MR. COLBATH:  And no more than that.  I had that

14   question.  I will ask was she aware --

15             THE COURT:  Okay.  Fair enough.

16             MR. COLBATH:  And if so, how.  And other than

17   that -- that was going to be my next question, just for

18   general context.  And then I'm going to ask her whether she

19   has an opinion to offer the Court on credibility.  I will not

20   get into either hearsay or the details of the investigation

21   other than to make sure the Court knows that she knows of it.

22             THE COURT:  Okay.  Mr. Ebell.

23             MR. EBELL:  I withdraw my objection, Your Honor.  I

24   have no objection to that line of questioning.

25             THE COURT:  All right.  Fair enough.

1          BY MR. COLBATH:

2     Q.        So Ms. Drake, just to reiterate, during -- and I

3     think you answered this -- but during your relationship with

4     Mr. Howard, did you become aware of an internal investigation

5     being done by the Alaska State Troopers regarding Mr. Howard?

6     A.        Yes, I did become aware of it.

7     Q.        And were you personally involved in that, or how did

8     you know about it?

9     A.        I personally was interviewed in regards to the

10    investigation.

11    Q.        Okay.  And you participated in those interviews or

12    cooperated with the Alaska State Troopers in their

13    investigation?

14    A.        Yes.

15    Q.        Based on your interactions, relationship, and

16    knowledge of Trevor Howard -- with Trevor Howard -- do you

17    have an opinion on whether or not at the time that you knew

18    him he had a reputation for having a character trait of being

19    untruthful?

20              Do you have an opinion on that?

21    A.        Yes, I do.

22    Q.        And what would -- what would be your opinion relative

23    to his truthfulness and veracity?

24    A.        He was frequently untruthful.  A daily occurrence of

25    it.

1    Q.      And during your relationship with him, again while he

2    was an Alaska State Trooper, were you aware of instances

3    where he himself committed law violations?

4          MR. EBELL:  Objection, Your Honor.  This goes beyond

5    the scope of reputation evidence permitted for a credibility

6    witness.

7          THE COURT:  Specific instances, yeah.  I'd be

8    inclined to sustain the objection, Mr. Colbath.

9          BY MR. COLBATH:

10   Q.      Ms. Drake, this case involves a traffic stop by

11   Mr. Howard that occurred on March 24th of 2019.  Did you --

12   do you have any personal information about that stop?

13          Did you have any personal information about that stop

14   on the day it occurred, March 24th, 2019?

15   A.      I don't recall him giving me any information about a

16   stop at that time.

17   Q.      Okay.  You may have -- and my point is, you may have

18   heard something about it after the fact, but I don't want to

19   hear anything you heard about it after the fact.  I simply

20   wanted to make sure, you didn't have any firsthand knowledge

21   of it on the day it occurred; correct?

22   A.      No.

23   Q.      All right.

24          MR. COLBATH:  Then I don't have any -- based on the

25   Court's -- well, Your Honor, based on the Court's ruling, I

1        would proffer this, so that it is in the record.

2                THE COURT:  Okay.

3                MR. COLBATH:  If allowed to answer these questions,

4        Your Honor, I would elicit from Ms. Drake that, number one,

5        she witnessed Mr. Howard in her presence or from her

6        firsthand knowledge -- not hearsay -- use controlled

7        substances not prescribed to him while an Alaska State

8        Trooper.  And also, that there was an incident where

9        Mr. Howard had taken her car while intoxicated and drove it,

10       and another officer stopped him, but rather than arrest him

11       for any offense, gave him a speeding ticket and allowed him

12       to drive home with his own volition, in other words, covering

13       for him.  And I would be offering those both as an attack on

14       his credibility as well as in further support of the argument

15       that -- because I think we'll hear from other

16       officers -- that they may condone or otherwise sanction

17       otherwise illegal activity that they know about on his part.

18               THE COURT:  Okay.  All right.  Based on that proffer,

19       Mr. Ebell, your response?

20               MR. EBELL:  It's the same objection, Your Honor.  I

21       think that is exactly the type of specific instances of

22       conduct for truthfulness that is barred by Rule 608.

23               THE COURT:  I'm inclined to agree.  If she had a

24       general -- if you wanted to elicit a general opinion about

25       his character for being law-abiding, I think you could do

1        that, if she has one.  And if another witness were to testify

2        that he has a general character for being law-abiding, you

3        could impeach with those specific instances.  But as far as

4        offering those -- I think Mr. Ebell is correct, I think

5        they're barred under 608.

6                MR. COLBATH:  That's fine, Your Honor.  Then -- I'm

7        not sure she has that opinion, but I'll be happy to ask her

8        and leave it at that based on the Court's ruling.

9                BY MR. COLBATH:

10       Q.      Ms. Drake, based on your knowledge of Mr. Howard and

11       your interactions with him from 2018 to 2020, as you've

12       described, do you have an opinion as to whether Mr. Howard

13       was -- had a reputation for being a law-abiding person?

14       A.      I do have an opinion.  I did not find him to be a

15       law-abiding person.

16       Q.      All right.  The Court has ruled that I cannot ask you

17       the basis or the underlying things related to that opinion,

18       so I don't have more questions for you, Ms. Drake, at this

19       point.  The government attorney here may have, so please stay

20       on the line pending those questions.

21               Thank you.

22               THE COURT:  All right.  Thank you, Mr. Colbath.

23               Mr. Ebell, cross-examination.

24               MR. EBELL:  Thank you, Your Honor.

25               Thank you, Ms. Drake.

1          I don't have any further questions from this witness.

2          THE COURT:  All right.  Ms. Drake, thank you so much

3     for calling in.  Thank you for your time.  You can go ahead

4     and disconnect.

5          THE WITNESS:  Thank you.

6          THE COURT:  All right.  Mr. Colbath, do you have

7     another witness?

8          MR. COLBATH:  Your Honor, at this time, I do not have

9     another witness or other evidentiary matters from the defense

10    to present to the Court.

11         THE COURT:  All right.  Thank you, sir.

12         Mr. Ebell, do you have a witness or evidence to

13    present?

14         MR. EBELL:  Yes, Your Honor.  The government would

15    call Sergeant Ronny Simmons.

16         I believe that he is calling in at present.

17         THE COURT:  Perfect.

18         THE DEPUTY CLERK:  This is Holly with the Clerk's

19    Office.  Who just joined the line?

20         THE WITNESS:  This is Ronny Simmons with the

21    troopers.

22         THE DEPUTY CLERK:  Sir, would you please raise your

23    right hand and let me know when it's raised.

24         THE WITNESS:  It is.

25

1           RONNY SIMMONS,

2           having been duly sworn, was examined and testified as

3      follows:

4           THE DEPUTY CLERK:  For the record, would you please

5      state and spell your full name.

6           THE WITNESS:  Ronny Allen Simmons, S-I-M-M-O-N-S.

7           THE DEPUTY CLERK:  I'm sorry.  Could you spell your

8      full name.

9           THE WITNESS:  Oh, yeah, sorry.  Ronny, R-O-N-N-Y;

10     middle is Allen, A-L-L-E-N; last is Simmons, S-I-M-M-O-N-S.

11          THE DEPUTY CLERK:  Thank you.

12          THE COURT:  All right.  Thank you, Sergeant Simmons.

13          Mr. Ebell, you may inquire.

14                         DIRECT EXAMINATION

15          BY MR. EBELL:

16     Q.     Hi, Sergeant.  This is Mike Ebell with the

17     government.

18          Let me just -- I'll just ask you a few questions

19     here.  We'll try and keep it brief.

20          But what is your job and general job duties?

21     A.     I'm currently assigned as a shift sergeant, Soldotna

22     Trooper Post, where I'm assigned to one of our day shifts, so

23     I supervise that shift as normal patrol in the Soldotna area.

24     Q.     And was that your same job and duties on March 24,

25     2019?

1    A.       Yes, sir.

2    Q.       And what's the relationship between the Soldotna

3    Trooper Post and the Seward Trooper Post?

4    A.       Because we're in the hub for the area, they're one of

5    what we call outposts.  So there's more troopers than the

6    hubs, like Palmer, Soldotna, Fairbanks, for each of those we

7    will have outposts.  And at the outpost, they're -- they're

8    supervised by a sergeant, and then usually three to four to

9    five troopers would be command staff, the lieutenant and

10   captain that are stationed in Soldotna, and so they oversee

11   the Seward Coast, but we kind of like (indiscernible).  We

12   work together.  It's such a big area that their primary focus

13   is that area.  That's where they live, and that's where they

14   work.

15   Q.       Do you supervise troopers in Seward as a sergeant in

16   Soldotna?

17   A.       I can if -- if there's -- if their supervisor is not

18   on, is not working, then they call me for help or direction

19   if they need, or I can -- I can supervise them.  But they

20   have their own sergeants over there that they directly report

21   to at the Seward post.

22   Q.       Do you know the Soto-Lopez case that you're here to

23   testify about?

24   A.       Just my brief involvement, sir.  I know what we're

25   talking about.

1    Q.      What did you review prior to your testimony here

2    today?

3    A.      I reviewed the report that was generated along with

4    the CAD notes and the photos that I took.

5    Q.      So what was your involvement in this case?

6    A.      My only involvement was being advised that Mr. Ira

7    Beck, who I know as a tow truck driver in the area, called to

8    say that he thought that he had found drugs in the vehicle

9    that had been impounded.  I didn't have any involvement with

10   the case out there on the highway or any of that.  I was at

11   the Soldotna Trooper Post when that call came in.  So I

12   simply stated that Beck had found what he believed to be meth

13   in the car, and asked that we -- what we wanted to do with

14   it.  And I asked him to have it brought over to the Soldotna

15   Post, where I secured it inside our garage.

16   Q.      And so you spoke with Mr. Beck?

17   A.      Yes.

18   Q.      Did you -- and then did you see the car?

19   A.      I didn't.  He -- he asked if we wanted it towed to

20   our place of business, our trooper post.  And I explained

21   yes.  I made sure there was a spot for it in the garage.

22   Once it arrived, I took photos of the outside of the vehicle.

23   I didn't open the vehicle or get into the vehicle.  I took

24   photos of it as it arrived.  One of the things that I wanted,

25   of course, to take photos of was the back window that

1    apparently was broken out on the drive.  On the tow truck.

2    Q.        Did I -- did I e-mail you a couple of photos related

3    to this case when we spoke?  I guess it was a couple of weeks

4    ago now.

5    A.        You did.

6    Q.        Do you have those available to look at?

7    A.        (Indiscernible).  Yes, sir, I have those photos.

8    Q.        And I'd ask you to look at the one that I've marked

9    as Exhibit 2.

10            Your Honor, I believe the Court had a courtesy copy.

11   And these have been previously filed.

12            THE COURT:  Yes.

13            MR. EBELL:  So I wasn't going to try and display

14   them.  There is no one here who doesn't have their own copy.

15            BY MR. EBELL:

16   Q.        Do you see what I marked as Exhibit 2, Sergeant?

17   A.        I do.

18   Q.        Did you take that photo?

19   A.        Yes, I did.

20            MR. EBELL:  I'd move to admit Exhibit 2.

21            THE COURT:  Mr. Colbath?

22            MR. COLBATH:  Your Honor, I actually don't have

23   it --

24            MR. EBELL:  Sure --

25            MR. COLBATH:  -- with me.

```
 1              MR. EBELL:  Could you just describe --

 2              MR. COLBATH:  I've previously seen them.  But I

 3       just --

 4              THE COURT:  Okay.

 5              MR. COLBATH:  -- I assumed we would be seeing it.

 6              MR. EBELL:  Sure.  I understand.

 7              THE DEPUTY CLERK:  Exhibit 2 was admitted on 5/20.

 8              MR. EBELL:  Oh, we did it with --

 9              THE COURT:  It was previously admitted.

10              MR. EBELL:  Okay.

11              MR. COLBATH:  Okay.

12              BY MR. EBELL:

13       Q.     So in what context was the picture for Exhibit 2

14       taken, Sergeant?

15       A.     Me taking a picture of the back seat and the case

16       that was reported to have maybe something in it.  For

17       me -- you can kind of see the glare off of it.  Me from

18       outside the car taking pictures of the interior from outside

19       of it.

20       Q.     Could you then turn to what I sent you marked as

21       Exhibit 3.

22       A.     Okay.  I have that.

23       Q.     And I know that I sent this out, so I wanted to

24       clarify this.  You don't know where this picture came from,

25       do you, Sergeant?
```

```
 1     A.      No, I don't.

 2     Q.      Okay.  And then could you look at what I'd marked as

 3     Exhibit 4.

 4     A.      I have that.

 5     Q.      And what is that, in general terms?

 6     A.      That's our CAD report.  "CAD," I believe, stands for

 7     computer-aided dispatch.  Things are called in and they're

 8     reported to dispatch.  It's kind of their running log of

 9     what's going on and what's happening.

10     Q.      And specifically is this the CAD related to this

11     incident with Mr. Soto-Lopez's vehicle and Mr. Ira Beck

12     calling it in?

13     A.      Yes, it is.

14     Q.      As best as you remember, is this CAD accurate, as far

15     as your involvement in the case?

16     A.      Yes.

17             MR. EBELL:  I mean, I can do further authentication

18     with another witness, Your Honor.

19             I move to admit Exhibit 4.  I don't know if --

20             THE COURT:  Mr. Colbath, Exhibit 4?

21             MR. COLBATH:  Your Honor, is the exhibit that was

22     provided, is that a seven-page exhibit?

23             THE COURT:  I do not know.

24             MR. EBELL:  I think I only provided three --

25             THE DEPUTY CLERK:  I don't have the exhibits.
```

1          THE COURT:  Let's see.  Give me just a second.  I
2     will pull up the docket.
3          THE DEPUTY CLERK:  Mr. Ebell, did you file those?
4          MR. EBELL:  My understanding was that Ms. O'Leary had
5     filed them before I had taken on the case, from my review.
6     But perhaps I was --
7          THE COURT:  There have been several times that
8     exhibits were filed.  Let's see.
9          (Pause)
10          Let's take a look at docket 121.
11          All right, so, yeah, 121, on March 31st.
12          Is this Exhibit 4, Mr. Ebell?
13          MR. EBELL:  Yes, Your Honor, that's the one I'm
14     referencing.
15          THE COURT:  All right.  So that Exhibit 4 consists
16     of, it looks like, three pages.
17          MR. EBELL:  That's what I have as well.
18          THE COURT:  All right.
19          MR. COLBATH:  Did you have a more -- did you want to
20     submit a more complete CAD?
21          Your Honor, I guess I don't -- I don't have any
22     objection to it.  The one provided to me is longer.  So I'm
23     not sure what those three pages -- which three pages it is.
24          THE COURT:  All right.  I will go ahead -- I mean I
25     think 4 is already admitted.  If not, I will admit it.  And

1    Mr. Colbath, if you believe that this particular CAD log is

2    incomplete in some way, you're welcome to file the complete

3    version after the hearing.

4              (Government 4 admitted in evidence)

5              MR. EBELL:  Thank you.

6              Sergeant -- thank you, Your Honor.

7              BY MR. EBELL:

8    Q.       Are you familiar with ASAP Towing?

9    A.       I am.

10   Q.       About how long does it take to get there, from there

11   to Skilak Lake Road?

12   A.       We're talking 58 miles there.  Maybe a half hour to

13   45 minutes.

14   Q.       You said that you had had -- you had contact with Ira

15   Beck when he dropped the vehicle off?

16   A.       Yes, when he brought it to our office.  He had got it

17   to his yard, and he found towing, was my understanding, and

18   that's ASAP Towing.  Their yard is right in Soldotna, maybe

19   two to three miles from our office.  But from ASAP Towing to

20   58-ish miles, Skilak Lake, that area, it would probably take

21   a half hour, 45 minutes to get there from Soldotna.

22   Q.       Who -- did the troopers end up acquiring a warrant to

23   search that vehicle?

24   A.       Yes, they did.

25   Q.       Who got that warrant?  Which trooper actually did the

1    application, I mean?

2    A.      I can review the report to look.  Officer involved

3    (indiscernible) right now.  One moment.

4    Q.      If you don't remember, Sergeant, and that's your

5    accurate answer, I guess I would ask you a little different

6    since we're on the phone.  I guess I would ask you to go

7    ahead and make that your answer, you don't remember.  And if

8    we need to refresh your memory, I will instruct you to do

9    that.

10   A.      Okay.  Yes, sir.  I wasn't involved any more than

11   taking the vehicle and documenting it as it came in.  I

12   wasn't involved in the case any more than that.

13   Q.      So you didn't apply for that warrant, then.  You know

14   that for sure?

15   A.      I know that for sure, yes, sir.

16   Q.      But just to be clear, you had personal contact with

17   Beck when you dropped the car off?  You talked with him?

18   A.      I did.

19   Q.      So, at that point, you had a general understanding of

20   why he was bringing the car in and what he had reported to

21   troopers?

22   A.      Yes.

23   Q.      Do you -- in your role as sergeant out of Soldotna,

24   do you ever apply for warrants?

25   A.      I do.

1    Q.      Do you supervise people who apply for warrants?

2    A.      I do.

3    Q.      When you are applying for a warrant -- do you ever

4    include statements of witnesses in those applications -- in

5    your affidavits for a warrant?

6            MR. COLBATH:  Your Honor, I'm going to object as

7    to -- Your Honor, I'm going to object as to the relevance of

8    this officer's warrant practice.

9            THE COURT:  I'm inclined to agree.

10           MR. EBELL:  Your Honor, I think that the general

11   warrant practice of troopers is highly relevant to reckless

12   disregard in someone's actions.  Recklessness and negligence

13   and intentionality all comes from the context of what a

14   reasonable person in that situation would or would not do.

15   Certainly, I think whether or not Trooper Howard's actions

16   were reckless is critically informed as to how he was

17   trained, how the troopers around him behaved, how his

18   supervisors or potential supervisors behave in doing similar

19   actions.

20           THE COURT:  Well, I take your point, but the question

21   wasn't what's the general practice of troopers; it's what's

22   this trooper's practice.  And those are two different things.

23           MR. EBELL:  Understood, Your Honor.

24           THE COURT:  So based on the way the question is

25   framed, I will sustain the objection.

1          BY MR. EBELL:

2     Q.      Sergeant Simmons, have you ever had an

3     opportunity -- do you ever review other troopers' affidavits

4     or warrants in the course of your job?

5     A.      Yes.

6     Q.      What is the general practice with respect to whether

7     or not witness statements are included in affidavits for

8     warrants?

9     A.      I would say we do include them.

10    Q.      Generally speaking, if a witness were to report

11    criminal activity that's relevant to a potential warrant

12    application, would it be the general practice of a trooper to

13    include a summary of that witness's statements in their own

14    affidavit?

15    A.      Yes, it would.

16    Q.      What would the general practices in that context be

17    about reviewing that witness's criminal history before

18    putting their statements in an affidavit for a warrant?

19    A.      I don't -- I don't think we would.  I think we would

20    include their statements as everybody's without -- I don't

21    think it would be normal practice to include somebody's

22    criminal history inside their statement, inside of a, you

23    know, an affidavit for a warrant.  So I wouldn't do that.  I

24    would just put what they said no matter who the person was

25    or, you know, how bad they might be or good they might be.

1      I'm not going to add that.  I'm just going to state what they

2      said.

3      Q.      As a sergeant trooper, in what context -- are you

4      familiar with the phrase "informant" within law enforcement

5      purposes?  Just that word, the idea of an informant.

6      A.      Yes.

7      Q.      In your experience as a sergeant with the troopers,

8      what -- when would you categorize someone as a,

9      quote/unquote, informant?

10             MR. COLBATH:  Your Honor, I guess to the extent that

11     that calls for a legal conclusion, I would object.

12             THE COURT:  Well, I don't really hear him asking for

13     a legal conclusion.  I hear him asking what Sergeant Simmons'

14     particular practice is.

15             MR. COLBATH:  So in the law enforcement context?

16             THE COURT:  Well, actually, I didn't hear the

17     question being framed as in a law enforcement context.  I

18     heard it as, what do you, Sergeant Simmons, do; when do you

19     characterize somebody as an informant.

20             MR. COLBATH:  Okay.

21             THE COURT:  So if that's the question.

22             Sergeant Simmons, can you answer that question?

23             THE WITNESS:  Sure can.

24             THE COURT:  All right.  Go ahead, sir.

25             THE WITNESS:  My -- okay.  I've never been part of,

1    like, the drug unit. I've never worked with informants. I

2    won't even get into what I believe their policies would be or

3    what -- in order to use somebody or not use somebody, I know

4    they're saying in that world that I have no clue of, sir. So

5    I don't -- I don't classify anybody as an informant on my

6    own, and I've never actually, you know, been directly

7    involved with using an informant or, you know, getting

8    somebody to be an informant. So I don't have any knowledge

9    of that area.

10           BY MR. EBELL:

11   Q.      In the general practices of the troopers in your

12   experience, would it be accurate that troopers generally run

13   a distinction between civilian -- a witness reporting a crime

14   and what they would -- what troopers would categorize as an

15   informant?

16           MR. COLBATH: I'll object as to leading.

17           THE COURT: I don't know that it is leading, but this

18   witness just said that he really doesn't know anything about

19   how informants work. So I don't know -- I think there is an

20   issue as to foundation.

21           MR. EBELL: I guess, Your Honor, I'll try and

22   rephrase the question.

23           BY MR. EBELL:

24   Q.      You just gave an answer that was specific to

25   yourself, Sergeant Simmons. I guess my question is: Do you

1    feel in your experience that that is the perception of the

2    troopers and the general trooper practice that you have seen

3    and witnessed, that that is a similar -- that is common

4    amongst the troopers that you see, as a general practice?

5              THE COURT:  I'm sorry, Mr. Ebell.  I'm confused.

6              MR. EBELL:  I understand.

7              THE COURT:  I don't know if maybe the witness is,

8    too.

9              What is the general practice you're referring to?

10             MR. EBELL:  The answer that he just gave, Your Honor.

11   I suppose I could rephrase that.

12             BY MR. EBELL:

13   Q.       Sergeant Simmons, my question is:  The answer that

14   you just gave, in your experience with other troopers, is

15   that unique to you or the general -- the general perception

16   of troopers as it relates to who is and is not considered an

17   informant?

18   A.       I think that's -- everybody who's not -- anybody

19   who's not part of the drug units.  We understand that an

20   informant, you know, is somebody who would -- you know, who

21   gives information to the drug unit.  But I don't think the

22   normal -- the normal working trooper on the street who's

23   never been a part of the drug world totally understands what

24   goes into using or making an informant or the differences

25   between them.  So I don't know -- I think that generally we

1    understand there's a lot of people -- just what an informant

2    would be.  But we don't -- we don't deal with them directly

3    as working group troopers.  Our day to day -- I don't have

4    informants for me that are working out there, and a normal

5    trooper does not.  That's something specific to the drug

6    unit.  So it depends on if the trooper had been assigned to

7    the drug unit at some point.  Then, their knowledge of

8    informants and how they work and what they do is going to be

9    vastly different than somebody who has not been assigned to

10   the drug unit.  Because we keep those units separate, and we

11   don't -- we don't cross over too much until, you know,

12   somebody is needed.

13   Q.     Thank you, Sergeant.

14          Do you -- do you remember -- do you know who Trevor

15   Howard is?

16   A.     I do.

17   Q.     Did you speak to then-Trooper Howard about

18   this -- about Mr. Soto-Lopez's vehicle or Ira Beck or this

19   particular case at the time, you know, close to this time

20   when it was brought in?

21   A.     I believe I had.  I don't remember exactly what we

22   talked about.  But after reviewing the report, I think after

23   talking to Mr. Beck -- I talked with him to make sure that we

24   were all on the same page, you know, with getting a warrant

25   for the car.  In the audio that you gave me, it says -- if I

1    can just go grab it out of there -- and I explained, you're

2    going to need a warrant for it.  So that's the way it went

3    down.

4          So to answer your question, I did talk to him.  I

5    don't remember what we talked about.

6    Q.    Do you remember whether or not you saw a safe in the

7    back of this vehicle?

8    A.    I don't recall seeing a safe.  I remember the

9    generator and that little case, we call that a -- it has

10   little numbers on it.  But that case and the photos of it

11   that you presented as your exhibits, I can go back to my

12   photos if you want, but I don't recall seeing the safe.

13   Q.    That's fine, Sergeant.  As I said before, not

14   remembering something is an answer, and I appreciate it.

15         Do you -- are you familiar with the term "inventory

16   search"?

17   A.    Yes.

18   Q.    Is that a type of search that sometimes you would

19   perform, or troopers, I suppose, would perform on vehicles

20   that come into your possession?

21   A.    We could.

22   Q.    In your conversations with either Ira Beck on that

23   day or Trooper Howard or another trooper on that day, do you

24   remember, did the term -- I will just ask it -- did the term

25   "inventory search" come up at any point?

1    A.      I don't recall, sir.

2            MR. EBELL:  No further questions, Your Honor.

3            THE COURT:  Thank you, Mr. Ebell.

4            Mr. Colbath, cross-examination.

5            MR. COLBATH:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7            BY MR. COLBATH:

8    Q.      Sergeant Simmons, this is Gary Colbath.  Just because

9    you're on the phone here, so you know who you're talking

10   about, I am Mr. Soto-Lopez's attorney.

11           As we begin your testimony, I want to start by

12   playing -- and Your Honor, I will move to admit Defendant's

13   Exhibit 4, D-4, which is a brief dispatch audio

14   involving -- I think involving Trooper Simmons.  Before I ask

15   him, I would like to admit and play D-4.

16           MR. EBELL:  No objection.

17           THE COURT:  All right.  Without objection, D-4 is

18   admitted.

19           (D-4 admitted in evidence)

20           BY MR. COLBATH:

21   Q.      Trooper, if you would listen to this, and then I'll

22   have a question for you.

23           (Exhibit played)

24           BY MR. COLBATH:

25   Q.      Sergeant Simmons, that was you on the phone of that

1   dispatch call; correct?

2   A.      Yes.

3   Q.      And was that really -- does that telephone call

4   constitute the beginning of your involvement in this case?

5   A.      Yes, it does.

6   Q.      All right.  And you recognized right away that the

7   vehicle that was being called about was in the tow truck

8   driver's possession, Ira Beck's possession; right?

9   A.      Yes.

10  Q.      And Ira Beck and ASAP Towing, that was somebody prior

11  to that call you were familiar with, you knew at least

12  generally who Beck was; right?

13  A.      Yes, we knew.

14  Q.      And you were familiar with their lot that was located

15  a couple of miles there in Soldotna, a couple of miles away

16  from your trooper post?

17  A.      Yes.

18  Q.      Okay.  And you knew that they had a secure lot, it

19  was fenced, and they monitored it and could control things

20  that came and went from their lot.  That was their practice

21  as a towing business?

22  A.      I would assume that they have that.  I think one of

23  the requirements -- yeah, I don't know how secure it is and

24  how monitored their lot is.  I just know where it is, sir.

25  Q.      Okay.  The dispatcher informed you that

1    Mr. Soto-Lopez had been arrested by then-Trooper Howard.  So

2    he was in custody.  You learned that during the call.

3    A.      Yes.

4    Q.      Okay.  And you saw it as a problem at that time with

5    you going to retrieve the car or the drugs without a warrant;

6    right?  That was your comment.  You're not going over there

7    without a search warrant.

8    A.      Yeah, that would be to get the items out of the

9    vehicle, I wasn't going to enter the vehicle without a

10   warrant.

11   Q.      Okay.  But you did make the decision, either after

12   talking to Mr. Howard or talking to Mr. Beck, to have the

13   vehicle brought to the trooper's post pending a warrant?

14   A.      Correct.

15   Q.      Okay.  So you caused it to go from out of law

16   enforcement's control -- that's with the tow truck

17   company -- into your possession and control within your

18   garage at the lot, at the trooper post, so that you guys

19   could investigate and apply for a warrant?

20   A.      Yes.

21   Q.      All right.  And when the -- when the vehicle arrived,

22   when Mr. Beck brought it there, he pointed out to you the

23   case that I guess -- it's -- I think it is Exhibit 2 -- the

24   photo you took through the window of the -- kind of the case

25   there with the dial lock on the front?

1    A.      Yeah, if that's the question, I assume he did.

2    That's why I have a photo of it.  But I don't remember -- two

3    years ago -- I don't remember exactly what -- what was said

4    to each other that morning.

5    Q.      Sure.  Well, you just listened to the dispatch call.

6    Said he found -- the dispatcher told you, Beck called and

7    said he found drugs sticking out of a case on the back seat.

8    And then you showed us a photo you took after talking to him

9    of a case laying on the back seat.  Does it make sense to you

10   that that's what he pointed out to you and that's the

11   location that was of concern, which is why you took a photo

12   of it?

13   A.      Yes, sir.

14   Q.      Okay.  And you're saying that neither you nor any

15   other trooper entered the vehicle or did any searching or

16   moving of objects inside the vehicle when Beck brought it

17   there?

18   A.      While I was right there with him, no, he did not

19   enter the vehicle.  I took photos of the outside.  And that

20   was the end of my involvement with it.

21   Q.      Okay.  And certainly Ira Beck never told you that he

22   discovered anything during an inventory search or anything

23   other -- well, he never told you that he discovered anything

24   during an inventory search?

25   A.      Again, sir, I don't remember our exact conversation,

1    what in fact he said.  And then, you know, got to bring it

2    over.  I didn't do a full-blown interview with Ira on what

3    was done or not done or what -- the common understanding that

4    that's where it was found.  So I talked to him

5    (indiscernible), and that was it.

6    Q.      Okay.  And you don't recall any information you might

7    have provided prior to the application of the warrant -- or

8    for the warrant to Trevor Howard?

9    A.      I don't.

10   Q.      Okay.  Do you agree, though, that you would not have

11   provided Mr. Howard any information about the contents of the

12   vehicle because you hadn't searched it, you hadn't done

13   anything but photograph the outside?

14   A.      I could have told him what I saw from the outside,

15   which would have been that case or the generator or whatever

16   else was seen from the outside.  But I wouldn't have told

17   him, you know, anything firsthand as of me entering the

18   vehicle, sir.

19   Q.      Okay.  And the focus at that point was the case on

20   the back seat where Mr. Beck found the drugs?  Or what he

21   thought was drugs?

22   A.      Yes.

23           MR. COLBATH:  Okay.  That is all the questions I have

24   for Sergeant Simmons, Your Honor.  Thank you.

25           THE COURT:  All right.  Thank you.

1          Mr. Ebell, redirect.

2          MR. EBELL:  No redirect, Your Honor.

3          THE COURT:  All right.  Sergeant Simmons, thank you

4    so much for calling in.  Thank you for your time.  You can go

5    ahead and disconnect.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  All right.  Mr. Ebell, any additional

8    witnesses?

9          MR. EBELL:  Yes, Your Honor.  The government will

10   call Trooper John King.

11         I apologize for the use of my telephone in court.

12   I'm coordinating the witnesses, so I apologize --

13         THE COURT:  I understand.

14         MR. EBELL:  -- to either defense or Your Honor, that

15   I wouldn't normally do that, but I'm trying to make sure that

16   he can call in as soon as possible.

17         THE COURT:  I appreciate that.

18         MR. EBELL:  So he has texted back, and he should be

19   trying to call in --

20         THE COURT:  He should be calling.

21         MR. EBELL:  -- and punching all those numbers right

22   now.

23         THE COURT:  Okay.

24         MR. EBELL:  I do expect him to be very brief.

25         THE COURT:  And then we have more witnesses after

1     him?

2          MR. EBELL:  I do not have any further witnesses after

3     him.

4          THE COURT:  Okay.

5          Will you have any rebuttal witnesses, Mr. Colbath?

6          MR. COLBATH:  I don't believe so, Your Honor.

7          THE DEPUTY CLERK:  This is Holly with the Clerk's

8     Office.  Who just joined the line?

9          THE WITNESS:  This is Trooper John King.

10         THE COURT:  Officer, would you please raise your

11    right hand and let me know when it's raised.

12         THE WITNESS:  Yes.

13                         JOHN KING,

14         having been duly sworn, was examined and testified as

15    follows:

16         THE DEPUTY CLERK:  For the record, would you please

17    state and spell your full name.

18         THE WITNESS:  John, J-O-H-N; Wesley, W-E-S-L-E-Y,

19    King, K-I-N-G.

20         THE DEPUTY CLERK:  Thank you.

21         THE COURT:  All right.  Mr. Ebell, you may inquire.

22         MR. EBELL:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24         BY MR. EBELL:

25    Q.     Thank you, Trooper King.

1    Very briefly, could you just tell the Court what your
2    job and job duties are.
3    A.    Right now, I'm an Alaska State Trooper currently
4    assigned to patrol.  My current duty station is the Seward
5    Post.  And my job is to respond to calls for service and
6    patrol routes.
7    Q.    And was that your -- did you have that position and
8    that job with the same general duties on March 24th of 2019?
9    A.    Yes.
10   Q.    Are you familiar with the case you're here to testify
11   about involving Mr. Soto-Lopez?
12   A.    Yes.
13   Q.    What did you review in preparation for your testimony
14   in this hearing?
15   A.    I reviewed, I believe, what you called Exhibit 4, the
16   CAD notes that you gave me.  And that's about it.  My
17   participation was fairly limited.
18   Q.    So you reviewed that CAD that you -- and I actually
19   sent you one labeled as Exhibit 4.  That's what you're
20   saying?
21   A.    Yes, sir.
22   Q.    And as far as your review of that CAD, is that
23   accurate?  Is it accurate of what you remember happening that
24   day as far as you were involved?
25   A.    To the best of my recollection, yes, sir.

1    Q.       Generally speaking, then, what was your involvement

2    in this case?  How did you first become involved?

3    A.        I responded when I heard Trooper Howard stop the

4    vehicle, and I remember I decided I was going to go down

5    there when he was asked to do a probation search.  I don't

6    remember the decision point for that.  But I decided -- I

7    responded in that direction.  Trooper Howard reported that

8    there was another vehicle that had driven past him

9    repeatedly, appeared to be watching him.  I contacted that

10   driver on my way there, on my way to Trooper Howard.  And

11   then I arrived at Trooper Howard's location, the location of

12   the stop.  And I stayed there with the vehicle until the

13   wrecker arrived, the tow truck arrived to take it to the

14   impound yard.

15   Q.       So when you arrived on the scene there, who was

16   there?

17   A.        Trooper Howard and presumably the defendant.  I

18   didn't have any contact with him, but I heard he was arrested

19   already, so --

20   Q.       And did --

21   A.        -- I don't recall having to speak to him.  I believe

22   he was in Trooper Howard's car.

23   Q.       Did Trooper Howard leave before the tow truck got

24   there?

25   A.        Yes.

1    Q.      When the tow truck driver -- do you know Ira Beck?

2    A.      I do.  I mean, I'm not a close personal friend of

3    Beck.  I know him from encountering him on the job.  I could

4    pick him out of a lineup.

5    Q.      Okay.  So was he the tow truck driver that day you

6    arrived?

7    A.      Yes.

8    Q.      Did you speak with him there on the scene?

9    A.      If I did, it was very limited.  Here's the car.

10   Maybe here's an impound slip.  That's about it.

11   Q.      Did you search the car at all?

12   A.      No.

13   Q.      Did you have any further involvement in this case

14   besides being called to testify at these hearings?

15   A.      No.

16           MR. EBELL:  I have no further questions, Your Honor.

17           THE COURT:  All right.  Thank you.

18           Mr. Colbath, cross-examination.

19                          CROSS-EXAMINATION

20           BY MR. COLBATH:

21   Q.      Trooper King, this is Gary Colbath.  I'm the other

22   attorney involved in the case, just so you're aware of who's

23   asking you questions here.

24           When you arrived at the scene, do you know how long

25   it was before Mr. Howard took off with the defendant and left

1      the scene?

2      A.      I don't recall exactly.  I can probably look at these

3      CAD notes and figure that out, at least ballpark it --

4      Q.      It was fairly quickly --

5      A.      -- if that's helpful.

6      Q.      -- is that reasonable?

7      A.      Yeah.  Yeah.  He didn't remain for an extended period

8      after I got there.

9      Q.      And was it your understanding that the vehicle that

10     was to be released to the tow truck driver and to go in the

11     tow truck company's custody -- in other words, it wasn't

12     being impounded for investigation or police use; it was going

13     back to the owner via the tow truck company?  Is that what

14     you were told?

15     A.      Yes, sir, that was my understanding.  It was going to

16     their yard and not ours.

17     Q.      And did you have the details of what and why

18     Mr. Soto-Lopez was arrested?

19     A.      I don't know if I had the specifics.  It was my

20     understanding that there was some kind of probation or parole

21     violation.  I don't recall this long after the fact.  And I

22     know from what Trooper Howard said on the radio he found a

23     small amount of heroin, if I recall.

24     Q.      Do you --

25     A.      And I think there was something about a travel pass.

1    Q.      Do you recall providing any of that information, the

2    arrest information, or details of the stop to the tow truck

3    driver?

4    A.      I don't recall that.  It's not -- if it was something

5    -- we wouldn't usually give them details of the case.  But

6    no, I don't remember.

7    Q.      And I don't -- I don't have the impound slip in front

8    of me or I'm not terribly familiar with that paperwork.

9    Would the impound slip give the tow company or tow driver any

10   details about the driver other than just simply -- or the

11   owner other than just biographical information?

12   A.      No, not in detail to the owner.  It has a spot for

13   registered owner, address, telephone number, and lienholder.

14   Q.      Okay.  And after the scene of the accident, you, as I

15   understand it, you had no more contact with Ira Beck relative

16   to this case after you and he left the scene of the accident?

17   A.      Well, it was a traffic stop but --

18   Q.      Oh, I'm sorry.

19   A.      -- after he took the vehicle, I didn't contact him

20   further, and I'm sure I've seen him since then at other

21   incidents but not regarding this one.

22           MR. COLBATH:  All right.  I have no other questions

23   for Trooper King, Your Honor.

24           THE COURT:  All right.  Thank you.

25           Any redirect, Mr. Ebell?

```
 1              MR. EBELL:  No, Your Honor.

 2              THE COURT:  All right.  Trooper, thank you so much

 3      for calling in.  Thank you for your time.  You can go ahead

 4      and disconnect.

 5              THE WITNESS:  Yes, sir.  Thank you, Your Honor.

 6              THE COURT:  All right.  Mr. Ebell, any further

 7      witnesses or evidence to present?

 8              MR. EBELL:  No, Your Honor.

 9              THE COURT:  All right.  And Mr. Colbath, any rebuttal

10      witnesses or evidence?

11              MR. COLBATH:  No.

12              THE COURT:  All right.  Do the parties wish to argue?

13              MR. COLBATH:  Your Honor, my request was going to be

14      this for the Court:  First of all, I recall us

15      being -- having about a two-hour time window, which we are at

16      right now.

17              THE COURT:  Indeed, we are.

18              MR. COLBATH:  I was going to request, rather than the

19      Court hear oral argument from me, that I be allowed to just

20      file a written argument with a little bit of supplemental

21      authority.  I can have that in by Monday so we don't have a

22      much further delay.  I'm in Fairbanks Thursday and Friday or

23      I would have it by the end of the week.  But if I can have

24      until Monday.

25              I also make that -- I make that request for a couple
```

1    of things.  One, just because of our time.  But perhaps more

2    importantly, since the filing of my briefing and original

3    motion, I received from the government, via the Court,

4    discovery regarding Mr. Howard that I did not have, very

5    substantive discovery regarding his termination from the

6    troopers and his credibility and those circumstances.  So

7    that's not mentioned or addressed in my written

8    submissions --

9            THE COURT:  Sure.

10           MR. COLBATH:  -- at all.

11           Plus, now, obviously, we have a much better handle on

12   the record.  I have a transcript from his testimony, and I

13   will have it fresh in my mind, the testimony here today, so

14   to the extent that I could point to actual facts as opposed

15   to what I anticipated the evidence to show or not show in my

16   brief.  I think I would just make a more coherent argument

17   for the Court if I could summarize that in written form.  I

18   will have it to the Court by Monday.  I would certainly have

19   no objection to -- or I wouldn't expect a simultaneous

20   submission.  The government could have a couple of days or

21   the week or whatever to respond.  And I think that would make

22   both a better and a more orderly presentation for the Court,

23   if I could.

24           THE COURT:  That all makes sense to me.  Any

25   objection to that, Mr. Ebell?

1          MR. EBELL:  No, Your Honor.  Yeah, I think that I can
2     do something similar.
3          THE COURT:  Okay.  All right.  So Mr. Colbath, let's
4     say your -- we will call it your written summation will be
5     due -- today is the 8th -- we'll make yours due on the 14th,
6     that's Monday.
7          MR. COLBATH:  Monday, yes, Your Honor.
8          THE COURT:  Mr. Ebell, how about the following
9     Friday, the 18th, for you?
10          MR. EBELL:  That's more than sufficient, Your Honor.
11          THE COURT:  All right.  So government's written
12     argument will be due Friday, the 18th.
13          I will order an expedited transcript of today's
14     hearing, and the matter will be taken under submission
15     for -- thank you -- whatever is received later.  So if I get
16     the transcript after the 18th, that will be the date the
17     matter is under submission.  If I get the transcript before
18     that, then the 18th will be the date the matter is taken
19     under submission.
20          Does that make sense?
21          MR. COLBATH:  It does, Your Honor.
22          MR. EBELL:  Yes, sir.
23          THE COURT:  All right.  All right.  Regarding the
24     evidentiary hearing, then, anything else we need to take up
25     today?

1          MR. COLBATH:  Not from the defense, Your Honor.

2          MR. EBELL:  Not from the government.

3          THE COURT:  Madam Deputy has helpfully reminded me of

4     something that I had completely forgotten about, which is

5     that we have a bail review issue to address.

6          Let me just catch up.

7          All right.  Madam Deputy, is it 136 that we need to

8     address?

9          THE DEPUTY CLERK:  It's 138.

10          THE COURT:  138.  All right.  So, at docket 138, a

11     petition for action on conditions of pretrial release was

12     filed.  And Mr. Soto-Lopez has not made his initial

13     appearance on that petition yet.

14          Mr. Colbath, are you prepared to take that up today?

15          MR. COLBATH:  We are.

16          THE COURT:  Okay.  Mr. Ebell?

17          MR. EBELL:  Yes, Your Honor.

18          THE COURT:  All right.  Bear with me one second here.

19          (Pause)

20          THE COURT:  All right.  Mr. Soto-Lopez -- would it be

21     helpful to provide a copy of the petition for Mr. Soto-Lopez?

22          MR. COLBATH:  Maybe, Your Honor.

23          THE COURT:  Okay.  If we can do that, Madam Clerk.

24          MR. COLBATH:  I mean, we're familiar, and we've

25     discussed it at length.

1          THE COURT:  No, I understand.  But it is also sort of

2     an afterthought for today.  I understand.

3          All right.  Mr. Soto-Lopez, a petition for action on

4     your conditions of pretrial release has been filed at docket

5     138.  I believe your lawyer has just now handed you a copy of

6     the petition.  So I need to advise you of the allegations

7     that are contained in the petition, some of your

8     constitutional rights, and we need to discuss what we do

9     going forward based on this petition.

10         Regarding your constitutional rights, you have the

11    right to remain silent.  You don't have to make a statement

12    or answer any questions, to include my own.  Any statement

13    that you do make other than to your own attorney can be used

14    against you.

15         Do you understand all that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Okay.  You also have the right to

18    counsel.  You have the right to an attorney to represent you

19    on this petition.  Mr. Colbath, who represents you on the

20    matter which led to your placement on bond, will represent

21    you on this petition, as well.

22         So looking at the petition filed at docket 138, there

23    are three violations alleged.

24         The first states that you violated the Pretrial

25    Services release condition that you must participate in one

1    of the following location restriction programs and comply

2    with its requirements as directed; specifically, home

3    incarceration.  You're restricted 24 hours a day, locked down

4    to your residence except for medical necessities and court

5    appearances or other activities specifically approved by the

6    Court or U.S. Probation/Pretrial Services, in that you

7    deviated from your approved location monitoring schedule on

8    April 27th, 2021.

9              Second, that you violated the pretrial --

10             MR. COLBATH:  Your Honor, I apologize for

11   interrupting.

12             THE DEPUTY CLERK:  That's 136.

13             MR. COLBATH:  We got 136.

14             THE DEPUTY CLERK:  I apologize.  I just hit "print."

15             THE COURT:  All right.  Now we're caught up, I think.

16             MR. COLBATH:  Yes, Your Honor.

17             THE COURT:  Okay.  So Mr. Soto-Lopez, did you

18   understand what I was saying about the first allegation, or

19   do you need me to go over that again?

20             THE DEFENDANT:  No, I understand.

21             THE COURT:  Okay.  All right.  So the second

22   allegation is that you violated the Pretrial Services release

23   condition that you must not use or unlawfully possess a

24   narcotic drug or other controlled substance as defined in

25   Title 21 United States Code 802 unless prescribed to you by a

licensed medical practitioner, in that you used

methamphetamine between April 14th, 2021, and April 27th,

2021, as indicated by a positive sweat patch result confirmed

by PharmChek Laboratory.

Violation number three is that you violated that same

Pretrial Services release condition that you must not use or

unlawfully possess a narcotic drug, in that you used heroin

between April 14th 2021, and April 27th, 2021, as indicated

by a positive sweat patch result and confirmed by PharmChek

Laboratory.

Do you understand those allegations, sir?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. So you have -- you're

entitled to a hearing on these allegations. At that hearing,

the government would have the burden of demonstrating the

allegations are true. If I find they're true either because

you admit them or from evidence adduced at a hearing, then I

must still hear from both sides as to what, if anything, I

should do. I could order that your order of release be

revoked. You could be put back in custody. I could allow

you to remain released but under different or additional

conditions, or I might do nothing, depending on how I find

the circumstances to be.

So, Mr. Colbath, how would your client like to

proceed today?

1          MR. COLBATH:  Your Honor, I guess

2     Mr. Soto-Lopez -- and I will confirm this with him after he

3     hears my explanation -- I think he would provide an admission

4     to part of the conduct in number one or with an explanation

5     in number one and a denial to number two and number three.  I

6     guess to be clear, we've been provided -- on two and three,

7     we've provided a positive patch result, laboratory results.

8     It is certainly Mr. Soto's position that he denies drug use.

9     And that's the gist of the allegations.  We don't deny that

10    positive test results came back.  But he denies the use.  So

11    we would deny two and three and I think admit, with an

12    explanation, number one.

13         THE COURT:  Okay.  Let me check in with the

14    government.  Mr. Ebell, based on these allegations, is the

15    government seeking detention?

16         MR. EBELL:  I'll say yes.  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. EBELL:  I mean, my hesitation is that I

19    believe -- I mean, my understanding is -- you know, I wasn't

20    the assigned attorney at the time that the initial release

21    orders were put in place.  My understanding is that the

22    government sought detention at those times.

23         THE COURT:  That's right.

24         MR. EBELL:  So sometimes with these type of

25    violations, it's a difficult position because our position

```
1        remains that Mr. Soto-Lopez should be detained into custody.

2              So with that context in mind, yes, we would request

3        detention in the light of these alleged violations.

4              THE COURT:  All right.  Thank you, sir.

5              Officer Kosakowski, let me check in with you.  And

6        thank you for your patience.  You have been sitting here all

7        day.  Thank you for your patience.

8              THE PROBATION OFFICER:  Yes, Your Honor.

9              THE COURT:  What is probation's recommendation?

10             THE PROBATION OFFICER:  So at this time I believe the

11       intention that I was trying to achieve in bringing

12       Mr. Soto-Lopez before the Court, I believe that has been

13       achieved.  I have seen progress with his behavior.  He has

14       provided two subsequent sweat patches that have tested

15       negative, and he's currently attending substance abuse

16       treatment four days a week, as well as individual counseling

17       with a separate therapist.  He has not had any known

18       scheduled deviations and has been in compliance since then.

19             THE COURT:  All right.  Thank you, Officer

20       Kosakowski.

21             All right.  What I would be inclined to do is leave

22       Mr. Soto-Lopez out of custody on his current conditions.

23             Mr. Soto-Lopez, I'm really big on giving second

24       chances.  Everybody needs a second chance in life.  I'm

25       really not big on giving third chances so if you hit a speed
```

bump, I get it. I'm not going to beat you up over that. But if you hit another speed bump, then we're going to have a problem. It just means I run out of options. I don't have an infinite range of things that I can do just based on the law of detention. Okay?

So I'm really, really pleased to hear from what Officer Kosakowski said that you're taking some steps to make things better. So good on you for doing that. Keep taking those positive steps, and things are going to keep going well for you, you're going to stay out of custody. If we're back here again because of another dirty test or because you can't comply with your conditions of release, then I'm just out of options, and you end up back in custody. I don't want that for you. Okay? But it doesn't really matter what I want. What matters is what you want. So if you don't want that for you, then you need to decide every day that I'm going to do what I have to do to stay out of custody. Okay? I'm not trying to talk down to you or be disrespectful. I just want to let you know that you've got a lot at stake here. Okay? All right.

Any questions?

Okay. Officer Kosakowski, are there any additional release conditions that we should be talking about?

THE PROBATION OFFICER: No, not at this time, Your Honor.

1    THE COURT:  All right.  Thank you very much.

2    THE PROBATION OFFICER:  Thank you.

3    THE COURT:  All right.  So as I said, I will leave

4  Mr. Soto-Lopez out of custody based on his current conditions

5  of release.

6    Madam Deputy, can you tell me our next court date,

7  whether it is before me or the DJ.

8    THE DEPUTY CLERK:  Yes, Your Honor.

9    There is no next court date.

10    THE COURT:  Okay.  All right.  That's easy.

11    Mr. Soto-Lopez, I'm going to order that you stay in

12  contact with your attorney.  When another court date gets

13  set, he will advise you what that court date is.  I'm

14  ordering you to appear at the date, time, and location that

15  your attorney advises you of.  Okay?

16    THE DEPUTY CLERK:  Your Honor, I'm sorry.  It is

17  June 21st, a status conference.

18    THE COURT:  And is that in front of a DJ?

19    THE DEPUTY CLERK:  9 a.m.  Yes.

20    THE COURT:  Okay.  All right.  So allow me to

21  rephrase.

22    Mr. Soto-Lopez, I am going to order that you appear

23  the 21st of June at 9 a.m., and that's going to be before

24  Judge Kindred.

25    Failing to appear in court as required is a crime for

1   which you could be sentenced to prison.  If you violate any

2   of the conditions of release that I know you're familiar

3   with, you could have your conditions of release revoked, and

4   you could be sent back to jail.  Committing a crime while on

5   release could result in more severe penalties than you would

6   receive for committing the same crime at any other time.  And

7   it is a crime to try to influence or threaten a juror,

8   witness, or anyone else that may have information about your

9   case.  Okay?

10          All right.  Anything else we can do today from the

11  government?

12          MR. EBELL:  No, Your Honor.

13          THE COURT:  Anything else from the defense?

14          MR. COLBATH:  Your Honor, could I inquire, was that

15  an in-person -- scheduled as an in-person on June 21st?

16          THE DEPUTY CLERK:  Yes, at 9 a.m.

17          MR. COLBATH:  Nothing further from us, Your Honor.

18  Thank you.

19          THE COURT:  Okay.  Mr. Soto-Lopez, any questions,

20  comments or concerns?

21          THE DEFENDANT:  No, Your Honor.

22          THE COURT:  All right.  I want to thank both sides

23  for their really thoughtful presentations.  This is just

24  subtle issues, well presented.  Everybody's respective client

25  was well represented today.

1          Thank you very much.

2          We're in recess.

3           (Proceedings adjourned)

4

5

6                    * * * * *

7

8               CERTIFICATE OF TRANSCRIBER

9

10              I, Patricia A. Kaneshiro-Miller, certify

11     that the foregoing is a transcript made from the FTR Gold

12     recording in the above-entitled matter.

13

14     /s/ Patricia A. Kaneshiro-Miller     June 16, 2021
       ---------------------
15     PATRICIA A. KANESHIRO-MILLER

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 92:14

## 1

**10** [1] - 33:8
**11** [1] - 2:15
**121** [2] - 58:10, 58:11
**136** [3] - 83:7, 85:12, 85:13
**138** [5] - 83:9, 83:10, 84:5, 84:22
**14th** [1] - 82:5, 86:2, 86:8
**15** [1] - 31:8
**16** [1] - 92:14
**18th** [4] - 82:9, 82:12, 82:16, 82:18

## 2

**2** [7] - 11:1, 55:9, 55:16, 55:20, 56:7, 56:13, 70:23
**2012** [1] - 44:1
**2015** [1] - 36:16
**2018** [4] - 44:9, 44:16, 50:11
**2019** [20] - 6:21, 10:12, 30:16, 36:18, 36:22, 37:2, 37:10, 37:16, 37:20, 37:21, 38:20, 39:1, 39:8, 40:20, 44:24, 48:11, 48:14, 52:25, 75:8
**2020** [4] - 44:17, 44:25, 45:13, 50:11
**2021** [7] - 1:11, 85:8, 86:2, 86:3, 86:8, 92:14
**21** [2] - 2:18, 85:25
**21st** [3] - 90:17, 90:23, 91:15
**222** [1] - 1:15
**24** [4] - 30:16, 40:20, 52:24, 85:3
**24th** [5] - 6:21, 10:12, 48:11, 48:14, 75:8
**25** [1] - 2:16
**27th** [3] - 85:8, 86:2, 86:8

## 3

**3** [1] - 56:21
**30** [2] - 2:5, 18:6
**30-degree** [1] - 19:16
**31st** [1] - 58:11
**35** [1] - 2:6
**3:19-CR-114-JMK** [1] - 1:5
**3:19-Criminal-114-JMK-MMS** [1] - 3:7

## 4

**4** [13] - 1:9, 2:21, 3:18, 57:3, 57:19, 57:20, 58:12, 58:15, 58:25, 59:4, 68:13, 75:15, 75:19
**425** [1] - 1:18
**43** [1] - 2:7
**45** [2] - 59:13, 59:21

## 5

**5/20** [1] - 56:7
**52** [1] - 2:8
**58** [2] - 11:24, 59:12
**58-ish** [1] - 59:20
**59** [1] - 2:21

## 6

**6** [2] - 2:5, 14:15
**608** [2] - 49:22, 50:5
**68** [2] - 2:8, 2:17

## 7

**74** [1] - 2:9
**77** [1] - 2:9
**7th** [1] - 1:15

## 8

**8** [1] - 1:11
**8-foot-high** [1] - 14:15
**800** [1] - 1:18
**802** [1] - 85:25
**8th** [1] - 82:5

## 9

**9** [3] - 90:19, 90:23, 91:16
**99501** [1] - 1:19
**99513** [1] - 1:15

## A

**a.m** [3] - 90:19, 90:23, 91:16
**abiding** [4] - 49:25, 50:2, 50:13, 50:15
**above-entitled** [1] - 92:12
**absolutely** [1] - 6:2
**abuse** [1] - 88:15
**acceptable** [2] - 4:24, 4:25
**access** [2] - 15:2, 18:11
**accessing** [1] - 8:24
**accident** [2] - 79:14, 79:16
**accurate** [5] - 57:14, 60:5, 64:12, 75:23
**achieve** [1] - 88:11
**achieved** [1] - 88:13
**acquainted** [1] - 44:9
**acquiring** [1] - 59:22
**action** [2] - 83:11, 84:3
**actions** [3] - 61:12, 61:15, 61:19
**activities** [1] - 85:5
**activity** [2] - 49:17, 62:11
**actual** [1] - 81:14
**add** [1] - 63:1
**additional** [3] - 73:7, 86:21, 89:22
**address** [4] - 24:2, 79:13, 83:5, 83:8
**addressed** [1] - 81:7

**adduced** [1] - 86:17
**adjourned** [1] - 92:3
**adjusting** [1] - 22:1
**admission** [1] - 87:3
**admit** [10] - 11:1, 21:4, 24:25, 55:20, 57:19, 58:25, 68:12, 68:15, 86:17, 87:11
**admitted** [12] - 11:8, 11:9, 21:9, 21:10, 25:6, 25:7, 56:7, 56:9, 58:25, 59:4, 68:18, 68:19
**advise** [2] - 84:6, 90:13
**advised** [1] - 54:6
**advises** [1] - 90:15
**affidavit** [5] - 15:19, 18:20, 62:14, 62:18, 62:23
**affidavits** [4] - 34:17, 61:5, 62:3, 62:7
**affiliated** [1] - 36:10
**afternoon** [3] - 3:14, 3:15
**afterthought** [1] - 84:2
**ago** [2] - 55:4, 71:3
**agree** [4] - 49:23, 61:9, 72:10
**agreed** [1] - 27:5
**agrees** [1] - 7:14
**ahead** [16] - 9:19, 10:25, 17:18, 19:13, 21:11, 25:8, 34:3, 35:9, 42:2, 42:15, 51:3, 58:24, 60:7, 63:24, 73:5, 80:3
**aided** [1] - 57:7
**ALASKA** [1] - 1:2
**Alaska** [20] - 1:11, 1:15, 1:19, 3:3, 6:22, 10:6, 10:19, 12:7, 36:9, 36:23, 38:7, 38:21, 39:1, 43:24, 45:2, 47:5, 47:12, 48:2, 49:7, 75:3
**alert** [1] - 4:22
**alerted** [1] - 10:6
**allegation** [2] - 85:18, 85:22
**allegations** [6] - 84:6, 86:11, 86:14, 86:16, 87:9, 87:14
**allege** [1] - 16:12
**alleged** [4] - 15:18, 34:18, 84:23, 88:3
**allegedly** [2] - 7:22, 19:8
**Allen** [3] - 35:18, 52:6, 52:10
**ALLEN** [2] - 35:19, 52:10
**allow** [4] - 37:8, 39:5, 86:20, 90:20
**allowed** [3] - 49:3, 49:11, 80:19
**America** [1] - 3:7
**AMERICA** [1] - 1:4
**amount** [1] - 78:23
**analyst** [1] - 44:5
**Anchorage** [1] - 1:11, 1:15, 1:19
**angle** [1] - 19:16
**answer** [21] - 8:17, 9:8, 9:9, 9:12, 9:15, 9:16, 19:10, 41:25, 49:3, 60:5, 60:7, 63:22, 64:24, 65:10, 65:13, 67:4, 67:14, 84:12
**answered** [2] - 11:21, 47:3
**anticipated** [1] - 81:15
**anytime** [1] - 32:14
**anyways** [1] - 8:11
**apologize** [4] - 73:11, 73:12, 85:10,

85:14
**appear** [4] - 40:15, 90:14, 90:22, 90:25
**appearance** [1] - 83:13
**appearances** [2] - 5:25, 85:5
**appeared** [1] - 76:9
**appearing** [3] - 4:10, 5:3
**application** [5] - 16:22, 60:1, 62:12, 72:7
**applications** [1] - 61:4
**apply** [5] - 5:1, 60:13, 60:24, 61:1, 70:19
**applying** [1] - 61:3
**appreciate** [4] - 8:15, 35:1, 67:14, 73:17
**approved** [3] - 37:6, 85:5, 85:7
**April** [7] - 44:16, 44:24, 85:8, 86:2, 86:8
**area** [7] - 52:23, 53:4, 53:12, 53:13, 54:7, 59:20, 64:9
**arguably** [1] - 15:22
**argue** [2] - 16:21, 80:12
**argument** [8] - 16:6, 16:9, 18:17, 49:14, 80:19, 80:20, 81:16, 82:12
**arrange** [1] - 40:5
**arrest** [2] - 49:10, 79:2
**arrested** [4] - 13:18, 70:1, 76:18, 78:18
**arrive** [1] - 31:10
**arrived** [12] - 12:6, 12:13, 40:21, 54:22, 54:24, 70:21, 76:11, 76:13, 76:15, 77:6, 77:24
**arriving** [1] - 11:23
**ASAP** [16] - 6:15, 9:24, 10:2, 11:21, 26:10, 36:10, 36:22, 38:3, 39:11, 40:8, 40:17, 59:8, 59:18, 59:19, 69:10
**assessing** [1] - 34:17
**assessment** [1] - 34:24
**assigned** [6] - 52:21, 52:22, 66:6, 66:9, 75:4, 87:20
**assume** [5] - 5:25, 15:3, 45:22, 69:22, 71:1
**assumed** [1] - 56:5
**AST** [1] - 45:17
**attack** [1] - 49:13
**attending** [1] - 88:15
**attention** [1] - 21:23
**Attorney** [1] - 1:14
**attorney** [10] - 29:25, 33:16, 50:19, 68:10, 77:22, 84:13, 84:18, 87:20, 90:12, 90:15
**attorneys** [1] - 36:5
**audio** [7] - 11:2, 22:1, 22:17, 22:24, 66:25, 68:13
**August** [4] - 44:17, 44:25, 45:13, 45:15
**authentication** [1] - 57:17
**authority** [1] - 80:21
**available** [1] - 55:6
**Avenue** [1] - 1:15
**aware** [14] - 10:2, 38:20, 39:10, 40:19, 40:21, 40:24, 41:14, 42:2, 45:17, 46:14,
47:4, 47:6, 48:2, 77:22
**awkward** [1] - 30:7

## B

**B-E-C-K** [1] - 5:20
**background** [1] - 39:6
**bad** [1] - 62:25
**bag** [4] - 19:23, 19:25, 25:23, 26:1
**bail** [1] - 83:5
**ballpark** [1] - 78:3
**barred** [2] - 49:22, 50:5
**based** [13] - 16:20, 33:25, 47:15, 48:24, 48:25, 49:18, 50:8, 50:10, 61:24, 84:9, 87:14, 89:4, 90:4
**basis** [2] - 16:12, 50:17
**bear** [1] - 83:18
**beat** [1] - 89:1
**became** [3] - 10:13, 41:13, 44:9
**BECK** [2] - 2:5, 5:14
**Beck** [59] - 5:9, 5:11, 5:19, 5:22, 6:6, 6:14, 7:12, 7:18, 8:13, 8:24, 9:1, 9:23, 10:16, 11:12, 11:18, 15:12, 15:20, 15:21, 15:24, 16:15, 16:18, 17:21, 18:16, 19:2, 19:8, 19:11, 21:14, 23:16, 25:2, 25:13, 29:23, 30:6, 34:1, 34:2, 37:22, 37:24, 38:20, 39:9, 40:17, 54:7, 54:12, 54:16, 57:11, 59:15, 60:17, 66:18, 66:23, 67:22, 69:10, 69:12, 70:12, 70:22, 71:6, 71:16, 71:21, 72:20, 77:1, 77:3, 79:15
**Beck's** [4] - 15:17, 17:1, 18:18, 69:8
**become** [6] - 40:24, 42:2, 45:17, 47:4, 47:6, 76:2
**bed** [1] - 14:2
**BEFORE** [1] - 1:10
**begin** [2] - 4:13, 68:11
**beginning** [2] - 37:18, 69:4
**begins** [1] - 35:4
**behalf** [1] - 11:21
**behave** [1] - 61:18
**behaved** [1] - 61:17
**behavior** [1] - 88:13
**behind** [2] - 16:24, 19:21
**benefit** [1] - 31:23
**best** [5] - 8:18, 9:8, 39:16, 57:14, 75:25
**better** [3] - 81:11, 81:22, 89:8
**between** [6] - 25:1, 53:2, 64:13, 65:25, 86:2, 86:8
**beyond** [2] - 45:24, 48:4
**big** [3] - 53:12, 88:23, 88:25
**biographical** [2] - 39:4, 79:11
**bit** [6] - 7:11, 10:17, 27:25, 30:7, 31:13, 80:20
**blown** [1] - 72:2
**blue** [4] - 19:22, 25:18, 28:9, 28:14
**bond** [2] - 17:8, 84:20
**boss** [2] - 10:10, 29:19
**Boulevard** [1] - 14:9
**brake** [1] - 19:18

**brief** [5] - 52:19, 53:24, 68:13, 73:24, 81:16
**briefing** [1] - 81:2
**briefly** [2] - 30:8, 75:1
**bring** [5] - 16:19, 27:3, 27:5, 31:20, 72:1
**bringing** [3] - 28:21, 60:20, 88:11
**broke** [6] - 23:23, 24:10, 24:11, 24:12, 24:16, 24:17
**broken** [1] - 55:1
**brought** [7] - 24:14, 54:14, 59:16, 66:20, 70:13, 70:22, 71:16
**building** [1] - 14:16
**buildings** [1] - 14:13
**bump** [2] - 89:1, 89:2
**burden** [1] - 86:15
**business** [12] - 14:13, 14:23, 15:6, 36:10, 36:20, 36:23, 37:3, 39:9, 39:19, 44:11, 54:20, 69:21
**BY** [32] - 1:14, 1:18, 6:5, 7:17, 9:22, 10:20, 11:17, 17:20, 19:1, 21:13, 23:15, 25:12, 30:5, 35:24, 42:1, 43:22, 47:1, 48:9, 50:9, 52:15, 55:15, 56:12, 59:7, 62:1, 64:10, 64:23, 65:12, 68:7, 68:20, 68:24, 74:24, 77:20

## C

**CAD** [11] - 54:4, 57:6, 57:10, 57:14, 58:20, 59:1, 75:16, 75:18, 75:22, 78:3
**calendar** [1] - 37:16
**California** [1] - 38:21
**call-out** [2] - 37:1, 37:3
**callers** [1] - 23:18
**cameras** [1] - 17:21
**cannot** [1] - 50:16
**captain** [1] - 53:10
**car** [34] - 10:14, 12:3, 12:22, 12:23, 13:20, 18:6, 18:18, 19:18, 20:1, 20:9, 20:18, 23:21, 25:19, 26:19, 30:18, 31:6, 31:8, 32:3, 32:25, 33:10, 33:12, 33:13, 33:19, 49:9, 54:13, 54:18, 56:18, 60:17, 60:20, 66:25, 70:5, 76:22, 77:9, 77:11
**cars** [2] - 14:18, 14:19
**case** [39] - 6:8, 19:22, 19:24, 20:4, 25:18, 26:16, 28:9, 28:14, 28:21, 31:23, 32:5, 34:25, 48:10, 53:22, 54:5, 54:10, 55:3, 56:15, 57:15, 58:5, 60:12, 66:19, 67:9, 67:10, 69:4, 70:23, 70:24, 71:7, 71:9, 72:15, 72:19, 75:10, 76:2, 77:13, 77:22, 79:5, 79:16, 91:9
**CASE** [1] - 1:5
**Case** [1] - 3:6
**cases** [1] - 20:19
**catch** [1] - 83:6
**categorize** [2] - 63:8, 64:14
**caught** [2] - 33:7, 85:15
**caused** [2] - 25:24, 70:15
**CDs** [1] - 22:24
**cellphone** [1] - 7:3

**certainly** [1] - 23:2, 35:3, 61:15, 71:21, 81:18, 87:8
**CERTIFICATE** [1] - 92:8
**certify** [1] - 92:10
**chambers** [1] - 23:3
**chance** [1] - 88:24
**chances** [2] - 88:24, 88:25
**change** [1] - 33:18
**character** [3] - 47:18, 49:25, 50:2
**characterization** [1] - 7:13
**characterize** [1] - 63:19
**charge** [5] - 7:2, 7:19, 7:21, 8:20, 36:17
**charges** [15] - 6:22, 7:6, 7:13, 7:18, 8:3, 9:17, 9:21, 10:3, 10:7, 10:8, 10:11, 31:14, 31:16
**check** [2] - 87:13, 88:5
**circumstances** [3] - 19:8, 81:6, 86:23
**civilian** [1] - 64:13
**clarify** [2] - 4:19, 56:24
**clarity** [1] - 41:13
**classify** [1] - 64:5
**cleaning** [1] - 18:5
**clear** [3] - 39:24, 60:16, 87:6
**clearer** [1] - 24:23
**CLERK** [36] - 3:2, 5:11, 5:17, 5:21, 10:16, 11:14, 22:1, 22:10, 22:17, 35:5, 35:10, 35:16, 35:20, 42:23, 43:5, 43:8, 43:15, 43:18, 51:18, 51:22, 52:4, 52:7, 52:11, 56:7, 57:25, 58:3, 74:7, 74:16, 74:20, 83:9, 85:12, 85:14, 90:8, 90:16, 90:19, 91:16
**Clerk** [4] - 10:16, 21:18, 21:22, 83:23
**Clerk's** [2] - 43:5, 51:18, 74:7
**client** [2] - 86:24, 91:24
**climbed** [1] - 19:17
**close** [3] - 20:6, 66:19, 77:2
**closed** [2] - 26:4, 26:6
**closer** [2] - 31:1, 31:3
**clue** [1] - 64:4
**Coast** [1] - 53:11
**Code** [1] - 85:25
**cohabitate** [1] - 44:19
**coherent** [1] - 81:16
**Colbath** [38] - 3:11, 3:15, 3:16, 3:24, 4:6, 4:16, 5:23, 6:6, 7:9, 9:1, 9:7, 9:19, 16:4, 18:21, 22:12, 25:8, 33:24, 35:21, 35:25, 42:19, 43:19, 46:2, 48:8, 50:22, 51:6, 55:21, 57:20, 59:1, 68:4, 68:8, 74:5, 77:18, 77:21, 80:9, 82:3, 83:14, 84:19, 86:24
**COLBATH** [101] - 1:18, 3:11, 3:25, 4:2, 4:7, 4:18, 5:9, 5:24, 6:3, 6:5, 7:16, 7:17, 8:22, 9:22, 10:20, 11:10, 11:17, 16:6, 17:1, 17:7, 17:14, 17:19, 17:20, 18:23, 19:1, 21:12, 21:13, 21:17, 21:22, 22:3, 22:7, 22:14, 22:19, 22:21, 23:5, 23:8, 23:11, 23:15, 25:9, 25:12, 33:25, 34:6, 35:22, 35:24, 41:3, 41:15, 41:20, 41:23, 42:1, 42:9, 42:20, 42:24, 43:2, 43:20, 43:22, 46:10, 46:13, 46:16, 47:1, 48:9, 48:24, 49:3, 50:6, 50:9, 51:8, 55:22, 55:25, 56:2, 56:5, 56:11, 57:21, 58:19, 61:6, 63:10, 63:15, 63:20, 64:16, 68:5, 68:7, 68:20, 68:24, 72:23, 74:6, 77:20, 79:22, 80:11, 80:13, 80:18, 81:10, 82:7, 82:21, 83:1, 83:15, 83:22, 83:24, 85:10, 85:13, 85:16, 87:1, 91:14, 91:17
**combination** [2] - 15:1, 17:22
**coming** [2] - 10:9, 21:20
**command** [1] - 53:9
**comment** [1] - 70:6
**comments** [1] - 91:20
**committed** [1] - 48:3
**committing** [2] - 91:4, 91:6
**common** [2] - 65:3, 72:3
**commonly** [2] - 23:2, 32:12
**communicated** [1] - 42:24
**communication** [1] - 11:25
**community** [3] - 36:7, 36:20, 43:23
**company** [5] - 39:11, 40:13, 70:17, 78:13, 79:9
**company's** [1] - 78:11
**compartment** [1] - 28:5
**compartments** [1] - 40:11
**complete** [2] - 58:20, 59:2
**completely** [1] - 83:4
**compliance** [1] - 88:18
**comply** [2] - 85:1, 89:12
**computer** [3] - 22:15, 22:18, 57:7
**computer-aided** [1] - 57:7
**concern** [1] - 71:11
**concerns** [1] - 91:20
**conclusion** [2] - 63:11, 63:13
**condition** [3] - 84:25, 85:23, 86:6
**conditions** [9] - 83:11, 84:4, 86:22, 88:22, 89:12, 89:23, 90:4, 91:2, 91:3
**condone** [1] - 49:16
**conduct** [2] - 49:22, 87:4
**conex** [1] - 14:17
**conference** [1] - 90:17
**confirm** [1] - 87:2
**confirmed** [2] - 86:3, 86:9
**confused** [1] - 65:5
**connection** [1] - 6:11
**consider** [1] - 23:2
**consideration** [1] - 18:19
**considered** [1] - 65:16
**considering** [1] - 16:1
**consists** [1] - 58:15
**constitute** [1] - 69:4
**constitutional** [2] - 84:8, 84:10
**contact** [8] - 29:10, 40:4, 59:14, 60:16, 76:18, 79:15, 79:19, 90:12
**contacted** [1] - 76:9
**contained** [1] - 84:7
**container** [2] - 26:17, 28:9
**containers** [2] - 40:6, 40:11
**contemporaneous** [1] - 41:20

**contents** [1] - 72:11
**context** [16] - 10:5, 15:17, 34:16, 41:12, 44:10, 44:11, 44:12, 46:18, 56:13, 61:13, 62:16, 63:3, 63:15, 63:17, 88:2
**contextual** [1] - 41:23
**continue** [2] - 4:19, 5:1
**continued** [1] - 3:18
**contract** [1] - 36:23
**contractor** [4] - 9:25, 10:1, 37:25, 38:1
**contracts** [1] - 36:25
**contradicting** [1] - 7:12
**control** [6] - 13:4, 14:21, 32:13, 69:19, 70:16, 70:17
**controlled** [2] - 49:6, 85:24
**convenience** [1] - 9:4
**conventionally** [3] - 22:22, 23:1, 23:6
**conversation** [3] - 28:23, 29:14, 71:25
**conversations** [1] - 67:22
**convictions** [1] - 38:21
**cooperated** [1] - 47:12
**coordinating** [1] - 73:12
**cop** [1] - 27:21
**copy** [4] - 55:10, 55:14, 83:21, 84:5
**corner** [2] - 19:22, 25:23
**correct** [13] - 6:16, 6:23, 7:7, 8:4, 13:20, 25:19, 36:2, 36:18, 45:9, 48:21, 50:4, 69:1, 70:14
**counsel** [2] - 3:9, 5:3, 84:18
**counseling** [1] - 88:16
**couple** [9] - 16:14, 17:18, 29:17, 55:2, 55:3, 69:15, 80:25, 81:20
**course** [6] - 8:2, 14:3, 16:7, 23:13, 54:25, 62:4
**COURT** [156] - 1:2, 3:12, 3:22, 3:24, 4:1, 4:4, 4:12, 4:16, 4:25, 5:10, 5:22, 6:2, 7:9, 8:13, 9:1, 9:14, 9:19, 11:4, 11:7, 15:12, 16:3, 16:23, 17:6, 17:11, 17:15, 18:16, 18:21, 18:24, 19:7, 19:13, 21:8, 21:11, 21:19, 22:2, 22:5, 22:8, 22:11, 22:20, 23:1, 23:7, 23:10, 23:13, 25:3, 25:5, 25:8, 30:2, 33:23, 34:2, 34:5, 34:9, 34:12, 35:1, 35:8, 35:21, 41:2, 41:4, 41:9, 41:12, 41:19, 41:22, 41:24, 42:11, 42:14, 42:18, 43:1, 43:4, 43:19, 45:21, 46:2, 46:12, 46:15, 46:22, 46:25, 48:7, 49:2, 49:18, 49:23, 50:22, 51:2, 51:6, 51:11, 51:17, 52:12, 55:12, 55:21, 56:4, 56:9, 57:20, 57:23, 58:1, 58:7, 58:15, 58:18, 58:24, 61:9, 61:20, 61:24, 63:12, 63:16, 63:21, 63:24, 64:17, 65:5, 65:7, 68:3, 68:17, 72:25, 73:3, 73:7, 73:13, 73:17, 73:20, 73:23, 73:25, 74:4, 74:10, 74:21, 77:17, 79:24, 80:2, 80:6, 80:9, 80:12, 80:17, 81:9, 81:24, 82:3, 82:8, 82:11, 82:23, 83:3, 83:10, 83:16, 83:18, 83:20, 83:23, 84:1, 84:17, 85:15, 85:17, 85:21, 86:13, 87:13, 87:17, 87:23, 88:4, 88:9, 88:19, 90:1, 90:3, 90:10, 90:18, 90:20, 91:13,

91:19, 91:22

**Court** [25] - 3:2, 3:3, 3:13, 4:8, 4:19, 5:2, 6:23, 22:22, 23:8, 36:7, 46:19, 46:21, 50:16, 51:10, 55:10, 75:1, 80:14, 80:19, 81:3, 81:17, 81:18, 81:22, 85:6, 88:12

**court** [12] - 8:12, 8:16, 8:19, 9:7, 12:9, 73:11, 85:4, 90:6, 90:9, 90:12, 90:13, 90:25

**Court's** [5] - 16:1, 21:23, 48:25, 50:8

**courtesy** [2] - 9:4, 55:10

**covering** [1] - 49:12

**credibility** [6] - 45:23, 46:10, 46:19, 48:5, 49:14, 81:6

**crime** [5] - 64:13, 90:25, 91:4, 91:6, 91:7

**criminal** [6] - 6:22, 38:13, 38:14, 62:11, 62:17, 62:22

**critically** [1] - 61:16

**CROSS** [4] - 2:4, 30:4, 68:6, 77:19

**cross** [8] - 30:2, 31:22, 42:11, 42:12, 50:23, 66:11, 68:4, 77:18

**cross-examination** [6] - 30:2, 42:11, 42:12, 50:23, 68:4, 77:18

**CROSS-EXAMINATION** [3] - 30:4, 68:6, 77:19

**crystals** [1] - 19:23

**current** [3] - 75:4, 88:22, 90:4

**cursory** [2] - 39:17, 39:25

**custody** [11] - 3:13, 13:9, 70:2, 78:11, 86:20, 88:1, 88:22, 89:10, 89:13, 89:17, 90:4

### D

**D-2** [7] - 2:15, 11:1, 11:5, 11:7, 11:9, 11:16, 30:16

**D-3** [7] - 2:16, 24:25, 25:1, 25:3, 25:5, 25:7, 25:11

**D-4** [5] - 2:17, 68:13, 68:15, 68:17, 68:19

**D-5** [6] - 2:18, 21:5, 21:6, 21:8, 21:10, 21:16

**D-R-A-K-E** [1] - 43:17

**daily** [3] - 45:5, 45:7, 47:24

**date** [7] - 82:16, 82:18, 90:6, 90:9, 90:12, 90:13, 90:14

**dating** [2] - 44:15, 44:16

**DAY** [1] - 1:9

**days** [3] - 29:18, 81:20, 88:16

**DE-2** [1] - 11:1

**deal** [1] - 66:2

**deals** [1] - 16:8

**decide** [1] - 89:16

**decided** [2] - 76:4, 76:6

**decision** [2] - 70:11, 76:6

**deck** [1] - 14:4, 19:15, 19:17

**Defendant** [1] - 1:7, 11:9

**defendant** [2] - 76:17, 77:25

**DEFENDANT** [6] - 1:17, 2:14, 84:16,

85:20, 86:12, 91:21

**Defendant's** [2] - 21:4, 68:12

**Defender** [1] - 1:17

**Defender's** [1] - 36:1

**Defense** [2] - 11:1, 11:5

**defense** [5] - 22:24, 51:9, 73:14, 83:1, 91:13

**defense's** [1] - 3:25

**deficient** [1] - 16:13

**defined** [1] - 85:24

**delay** [1] - 80:22

**demonstrating** [1] - 86:15

**denial** [1] - 87:5

**denies** [2] - 87:8, 87:10

**deny** [2] - 87:9, 87:11

**DEPUTY** [36] - 3:2, 5:11, 5:17, 5:21, 10:16, 11:14, 22:1, 22:10, 22:17, 35:5, 35:10, 35:16, 35:20, 42:23, 43:5, 43:8, 43:15, 43:18, 51:18, 51:22, 52:4, 52:7, 52:11, 56:7, 57:25, 58:3, 74:7, 74:16, 74:20, 83:9, 85:12, 85:14, 90:8, 90:16, 90:19, 91:16

**Deputy** [6] - 5:10, 22:8, 35:8, 83:3, 83:7, 90:6

**describe** [5] - 14:12, 19:3, 19:4, 44:11, 56:1

**described** [1] - 50:12

**describing** [1] - 23:24

**detail** [2] - 13:16, 79:12

**details** [6] - 42:7, 46:20, 78:17, 79:2, 79:5, 79:10

**detained** [1] - 88:1

**detention** [4] - 87:15, 87:22, 88:3, 89:5

**deviated** [1] - 85:7

**deviations** [1] - 88:18

**DEVIN** [3] - 2:7, 43:12, 43:17

**Devin** [3] - 42:21, 43:7, 43:17

**dial** [1] - 70:25

**differences** [1] - 65:24

**different** [4] - 60:5, 61:22, 66:9, 86:21

**difficult** [1] - 87:25

**difficulty** [1] - 10:18

**DIGITAL** [1] - 1:23

**DIRECT** [6] - 2:4, 6:4, 35:23, 43:21, 52:14, 74:23

**directed** [1] - 85:2

**direction** [2] - 53:18, 76:7

**directly** [1] - 53:20, 64:6, 66:2

**dirty** [1] - 89:11

**disconnect** [5] - 34:3, 42:16, 51:4, 73:5, 80:4

**discovered** [2] - 71:22, 71:23

**discovery** [3] - 21:6, 81:4, 81:5

**discuss** [1] - 84:8

**discussed** [1] - 83:25

**dismissed** [4] - 7:4, 7:6, 7:8, 8:10

**dispatch** [18] - 10:15, 10:19, 11:3, 12:1, 20:25, 21:5, 23:20, 24:6, 24:8, 24:20, 25:1, 31:9, 57:7, 57:8, 68:13,

69:1, 71:5

**dispatcher** [3] - 25:15, 69:25, 71:6

**display** [1] - 55:13

**dispute** [1] - 17:12

**disregard** [3] - 15:19, 34:18, 61:12

**disrespectful** [1] - 89:18

**distinction** [1] - 64:13

**DISTRICT** [2] - 1:2, 1:2

**District** [1] - 3:3

**Division** [1] - 6:23

**DJ** [2] - 90:7, 90:18

**DMV** [1] - 33:16

**docket** [5] - 58:2, 58:10, 83:10, 84:4, 84:22

**documenting** [1] - 60:11

**domestic** [2] - 8:9, 8:10

**done** [6] - 39:21, 45:17, 47:5, 72:3, 72:12

**down** [13] - 6:23, 14:3, 19:15, 20:2, 20:25, 24:14, 27:4, 32:17, 46:7, 67:3, 76:4, 85:3, 89:18

**DRAKE** [2] - 2:7, 43:12

**Drake** [12] - 42:21, 43:7, 43:9, 43:17, 43:23, 47:2, 48:10, 49:4, 50:10, 50:18, 50:25, 51:2

**drive** [5] - 13:25, 14:5, 24:16, 49:12, 55:1

**driven** [1] - 76:8

**driver** [12] - 10:6, 12:4, 32:24, 38:3, 54:7, 76:10, 77:1, 77:5, 78:10, 79:3, 79:9, 79:10

**driver's** [4] - 25:22, 38:16, 39:4, 69:8

**drivers** [3] - 38:8, 38:9, 38:12

**driving** [4] - 38:3, 38:15, 38:16, 38:19

**drop** [2] - 24:12, 28:22

**dropped** [6] - 19:15, 28:24, 32:2, 59:15, 60:17

**drove** [3] - 14:2, 18:3, 49:9

**drug** [10] - 64:1, 65:19, 65:21, 65:23, 66:5, 66:7, 66:10, 85:24, 86:7, 87:8

**drugs** [15] - 23:21, 24:15, 26:2, 26:16, 26:17, 28:4, 28:9, 28:14, 31:24, 32:2, 54:8, 70:5, 71:7, 72:20, 72:21

**due** [3] - 82:5, 82:12

**duly** [5] - 5:15, 35:14, 43:13, 52:2, 74:14

**dumped** [1] - 18:7

**during** [13] - 14:23, 15:6, 31:16, 44:18, 45:4, 45:16, 47:2, 47:3, 48:1, 70:2, 71:22, 71:24

**duties** [4] - 52:20, 52:24, 75:2, 75:8

**duty** [1] - 75:4

### E

**e-mail** [1] - 55:2

**easy** [1] - 90:10

**EBELL** [80] - 1:14, 3:10, 3:21, 3:23, 4:15, 5:7, 11:6, 15:8, 15:11, 15:15, 18:14, 18:17, 19:5, 21:7, 25:4, 30:3,

30:5, 33:22, 34:10, 34:13, 40:25, 41:6, 41:10, 42:12, 45:19, 45:22, 46:23, 48:4, 49:20, 50:24, 51:14, 52:15, 55:13, 55:15, 55:20, 55:24, 56:1, 56:6, 56:8, 56:10, 56:12, 57:17, 57:24, 58:4, 58:13, 58:17, 59:5, 59:7, 61:10, 61:23, 62:1, 64:10, 64:21, 64:23, 65:6, 65:10, 65:12, 68:2, 68:16, 73:2, 73:9, 73:14, 73:18, 73:21, 73:24, 74:2, 74:22, 74:24, 77:16, 80:1, 80:8, 82:1, 82:10, 82:22, 83:2, 83:17, 87:16, 87:18, 87:24, 91:12

**Ebell** [30] - 3:10, 3:14, 3:16, 4:13, 11:4, 25:3, 30:2, 30:8, 33:23, 42:11, 46:22, 49:19, 50:4, 50:23, 51:12, 52:13, 52:16, 58:3, 58:12, 65:5, 68:3, 73:1, 73:7, 74:21, 79:25, 80:6, 81:25, 82:8, 83:16, 87:14

**eighty** [1] - 14:18
**either** [10] - 4:9, 4:11, 16:18, 28:19, 29:10, 46:20, 67:22, 70:11, 73:14, 86:16
**elaborate** [1] - 15:15
**elicit** [2] - 49:4, 49:24
**employed** [1] - 45:2
**employee** [2] - 9:24, 37:24
**employees** [1] - 15:2
**employer** [1] - 39:25
**employment** [1] - 10:5
**encountering** [1] - 77:3
**end** [4] - 59:22, 71:20, 80:23, 89:13
**ended** [1] - 10:10
**enforcement** [5] - 10:7, 13:10, 63:4, 63:15, 63:17
**enforcement's** [1] - 70:16
**enlighten** [1] - 42:5
**ensure** [1] - 5:4
**enter** [2] - 70:9, 71:19
**entered** [1] - 71:15
**entering** [1] - 72:17
**entitled** [2] - 86:14, 92:12
**entrance** [1] - 14:21
**essentially** [1] - 5:1
**estimated** [1] - 30:16
**evidence** [15] - 4:14, 7:22, 11:9, 16:16, 16:17, 21:10, 25:7, 48:5, 51:12, 59:4, 68:19, 80:7, 80:10, 81:15, 86:17
**EVIDENTIARY** [1] - 1:9
**evidentiary** [3] - 3:18, 51:9, 82:24
**exact** [3] - 8:20, 34:14, 71:25
**exactly** [7] - 7:23, 14:1, 41:13, 49:21, 66:21, 71:3, 78:2
**EXAMINATION** [8] - 6:4, 30:4, 35:23, 43:21, 52:14, 68:6, 74:23, 77:19
**examination** [6] - 30:2, 42:11, 42:12, 50:23, 68:4, 77:18
**examined** [5] - 5:15, 35:14, 43:13, 52:2, 74:14
**except** [1] - 85:4
**excerpt** [1] - 11:2
**exclusion** [1] - 5:1

**excuse** [1] - 16:10
**EXHIBIT** [2] - 2:14, 2:20
**exhibit** [8] - 10:21, 21:2, 21:16, 23:14, 25:11, 57:21, 57:22, 68:23
**Exhibit** [22] - 11:1, 11:5, 11:16, 21:5, 24:25, 30:16, 55:9, 55:16, 55:20, 56:7, 56:13, 56:21, 57:3, 57:19, 57:20, 58:12, 58:15, 68:13, 70:23, 75:15, 75:19
**exhibits** [3] - 57:25, 58:8, 67:11
**exigency** [1] - 17:2
**exit** [1] - 14:21
**expect** [2] - 73:24, 81:19
**expedited** [1] - 82:13
**experience** [4] - 63:7, 64:12, 65:1, 65:14
**explained** [2] - 54:20, 67:1
**explanation** [3] - 87:3, 87:4, 87:12
**extended** [1] - 78:7
**extent** [2] - 63:10, 81:14
**eyeballing** [2] - 20:16, 20:17
**eyes** [1] - 20:18

## F

**facility** [1] - 17:5
**fact** [5] - 41:17, 48:18, 48:19, 72:1, 78:21
**facts** [1] - 81:14
**factual** [2] - 34:25, 41:10
**failing** [1] - 90:25
**fair** [5] - 6:20, 41:22, 41:24, 46:15, 46:25
**Fairbanks** [2] - 53:6, 80:22
**fairly** [2] - 75:17, 78:4
**falls** [1] - 38:1
**familiar** [9] - 59:8, 63:4, 67:15, 69:11, 69:14, 75:10, 79:8, 83:24, 91:2
**far** [8] - 16:20, 39:3, 40:6, 40:10, 50:3, 57:14, 75:22, 75:24
**fashion** [2] - 4:11, 4:24
**February** [3] - 37:15, 37:18, 39:1
**Federal** [1] - 1:17, 35:25
**fees** [1] - 37:7
**felony** [2] - 7:1, 7:18
**felt** [1] - 27:2
**female** [1] - 25:15
**fence** [3] - 14:15, 16:5, 16:24
**fenced** [1] - 69:19
**fences** [1] - 14:13
**few** [2] - 36:6, 52:18
**field** [1] - 38:3
**fight** [1] - 32:17
**figure** [1] - 78:3
**file** [3] - 58:3, 59:2, 80:20
**filed** [8] - 22:22, 23:1, 55:11, 58:5, 58:8, 83:12, 84:4, 84:22
**filing** [1] - 81:2
**fill** [3] - 13:2, 33:6, 37:5
**fills** [1] - 33:3

**finance** [1] - 44:4
**fine** [8] - 9:4, 9:10, 17:16, 27:24, 41:13, 41:19, 50:6, 67:13
**first** [12] - 4:3, 4:16, 4:22, 4:24, 10:13, 19:25, 21:18, 21:23, 27:16, 29:17, 37:21, 38:8, 40:24, 41:16, 44:11, 76:2, 80:14, 84:24, 85:18
**firsthand** [3] - 48:20, 49:6, 72:17
**fist** [1] - 26:2
**five** [1] - 53:9
**flatbed** [2] - 13:25, 31:7
**focus** [2] - 53:12, 72:19
**following** [2] - 82:8, 85:1
**follows** [5] - 5:16, 35:15, 43:14, 52:3, 74:15
**fond** [1] - 27:3
**foot** [1] - 19:18
**FOR** [3] - 1:2, 1:13, 1:17
**foregoing** [1] - 92:11
**forgotten** [1] - 83:4
**form** [2] - 45:7, 81:17
**former** [1] - 15:18
**former-Trooper** [1] - 15:18
**forward** [4] - 14:4, 20:2, 32:5, 84:9
**foundation** [2] - 45:24, 64:20
**four** [2] - 53:8, 88:16
**frame** [2] - 37:20, 44:22
**framed** [2] - 61:25, 63:17
**Franks** [1] - 16:1
**free** [1] - 35:3
**frequent** [1] - 45:6
**frequently** [1] - 47:24
**fresh** [1] - 81:13
**Friday** [3] - 80:22, 82:9, 82:12
**friend** [2] - 33:13, 77:2
**FROM** [1] - 1:23
**front** [5] - 8:3, 19:17, 70:25, 79:7, 90:18
**fruit** [2] - 39:15, 40:14
**FTR** [1] - 92:11
**full** [5] - 5:18, 14:18, 35:17, 43:16, 52:5, 52:8, 72:2, 74:17
**full-blown** [1] - 72:2
**function** [1] - 40:8

## G

**garage** [3] - 54:15, 54:21, 70:18
**garbled** [1] - 22:6
**Gary** [5] - 3:11, 6:6, 35:25, 68:8, 77:21
**GARY** [1] - 1:18
**gate** [7] - 14:20, 14:22, 15:5, 15:14, 16:5, 16:24, 24:2
**gate's** [1] - 14:23
**gear** [2] - 19:15
**general** [16] - 4:18, 49:24, 50:2, 52:20, 57:5, 60:19, 61:10, 61:21, 62:6, 62:12, 62:16, 64:11, 65:2, 65:4, 65:9, 65:15, 75:8

**generally** [14] - 6:18, 6:20, 14:12, 15:5, 16:7, 23:17, 36:7, 44:2, 44:12, 62:10, 64:12, 65:25, 69:12, 76:1
**generated** [1] - 54:3
**generator** [5] - 23:25, 24:4, 28:5, 67:9, 72:15
**GEORGE** [1] - 1:18
**gist** [1] - 87:9
**given** [1] - 5:25
**glare** [1] - 56:17
**glass** [1] - 24:5
**Gold** [1] - 92:11
**government** [17] - 3:10, 3:20, 11:3, 21:6, 29:25, 50:19, 51:14, 52:17, 73:9, 81:3, 81:20, 83:2, 86:15, 87:14, 87:15, 87:22, 91:11
**Government** [1] - 59:4
**GOVERNMENT** [2] - 1:13, 2:20
**government's** [2] - 17:16, 82:11
**grab** [1] - 67:1
**great** [3] - 6:13, 22:10, 42:17
**ground** [1] - 19:17
**group** [1] - 66:3
**guard** [1] - 18:4
**guess** [15] - 8:22, 10:25, 21:23, 29:8, 46:7, 55:3, 58:21, 60:5, 60:6, 63:10, 64:21, 64:25, 70:23, 87:1, 87:6
**guys** [5] - 26:11, 27:4, 28:22, 32:17, 70:18

## H

**half** [3] - 31:12, 59:12, 59:21
**hall** [1] - 30:8
**hand** [6] - 5:12, 19:20, 35:11, 43:9, 51:23, 74:11
**handed** [1] - 84:5
**handle** [2] - 24:3, 81:11
**hands** [2] - 32:15
**hang** [4] - 7:9, 15:12, 18:16, 41:4
**hanging** [2] - 39:15, 40:14
**happy** [1] - 50:7
**hard** [1] - 8:23
**Health** [1] - 44:4
**hear** [11] - 6:10, 6:13, 19:11, 48:19, 49:15, 63:12, 63:13, 63:16, 80:19, 86:18, 89:6
**heard** [8] - 21:18, 22:6, 30:16, 48:18, 48:19, 63:18, 76:3, 76:18
**hearing** [16] - 3:18, 6:15, 10:18, 15:18, 15:25, 16:2, 26:11, 30:9, 34:16, 59:3, 75:14, 82:14, 82:24, 86:14, 86:17
**HEARING** [1] - 1:9
**hearings** [2] - 29:13, 77:14
**hears** [1] - 87:3
**hearsay** [3] - 46:5, 46:20, 49:6
**height** [1] - 16:4
**help** [2] - 40:5, 53:18
**helpful** [2] - 78:5, 83:21
**helpfully** [1] - 83:3

**helping** [1] - 31:24
**heroin** [2] - 78:23, 86:7
**hesitation** [1] - 87:18
**hi** [1] - 52:16
**hidden** [2] - 28:4, 28:6
**highly** [1] - 61:11
**Highway** [1] - 11:24
**highway** [1] - 54:10
**himself** [1] - 48:3
**history** [3] - 38:13, 62:17, 62:22
**hit** [3] - 85:14, 88:25, 89:2
**hold** [1] - 41:3
**holding** [2] - 13:9, 13:10
**Holly** [3] - 43:5, 51:18, 74:7
**home** [4] - 24:12, 44:24, 49:12, 85:2
**Honda** [6] - 13:22, 16:8, 18:12, 19:2, 31:10, 40:20
**Honor** [88] - 3:2, 3:6, 3:21, 4:7, 4:15, 4:18, 5:7, 5:24, 8:22, 10:24, 15:8, 16:6, 18:18, 19:5, 21:4, 21:7, 21:17, 24:24, 30:3, 33:22, 34:1, 34:6, 34:10, 40:25, 42:9, 42:12, 42:20, 42:25, 43:20, 45:19, 46:10, 46:23, 48:4, 48:25, 49:4, 49:20, 50:6, 50:24, 51:8, 51:14, 55:10, 55:22, 57:18, 57:21, 58:13, 58:21, 59:6, 61:6, 61:7, 61:10, 61:23, 63:10, 64:21, 65:10, 68:2, 68:5, 68:12, 72:24, 73:2, 73:9, 73:14, 74:6, 74:22, 77:16, 79:23, 80:1, 80:5, 80:8, 80:13, 82:1, 82:7, 82:10, 82:21, 83:1, 83:17, 83:22, 85:10, 85:16, 87:1, 87:16, 88:8, 89:25, 90:8, 90:16, 91:12, 91:14, 91:17, 91:21
**HONORABLE** [1] - 1:10
**Honorable** [1] - 3:4
**hope** [1] - 32:4
**hour** [7] - 30:17, 30:20, 30:23, 31:1, 59:12, 59:21, 80:15
**hours** [4] - 14:23, 15:6, 31:12, 85:3
**house** [1] - 31:2
**housekeeping** [2] - 4:5, 4:13
**Howard** [37] - 12:7, 16:16, 16:17, 27:11, 27:16, 27:19, 29:11, 34:17, 44:6, 44:8, 45:1, 45:18, 45:25, 47:4, 47:5, 47:16, 48:11, 49:5, 49:9, 50:10, 50:12, 66:15, 66:17, 67:23, 70:1, 70:12, 72:8, 72:11, 76:3, 76:7, 76:10, 76:17, 76:23, 77:25, 78:22, 81:4
**Howard's** [5] - 15:18, 16:13, 18:19, 61:15, 76:11, 76:22
**hub** [1] - 53:4
**hubs** [1] - 53:6

## I

**ID** [1] - 33:1
**idea** [1] - 63:5
**identify** [1] - 3:9
**illegal** [1] - 49:17
**illegally** [1] - 16:10
**immediately** [1] - 37:9

**impeach** [1] - 50:3
**important** [3] - 8:16, 9:6, 32:22
**importantly** [1] - 81:2
**impossible** [1] - 5:2
**impound** [14] - 13:3, 13:14, 32:8, 32:11, 32:16, 32:21, 33:2, 33:3, 33:11, 76:14, 77:10, 79:7, 79:9
**impounded** [3] - 32:23, 54:9, 78:12
**in-person** [2] - 91:15
**incarceration** [1] - 85:3
**incident** [6] - 6:19, 31:17, 34:22, 34:23, 49:8, 57:11
**incidents** [1] - 79:21
**inclined** [4] - 48:8, 49:23, 61:9, 88:21
**include** [6] - 61:4, 62:9, 62:13, 62:20, 62:21, 84:12
**included** [1] - 62:7
**incomplete** [1] - 59:2
**incorrect** [1] - 34:22
**indeed** [1] - 80:17
**independent** [4] - 9:24, 10:1, 37:25, 38:1
**indicated** [3] - 38:24, 86:3, 86:8
**indiscernible** [17] - 6:24, 7:24, 8:6, 8:20, 8:21, 10:15, 14:11, 18:4, 22:19, 27:1, 27:25, 28:18, 31:5, 33:15, 39:18, 60:3, 72:5
**indiscernible)** [9] - 12:16, 13:7, 24:5, 26:15, 29:7, 32:22, 33:17, 53:11, 55:7
**individual** [3] - 37:21, 44:6, 88:16
**infinite** [1] - 89:4
**influence** [1] - 91:7
**informant** [12] - 63:4, 63:5, 63:9, 63:19, 64:5, 64:7, 64:8, 64:15, 65:17, 65:20, 65:24, 66:1
**informants** [4] - 64:1, 64:19, 66:4, 66:8
**information** [24] - 12:3, 13:15, 29:2, 32:18, 34:20, 37:11, 37:17, 38:6, 38:7, 39:5, 41:16, 46:4, 46:5, 48:12, 48:13, 48:15, 65:21, 72:6, 72:11, 79:1, 79:2, 79:11, 91:8
**informed** [2] - 61:16, 69:25
**initial** [2] - 83:12, 87:20
**inquire** [6] - 5:23, 35:21, 43:19, 52:13, 74:21, 91:14
**inside** [5] - 40:6, 54:15, 62:22, 71:16
**insofar** [1] - 16:23
**instances** [4] - 48:2, 48:7, 49:21, 50:3
**instruct** [1] - 60:8
**instructed** [1] - 4:21
**insurance** [1] - 37:6
**intention** [1] - 88:11
**intentionality** [1] - 61:13
**interact** [1] - 45:5
**interacted** [2] - 31:19, 45:7
**interaction** [1] - 41:21
**interactions** [8] - 15:21, 16:15, 34:19, 34:21, 34:22, 41:10, 47:15, 50:11

**interest** [1] - 33:19
**interested** [1] - 29:9
**interior** [1] - 56:18
**internal** [3] - 45:17, 46:4, 47:4
**internet** [2] - 8:24, 9:11
**interrupting** [1] - 85:11
**interview** [1] - 72:2
**interviewed** [1] - 47:9
**interviews** [1] - 47:11
**intoxicated** [1] - 49:9
**inventory** [9] - 26:8, 26:12, 39:12, 39:17, 40:12, 67:15, 67:25, 71:22, 71:24
**investigate** [3] - 38:18, 39:2, 70:19
**investigation** [11] - 13:1, 39:6, 45:17, 46:1, 46:4, 46:5, 46:20, 47:4, 47:10, 47:13, 78:12
**investigator** [1] - 10:25
**involved** [13] - 10:8, 10:13, 10:14, 29:12, 36:5, 47:7, 60:2, 60:10, 60:12, 64:7, 75:24, 76:2, 77:22
**involvement** [13] - 6:7, 6:19, 32:4, 32:6, 53:24, 54:5, 54:6, 54:9, 57:15, 69:4, 71:20, 76:1, 77:13
**involves** [1] - 48:10
**involving** [3] - 68:14, 75:11
**IRA** [3] - 2:5, 5:14, 5:19
**Ira** [17] - 5:9, 5:19, 6:14, 37:22, 41:1, 42:4, 54:6, 57:11, 59:14, 66:18, 67:22, 69:8, 69:10, 71:21, 72:2, 77:1, 79:15
**issue** [3] - 21:24, 64:20, 83:5
**issues** [2] - 42:3, 91:24
**items** [2] - 20:18, 70:8

## J

**jail** [3] - 17:7, 33:8, 91:4
**January** [4] - 37:13, 37:15, 37:18, 39:1
**job** [9] - 52:20, 52:24, 62:4, 75:2, 75:5, 75:8, 77:3
**Joel** [1] - 3:8
**JOEL** [1] - 1:6
**John** [3] - 73:10, 74:9, 74:18
**JOHN** [3] - 2:9, 74:13, 74:18
**join** [1] - 35:5
**joined** [3] - 43:6, 51:19, 74:8
**Judge** [5] - 8:13, 22:3, 90:24
**JUDGE** [1] - 1:10
**jumped** [1] - 19:17
**June** [5] - 1:11, 90:17, 90:23, 91:15, 92:14
**juror** [1] - 91:7
**jury** [1] - 17:17

## K

**K-I-N-G** [1] - 74:19
**Kaneshiro** [2] - 92:10, 92:14
**KANESHIRO** [1] - 92:15
**Kaneshiro-Miller** [2] - 92:10, 92:14

**KANESHIRO-MILLER** [1] - 92:15
**keep** [5] - 26:25, 52:19, 66:10, 89:8, 89:9
**Kenai** [1] - 6:23
**kept** [1] - 39:22
**keys** [1] - 13:20
**kind** [10] - 7:22, 20:19, 26:20, 27:20, 31:23, 53:11, 56:17, 57:8, 70:24, 78:20
**Kindred** [1] - 90:24
**KING** [2] - 2:9, 74:13
**King** [6] - 73:10, 74:9, 74:19, 74:25, 77:21, 79:23
**knowing** [1] - 45:24
**knowledge** [8] - 18:11, 45:25, 47:16, 48:20, 49:6, 50:10, 64:8, 66:7
**known** [3] - 34:20, 44:8, 88:17
**knows** [2] - 46:21
**Kosakowski** [4] - 88:5, 88:20, 89:7, 89:22

## L

**labeled** [1] - 75:19
**Laboratory** [2] - 86:4, 86:10
**laboratory** [1] - 87:7
**Lake** [2] - 59:11, 59:20
**last** [4] - 26:11, 30:9, 37:10, 52:10
**late** [1] - 45:15
**law** [12] - 10:7, 13:10, 48:3, 49:25, 50:2, 50:13, 50:15, 63:4, 63:15, 63:17, 70:15, 89:5
**law-abiding** [4] - 49:25, 50:2, 50:13, 50:15
**lawyer** [1] - 84:5
**lay** [1] - 24:14
**laying** [3] - 41:12, 45:24, 71:9
**leading** [2] - 64:16, 64:17
**learned** [2] - 41:16, 70:2
**least** [2] - 69:11, 78:3
**leave** [6] - 3:19, 5:3, 50:8, 76:23, 88:21, 90:3
**leaves** [1] - 5:5
**leaving** [2] - 29:8, 29:9
**led** [1] - 84:20
**Lee** [1] - 5:19
**left** [7] - 12:14, 15:6, 26:5, 31:2, 77:25, 79:16
**legal** [4] - 31:23, 33:19, 63:11, 63:13
**legally** [1] - 38:19
**length** [1] - 83:25
**less** [3] - 30:21, 30:23, 45:5
**license** [2] - 38:16, 39:5
**licensed** [2] - 38:13, 86:1
**lienholder** [3] - 33:5, 33:8, 79:13
**lienholder's** [1] - 33:5
**lieutenant** [1] - 53:9
**life** [1] - 88:24
**light** [1] - 88:3
**likely** [1] - 37:17

**limited** [2] - 75:17, 77:9
**line** [8] - 15:15, 30:1, 43:6, 45:15, 46:24, 50:20, 51:19, 74:8
**lineup** [1] - 77:4
**list** [8] - 37:1, 37:3, 37:4, 37:7, 37:8, 37:12, 39:9, 40:7
**listen** [5] - 5:5, 8:17, 10:22, 11:12, 21:15, 23:3, 23:9, 68:21
**listened** [1] - 71:5
**listing** [1] - 40:12
**live** [4] - 36:7, 43:23, 44:19, 53:13
**lived** [1] - 43:25
**living** [1] - 44:23
**load** [3] - 23:23, 31:6, 31:8
**loaded** [1] - 39:22
**local** [1] - 10:7
**located** [4] - 14:8, 19:8, 36:20, 69:14
**location** [10] - 14:14, 16:19, 16:24, 39:18, 71:11, 76:11, 85:1, 85:7, 90:14
**lock** [4] - 15:1, 17:22, 40:5, 70:25
**locked** [10] - 14:24, 15:5, 15:10, 15:14, 16:5, 16:24, 17:2, 17:5, 85:3
**log** [4] - 22:14, 34:8, 57:8, 59:1
**look** [10] - 26:20, 39:25, 40:10, 40:11, 55:6, 55:8, 57:2, 58:10, 60:2, 78:2
**looked** [5] - 19:21, 20:5, 20:13, 20:15, 20:17, 24:9, 26:15
**looking** [5] - 25:22, 40:2, 40:6, 40:10, 84:22
**looks** [1] - 58:16
**LOPEZ** [1] - 1:6
**Lopez** [26] - 3:8, 3:11, 3:12, 3:17, 12:19, 12:21, 13:16, 17:7, 53:22, 70:1, 75:11, 78:18, 83:12, 83:20, 83:21, 84:3, 85:17, 87:2, 88:1, 88:12, 88:22, 88:23, 90:4, 90:11, 90:22, 91:19
**Lopez's** [5] - 10:14, 17:25, 57:11, 66:18, 68:10
**low** [2] - 39:15, 40:14
**low-hanging** [2] - 39:15, 40:14

## M

**M-I-Z-E** [1] - 35:19
**ma'am** [2] - 5:13, 35:7
**Madam** [8] - 5:10, 21:18, 21:22, 35:8, 83:3, 83:7, 83:23, 90:6
**madam** [1] - 22:8
**MAGISTRATE** [1] - 1:10
**mail** [1] - 55:2
**major** [1] - 20:14
**man** [1] - 6:13
**March** [18] - 6:21, 10:12, 30:16, 36:16, 36:18, 36:22, 37:2, 37:10, 37:16, 37:20, 40:20, 48:11, 48:14, 52:24, 58:11, 75:8
**marked** [4] - 55:8, 55:16, 56:20, 57:2
**marriage** [1] - 44:15
**matched** [1] - 33:2
**matter** [8] - 6:16, 62:24, 82:14, 82:17, 82:18, 84:20, 89:14, 92:12

**matters** [4] - 4:5, 4:13, 51:9, 89:15
**Matthew** [1] - 3:4
**MATTHEW** [1] - 1:10
**mean** [13] - 13:22, 19:7, 20:17, 22:22, 22:24, 41:12, 57:17, 58:24, 60:1, 77:2, 83:24, 87:18, 87:19
**means** [1] - 89:3
**meantime** [1] - 8:8
**medical** [2] - 85:4, 86:1
**memory** [1] - 60:8
**mention** [1] - 31:16
**mentioned** [1] - 81:7
**met** [2] - 12:11, 30:8
**meth** [1] - 54:12
**methamphetamine** [1] - 86:2
**MICHAEL** [1] - 1:14
**Michael** [2] - 3:10, 30:8
**microphone** [1] - 6:1
**middle** [1] - 52:10
**might** [7] - 7:2, 34:10, 39:15, 62:25, 72:6, 86:22
**Mike** [1] - 52:16
**mile** [1] - 11:24
**miles** [5] - 59:12, 59:19, 59:20, 69:15
**Miller** [2] - 92:10, 92:14
**MILLER** [1] - 92:15
**mind** [4] - 31:22, 37:24, 81:13, 88:2
**minute** [2] - 11:2, 22:16
**minutes** [4] - 18:6, 31:8, 59:13, 59:21
**misdemeanor** [2] - 7:2, 7:21
**MIZE** [2] - 2:6, 35:13
**Mize** [13] - 29:20, 29:21, 34:7, 34:21, 35:5, 35:9, 35:10, 35:18, 35:25, 42:2, 42:10, 42:13, 42:14
**Mize's** [1] - 34:16
**mom** [1] - 29:15
**moment** [1] - 60:3
**Monday** [5] - 80:21, 80:24, 81:18, 82:6, 82:7
**monitored** [1] - 69:19, 69:24
**monitoring** [1] - 85:7
**months** [1] - 37:21
**Moore** [1] - 5:19
**morning** [6] - 3:15, 3:16, 6:6, 71:4
**mostly** [1] - 14:18
**motion** [3] - 16:7, 29:13, 81:3
**move** [10] - 10:25, 17:14, 17:18, 18:23, 20:18, 21:4, 24:25, 55:20, 57:19, 68:12
**moved** [1] - 44:24
**moving** [2] - 18:4, 71:16
**MR** [179] - 3:10, 3:11, 3:21, 3:23, 3:25, 4:2, 4:7, 4:15, 4:18, 5:7, 5:9, 5:24, 6:3, 6:5, 7:16, 7:17, 8:22, 9:22, 10:20, 11:6, 11:10, 11:17, 15:8, 15:11, 15:15, 16:6, 17:1, 17:7, 17:14, 17:19, 17:20, 18:14, 18:17, 18:23, 19:1, 19:5, 21:7, 21:12, 21:13, 21:17, 21:22, 22:3, 22:7, 22:14, 22:19, 22:21, 23:5, 23:8, 23:11, 23:15, 25:4, 25:9, 25:12, 30:3, 30:5, 33:22,

33:25, 34:6, 34:10, 34:13, 35:22, 35:24, 40:25, 41:3, 41:6, 41:10, 41:15, 41:20, 41:23, 42:1, 42:9, 42:12, 42:20, 42:24, 43:2, 43:20, 43:22, 45:19, 45:22, 46:10, 46:13, 46:16, 46:23, 47:1, 48:4, 48:9, 48:24, 49:3, 49:20, 50:6, 50:9, 50:24, 51:8, 51:14, 52:15, 55:13, 55:15, 55:20, 55:22, 55:24, 55:25, 56:1, 56:2, 56:5, 56:6, 56:8, 56:10, 56:11, 56:12, 57:17, 57:21, 57:24, 58:4, 58:13, 58:17, 58:19, 59:5, 59:7, 61:6, 61:10, 61:23, 62:1, 63:10, 63:15, 63:20, 64:10, 64:16, 64:21, 64:23, 65:6, 65:10, 65:12, 68:2, 68:5, 68:7, 68:16, 68:20, 68:24, 72:23, 73:2, 73:9, 73:14, 73:18, 73:21, 73:24, 74:2, 74:6, 74:22, 74:24, 77:16, 77:20, 79:22, 80:1, 80:8, 80:11, 80:13, 80:18, 81:10, 82:1, 82:7, 82:10, 82:21, 82:22, 83:1, 83:2, 83:15, 83:17, 83:22, 83:24, 85:10, 85:13, 85:16, 87:1, 87:16, 87:18, 87:24, 91:12, 91:14, 91:17
**must** [4] - 84:25, 85:23, 86:6, 86:18

# N

**name** [10] - 5:18, 5:19, 33:2, 33:4, 33:5, 35:17, 43:16, 52:5, 52:8, 74:17
**named** [2] - 37:22, 44:6
**narcotic** [2] - 85:24, 86:7
**narcotics** [1] - 19:9
**necessities** [1] - 85:4
**need** [12] - 19:11, 32:25, 38:16, 53:19, 60:8, 67:2, 82:24, 83:7, 84:6, 84:8, 85:19, 89:16
**needed** [2] - 17:3, 66:12
**needs** [1] - 88:24
**negative** [1] - 88:15
**negligence** [1] - 61:12
**netting** [1] - 14:16
**never** [8] - 12:11, 20:9, 63:25, 64:1, 64:6, 65:23, 71:21, 71:23
**nevertheless** [1] - 17:9
**next** [8] - 4:6, 4:22, 14:6, 34:6, 42:19, 46:17, 90:6, 90:9
**NIA** [1] - 45:25
**NO** [1] - 1:5
**normal** [5] - 52:23, 62:21, 65:22, 66:4
**normally** [1] - 73:15
**note** [1] - 7:24
**notes** [3] - 54:4, 75:16, 78:3
**nothing** [4] - 25:10, 30:23, 86:22, 91:17
**noticed** [8] - 19:25, 24:1, 24:3, 24:7, 24:9, 24:15, 24:17, 26:16
**number** [6] - 49:4, 79:13, 86:5, 87:4, 87:5, 87:12
**numbers** [2] - 67:10, 73:21

# O

**O'Leary** [1] - 58:4
**object** [9] - 15:9, 15:25, 34:13, 34:15, 41:7, 61:6, 61:7, 63:11, 64:16
**objection** [31] - 11:4, 11:6, 11:7, 15:8, 15:13, 18:14, 18:24, 19:5, 19:6, 21:7, 21:8, 25:3, 25:4, 25:5, 35:1, 35:4, 40:25, 41:8, 45:19, 45:21, 46:23, 46:24, 48:4, 48:8, 49:20, 58:22, 61:25, 68:16, 68:17, 81:19, 81:25
**objects** [1] - 71:16
**obtain** [1] - 17:4
**obtaining** [1] - 16:17
**obvious** [1] - 40:14
**obviously** [5] - 10:8, 23:8, 34:14, 40:1, 81:11
**occasion** [1] - 45:4
**occurred** [3] - 48:11, 48:14, 48:21
**occurrence** [1] - 47:24
**OF** [4] - 1:2, 1:4, 1:9, 92:8
**off-loaded** [1] - 39:22
**offense** [1] - 49:11
**offer** [1] - 46:19
**offering** [2] - 49:13, 50:4
**Office** [4] - 1:14, 1:17, 36:1, 43:6, 51:19, 74:8
**office** [5] - 4:22, 34:7, 42:24, 59:16, 59:19
**officer** [5] - 16:18, 49:10, 60:2, 74:10, 88:5
**OFFICER** [4] - 88:8, 88:10, 89:24, 90:2
**Officer** [3] - 88:19, 89:7, 89:22
**officer's** [1] - 61:8
**officers** [3] - 10:8, 16:9, 49:16
**once** [4] - 20:5, 35:4, 54:22
**one** [39] - 4:22, 4:23, 5:5, 7:1, 7:2, 7:18, 7:21, 11:2, 12:18, 14:16, 14:17, 17:15, 22:16, 23:5, 23:11, 23:17, 24:22, 24:23, 28:19, 36:4, 49:4, 50:1, 52:22, 53:4, 54:24, 55:8, 55:14, 58:13, 58:22, 60:3, 69:22, 75:19, 79:21, 81:1, 83:18, 84:25, 87:4, 87:5, 87:12
**one-minute** [1] - 11:2
**open** [6] - 15:6, 20:19, 25:24, 39:16, 40:14, 54:23
**opened** [3] - 19:24, 20:4, 26:1
**operator** [2] - 38:5, 39:25
**opinion** [9] - 46:19, 47:17, 47:20, 47:22, 49:24, 50:7, 50:12, 50:14, 50:17
**opportunity** [1] - 62:3
**opposed** [2] - 34:24, 81:14
**options** [2] - 89:3, 89:13
**oral** [1] - 80:19
**order** [7] - 4:20, 64:3, 82:13, 86:19, 90:11, 90:22
**ordered** [1] - 16:18
**ordering** [1] - 90:14
**orderly** [1] - 81:22

**orders** [1] - 87:21
**original** [1] - 81:2
**otherwise** [3] - 15:22, 49:16, 49:17
**outpost** [1] - 53:7
**outposts** [2] - 53:5, 53:7
**outside** [8] - 15:24, 54:22, 56:18, 71:19, 72:13, 72:14, 72:16
**oversee** [1] - 53:10
**own** [10] - 26:18, 26:19, 39:6, 49:12, 53:20, 55:14, 62:13, 64:6, 84:12, 84:13
**owned** [1] - 36:15
**owner** [14] - 12:19, 12:24, 13:10, 15:2, 32:15, 32:19, 33:6, 36:14, 36:17, 78:13, 79:11, 79:12, 79:13
**owners** [3] - 10:2, 32:19, 33:4
**ownership** [1] - 33:1
**owns** [1] - 32:19

**P**

**packet** [1] - 37:5
**page** [2] - 57:22, 66:24
**PAGE** [2] - 2:14, 2:20
**pages** [3] - 58:16, 58:23
**paid** [1] - 33:9
**Palmer** [1] - 53:6
**paperwork** [1] - 79:8
**park** [2] - 14:3, 20:1
**parked** [1] - 18:3
**parking** [1] - 14:14
**parole** [1] - 78:20
**part** [11] - 16:6, 16:8, 22:23, 38:6, 39:19, 49:17, 63:25, 65:19, 65:23, 87:4
**parted** [1] - 44:25
**partially** [1] - 24:10
**participate** [1] - 84:25
**participated** [1] - 47:11
**participation** [1] - 75:17
**particular** [3] - 59:1, 63:14, 66:19
**parties** [1] - 80:12
**parts** [1] - 44:18
**pass** [1] - 78:25
**passenger** [1] - 19:20
**past** [1] - 76:8
**pat** [2] - 29:20, 29:21
**patch** [3] - 86:3, 86:9, 87:7
**patches** [1] - 88:14
**patience** [2] - 88:6, 88:7
**Patricia** [2] - 92:10, 92:14
**PATRICIA** [1] - 92:15
**Patrick** [4] - 34:7, 34:15, 34:20, 35:18
**PATRICK** [3] - 2:6, 35:13, 35:18
**patrol** [3] - 52:23, 75:4, 75:6
**Pause** [2] - 58:9, 83:19
**pay** [1] - 33:9
**penalties** [1] - 91:5
**pending** [7] - 6:22, 10:3, 10:7, 31:14, 31:23, 50:20, 70:13
**people** [3] - 33:10, 61:1, 66:1

**per** [1] - 13:2
**perception** [2] - 65:1, 65:15
**perfect** [1] - 51:17
**perform** [2] - 67:19
**perhaps** [4] - 15:22, 22:14, 58:6, 81:1
**period** [2] - 44:14, 78:7
**permitted** [1] - 48:5
**person** [7] - 36:17, 50:13, 50:15, 61:14, 62:24, 91:15
**personal** [6] - 32:4, 44:11, 48:12, 48:13, 60:16, 77:2
**personally** [3] - 38:23, 47:7, 47:9
**pertains** [2] - 8:11, 8:15
**pertinent** [2] - 37:7
**petition** [10] - 83:11, 83:13, 83:21, 84:3, 84:6, 84:7, 84:9, 84:19, 84:21, 84:22
**PharmChek** [2] - 86:4, 86:9
**phone** [11] - 4:22, 11:18, 24:20, 25:13, 27:15, 27:17, 27:19, 42:22, 60:6, 68:9, 68:25
**photo** [5] - 55:18, 70:24, 71:2, 71:8, 71:11
**photograph** [1] - 72:13
**photos** [9] - 54:4, 54:22, 54:24, 54:25, 55:2, 55:7, 67:10, 67:12, 71:19
**phrase** [1] - 63:4
**physically** [1] - 20:19
**pick** [4] - 10:13, 13:10, 33:13, 77:4
**picked** [2] - 12:24, 32:7
**picture** [3] - 56:13, 56:15, 56:24
**pictures** [1] - 56:18
**Pilot** [5] - 13:22, 16:8, 18:12, 19:2, 40:20
**place** [2] - 54:20, 87:21
**placement** [1] - 84:20
**play** [10] - 10:21, 11:11, 21:2, 21:14, 22:11, 23:4, 24:22, 24:24, 25:9, 68:15
**played** [5] - 11:16, 21:16, 23:14, 25:11, 68:23
**playing** [1] - 68:12
**pleased** [1] - 89:6
**plus** [1] - 81:11
**point** [22] - 15:9, 17:16, 19:24, 23:25, 27:2, 27:23, 28:13, 28:15, 29:23, 31:20, 35:2, 41:6, 45:23, 48:17, 50:19, 60:19, 61:20, 66:7, 67:25, 72:19, 76:6, 81:14
**pointed** [3] - 28:25, 70:22, 71:10
**pointing** [2] - 29:3, 29:9
**poking** [1] - 24:4
**police** [1] - 78:12
**policies** [1] - 64:2
**policy** [2] - 26:12, 39:11
**position** [4] - 75:7, 87:8, 87:25
**positive** [5] - 86:3, 86:9, 87:7, 87:10, 89:9
**possess** [2] - 85:23, 86:7
**possession** [12] - 12:23, 12:25, 17:1, 27:2, 27:6, 27:21, 27:23, 39:13, 67:20,

69:8, 70:17
**possible** [1] - 73:16
**Post** [6] - 52:22, 53:3, 54:11, 54:15, 55:5
**post** [12] - 11:24, 16:20, 27:6, 27:8, 27:10, 27:11, 27:17, 53:21, 54:20, 69:16, 70:13, 70:18
**potential** [2] - 61:18, 62:11
**power** [1] - 33:16
**practice** [13] - 39:19, 61:8, 61:11, 61:21, 61:22, 62:6, 62:12, 62:21, 63:14, 65:2, 65:4, 65:9, 69:20
**practices** [2] - 62:16, 64:11
**practitioner** [1] - 86:1
**preparation** [1] - 75:13
**prepared** [1] - 83:14
**prescribed** [2] - 49:7, 85:25
**presence** [1] - 49:5
**present** [5] - 3:12, 51:10, 51:13, 51:16, 80:7
**presentation** [2] - 3:25, 81:22
**presentations** [1] - 91:23
**presented** [2] - 67:11, 91:24
**presenting** [1] - 3:22
**presiding** [1] - 3:4
**presumably** [2] - 46:4, 76:17
**presume** [2] - 43:2, 43:3
**Pretrial** [3] - 84:24, 85:22, 86:6
**pretrial** [3] - 83:11, 84:4, 85:9
**pretty** [4] - 10:11, 13:7, 14:18, 27:4
**previous** [1] - 6:15
**previously** [4] - 44:13, 55:11, 56:2, 56:9
**primary** [1] - 53:12
**print** [1] - 85:14
**prison** [1] - 91:1
**privacy** [1] - 14:15
**PROBATION** [4] - 88:8, 88:10, 89:24, 90:2
**probation** [2] - 76:5, 78:20
**probation's** [1] - 88:9
**Probation/Pretrial** [1] - 85:6
**problem** [3] - 21:25, 70:4, 89:3
**proceed** [1] - 86:25
**proceeded** [1] - 16:11
**Proceedings** [1] - 92:3
**PRODUCED** [1] - 1:23
**proffer** [5] - 18:22, 41:7, 46:8, 49:1, 49:18
**programs** [1] - 85:1
**progress** [1] - 88:13
**prove** [3] - 33:1, 33:19
**provide** [8] - 29:2, 36:24, 38:7, 38:15, 39:4, 41:16, 83:21, 87:3
**provided** [10] - 37:11, 37:17, 57:22, 57:24, 58:22, 72:7, 72:11, 87:6, 87:7, 88:14
**Providence** [1] - 44:4
**providing** [1] - 79:1

**PTO** [1] - 19:15
**Public** [2] - 1:17, 36:1
**pull** [1] - 58:2
**punching** [1] - 73:21
**purely** [1] - 41:23
**purposes** [2] - 45:23, 63:5
**pursue** [1] - 41:21
**put** [16] - 14:3, 19:14, 19:15, 19:18, 19:19, 19:20, 19:25, 20:1, 20:6, 32:15, 33:3, 39:18, 62:24, 86:20, 87:21
**putting** [1] - 62:18

## Q

**questioned** [1] - 4:2
**questioning** [3] - 8:25, 15:16, 46:24
**questions** [31] - 6:7, 6:12, 9:7, 9:11, 10:22, 15:23, 16:15, 17:16, 17:18, 29:22, 30:1, 31:14, 33:22, 34:15, 34:25, 36:6, 41:18, 42:10, 49:3, 50:18, 50:20, 51:1, 52:18, 68:2, 72:23, 77:16, 77:23, 79:22, 84:12, 89:21, 91:19
**quick** [1] - 31:15
**quickly** [1] - 78:4
**quote/unquote** [1] - 63:9

## R

**radio** [1] - 78:22
**raise** [5] - 5:11, 35:10, 43:9, 51:22, 74:10
**raised** [7] - 5:12, 35:11, 35:12, 43:10, 43:11, 51:23, 74:11
**ran** [1] - 14:3
**range** [1] - 89:4
**rather** [3] - 34:11, 49:10, 80:18
**re** [3] - 6:11, 20:2, 23:9
**re-ask** [1] - 6:11
**re-listen** [1] - 23:9
**re-strapped** [1] - 20:2
**reached** [2] - 19:24, 20:4
**real** [2] - 20:14, 31:15
**really** [17] - 8:12, 9:3, 15:20, 21:19, 26:20, 27:13, 27:21, 37:20, 63:12, 64:18, 69:3, 88:23, 88:25, 89:6, 89:14, 91:23
**rear** [3] - 24:9, 28:5
**reason** [2] - 17:3, 23:3
**reasonable** [2] - 61:14, 78:6
**rebuttal** [2] - 74:5, 80:9
**receive** [1] - 91:6
**received** [4] - 11:2, 21:6, 81:3, 82:15
**recess** [1] - 92:2
**reckless** [4] - 15:19, 34:18, 61:11, 61:16
**recklessness** [1] - 61:12
**recognize** [2] - 11:18, 23:17
**recognized** [1] - 69:6
**recollection** [1] - 75:25
**recommendation** [1] - 88:9

**record** [18] - 3:6, 3:9, 5:17, 21:20, 22:23, 23:4, 35:16, 38:14, 38:15, 38:16, 38:22, 38:23, 43:15, 46:6, 49:1, 52:4, 74:16, 81:12
**RECORD** [1] - 1:23
**recording** [7] - 21:5, 22:5, 22:8, 23:16, 24:22, 25:1, 92:12
**records** [1] - 39:3
**RECROSS** [1] - 2:4
**redirect** [5] - 33:24, 34:1, 73:1, 73:2, 79:25
**REDIRECT** [1] - 2:4
**referencing** [1] - 58:14
**referring** [1] - 65:9
**refresh** [1] - 60:8
**regarding** [8] - 6:7, 45:18, 47:5, 79:21, 81:4, 81:5, 82:23, 84:10
**regards** [1] - 47:9
**registered** [2] - 33:3, 79:13
**reiterate** [1] - 47:2
**related** [3] - 50:17, 55:2, 57:10
**relates** [1] - 65:16
**relationship** [13] - 36:23, 44:15, 44:16, 44:19, 45:1, 45:4, 45:9, 45:11, 45:16, 47:3, 47:15, 48:1, 53:2
**relative** [4] - 17:25, 42:3, 47:22, 79:15
**release** [14] - 33:11, 83:11, 84:4, 84:25, 85:22, 86:6, 86:19, 87:20, 89:12, 89:23, 90:5, 91:2, 91:3, 91:5
**released** [2] - 78:10, 86:21
**relevance** [13] - 15:11, 15:13, 15:16, 15:20, 15:25, 16:4, 18:14, 18:17, 34:15, 41:11, 45:22, 46:8, 61:7
**relevant** [9] - 18:18, 18:22, 19:9, 34:19, 34:24, 41:14, 41:15, 61:11, 62:11
**remain** [3] - 78:7, 84:11, 86:21
**remains** [1] - 88:1
**remember** [23] - 12:21, 22:23, 25:16, 26:11, 27:10, 27:13, 30:9, 57:14, 60:4, 60:7, 66:14, 66:21, 67:5, 67:6, 67:8, 67:24, 71:2, 71:3, 71:25, 75:23, 76:4, 76:6, 79:6
**remembering** [1] - 67:14
**reminded** [1] - 83:3
**removed** [1] - 39:9
**repeat** [1] - 40:9
**repeatedly** [1] - 76:9
**rephrase** [3] - 64:22, 65:11, 90:21
**report** [10] - 16:13, 38:9, 38:11, 39:2, 53:20, 54:3, 57:6, 60:2, 62:10, 66:22
**reported** [6] - 23:20, 38:25, 56:16, 57:8, 60:20, 76:7
**reporting** [1] - 64:13
**represent** [2] - 84:18, 84:20
**represented** [1] - 91:25
**represents** [1] - 84:19
**reputation** [3] - 47:18, 48:5, 50:13
**request** [4] - 80:13, 80:18, 80:25, 88:2
**require** [1] - 37:12

**required** [2] - 38:6, 90:25
**requirements** [2] - 69:23, 85:2
**research** [1] - 9:10
**residence** [1] - 85:4
**respect** [1] - 62:6
**respective** [1] - 91:24
**respond** [2] - 75:5, 81:21
**responded** [2] - 76:3, 76:7
**response** [1] - 49:19
**rest** [1] - 20:11
**rested** [1] - 3:20
**restricted** [1] - 85:3
**restriction** [1] - 85:1
**result** [4] - 86:3, 86:9, 87:7, 91:5
**results** [2] - 87:7, 87:10
**retrieve** [1] - 70:5
**return** [1] - 19:2
**reverse** [2] - 19:19
**review** [7] - 54:1, 58:5, 60:2, 62:3, 75:13, 75:22, 83:5
**reviewed** [3] - 54:3, 75:15, 75:18
**reviewing** [2] - 62:17, 66:22
**revoked** [2] - 86:20, 91:3
**Rey** [1] - 3:8
**REY** [1] - 1:6
**rights** [2] - 84:8, 84:10
**road** [1] - 46:7
**Road** [1] - 59:11
**role** [1] - 60:23
**Ronny** [4] - 51:15, 51:20, 52:6, 52:9
**RONNY** [3] - 2:8, 52:1, 52:9
**room** [1] - 5:5
**routes** [1] - 75:6
**Rule** [1] - 49:22
**ruled** [1] - 50:16
**rules** [1] - 33:12
**ruling** [2] - 48:25, 50:8
**run** [3] - 30:14, 64:12, 89:3
**running** [2] - 25:10, 57:8

## S

**S-I-M-M-O-N-S** [2] - 52:6, 52:10
**safe** [4] - 17:5, 67:6, 67:8, 67:12
**safekeeping** [1] - 17:3
**sanction** [1] - 49:16
**sandwich** [1] - 19:23
**saw** [5] - 28:14, 28:21, 67:6, 70:4, 72:14
**scene** [13] - 10:13, 11:23, 12:6, 12:13, 13:15, 13:24, 14:6, 76:15, 77:8, 77:24, 78:1, 79:14, 79:16
**schedule** [1] - 85:7
**scheduled** [2] - 88:18, 91:15
**SCOBLE** [1] - 1:10
**Scoble** [2] - 3:4, 8:14
**scope** [1] - 48:5
**search** [17] - 16:8, 16:12, 16:17, 20:11, 26:8, 26:20, 27:1, 28:6, 59:23, 67:16,

67:18, 67:25, 70:7, 71:22, 71:24, 76:5, 77:11

**searched** [2] - 16:9, 72:12
**searches** [2] - 26:12, 39:12
**searching** [2] - 20:14, 71:15
**seat** [12] - 19:18, 19:21, 20:6, 23:21, 25:19, 25:23, 28:10, 56:15, 71:7, 71:9, 72:20
**seated** [1] - 3:5
**second** [11] - 7:10, 15:12, 41:3, 41:4, 46:7, 58:1, 83:18, 85:9, 85:21, 88:23, 88:24
**second-guess** [1] - 46:7
**secure** [8] - 14:20, 17:3, 39:16, 39:18, 40:3, 69:18, 69:23
**secured** [5] - 16:24, 17:2, 17:5, 17:12, 54:15
**security** [2] - 17:21, 17:22
**see** [16] - 3:19, 8:11, 8:15, 17:6, 24:23, 25:23, 34:23, 40:1, 41:10, 45:5, 54:18, 55:16, 56:17, 58:1, 58:8, 65:4
**seeing** [5] - 12:21, 27:11, 56:5, 67:8, 67:12
**seek** [1] - 38:15
**seeking** [1] - 87:15
**seized** [3] - 16:10, 16:25, 17:9
**seizure** [2] - 16:8, 16:21
**sense** [3] - 71:9, 81:24, 82:20
**sent** [4] - 56:20, 56:23, 75:19, 91:4
**sentenced** [1] - 91:1
**separate** [2] - 66:10, 88:17
**September** [1] - 45:15
**sequestration** [1] - 4:20
**Sergeant** [20] - 51:15, 52:12, 52:16, 55:16, 56:14, 56:25, 59:6, 60:4, 62:2, 63:13, 63:18, 63:22, 64:25, 65:13, 66:13, 67:13, 68:8, 68:25, 72:24, 73:3
**sergeant** [6] - 52:21, 53:8, 53:15, 60:23, 63:3, 63:7
**sergeants** [1] - 53:20
**service** [5] - 12:1, 12:2, 40:21, 42:3, 75:5
**Services** [5] - 44:4, 84:25, 85:6, 85:22, 86:6
**services** [1] - 36:24
**session** [1] - 3:4
**set** [1] - 90:13
**setup** [1] - 14:13
**seven** [1] - 57:22
**seven-page** [1] - 57:22
**seventy** [1] - 14:18
**several** [1] - 58:7
**severe** [1] - 91:5
**Seward** [8] - 43:24, 43:25, 44:3, 53:3, 53:11, 53:15, 53:21, 75:4
**shape** [1] - 45:7
**shift** [2] - 52:21, 52:23
**shifted** [1] - 23:23
**shifts** [1] - 52:22

**shit** [1] - 18:5
**short** [1] - 23:11
**shortly** [1] - 10:10
**show** [4] - 28:19, 38:12, 81:15
**showed** [2] - 29:1, 71:8
**side** [1] - 14:17
**sides** [3] - 4:9, 86:18, 91:22
**sight** [1] - 15:24
**significant** [1] - 44:13
**silent** [1] - 84:11
**similar** [3] - 61:18, 65:3, 82:2
**Simmons** [15] - 51:15, 51:20, 52:6, 52:10, 52:12, 62:2, 63:18, 63:22, 64:25, 65:13, 68:8, 68:14, 68:25, 72:24, 73:3
**SIMMONS** [2] - 2:8, 52:1
**Simmons'** [1] - 63:13
**simply** [6] - 23:20, 39:4, 40:13, 48:19, 54:12, 79:10
**simultaneous** [1] - 81:19
**single** [1] - 40:12
**sitting** [4] - 9:6, 19:16, 19:22, 88:6
**situation** [5] - 9:2, 15:17, 28:2, 38:1, 61:14
**size** [2] - 19:25, 26:2
**Skilak** [2] - 59:11, 59:20
**slip** [13] - 13:3, 13:14, 32:8, 32:10, 32:11, 32:16, 32:21, 33:2, 33:3, 77:10, 79:7, 79:9
**slips** [1] - 33:11
**small** [1] - 78:23
**social** [1] - 44:10
**Soldotna** [15] - 14:9, 36:9, 36:21, 52:21, 52:23, 53:2, 53:6, 53:10, 53:16, 54:11, 54:14, 59:18, 59:21, 60:23, 69:15
**someone** [3] - 32:24, 33:7, 63:8
**sometime** [1] - 37:17
**sometimes** [2] - 67:18, 87:24
**soon** [2] - 28:24, 73:16
**sorry** [11] - 14:25, 21:17, 22:20, 41:2, 41:5, 45:8, 52:7, 52:9, 65:5, 79:18, 90:16
**sort** [3] - 4:23, 33:18, 84:1
**Soto** [31] - 3:8, 3:11, 3:12, 3:17, 10:14, 12:19, 12:21, 13:16, 17:7, 17:25, 53:22, 57:11, 66:18, 68:10, 70:1, 75:11, 78:18, 83:12, 83:20, 83:21, 84:3, 85:17, 87:2, 88:1, 88:12, 88:22, 88:23, 90:4, 90:11, 90:22, 91:19
**SOTO** [1] - 1:6
**Soto's** [1] - 87:8
**SOTO-LOPEZ** [1] - 1:6
**Soto-Lopez** [26] - 3:8, 3:11, 3:12, 3:17, 12:19, 12:21, 13:16, 17:7, 53:22, 70:1, 75:11, 78:18, 83:12, 83:20, 83:21, 84:3, 85:17, 87:2, 88:1, 88:12, 88:22, 88:23, 90:4, 90:11, 90:22, 91:19
**Soto-Lopez's** [5] - 10:14, 17:25, 57:11, 66:18, 68:10
**sought** [1] - 87:22

**sound** [1] - 15:24
**sounded** [1] - 7:12
**sounds** [1] - 7:5
**Southern** [1] - 14:9
**speaking** [3] - 8:14, 62:10, 76:1
**special** [1] - 30:23
**specific** [5] - 48:7, 49:21, 50:3, 64:24, 66:5
**specifically** [3] - 57:10, 85:2, 85:5
**specifics** [1] - 78:19
**speed** [2] - 88:25, 89:2
**speeding** [1] - 49:11
**spell** [6] - 5:18, 35:17, 43:16, 52:5, 52:7, 74:17
**spot** [2] - 54:21, 79:12
**staff** [2] - 5:4, 53:9
**stake** [1] - 89:19
**standby** [1] - 43:2
**stands** [1] - 57:6
**start** [1] - 68:11
**started** [3] - 14:1, 19:14, 19:18
**state** [7] - 5:18, 35:17, 36:25, 43:16, 52:5, 63:1, 74:17
**State** [13] - 6:23, 10:6, 10:19, 12:7, 36:23, 38:7, 39:1, 45:2, 47:5, 47:12, 48:2, 49:7, 75:3
**statement** [3] - 62:22, 84:11, 84:12
**statements** [5] - 61:4, 62:7, 62:13, 62:18, 62:20
**states** [1] - 84:24
**STATES** [2] - 1:2, 1:4, 1:10
**States** [4] - 1:14, 3:3, 3:7, 85:25
**station** [2] - 32:3, 75:4
**stationed** [1] - 53:10
**status** [1] - 90:17
**stay** [6] - 6:1, 30:1, 50:19, 89:10, 89:17, 90:11
**stayed** [1] - 76:12
**steps** [2] - 89:7, 89:9
**Sterling** [2] - 11:24, 31:3
**sticking** [3] - 19:23, 25:23, 71:7
**still** [5] - 3:22, 32:17, 33:9, 40:17, 86:18
**stop** [9] - 12:4, 48:10, 48:12, 48:13, 48:16, 76:3, 76:12, 79:2, 79:17
**stopped** [2] - 14:6, 49:10
**straight** [1] - 18:3
**strapped** [2] - 14:3, 20:2
**strapping** [1] - 20:24
**street** [1] - 65:22
**Street** [1] - 1:18
**studying** [1] - 8:25
**stuff** [2] - 12:9, 18:5
**submission** [4] - 81:20, 82:14, 82:17, 82:19
**submissions** [1] - 81:8
**submit** [1] - 58:20
**submitted** [3] - 22:23, 23:6, 34:17
**subsequent** [1] - 88:14

**substance** [2] - 85:24, 88:15
**substances** [1] - 49:7
**substantive** [1] - 81:5
**subtle** [1] - 91:24
**sufficient** [1] - 82:10
**Suite** [1] - 1:18
**summarize** [1] - 81:17
**summary** [1] - 62:13
**summation** [1] - 82:4
**supervise** [4] - 52:23, 53:15, 53:19, 61:1
**supervised** [1] - 53:8
**supervisor** [1] - 53:17
**supervisors** [2] - 61:18
**supplemental** [1] - 80:20
**support** [2] - 5:4, 49:14
**suppose** [2] - 65:11, 67:19
**sustain** [2] - 48:8, 61:25
**sustained** [1] - 18:24
**swear** [1] - 35:9
**sweat** [3] - 86:3, 86:9, 88:14
**sworn** [5] - 5:15, 35:14, 43:13, 52:2, 74:14

## T

**tampering** [3] - 7:3, 7:21, 9:20
**telephone** [4] - 9:3, 69:3, 73:11, 79:13
**telephonic** [3] - 4:11, 30:7, 36:5
**term** [4] - 7:23, 67:15, 67:24
**terminated** [1] - 45:12
**termination** [1] - 81:5
**terms** [1] - 57:5
**terribly** [1] - 79:8
**test** [2] - 87:10, 89:11
**tested** [1] - 88:14
**testified** [6] - 5:15, 6:15, 35:14, 43:13, 52:2, 74:14
**testify** [5] - 9:5, 50:1, 53:23, 75:10, 77:14
**testifying** [4] - 4:9, 5:6, 9:3, 46:3
**testimony** [14] - 5:6, 6:18, 6:19, 16:20, 26:11, 34:16, 34:24, 35:4, 46:9, 54:1, 68:11, 75:13, 81:12, 81:13
**texted** [1] - 73:18
**THE** [238] - 1:2, 1:10, 1:13, 1:17, 1:23, 3:2, 3:12, 3:22, 3:24, 4:1, 4:4, 4:12, 4:16, 4:25, 5:10, 5:11, 5:13, 5:17, 5:19, 5:21, 5:22, 6:2, 7:9, 8:13, 8:19, 9:1, 9:13, 9:14, 9:15, 9:19, 9:20, 10:16, 10:19, 11:4, 11:7, 11:14, 15:10, 15:12, 16:3, 16:23, 17:6, 17:11, 17:15, 18:15, 18:16, 18:21, 18:24, 19:7, 19:12, 19:13, 19:14, 21:8, 21:11, 21:19, 22:1, 22:2, 22:5, 22:8, 22:10, 22:11, 22:17, 22:20, 23:1, 23:7, 23:10, 23:13, 25:3, 25:5, 25:8, 30:2, 33:23, 34:2, 34:4, 34:5, 34:9, 34:12, 35:1, 35:5, 35:7, 35:8, 35:10, 35:12, 35:16, 35:18, 35:20, 35:21, 41:1, 41:2, 41:4, 41:5, 41:9,

41:12, 41:19, 41:22, 41:24, 42:11, 42:14, 42:17, 42:18, 42:23, 43:1, 43:4, 43:5, 43:7, 43:8, 43:11, 43:15, 43:17, 43:18, 43:19, 45:20, 45:21, 46:2, 46:12, 46:15, 46:22, 46:25, 48:7, 49:2, 49:18, 49:23, 50:22, 51:2, 51:5, 51:6, 51:11, 51:17, 51:18, 51:20, 51:22, 51:24, 52:4, 52:6, 52:7, 52:9, 52:11, 52:12, 55:12, 55:21, 56:4, 56:7, 56:9, 57:20, 57:23, 57:25, 58:1, 58:3, 58:7, 58:15, 58:18, 58:24, 61:9, 61:20, 61:24, 63:12, 63:16, 63:21, 63:23, 63:24, 63:25, 64:17, 65:5, 65:7, 68:3, 68:17, 72:25, 73:3, 73:6, 73:7, 73:13, 73:17, 73:20, 73:23, 73:25, 74:4, 74:7, 74:9, 74:10, 74:12, 74:16, 74:18, 74:20, 74:21, 77:17, 79:24, 80:2, 80:5, 80:6, 80:9, 80:12, 80:17, 81:9, 81:24, 82:3, 82:8, 82:11, 82:23, 83:3, 83:9, 83:10, 83:16, 83:18, 83:20, 83:23, 84:1, 84:16, 84:17, 85:12, 85:14, 85:15, 85:17, 85:20, 85:21, 86:12, 86:13, 87:13, 87:17, 87:23, 88:4, 88:8, 88:9, 88:10, 88:19, 89:24, 90:1, 90:2, 90:3, 90:8, 90:10, 90:16, 90:18, 90:19, 90:20, 91:13, 91:16, 91:19, 91:21, 91:22
**then-Trooper** [3] - 34:17, 66:17, 70:1
**therapist** [1] - 88:17
**thereafter** [1] - 10:10
**therefore** [1] - 15:20
**thinking** [1] - 22:21
**third** [1] - 88:25
**thoughtful** [1] - 91:23
**threaten** [1] - 91:7
**three** [14] - 4:24, 22:4, 37:21, 53:8, 57:24, 58:16, 58:23, 59:19, 84:23, 86:5, 87:5, 87:6, 87:11
**throughout** [1] - 45:1
**Thursday** [1] - 80:22
**ticket** [1] - 49:11
**Title** [1] - 85:25
**today** [12] - 4:9, 8:12, 8:16, 54:2, 81:13, 82:5, 82:25, 83:14, 84:2, 86:25, 91:10, 91:25
**today's** [1] - 82:13
**together** [3] - 44:20, 44:23, 53:12
**took** [15] - 12:22, 27:8, 28:15, 30:21, 30:23, 31:1, 54:4, 54:22, 54:23, 70:24, 71:8, 71:11, 71:19, 77:25, 79:19
**total** [1] - 31:11
**totally** [1] - 65:23
**tow** [29] - 10:6, 13:25, 15:17, 17:12, 18:3, 19:14, 20:1, 20:24, 24:18, 28:12, 28:15, 32:17, 32:24, 38:2, 38:5, 54:7, 55:1, 69:7, 70:16, 76:13, 76:23, 77:1, 77:5, 78:10, 78:11, 78:13, 79:2, 79:9
**towards** [2] - 24:3, 24:18
**towed** [3] - 33:12, 40:20, 54:19
**Towing** [13] - 6:15, 9:24, 10:2, 26:10, 36:11, 38:4, 39:11, 40:8, 40:17, 59:8, 59:18, 59:19, 69:10

**towing** [4] - 36:22, 36:24, 59:17, 69:21
**track** [1] - 5:2
**traffic** [2] - 48:10, 79:17
**trained** [1] - 61:17
**trait** [1] - 47:18
**TRANSCRIBER** [1] - 92:8
**TRANSCRIPT** [2] - 1:9, 1:23
**transcript** [5] - 81:12, 82:13, 82:16, 82:17, 92:11
**transfer** [1] - 13:4
**transpired** [1] - 42:4
**travel** [1] - 78:25
**treat** [1] - 9:6
**treatment** [1] - 88:16
**Trevor** [9] - 12:7, 27:11, 27:16, 27:19, 44:6, 47:16, 66:14, 72:8
**trip** [1] - 24:11
**Trooper** [27] - 12:8, 15:18, 29:11, 34:17, 48:2, 49:8, 52:22, 53:3, 54:11, 61:15, 66:17, 67:23, 68:14, 70:1, 73:10, 74:9, 74:25, 75:3, 76:3, 76:10, 76:11, 76:22, 76:23, 77:21, 78:22, 79:23
**trooper** [37] - 12:11, 13:15, 15:21, 16:20, 17:9, 18:9, 25:16, 25:20, 25:24, 26:23, 27:6, 27:8, 27:10, 29:8, 29:10, 32:2, 32:3, 33:3, 34:18, 34:19, 34:20, 54:20, 59:25, 62:12, 63:3, 65:2, 65:22, 66:5, 66:6, 67:23, 68:21, 69:16, 70:18, 71:15, 76:7, 76:17, 80:2
**trooper's** [3] - 37:3, 61:22, 70:13
**troopers** [52] - 11:25, 12:17, 12:25, 13:2, 15:22, 15:23, 15:25, 17:3, 20:3, 26:7, 27:13, 28:3, 28:8, 28:13, 28:20, 29:11, 29:14, 31:16, 31:19, 31:24, 32:4, 32:8, 34:21, 34:23, 36:25, 37:11, 38:11, 39:2, 39:5, 41:21, 42:6, 51:21, 53:5, 53:9, 53:15, 59:22, 60:21, 61:11, 61:17, 61:21, 63:7, 64:11, 64:12, 64:14, 65:2, 65:4, 65:14, 65:16, 66:3, 67:19, 81:6
**Troopers** [8] - 10:6, 10:19, 36:24, 38:7, 39:1, 45:2, 47:5, 47:12
**troopers'** [1] - 62:3
**truck** [28] - 10:6, 13:25, 18:4, 18:13, 19:14, 20:1, 20:25, 24:3, 24:16, 24:18, 26:18, 26:19, 32:24, 38:2, 38:5, 54:7, 55:1, 69:7, 70:16, 76:13, 76:23, 77:1, 77:5, 78:10, 78:11, 78:13, 79:2
**truck's** [1] - 19:16
**trucks** [1] - 38:3
**true** [3] - 40:12, 86:16
**truth** [2] - 15:19, 34:18
**truthfulness** [2] - 47:23, 49:22
**try** [13] - 9:12, 22:16, 23:5, 23:11, 24:22, 30:14, 31:22, 39:16, 46:6, 52:19, 55:13, 64:21, 91:7
**trying** [8] - 8:19, 21:23, 32:16, 32:17, 73:15, 73:19, 88:11, 89:18
**turn** [1] - 56:20
**turned** [3] - 19:20, 22:18, 24:2
**two** [16] - 5:4, 7:11, 17:15, 27:12,

28:12, 31:12, 33:10, 59:19, 61:22, 71:2, 80:15, 87:5, 87:6, 87:11, 88:14
**two-hour** [1] - 80:15
**type** [9] - 9:24, 20:11, 36:22, 39:11, 39:19, 44:2, 49:21, 67:18, 87:24
**typically** [1] - 37:13

## U

**U.S** [1] - 85:6
**under** [8] - 19:8, 33:12, 38:1, 50:5, 82:14, 82:17, 82:19, 86:21
**underlying** [1] - 50:17
**understood** [1] - 61:23
**unique** [1] - 65:15
**unit** [5] - 64:1, 65:21, 66:6, 66:7, 66:10
**UNITED** [3] - 1:2, 1:4, 1:10
**United** [4] - 1:14, 3:2, 3:7, 85:25
**units** [2] - 65:19, 66:10
**unlawfully** [2] - 85:23, 86:7
**unless** [3] - 18:22, 41:16, 85:25
**unloading** [1] - 23:20
**unmuted** [1] - 11:15
**untruthful** [2] - 47:19, 47:24
**unusual** [2] - 9:2, 9:5
**up** [27] - 4:23, 10:10, 10:13, 10:17, 12:24, 13:10, 14:2, 18:5, 19:14, 19:17, 22:18, 25:10, 26:4, 31:7, 31:20, 32:7, 33:13, 40:5, 58:2, 59:22, 67:25, 82:24, 83:6, 83:14, 85:15, 89:1, 89:13
**urgency** [1] - 17:2
**useful** [1] - 22:12

## V

**valid** [1] - 38:17
**validly** [1] - 38:12
**valuable** [1] - 40:1
**value** [2] - 39:17, 40:15
**Vang** [8] - 11:11, 11:14, 21:14, 22:14, 22:17, 24:24, 25:9, 42:22
**various** [1] - 5:4
**vastly** [1] - 66:9
**vehicle** [55] - 12:19, 13:25, 14:2, 16:23, 17:11, 17:25, 18:1, 18:2, 20:12, 20:13, 24:9, 24:13, 26:24, 28:6, 28:24, 28:25, 32:13, 32:14, 32:18, 32:20, 32:23, 33:7, 33:11, 33:17, 40:2, 40:8, 40:10, 40:13, 40:19, 54:8, 54:22, 54:23, 57:11, 59:15, 59:23, 60:11, 66:18, 67:7, 69:7, 70:9, 70:13, 70:21, 71:15, 71:16, 71:19, 72:12, 72:18, 76:4, 76:8, 76:12, 78:9, 79:19
**vehicles** [3] - 39:12, 39:21, 67:19
**veracity** [1] - 47:23
**verbally** [1] - 38:24
**verification** [1] - 38:12
**version** [1] - 59:3
**versus** [1] - 3:8
**via** [2] - 78:13, 81:3

**violate** [1] - 91:1
**violated** [4] - 84:24, 85:9, 85:22, 86:5
**violation** [2] - 78:21, 86:5
**violations** [4] - 48:3, 84:23, 87:25, 88:3
**virtual** [2] - 5:25, 8:23
**virtually** [3] - 4:10, 5:3, 9:3
**voice** [4] - 11:18, 23:17, 34:10, 35:4
**voiced** [1] - 41:8
**volition** [1] - 49:12
**volume** [1] - 25:10

## W

**waiting** [1] - 18:13
**walking** [3] - 24:1, 24:2, 24:17
**warrant** [28] - 16:11, 16:12, 16:18, 16:22, 17:4, 17:10, 27:1, 59:22, 59:25, 60:13, 61:3, 61:5, 61:8, 61:11, 62:11, 62:18, 62:23, 66:24, 67:2, 70:5, 70:7, 70:10, 70:13, 70:19, 72:7, 72:8
**warrants** [4] - 60:24, 61:1, 62:4, 62:8
**watching** [1] - 76:9
**ways** [1] - 44:25
**week** [3] - 80:23, 81:21, 88:16
**weeks** [1] - 55:3
**welcome** [2] - 22:11, 59:2
**Wesley** [1] - 74:18
**WESLEY** [1] - 74:18
**West** [1] - 1:15
**whole** [1] - 28:2
**wife** [1] - 8:10
**window** [6] - 24:10, 28:25, 29:3, 54:25, 70:24, 80:15
**wish** [1] - 80:12
**withdraw** [1] - 46:23
**WITNESS** [35] - 2:4, 5:13, 5:19, 8:19, 9:13, 9:15, 9:20, 10:19, 15:10, 18:15, 19:12, 19:14, 34:4, 35:7, 35:12, 35:18, 41:1, 41:5, 42:17, 43:7, 43:11, 43:17, 45:20, 51:5, 51:20, 51:24, 52:6, 52:9, 63:23, 63:25, 73:6, 74:9, 74:12, 74:18, 80:5
**witness** [24] - 4:3, 4:6, 4:17, 4:25, 5:6, 19:9, 34:6, 41:25, 42:19, 45:23, 46:11, 48:6, 50:1, 51:1, 51:7, 51:9, 51:12, 57:18, 62:7, 62:10, 64:13, 64:18, 65:7, 91:8
**witness's** [2] - 62:13, 62:17
**witnessed** [2] - 49:5, 65:3
**witnesses** [13] - 4:9, 4:21, 5:4, 5:7, 9:5, 61:4, 73:8, 73:12, 73:25, 74:2, 74:5, 80:7, 80:10
**word** [1] - 63:5
**worded** [2] - 7:25, 8:21
**words** [2] - 49:12, 78:11
**works** [1] - 6:14
**world** [2] - 64:4, 65:23
**worried** [2] - 27:20, 27:21
**wrapping** [1] - 4:23

**wrecker** [1] - 76:13
**written** [5] - 80:20, 81:7, 81:17, 82:4, 82:11

## Y

**yard** [25] - 13:5, 13:8, 14:7, 14:8, 14:12, 14:16, 15:17, 17:12, 17:22, 17:24, 18:4, 18:5, 24:13, 26:25, 28:12, 28:15, 28:16, 28:20, 29:8, 29:10, 31:10, 59:17, 59:18, 76:14, 78:16
**year** [3] - 37:14, 37:16, 37:18
**yearly** [1] - 37:15
**years** [2] - 33:8, 71:3
**yourself** [1] - 64:25
**yourselves** [1] - 3:9

## Z

**zero** [1] - 32:6