# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

               Plaintiff,

      vs.

REY JOEL SOTO-LOPEZ,

               Defendant.

3:19-CR-00114-JMK-MMS

**INITIAL REPORT AND RECOMMENDATION ON THE RECONSIDERATION OF MOTION TO SUPPRESS [DKT. 17]**

## I.  MOTION PRESENTED

The posture of Soto-Lopez's case is unique: a previously-denied motion to suppress is under reconsideration after a law enforcement official's documented history of dishonesty, of neglect of duty, and of violating state law, were brought to the attention of this Court.

A look at the standard for motions to reconsider underscores the significance of the posture of Soto-Lopez's case. There are three circumstances when judicial finality and conservation of judicial resources yield to the extraordinary remedy of reconsideration: (1) when there is newly discovered evidence, (2) when there is clear error, or (3) when there is an intervening change in controlling law. *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1177–78 (9th Cir. 1998). Because the Federal Rules of Criminal Procedure do not provide for reconsideration motions, a federal court can look to the local criminal rules that are generally accepted in criminal cases. The District of Alaska's Local Rule 47.1(g)(1)

tracks the three circumstances above and is also explicit regarding the standard that a moving party has to meet for reconsideration. A federal court, under Rule 47.1(g)(1), will "*ordinarily deny* a motion for reconsideration absent a showing of one of the following" circumstances (emphasis added): (1) a manifest error of law or fact, (2) "discovery of new material facts not previously available", or (3) an intervening change in relevant law.

After the District Court Judge denied Soto-Lopez's motion to suppress by issuing its own order that adopted the Magistrate Judge's Final Report and Recommendation, the government alerted this Court to newly discovered evidence. Dkt. 17; Dkt. 68; Dkt. 71. The newly discovered evidence consisted of Alaska State Troopers records of an internal investigation into Trooper Howard's 43 documented events that violated several standardized procedures of the Alaska State Troopers, and that violated state law.

In February 2022, the District Court granted Soto-Lopez's reconsideration motion because there was "good cause to re-open" and resubmit the [Dkt. 17] motion to suppress to this Court for additional consideration. Dkt. 17; Dkt. 234. This Court, in April 2022, held an additional evidentiary hearing and the parties timely filed post-hearing briefs in June 2022. Dkt. 245; Dkt. 248; Dkt. 249. This Report and Recommendation will summarize the facts and procedural history for clarity.

This Court has carefully reconsidered Soto-Lopez's [Dkt. 17] motion, arguments of counsel, and the pertinent portions of the record. Having done so, this Court hereby issues its Initial Report and Recommendation regarding Soto-Lopez's Motion to Suppress. Dkt.

17. For the reasons below, Soto-Lopez's Motion to Suppress should be **GRANTED in part and DENIED in part**. 28 U.S.C. § 636(b)(1)(b).

## II. FACTUAL HISTORY

### A. Video Footage of the May 24, 2019 Traffic Stop

In March 2018, Soto-Lopez was released on discretionary parole following convictions and incarceration for second-degree murder, robbery, and assault. Dkt. 2 at 3; Dkt. 21-1 at 2. The conditions of Soto-Lopez's parole required, among other things, that he "obtain the prior written permission from his P.O. in the form of an interstate travel agreement before leaving Alaska." Dkt. 21-1 at 2. In other words, Soto-Lopez required a "travel permit." *Id.* Another relevant condition was that Soto-Lopez needed "permission from [his] P.O. before leaving the area of the state to which [his] case [was] assigned." *Id.* Soto-Lopez was to obey all laws, obey all parole conditions, and obey "any special instructions, rules or orders given" by the probation office. *Id.* at 2-3.

In March 24, 2019, at around 2:00 p.m., Trooper Trevor Howard's patrol vehicle was parked on a pull-out with the dashcam video running. Def. Ex. 6 at 00:01. A black vehicle drove by in the first thirty seconds; but no action was taken by Trooper Howard. *Id.* at 00:30-00:37. Trooper Howard then observed a different vehicle speeding down the highway, Trooper Howard followed that vehicle for a few seconds, turned on the emergency lights, and stopped that speeding vehicle. *Id.* at 00:55-01:44. The driver, now identified as Soto-Lopez, mentioned that he was on "parole" for "second-degree murder and first degree assault" within seconds of Trooper Howard approaching and explaining

3

the basis of the stop. *Id.* at 02:15-02:25. Trooper Howard then asked, "Do you have a travel pass?" *Id.* at 02:26-02:28. Soto-Lopez responded that he had attended "class, so we're just doing training … no I don't have" a travel pass. *Id.* at 02:28-02:36. Trooper Howard again asked Soto-Lopez regarding the travel pass; Soto-Lopez mentioned that he did not have one. *Id.* at 02:37-02:57. At this point, Trooper Howard asked Soto-Lopez to step out of his vehicle, advised he would be detained pending verification of the travel pass, and opened the vehicle's driver-side door. *Id.* at 02:58-03:05. Soto-Lopez was handcuffed and searched but nothing was found on his person. *Id.* at 03:06-04:15.

Inside the patrol vehicle, Trooper Howard and Soto-Lopez discussed his speeding while Trooper Howard concurrently radioed Soto-Lopez's information to a dispatcher. *Id.* at 04:35-05:15. The black vehicle reappeared in the opposite driving lane, which prompted Trooper Howard to ask if Soto-Lopez knew the driver of that black vehicle. *Id.* at 05:25-05:56. Soto-Lopez gave a vague denial: "No, I didn't drive with anybody in a" black vehicle, "now there's co-workers that came by, but not" that black vehicle. *Id.* at 05:56-06:15.

Trooper Howard radioed the dispatcher with a request that the probation officer be notified that Soto-Lopez was traveling from Soldotna and was stopped in Cooper's Landing. *Id.* at 06:21-06:33. When asked at various times about the black vehicle, Soto-Lopez vaguely replied that other co-workers attended the class and that "he'd have to see" the vehicle first before confirming whether he knew the driver. *Id.* at 06:35-06:53. Soto-Lopez said he was "just trying to keep up with the speed of everybody." *Id.* at 06:54-07:03.

4

The black vehicle then drove by again. *Id.* at 08:07-08:09. Soto-Lopez, at this point, conceded that it was his co-worker, Rolando, who was driving the black vehicle. *Id.* at 08:10-08:52. Trooper Howard radioed the information of the black vehicle to dispatch for identification purposes. *Id.* at 08:53-08:59. The conversation continued, and this Court notes that in this, and all their interactions, Trooper Howard and Soto-Lopez were cordial, calm, and relaxed with one another. *Id.* at 09:41-10:29. A minute later, while Trooper Howard concurrently radioed a request to stop the black vehicle, dispatch stated that the "P.O. is requesting a search for alcohol," but Trooper Howard conveyed that message differently to Soto-Lopez: "P.O. wants a search of the car" to which Soto-Lopez promptly denied having any alcohol. *Id.* at 11:30-12:00.

Trooper Howard first searched the panel of the driver-side door, appeared to find some item of interest, and proceeded to smell that item. *Id.* at 12:17-13:07. Trooper Howard next searched the driver's seat that included any location within arm's reach, and a few seconds later, bent inside the vehicle to widen his search. *Id.* at 13:10-13:28. Trooper Howard was now fully inside Soto-Lopez's vehicle, and although the view was obstructed, one could hear Trooper Howard sifting through Soto-Lopez's vehicle. *Id.* at 13:29-14:00. After stepping out of the vehicle for approximately forty seconds, Trooper Howard listened to dispatch's recommendation that Soto-Lopez be issued a ticket and that Soto-Lopez report to the probation office at a given time, all the while sniffing an item of interest. *Id.* at 14:01:14:40.

Trooper Howard re-entered Soto-Lopez's vehicle while simultaneously radioing with dispatch, the view was again obstructed, but this time it appeared that Trooper Howard opened the center console. *Id.* at 14:41-14:42. It is at this point that Trooper Howard found "a scale" and what "look[ed] like an ounce of heroin." *Id.* at 14:43-15:04. With this evidence uncovered, Trooper Howard goes in and out of the vehicle in successive motions until he closes the driver-side door. *Id.* at 15:05-15:35. The passenger-side doors are next on the search list. *Id.* at 15:36-15:40.

On the passenger-side front door, Trooper Howard went halfway inside, and this viewpoint too is obstructed, but you can likewise hear Trooper Howard sifting through the front passenger side and through any location that was in arm's reach. *Id.* at 15:41-17:28. The passenger-side back door is next opened, and it appeared that Trooper Howard was searching through something but stepped out within seconds and closed the door. *Id.* at 17:29-17:37. The hatch door was immediately opened and Trooper Howard searched some bags that were to the left of what appeared to be a generator. *Id.* at 17:38-18:14. Nothing was found in Trooper Howard's search to the right of the generator as well. *Id.* at 18:15-18:20. With the hatch door left open, Trooper Howard opted to return to the passenger-side back door, but before diving back in, the black vehicle reappeared with their right front passenger window slid half-way down. *Id.* at 18:21-18:23. With his left hand, Trooper Howard radioed in the black vehicle's reappearance while his other hand continued searching. *Id.* at 18:24-18:29. Both hands were now used to search but both hands turned

up empty. *Id.* at 18:30-18:43. The search is over. *Id.* at 18:44-19:00. The responsibilities are not. *Id.* at 19:00-19:15.

The dashcam footage details the wide-ranging conversation between Trooper Howard and Soto-Lopez after the search of Soto-Lopez's vehicle is completed. *Id.* at 31:40. Soto-Lopez opted to speak with Trooper Howard regarding the "little bit of heroin" found after his Miranda rights were read. *Id.* at 31:40-36:00. It was 36 minutes into the traffic stop when Trooper Howard radioed in the following: "Can I get the next available 51?" *Id.* at 36:22-36:27.

Downplaying the severity of the stop and acknowledging that Soto-Lopez had been compliant, Trooper Howard stated, "you've been nothing but cooperative with me. And I am going to be as cool as I can with you." *Id.* 37:36-37:45. The needles found, Soto-Lopez alleged, were used for partying. *Id.* at 38:30-38:59. At this point, it appeared that the black vehicle was stopped and dispatch mentioned that Soto-Lopez was following that black vehicle because of a broken taillight. *Id.* at 39:30-40:05. Trooper Howard confessed that he was "mainly concerned because he kept driving and obviously with this guy's history." *Id.* at 40:15-40:22. Dispatch, 5 minutes after Trooper Howard's "51" request, notified Trooper Howard that "the next available we could find is ASAP Towing" so it could be taken to an "impound yard." *Id.* at 40:57-41:15. Two minutes later, dispatch clarified that "it's gonna be about an hour" for ASAP Towing to arrive at the traffic stop scene. [*sic*]. *Id.* at 43:45-44:00. Trooper Howard acknowledged the wait time with a "10-4" response. *Id.* The conversation picked up two minutes later:

Soto-Lopez: What's gonna happen with my vehicle?

Trooper Howard: It's gonna get impounded.

Soto-Lopez: Out here?

Trooper Howard: Yeah.

Soto-Lopez: So where will it go?

Trooper Howard: It's gonna go to Soldotna.

Soto-Lopez: And I gotta get it out there?

Trooper Howard: Yeah, or have somebody come get it.

Soto-Lopez: Can they come get it?

Trooper Howard?: From Anchorage? … No, I don't have any cell phone reception and I can't wait here.

Soto-Lopez: Is there any way to not get it, uhmm, is that What the P.O. said?

Trooper Howard: Yeah unfortunately in this situation, it has to get impounded.

Soto-Lopez: No I mean like the violation .. is there any way to talk to the [P.O.]?

Trooper Howard: Uhmm, like I said, I don't have any cell service, and they requested that I take you in already. They're pretty pissed that you didn't have a travel pass … but yeah just let them know bro, you were coming down here to get some work, uhmm, and you fucked up a little bit. As long as, you know, you admit your mistakes and know that you are wrong but are trying to better yourself. Usually that Kind of helps your situation.

Soto-Lopez: Is there any way I can get some of my belongings from the vehicle?

Trooper Howard: What do you need?

Soto-Lopez: Like my cell-phone. I can probably can get somebody in Kenai to pick it up.

Trooper Howard: Well, I already got them coming, they already en route … I can get your cellphone for ya.

Soto-Lopez: [audio is muffled but it appears that Soto-Lopez was instructing Trooper Howard what to get from the vehicle].

8

[*sic.*]. *Id.* at 46:00-48:40. Trooper Howard approached the vehicle and retrieved Soto-Lopez's cell phone from the driver-side front door. *Id.* at 48:40-49:14. The audio is muffled when Soto-Lopez asks a question but the audio is clear when Trooper Howard responds, "No I doubt that. There's, I mean, P.O.s in Kenai that could work on their behalf for one. And I highly doubt that you're gonna be staying down here for a long while." *Id.* at 49:45-50:19. Soto-Lopez once again asked a question but the audio was muffled; it appeared that Soto-Lopez asked, something to the effect of, "How much would the impound [cost], do you know anything about that?" to which Trooper Howard responded that he did not know but that it may be based on the length of stay at the impound yard. *Id.* at 50:35-50:57. Approximately nine minutes later—and an hour into the traffic stop—Trooper Howard drove away from the scene. *Id.* at 59:40.

## B. Trooper John King

The following is taken from the June 8, 2021 evidentiary hearing and the April 15, 2022 evidentiary hearing. Dkt. 154; Dkt. 245. Trooper John King's involvement began when he stopped the black vehicle at Trooper Howard's request. Dkt. 154 at 76. After that investigation ceased, Trooper King then drove to the scene to relieve Trooper Howard by waiting for ASAP Towing's arrival. *Id.*; Dkt. 245 at 10-11. Trooper King described the surrounding scene of the traffic stop as follows:

> A. So it's, I guess I'd described it as fairly remote. If I recall, there was some road construction going on at the time that's since been completed. It's several miles outside of the Cooper Landing and I guess probably 20 miles, give or take, outside Sterling.
> …

9

Q. Have you ever had to deal with vandalism occurring to vehicles in that general area?

A. I'm not sure about vandalism specifically, probably, because that's a fairly common thing on the side of the road, theft from vehicles and other things. I took a theft report last week, or two weeks ago, from right in that area, for the road construction signs.

Q. Were the road construction signs themselves the things that were stolen?

A. On the side of the road -- batteries were stolen out of the -- vehicle batteries.

Q. Oh, vehicle batteries from construction vehicles?

A. From the warning signs that they put out there. So theft is a huge issue with vehicles along the side of the highway and other things that are stealable.

*Id.* at 11-12. It "sound[ed] right" to Trooper Howard that there would be approximately "seven to eight hours of daylight" left after the traffic stop ended, and that the construction in the area "was spread on over many, many miles" with "a number of work vehicles and signs and different things going on the highway at that time." *Id.* at 19.

Trooper King did not have any contact with Soto-Lopez. *Id.* Trooper King waited for the tow truck because "[a]ny time we take a driver away from a vehicle we prefer to not abandon that vehicle on the side of the road, if at all possible, if there's a way to have it removed from the scene." Dkt. 245 at 11. Soto-Lopez's vehicle would have been deemed abandoned since "there was nobody else there to drive it away." *Id.* A significant reason behind this policy, in Trooper King's mind, was to shield the Alaska State Troopers (AST) from liability. *Id.* at 13. After about an hour of waiting, the tow truck driver arrived to impound the vehicle to the tow yard instead of the AST's lot; this was an important

distinction because taking the vehicle to the AST lot would mean that the vehicle was seized for evidence, whereas releasing it to a private tow company would mean "it's just being removed from the scene to be held securely elsewhere until the owner can recover it." Dkt. 154 at 78; Dkt. 246 at 13-14. Soto-Lopez's vehicle was no longer seized for investigative purposes, according to Trooper King, at the moment when Trooper Howard decided to impound the car. Dkt. 246 at 24-25. It was, however, still under the custody of the troopers after Soto-Lopez was arrested but before the tow truck arrived. *Id.* at 29.

Trooper King was aware that law enforcement officials were bound by state law and AST policy to provide the detained driver with the opportunity to make arrangements for removal of the vehicle before officials had the discretion to impound the car. *Id.* at 15-16. These situations, Trooper King stated, "can happen. As long as it's within a reasonable time[.]" *Id.* at 16-17. Trooper King did not know whether Soto-Lopez made or tried to make proper arrangements, "[b]ut from that location it's unlikely he could have called." *Id.* at 17. It was "possible," however, for Trooper Howard to radio contact information to AST Dispatch on behalf of Soto-Lopez to then make proper arrangements for the vehicle, since Trooper Howard had already radioed for the tow truck. *Id.* If arrangements could not be made, Trooper King was also aware that, pursuant to state law and AST policy, the detained individual had the opportunity to choose the towing company. *Id.* at 18. Trooper King testified that state law and AST policy were complied with "when possible." *Id.* Trooper King did not know that Trooper Howard did not offer this other mandatory opportunity. *Id.*

11

Trooper King emphasized that all decisions regarding towing the vehicle were made before he arrived at the scene of the traffic stop. *Id.* The following was Trooper King's explanation as to what discretion, if any, is given to a state trooper under the relevant state law and AST policy: "I don't really know what the discretion was for having it moved there. The tow truck was already coming when I came to show up. So what the discussion was leading up to the decision being made to have it towed, I can't really speak to that because I wasn't part of that discussion." *Id.* at 25.

### C. ASAP Towing Company

The following is taken from the January 28, 2020 evidentiary hearing and the June 8, 2021 evidentiary hearing. Dkt. 45; Dkt. 154. In accordance with a "formal arrangement or agreement" that placed ASAP Towing Company on AST's "call-out list," the Troopers Department would utilize the towing services of ASAP Towing Company. Dkt. 45 at 135; Dkt. 154 at 36-37. The independent contractor who was tasked with towing Soto-Lopez's vehicle on March 24, 2019, was Ira Beck. Dkt. 45 at 134; Dkt. 154 at 5. Beck received the AST's request via telephone and estimated that it would take approximately an hour to arrive at the scene of the traffic stop from ASAP Towing Company's headquarters in Soldotna. Def. Ex. 2 at 00:30-1:02. It is unclear whether that estimate included preparation since Beck stated that "It's going to be a little bit. I gotta go grab a tow truck from town." [*sic.*] *Id.* Beck's arrival time was estimated to be between "30 or 45" minutes. Dkt. 45 at 136; *see also* Dkt. 154 at 29-30. Once at the scene, Beck was given an impound slip that indicated a "transfer of control" from the troopers to ASAP Towing Company so it can be

officially towed to the impound lot; Beck then undertook his ordinary responsibilities of loading the vehicle onto the tow truck, with no inventory taken of the inside of the vehicle. Dkt. 45 at 137; Dkt. 154 at 13. Beck did not know why Soto-Lopez's vehicle was being impounded or the underlying basis for Soto-Lopez's arrest. *Id.*; *Id.*

### D. The March 25, 2019 Search Warrant

Trooper Howard applied for a search warrant the day after the traffic stop. Dkt. 85-1. In describing the traffic stop, Trooper Howard, in particular, attested that "[d]ue to not having adequate cell phone reception, I requested dispatch contact the on-call probation officer in Anchorage and advise them of the situation." *Id.* at 5. Trooper Howard further attested to the user quantity of drugs found in the center console, that ASAP Towing Company took possession of Soto-Lopez's vehicle, and that Beck found a case with methamphetamine when he conducted an inventory search of the vehicle. *Id.* at 5-6. The search warrant was promptly executed and the following was found, which formed the basis of the [Dkt. 2] indictment: several ounces of methamphetamine and heroin, three firearms, and a silencer. *Id.* at 4-6.

## II.    PROCEDURAL HISTORY

### A. December 2019

On December 13, 2019, Soto-Lopez moved to suppress, all of the evidence found from the March 2019 traffic stop. Dkt. 17. Trooper Howard's documented history of dishonesty and neglect of duty began a week later, on December 17, 2019, when Trooper Howard returned to his residence for his 30 minute meal period. Deciding to exceed his

allowed meal period, Trooper Howard neglected his law enforcement duties for 39 minutes by remaining at his residence. Dkt. 117-3 at 5. Trooper Howard's supervisor was oblivious to Trooper Howard's decision and subsequent actions. *Id.* Neither the District Court nor this Court were notified of Trooper Howard's actions.

## B. January 2020

In January 2020, this Court held an evidentiary hearing for the December 2019 motion to suppress. Dkt. 17; Dkt. 45. Trooper Howard was among the several government witnesses that testified. Dkt. 45 at 47. Trooper Howard was stationed on the Sterling Highway, on March 24, 2019, tasked with observing potential traffic violations from traveling vehicles. *Id.* at 48-49. It was in the afternoon, on a "normal day," and there was ongoing construction in the area. *Id.* at 49-51. Trooper Howard had first noticed a black vehicle before stopping Soto-Lopez's vehicle for speeding. *Id.* at 52-53. It was very rare that a driver, stopped for an otherwise ordinary traffic violation, would be on parole for "[m]urder, robbery, and assault." *Id.* at 53-54. After confirming that Soto-Lopez did not have a travel pass, Trooper Howard decided to contact Soto-Lopez's parole officer through his radio; it was standard policy to contact a parole officer if a driver was on parole. *Id.* at 55. "So in this section of the highway, there's no cell phone reception, so I requested my dispatch contact the on-call parole officer." *Id.* Soto-Lopez conceded that he knew the black vehicle's driver after the black vehicle repeatedly drove past the traffic stop scene. *Id.* at 62-64. When the dispatcher relayed the parole officer's request to search for alcohol, Trooper Howard construed the request as a search of Soto-Lopez's vehicle. *Id.* at 66.

14

Trooper Howard used his radio again, before searching Soto-Lopez's vehicle, to request that Trooper King stop the black vehicle. *Id.* at 67. Dispatch, at this point, relayed the parole officer's request that Soto-Lopez be issued a traffic ticket and that he be told to report to the probation office. *Id.* at 68, 70-71. Trooper Howard continued searching. *Id.* Syringes, plastic bags with user amounts of narcotics, and a scale were found in the vehicle's front area. *Id.* at 76.

The evidentiary hearing turned to Trooper Howard's decision to impound Soto-Lopez's vehicle. *Id.* at 87-88. Because Soto-Lopez was under arrest for parole violations and for possession of drug substances, Trooper Howard's plan from there was to impound the vehicle to "[r]emove it from the roadway." *Id.* at 88-89. The decision to impound the vehicle was made at the moment that Trooper Howard decided to take Soto-Lopez into custody; and Soto-Lopez was not offered the opportunity to make arrangements for his vehicle. *Id.* at 114. Moreover, the time of day and the weather played no role in Trooper Howard's decision. *Id.* at 126. It sounded "right" that there would have been four to five hours of daylight left had Soto-Lopez's vehicle stayed at the scene of the traffic stop. *Id.* at 131. Trooper Howard replied with a "yes" when the government, on further direct examination, asked whether that would have been enough time for acts of vandalism to occur. *Id.* at 132. A private towing company was then slated to impound the vehicle to its private impound lot. *Id.* at 89. It appeared that Soto-Lopez's main concern regarding whether a driver can make arrangements for their vehicle was if Trooper Howard had his "cell phone," so he can "be like, 'Here, here's my phone if you want to call somebody or

15

call a tow, here you go.'" [*sic*]. *Id.* at 127. The following are Trooper Howard's answers

that the government elicited, on direct examination, as to vandalism concerns:

> A. Because it can become more responsibility, you know, if
> it gets vandalized … if I don't have the vehicle removed,
> myself, or there's no other people we can contact to have the
> vehicle removed, the likelihood of it getting vandalized on the
> side of the Sterling or Seward Highway is very high.
> Q. Are there lots of other towns around this area?
> A. No.
> Q. Are there lots of people sort of walking around, watching,
> in this area?
> A: No.
> Q: Is this a very rural part of the Sterling Highway?
> A. Yes.
> Q. Is that why you have concerns about vandalism?
> A. Yes.
> Q. Do you have any concerns about the safety of cars that
> are on the side of the road?
> A. Yes.
> Q. Why?
> A. It's -- it can be collided with, um --
> Q. What is this area that Mr. Soto-Lopez's vehicle was
> pulled off into? Did you say this was construction?
> A: Yeah … the roadway goes down into a dip, and this is
> right on top of the northbound side of that dip in the
> roadway. So Jim's Landing is right, maybe, a quarter of a
> mile or more.
> …
> Q. And did you have cell phone service out there?
> A. No.
> Q. So did you have a way to call someone else to come pick
> up the vehicle?
> A. No.
> …
> Q. Could you have let Mr. Soto-Lopez use your phone to

16

call?
A. No.
Q. Why not?
A. There's no cell phone service.

*Id.* at 90-92. Trooper Howard remembered some parts of the conversation, particularly, that Soto-Lopez inquired as to Trooper Howard's decision to impound the vehicle. *Id.* at 118-19. Trooper Howard, however, was clear that his decision would not have changed even if a third-party would have been available to retrieve the vehicle on Soto-Lopez's behalf. *Id.* at 121. "No, I didn't give -- we have a list that we go off of for impounds[,]" was Trooper Howard's answer as to whether Soto-Lopez was given such an opportunity. *Id.* at 122.

### C. February 2020 - March 2020

On February 4 and February 5, Trooper Howard continued neglecting his official law enforcement duties, exceeding his meal period by 76 minutes and 88 minutes. Dkt. 117-3 at 5. Trooper Howard repeated this behavior the following month on March 10-11 and on March 20, exceeding his meal periods on each mentioned day by 160 minutes, 99 minutes, and 97 minutes. *Id.* On March 26, Trooper Howard lied to his supervisors when he radioed in that he had commenced his law enforcement duties. *Id.*

### D. April 2020 - July 2020

Among the six instances that Trooper Howard abdicated his law enforcement duties for notable periods of times, April 14 stands out. That day, after lying about commencing his work shift, Trooper Howard failed to report to his law enforcement post for four hours. *Id.* Trooper Howard did not officially record his actions in the law enforcement database

17

for the day either. *Id.* It was probably, Trooper Howard stated, because he was "arguing with his girlfriend and did not want to get hourly checked for his location." *Id.* Trooper Howard would neglect his duties in May 2020 by 62 minutes, and in July 2020 by 37 minutes. *Id.*

### E. August 2020

This Court filed its Final Report and Recommendation on August 19. Dkt. 68. Trooper Howard, on August 31, trespassed onto a female co-worker's residential property. Dkt. 117-3 at 6-7. Trooper Howard had arrived at the co-worker's home without sufficient notice, trespassed into the co-worker's residence after waiting outside for 30-40 seconds, and found the co-worker using the bathroom. *Id.* The co-worker expressed anger and embarrassment toward Trooper Howard since this was the first time that Trooper Howard visited, let alone entered, the co-worker's residence. *Id.* Trooper Howard believed that "he had done nothing wrong and was just checking on her." *Id.* at 7. According to the dispatcher that fielded the co-worker's concerns, Trooper Howard "said in essence, we are the police, that's what we do." *Id.* at 2.

### F. September 2020 - January 2021

On September 18, the District Court denied Soto-Lopez's motion to suppress by issuing its own order that adopted this Court's final report and recommendation. Dkt. 71. Meanwhile, troubled by Trooper Howard's actions, AST had requested that the Department of Public Safety initiate an internal investigation into Trooper Howard. In total, 13 witnesses were interviewed, voluminous work records that spanned from December 2019

18

to October 2020 were reviewed, including audio recordings that spanned from February 2020 to August 2020. *Id.* at 4-5. The investigation uncovered 43 documented events where Trooper Howard abdicated his law enforcement duties. *Id.* at 8. As to these 43 documented events, the investigation found that Trooper Howard had violated 4 provisions of the Department of Public's Operating Procedures Manual: (1) Honesty, OPM 101.300(D); (2) Neglect of Duty, OPM 101.330(A)(1); (3) Reporting for Duty, OPM 101.330(B), and (4) Employees Will Accurately Represent Hours Worked, OPM 113.340(B). *Id.* As to Trooper Howard's trespass, the internal investigation found that Trooper Howard had violated three manual provisions: (1) Unbecoming Conduct, OPM 101.360(A), Personal Conduct, OPM 101.360(B), Conformance to Laws, OPM 101.360(C)(1). *Id.* at 9. Moreover, the internal investigation found that Trooper Howard had violated a state criminal statute, titled "Criminal Trespass in the Second Degree. AS. 11.46.300. *Id.* This state criminal violation brought "discredit upon himself" and brought "the department into disrepute." *Id.* The Department of Public Safety's findings were released to the Alaska State Troopers Office on December 10, which prompted Trooper Howard to resign eleven days later, on December 21. *Id.* at 1; Dkt. 117-5.

In January 2021, the State of Alaska released its performance evaluation report for Trooper Howard. Dkt. 117-6. The report found, in part, Trooper Howard's performance to be highly acceptable because Trooper Howard "demonstrated his working knowledge of Alaska Statutes and regulations to conduct criminal and traffic enforcement to complete investigations." *Id.* His overall rating, the report concluded, was deemed "unacceptable."

This was based on the investigation's findings that he had committed several policy and law violations. *Id.* Trooper Howard was not eligible for rehire. *Id.*

## G. March 2021

In March 2021, the government notified the District Court and this Court of the Department of Public Safety's internal investigation. Dkt. 117. This internal investigation was one of the topics covered in an April 2021 evidentiary hearing for a separate motion to suppress. Dkt. 84; Dkt. 127; Dkt. 148. Trooper Howard,[1] now a private citizen, again testified. Dkt. 148. Trooper Howard specified that he decided to impound Soto-Lopez's vehicle the moment that the "heroin tested presumptive positive." *Id.* at 23. It was also near this point that Trooper Howard's investigation and seizure of the vehicle ceased. *Id.* at 27-28. A few hours after the traffic stop, Trooper Howard was notified that the towing company had found additional narcotics, which made Trooper Howard "upset … because I missed it." *Id.* at 30.

When asked about the policies that he violated, Trooper Howard remembered that the main reason behind the violations was his dishonesty. *Id.* at 60. The criminal trespass violation was next discussed. It was not his intention to violate a state criminal statute because he "was going to get a haircut at somebody's house, and [he] knocked and no one came to the door. And I rang the doorbell and no one came to the door. So I opened the door and yelled for their name. And they were shocked and I was kind of caught off guard,

---

[1] This Report and Recommendation will continue referring to Howard as "Trooper Howard" for clarity purposes and identity purposes.

because I thought I was going to get a haircut[.]" *Id.* at 62. Trooper Howard confirmed that the January 2021 evaluation report deemed his overall rating as unacceptable and confirmed that he was not eligible for rehire. *Id.* at 63.

## III.    TROOPER HOWARD's TESTIMONY

The question before this Court is whether Trooper Howard acted as a community caretaker when his decision to impound Soto-Lopez's vehicle was in violation of state law and AST policy. That question is discussed in depth below, but before doing so, this Court first reconsiders the weight of Trooper Howard's testimony in light of the new evidence.

The government argues (1) that this Court's previous findings "remain accurate regardless" of Trooper Howard's credibility; (2) Trooper King's testimony "entirely supports" Trooper Howard's testimony; and (3) it is speculative and irrelevant to consider what other actions could have been taken by Trooper Howard because the issue before this Court was "whether the Fourth Amendment was violated by this seizure." *See generally* Dkt. 248. Soto-Lopez disagrees on several bases. Soto-Lopez argues (1) that this Court should reject Trooper Howard's testimony altogether since the new evidence "destroy[s] any reliability" that the testimony had carried; (2) this Court's conclusion relied on "uncorroborated assertions" by Trooper Howard when it concluded that Trooper Howard acted as a community caretaker; (3) and the government has not proffered an explanation as to Trooper Howard's decision to violate state law and AST policy.

Here, the [Dkt. 68] Report and Recommendation is worth revisiting. Despite a lengthy and wide-ranging evidentiary hearing, the clearest answer the government was able

to elicit from Trooper Howard, regarding concerns of vandalism, is the following: "if I don't have the vehicle removed, myself, or there's no other people we can contact to have the vehicle removed, the likelihood of it getting vandalized on the side of the Sterling or Seward Highway is very high." Dkt. 45 at 90. It was this answer that this Court relied on when reasoning that "Howard testified that he believed the vehicle was at risk of vandalism due to its location in a remote section of the Sterling Highway, and this Court finds his testimony to be credible." Dkt. 68 at 12. Further explaining in a footnote, this Court emphasized that this Court was "not prepared to second-guess a law enforcement's assessment," and re-emphasized this footnote when Soto-Lopez's objections were addressed *Id.* at 12, 18. In short, this Court opted not to second guess Trooper Howard's decision, instead, proceeding with deference to law enforcement's decision given the factual record and despite the state law violation and AST policy violation.

This Court now has the benefit of a more developed record on reconsideration. This is a close question, though one that marginally favors Soto-Lopez.

Consider the 43 documented events of dereliction of duty on their own. A law enforcement official is vested with an enormous amount of discretion. The enormity of such discretion is, in part, why "[h]onor and trustworthiness is the cornerstone of" the Alaska State Troopers' "relationship with the public" and "the employee/employer relationship as well." Honesty, OPM 101.300(D). Alaska State Troopers have "zero tolerance for acts of dishonesty in any form or manner." *Id.* Trooper Howard violated this important cornerstone when he committed the 43 documented events. It would be one thing

to have committed these violations while off-duty, but, in violating the Neglect of Duty, OPM 101.330(a) provision, Trooper Howard engaged in "activities or personal business that cause[d] them to neglect or be inattentive to their assigned tasks, while in duty status." This in turn affected the "proper performance of duty" that is required under the Reporting for Duty provision, OPM 101.330(b). It is significant to this Court that the Alaska State Troopers found Trooper Howard's misconduct to be serious enough to warrant an internal investigation; and that request, in turn, led to a rigorous investigation by the Department of Public Safety. Moreover, the detailed findings of the investigation underscore the significance of Trooper Howard's misconduct. These violations, on their own, are not enough to warrant more scrutiny of Trooper Howard's testimony. What tips the scale is Trooper Howard's violation of Alaska Statute 11.460.330, titled "Criminal Trespass in the second degree."

An individual commits the crime of criminal trespass in the second degree" when the individual "enters or remains unlawfully in or upon premises." Alaska Statute 11.460.330. Looking to Section 11.46.350, to "enter or remain in or upon premises" is defined as "at the time of the entry or remaining, [the premises] is not open to the public and when the defendant is not otherwise privileged to do so." Section 11.81.610 requires a showing of conduct that is committed "knowingly" and "a circumstance or a result [that] is recklessly." In other words, Trooper Howard acted with general intent when he violated this criminal statute, and which also violated the Conformance to Laws provision, OPM 101.360(C)(1). Trooper Howard offered three explanations, at different times, for his

trespassing actions: (1) "we are the police, that's what we do"; (2) "he had done nothing wrong and was just checking in on" the co-worker; and (3) he "thought he was getting a haircut." Now, consider this state criminal law violation in conjunction with the state law violations from Trooper Howard's impoundment decision. As the [Dkt. 68] Report and Recommendation reasoned, and without objection from the government, the ordinary meaning of the word "shall," was not trumped by any permissive language in the statute. In other words, "Howard had an affirmative legal obligation" to abide by the state impoundment law.[2]

It is true that some, although not all, of Trooper Howard's violations were unfolding in temporal conjunction to this Court's proceedings. Therein lies the problem. If the District Court, this Court, or Soto-Lopez had been notified of Trooper Howard's violations, whether 1 violation or 43 violations, it would have impacted the credibility of Trooper Howard's testimony. The trajectory of the litigation at the time would have changed, and more importantly, would have given this Court pause as to Trooper Howard's credibility and therefore the weight his testimony was due. Here, the state law and AST policy violations that emanated from impounding Soto-Lopez's vehicle, when taken together with the new evidence, reflect a pattern of dishonesty, of neglect of duty, and of violating state law. This is an important point because this Court had deferred to Trooper Howard's assessment of the appropriate course of conduct at the traffic stop, despite the state law

---

[2] It bears mentioning that the authority of § 13 AAC 02.345 is supplemented by Alaska Statute 28.05.011, found in the article titled "Powers and Duties of Departments of Public Safety and Administration."

violation and the AST policy violation. It is important to stress that Trooper Howard's testimony will not necessarily amount to an adverse credibility determination, as Soto-Lopez unavailingly argues. This Court, on the other hand, cannot accord the same level of deference that was previously given. Trooper Howard's testimony will therefore be scrutinized in light of all the facts, all of the arguments, and all of the record. With the weight of Trooper Howard's testimony reconsidered, this Court turns to what a "community caretaker" entails.

### IV.    TROOPER HOWARD AS A COMMUNITY CARETAKER

In *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), an intoxicated off-duty law enforcement officer crashed his vehicle, and after the vehicle was towed to a different location, the responding law enforcement officers searched the trunk for a police-issued firearm. *Id.* at 443. During this warrantless search, the law enforcement officers found evidence that linked the off-duty officer to a recent murder. *Id.* In ruling that the warrantless search was reasonable given the immediate need to secure the firearm, *Cady* explained the "community caretaking functions" that fall under a law enforcement officer's responsibilities, such as attending to vehicle accidents on public highways. *Id.* at 441. These "functions were totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id. Cady* further reasoned, that at least in the vehicle context, a law enforcement official does not violate the Fourth Amendment when the community caretaking tasks are executed in a reasonable manner pursuant to "state law or sound police procedure." *Id.* at 447.

25

A careful reading of *Cady* confirms that the Supreme Court did not intend to create a wholly new exception to the warrant requirement when it used the community caretaking phrase. The community caretaking phrase was used "for want of a better term," *Cady*, 413 U.S. at 411, or in other words, it was supposed to be a non-controversial term "merely used … in passing" to acknowledge non-criminal tasks that relate to public health and general safety. *Caniglia v. Strom*, 141 S. Ct. 1596, 1600 (2021) (Alito, J. concurring). Three years after *Cady*, the Supreme Court in *South Dakota v. Opperman*, 428 U.S. 364, 365 (1976), further developed the inventory exception to the warrant requirement, which included a review of *Cady*'s community caretaking phrase.

In *Opperman*, the defendant's vehicle was parked in an area that prohibited parking in the early morning hours. *Id.* at 365. Having been issued an overtime parking ticket during the prohibited time and another parking ticket some hours later, the vehicle fell under "circumstances [that] were routinely reported to police headquarters." *Id.* at 366. A law enforcement official decided to tow the vehicle to the city impound lot. *Id.* The law enforcement official, now at the impound lot, observed in plain view a number of personal items, and proceeded to search the vehicle for inventory purposes, "using a standard inventory form pursuant to standard police procedures." *Id.* Narcotics were found in the glove compartment. *Id. Opperman* ruled that the warrantless inventory search was reasonable under the Fourth Amendment. *Id.* at 376.

In doing so, *Opperman* alluded to the community caretaking tasks that a law enforcement official undertakes when examining vehicles for adherence to government

26

regulation or potential safety equipment issues. *Id.* at 368. Vehicles, *Opperman* reasoned, are impounded when there is a violation of "parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 368-69. *Opperman* emphasized that law enforcement commonly adhered to routine practices of securing and inventorying personal property when the vehicle was in police custody. *Id.* at 370. These routine practices were based off "three distinct needs" that support the reasonableness of post-impoundment inventory searches: (1) protecting the vehicle owner's property while it is in police custody, (2) protecting law enforcement from liability in situations where there are claims or disputes as to lost or stolen property, and (3) protecting law enforcement from possible danger. *Id.* "These caretaking procedures" are to respond to potential incidents of theft or vandalism. *Id.*

 *Opperman* stressed, however, that "in all Fourth amendment cases, [courts] are obliged to look to all the facts and circumstance" of a case "in light of the principles set forth" in the Supreme Court's prior decisions. *Id.* at 375. This was an important point because the warrantless inventory search had occurred while the vehicle was in police custody; or in other words, while it was under government seizure under the Fourth Amendment's meaning. Indeed, *Cady* had "carefully noted that the protective search was carried out in accordance with *standard procedures* in the local police department … a factor tending to ensure that the intrusion would be limited in scope to the extent necessary

to carry out the caretaking function." *Id.* at 374-75. (emphasis in original). Applying these principles, *Opperman* also ruled that the impoundment was reasonable because the vehicle had been illegally parked for several hours and because the vehicle's owner was not present at the time of the impoundment "to make other arrangements for the safekeeping of his belongings." *Id.* The Supreme Court again visited the inventory exception, twelve years later, in *Colorado v. Bertine*, 479 U.S. 367, 368 (1987).

The law enforcement official in *Bertine* took an intoxicated driver into custody, decided to impound the vehicle, but before the tow truck arrived, a different law enforcement official inventoried the personal property inside the vehicle "in accordance with local police procedures." *Id.* at 368-69. Drug substances were found inside a closed backpack. *Id.* at 369. In explaining that the inventory search of the vehicle was permissible under the Fourth Amendment, *Bertine* notably mentioned that "inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Id.* at 371. The community-caretaking phrase did not receive the same treatment. *Id. Bertine* stressed that the probable cause standard and the "policies behind the warrant requirement" were not implicated in inventory searches. *Id.* An inventory search, rather, can be reasonable even if it is not executed pursuant to a warrant backed by probable cause. *Id.* The Supreme Court further clarified that *Opperman* "observed that our cases accorded deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody." *Id.* at 372. Applying those principles, *Bertine* ruled that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the

28

Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." *Id.* at 375. Inventory searches did not need to consider less intrusive alternatives to protect personal property because law enforcement officials have to balance the limited time with the unique circumstances of a particular inventory search. *Id.* The inventory search was permissible despite "departmental regulations" that afforded the law enforcement official with discretion as to impounding the vehicle or leaving the vehicle locked in a public parking location. *Id.* That discretion had to be "exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." In the end, the law enforcement officials followed standard procedure when they inventoried the vehicle. *Id.* at 376.

*Bertine*, *Opperman*, and *Cady* did not create a community caretaking exception. These Supreme Court cases involved reasonable inventory searches that were executed in accordance with standard law enforcement procedure; and in the 30 years after *Bertine*, the Supreme Court declined to provide clarity to the community caretaking phrase. This left the Ninth Circuit to grapple with the contours of the phrase. A review of the Ninth Circuit case law offers helpful guidance for resolving the question before this Court. *See Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) (explaining that an analysis involving community caretaking turns on the facts and circumstances of each case).

In *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1476 (9th Cir. 1993), the defendant's vehicle was searched incident to a lawful arrest and impounded after a lawful stop. *Hallstrom* ruled, in a single sentence, that the "subsequent search of the vehicle and

29

its contents was proper and reasonable." *Id.* at 1477. The accompanying footnote explained that the law enforcement's supervision over the decision to impound the defendant's vehicle was an independent community caretaking function. *Id.* at n.4 1477. "It was not unreasonable for the arresting officers to protect the car from vandalism or theft by having it towed" from the parking lot. *Id.*

A year later, in *Gahn v. Fujino*, 39 F.3d 1187 (9th Cir. 1994),[3] the Ninth Circuit cited *Bertine* when it reasoned that the "Supreme Court has determined that the impoundment of a vehicle to protect it from theft, vandalism, or negligence is a proper exercise of the community caretaking function." *Id. Gahn* ruled that "the impoundment was incidental to the lawful arrest" because (1) the vehicle had a broken window, (2) it was parked in a private parking lot, (3) the defendant's privilege to park in the private parking was revoked once he was arrested, and (4) the defendant had refused to identify themselves or cooperate. It was therefore reasonable for the law enforcement to conclude that impoundment was an appropriate caretaking function since there was no way to know when the defendant would return to the vehicle or if the defendant was the vehicle's owner to begin with. *Id.* Moreover, under *Bertine*, the law enforcement official was not required to let the defendant make "alternative arrangements" for the vehicle because a law

---

[3] *Gahn* is an unpublished disposition that was issued before January 1, 2007. 9th Cir. FRAP 36-3. This Court cites *Gahn* because it is relevant under the doctrine of law and for factual purposes. 9th Cir. FRAP 36-3(a)-(b). This Court notes that there are no page numbers assigned, so *Id.* is liberally used.

30

enforcement official can discharge their caretaking functions without needing to use the least intrusive means. *Id.*

The Ninth Circuit next discussed the community caretaking phrase in *United States v. Jensen*, 425 F.3d 698, 706 (9th Cir. 2005). The defendant's vehicle was impounded to the law enforcement's lot after a lawful traffic stop. *Id.* at 701-702. The arrested defendant was taken to the impound lot where the defendant "refused to consent to a search of his" vehicle. *Id.* at 702. A K-9 then sniffed the vehicle, alerted to drug substances, and a search warrant was executed. *Id. Jensen* made two rulings. *Id.* at 706. First, it ruled that given the evidence and the K-9's drug alert, the impoundment was proper because there was probable cause that the vehicle contained illegal drug substance. *Id.* Second, *Jensen* cited *Hallstrom* and *Cady* when it ruled that the law enforcement official's impoundment decision was reasonable under the "community caretaking doctrine." *Id.* Now referred to as a doctrine, a defendant's arrest allows the "law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism." *Id.* The district court did not clearly err when it found that the vehicle obstructed traffic and that the law enforcement official's "concerns about vandalism were reasonable" given the circumstances. *Id.*

*Miranda*, 429 F.3d at 860, was decided a month later, where a husband was teaching his wife how to drive in their neighborhood. The husband was insured and licensed. *Id.* The wife was not. *Id.* A law enforcement official at some point observed the vehicle driving slowly and poorly. *Id.* This prompted the law enforcement official to activate his patrol

lights, following the vehicle until it stopped at the married couple's home, and the wife was then cited for being uninsured and unlicensed. *Id.* Both Spanish speakers with limited English skills, the married couple "did not know that their vehicle was to be impounded" after the law enforcement official mentioned their impoundment decision. *Id.* The decision was made under a city ordinance that allowed impoundment "without prior notice, if the officer has a reasonable belief that the driver is operating it without a valid operator's license." *Id.* The law enforcement official waited for the tow truck for about thirty minutes. *Id.*

*Miranda* first reasoned that the Supreme Court has limited an impounding officer's discretion and has "taken a more finely tuned approach to determining reasonableness under the Fourth Amendment." *Id.* at 863. A secondary source was cited favorably that explained that "impoundment is *not* a matter which can simply be left to the discretion of the individual officer." *Id.* (citing 3 Wayne R. LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 7.3, at 624 (4th ed. 2004)) (emphasis in original). *Miranda* affirmed the principles in *Jensen* and *Hallstrom* when it created a workable standard for impoundment decisions: "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Id.* at 864. An impoundment is reasonable under the "community caretaking function" if the impoundment "fits within the authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience[.]" *Id.* (citing

*Opperman*, 428 U.S. at 369). Deciding to impound a vehicle, under relevant state law, does not automatically determine the reasonableness of a seizure because a state-approved search must still adhere to the Fourth Amendment. *Id.* at 864-65. Based on all the facts, the Ninth Court reasoned that the vehicle had already been parked in the married couple's driveway, and was therefore not an impediment to traffic or a threat to public safety. *Id.* at 865-66.

By contrast, in *Ramirez v. City Buena Park*, 560 F.3d 1012, 1018-19 (9th Cir. 2009), a seemingly intoxicated driver, who was confrontational and irritable, was taken into custody for further sobriety testing. The responding law enforcement official also asked the back-up officials to tow the vehicle pursuant to a relevant state law, which authorized a vehicle's removal if a driver is arrested for an alleged offense. *Id.* Notably, the driver tested negative for drug substances. *Id.* at 1019. *Ramirez* applied the *Miranda* principles when it ruled that the law enforcement's decision to impound the vehicle for "safekeeping" was reasonable, despite the facts that the vehicle was legally parked in a drug store parking lot and the lot was about a mile away from the driver's residence. *Id.*

In *United States v. Cervantes*, 703 F.3d 1135, 1137 (9th Cir. 2012), a driver suspected of drug trafficking was stopped, arrested after failing to provide identification, and the driver's vehicle was then impounded. *Id.* at 1137-38. An inventory search found drug substances. *Id.* In affirming that a subsequent inventory search is tainted by an unlawful impoundment, *Cervantes* reasoned that the government had failed to introduce evidence that the vehicle would be vulnerable to vandalism or theft if left in the residential

location. *Id.* at 1142. Moreover, *Cervantes* further reasoned that the law enforcement officials might not have complied with the relevant state law. *Id.* at 1142-43.

This last Ninth Circuit case involved a consolidation of district court cases. *Sandoval v. County of Sonoma*, 912 F.3d 509, 513 (9th Cir. 2018). In one case, a driver's vehicle was detained based on an erroneous interpretation by the County Sheriff's Office, specifically, that a driver needed a California driver license to use California's roads. *Id.* The detained driver's vehicle was impounded because he had a Mexican driver's license, and despite the fact that there was a "friend [who] had a California's driver license and offered to take possession of the vehicle." In applying previous principles, *Sandoval* reasoned, among other things, that once the driver "was able to provide a licensed driver who could take possession of the truck, the City's community caretaking function was discharged." *Id.* at 516-17 (citing *Brewster v. Beck*, 859 F.3d 1194, 1196 (9th Cir. 2017)) ("The exigency that justified the seizure vanished once the vehicle arrived in impound and Brewster showed up with proof of ownership and a valid driver's license."). Moreover, even if the driver "could not have driven his vehicle on California's roads, he could have lent the truck to a friend, sold the truck, used it for storage, or taken any other innumerable possible actions that a property owner can lawfully take with his or her property. The City has not provided us with any reason that a government may warrantlessly interfere with private possessory interests in this way, beyond its general argument that such impounds are justified as a deterrent or penalty."

Having carefully reviewed the origins of the community-caretaking phrase, the Ninth Circuit's community-caretaking doctrine, and all of the facts and circumstance of Soto-Lopez's case, this Court concludes that Trooper Howard was not discharging a community caretaking function when he decided to unlawfully impound Soto-Lopez's vehicle. To conclude otherwise would subvert the Constitution's protection against unlawful searches and seizures. U.S. Const. amend. IV. ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" by the government).

This Court first turns to the state law and the AST's written policies that prescribe the "duty to prevent [the vehicle] from creating a hazard to other drivers or being a target for vandalism or theft." *Miranda*, 429 F.3d at 864. It is important to remember the basic premise that courts do not rewrite laws, even those that are ineptly structured, under the guise of statutory construction. A court can only strike down a statute if it is constitutionally deficient or vague.

The State of Alaska enacted an administrative code, authorized by a state statute, that is titled "Officers authorized to remove vehicles[.]" Alaska Admin. Code tit. 13, § 02.345. This administrative code applies when a law enforcement official arrests and detains a motor vehicle driver on the Alaskan roads. § 02.345(c). The code then directs the law enforcement official to impound the vehicle, or as used in the statute, "shall impound" and "remove the vehicle to a place of safety." *Id.* The arrangement of the code's language seems confusing at first glance because the code employs the word "however" and a semi-

colon as qualifying language, but a careful reading reveals that there are two sequential steps that a law enforcement official is required to execute when impounding a vehicle. The first step involves two prescribed duties: (1) "the officer shall inform that driver that he may elect to have another immediately available" licensed driver to "drive or otherwise remove the vehicle as the driver directs"; and (2) "the driver may designate the nearest available garage or tow car operator of his choosing to remove the vehicle." The second step applies if "the driver does not so indicate" a readily available driver, a nearby garage, or a preferred towing operator. A law enforcement official, at that point, "shall make the arrangements necessary to remove the vehicle."

The community caretaking functions are clear in this ordinance. Trooper Howard is required to impound a vehicle when a driver has been arrested. The critical language of the ordinance is in the first sequential step, which "circumscribes the discretion of" Trooper Howard's community caretaking function. *See Miranda*, 429 F.3d at 865 (quoting *Bertine*, 479 U.S. at 376 n.7). In other words, the discretion of the procedure to be followed prior to actual impoundment in the first sequential step, is vested in the driver, and not in Trooper Howard. The community caretaking function, at that step, is to notify the driver and wait for their decision, if any, regarding an available driver or as here, a preferred towing company. *See Sandoval*, 912 F.3d at 513 (explaining that "the City's community caretaking function was discharged" when the detained driver "was able to provide a licensed driver who could take possession of the truck[.]"). If, after the driver "does not so indicate," Trooper Howard has the discretionary authority to "remove any vehicle which," relevant

36

among them, can "be subject to vandalism." *Jensen*, 425 F.3d at 706; *see also Miranda*, 429 F.3d at 864 (explaining that an impoundment is reasonable if it "fits within the authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience[.]") (citing *Opperman*, 428 U.S. at 369).

The code uses the word "necessary" to describe the discretion but it is important to remember that "the decision to impound pursuant to the authority of city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment." *See Cervantes*, 703 F.3d at 1142 (9th Cir. 2012) (quoting *Miranda*, 429 F.3d at 864). The standards of the Fourth Amendment, in other words, are not relaxed when Trooper Howard is discharging his community caretaking function in the second sequential step. These sequential steps are important to highlight in light of the abundant Supreme Court and Ninth Circuit case law. From *Cady* to *Sandoval*, the relevant state law or ordinances were tailored to a law enforcement official's discretion to impound the car, and all those laws or ordinances did not require the official to provide notice to the driver or provide the opportunity to exercise alternative arrangements. Soto-Lopez's case stands apart from the abundant case law on that very point.

To proceed with caution, this Court turns to the AST policy to review what community caretaking functions are established there.

The Department of Public Safety Operating Procedures Manual has a chapter titled "Vehicle Impound" Dkt. 249-1 at 1. The authority of this chapter emanates from Administrative Code 02.345 and several state statutes from the "Powers and Duties of

37

Departments of Public Safety and Administration" article. The "Introduction" 209.100 provision states that this chapter "establishes the authority of officers for vehicle impounds, the events that prompt this action, and the processes involved in engaging in such activity." The 209.300(a) Authority provision, titled "Authority to impound vehicles," notably does not mention Admin Code 02.345(c). It is 209.300(b) that is titled "When the driver of a vehicle is arrested the vehicle must be removed." This Court draws on another basic premise, that is, if possible, every word and provision is to be given effect. That written, this Court highlights the difference in language regarding what the driver can do under this provision. "If arrested, a driver may have the vehicle *removed* immediately by someone or by a towing company." (emphasis added). The "impoundment" word is instead used in the next sentence: "If the driver cannot or will not designate someone to take charge of the vehicle it will be *impounded* [Ref 13 AAC 02.345(c)]." (emphasis added). This AST policy is explicit that a driver has to first refuse the opportunity to have the vehicle removed by "someone" or by a "towing company" before it can be impounded. The government, in attempting to avoid this wall of adverse authority, and by relying on an out-of-circuit case, argues that suppression is not an "appropriate remedy for violations of the Alaska Administrative Code that do not violate the Fourth Amendment." This argument is foreclosed by the Supreme Court and the Ninth Circuit. Impounding a vehicle is invalid under the Fourth Amendment when it is not conducted pursuant to standardized procedures, written law enforcement policy, or state law. *See* Opperman, 428 U.S. at 369; *see also* Miranda, 429 F.3d at 864; *see also Bertine*, 479 U.S. at 371-73. Trooper Howard

38

was duty bound to follow pre-existing rules from two authoritative sources that required a specific process before deciding how to impound the vehicle. Soto-Lopez's facts may differ from *Sandoval*, 912 F.3d at 513, but *Sandoval*'s lessons are helpful in guiding this Court's analysis. There—similar to here—the arrested driver "could have … taken any other innumerable possible actions that a property owner can lawfully take with his or her property." *Id.*

Trooper Howard did not properly discharge his community caretaking functions that were prescribed by Alaska's administrative code and by AST policy. Trooper Howard, however, has an answer for that: he lacked "adequate cell phone reception." Because he lacked cell phone reception, this brought "more responsibility" to remove the vehicle so it does not get vandalized, since "the likelihood of getting vandalized on the side of Sterling or Seward Highway is very high." Trooper Howard's central theory has intuitive purchase on its face, but crumbles under scrutiny.

This brings us to the other prong of *Miranda*'s standard: "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle." Trooper Howard had been stationed at the Seward post since July 2017. His law enforcement duties, relevant among them, included "criminal investigations; patrol functions; traffic enforcement." Finding his performance highly acceptable in a performance evaluation report, Trooper "Howard demonstrated his working knowledge of Alaska statutes and regulations to conduct criminal and traffic enforcement to complete investigations." The patrol post "included the Seward Highway from Mile 0 to 75 and the

Sterling Highway from Mile 37 to 67." This Court can take judicial notice that the surrounding area of the traffic stop was remote. Fed. R. Evid. 201. It was less than an hour away from Soldotna, and according to Trooper King, about "20 miles, give or take, outside Sterling, [Alaska]." It took Beck, the tow truck driver, approximately "30 or 45" minutes to arrive at the traffic stop scene from ASAP Towing's headquarters in Soldotna, with the estimated time seemingly including the time it took to "grab a tow truck from town."

This Court hastens to add that there can be fact-specific circumstances where a law enforcement official is accorded a wider berth of reasonableness in which they can make a split-second judgment of impounding a vehicle. The cornerstone of the Fourth Amendment, after all, is reasonableness. However—as in *Miranda*—the particular facts and "special circumstances of this case" caution a need for a wider berth of reasonableness. The narrow issue before this Court is whether there was a reasonable concern for vandalism since both parties agreed that there was no concern of impeding traffic or threat to public safety. That said, this Court turns to the traffic stop and interactions between Trooper Howard and Soto-Lopez. The United States Naval Observatory reports that the sunset in Soldotna, Alaska occurred at 8:29 P.M.[4] The traffic stop was therefore not in the early morning hours. *Cf. e.g., Opperman*, 428 U.S. at 365 ("During the early morning hours of December 10, 1973, ...."). The broken window occurred after Soto-Lopez's vehicle was impounded. *Cf. Gahn*, 39 F.3d at 187 (reasoning that the "impoundment was incidental to the lawful arrest" because the vehicle had a broken window). Soto-Lopez immediately

---

[4] https://aa.usno.navy.mil

notified Trooper Howard of the serious charges that he was on parole for. *Cf. Id.* (explaining that the defendant had refused to identify themselves); *see also Cf. Cervantes*, 703 F.3d at 1137 (explaining the defendant was arrested because he failed to provide identification). Trooper Howard testified that he was "concerned about [Soto-Lopez's] history." Indeed, the government sought to emphasize this point in their line of questioning. This argument stumbles at this juncture because the dashcam video shows that Trooper Howard downplayed the severity of the stop, engaged in light conversation with Soto-Lopez, and at one point stated to Soto-Lopez, "you've been nothing but cooperative with me. And I am going to be as cool as I can with you." *Cf. Gahn*, 39 F.3d at 187 (explaining that the defendant refused to cooperate). Moreover, Soto-Lopez did not exhibit signs of hostility or aggression throughout the traffic stop. *Cf. Ramirez*, 560 F.3d at 1018-19 (the defendant "appeared irritable and aggressive[.]"). Neither was Soto-Lopez under the influence of drug substances or intoxicated. *Cf. Id.* (explaining that the law enforcement office "began to suspect that [defendant] might be under the influence."); *see also Cf. Cady*, 413 U.S. at 436 ("On the way, the officers noticed that respondent appeared to be drunk; he offered three conflicting versions of how the accident occurred."). Trooper Howard was concerned about the black vehicle that repeatedly drove past the traffic stop but any potential danger dissipated when the vehicle was stopped and cleared by Trooper King. *See e.g.*, *Opperman*, 428 U.S. at 369 (explaining that post-impoundment inventory searches are made to protect "police from potential danger."). Trooper Howard's decision to impound the vehicle was not a fast-paced decision since there is no indication that any

delay would have "gravely endanger[ed] their lives or the lives of others." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 298–99 (1967). Also critical to this case is that Soto-Lopez mentioned that he "probably can get somebody in Kenai to pick it up." This Court stresses that although there is no evidence that there was a known individual that could have immediately taken custody of the vehicle, it nonetheless highlights the problem that Trooper Howard should have permitted Soto-Lopez the adequate opportunities found in the administrative code and in AST policy.

Both the government and Trooper Howard repeatedly emphasized that since there was no cell phone coverage in the area, it would have been impossible to contact a third-party. The only basis for this idea is Trooper Howard's testimony, and given Trooper Howard's documented lack of candor in his work, this testimony is not persuasive. There was no proof that AST had standardized procedures and written policies as to methods of communication; because there was no such proof, this Court cannot exclude the possibility that Trooper Howard may have violated those procedures and policies as well. More to the point, there is no proof that a law enforcement official used a cell phone to carry out official duties. The record is also silent on the plausible situation that it was instead the case that Soto-Lopez would use his cell phone. Even in that situation—there was no proof that Trooper Howard knew about Soto-Lopez's cell-phone reception.

The record before this Court, to the contrary, indicates that: (1) Trooper Howard radioed dispatch to get in contact with Soto-Lopez's parole officer; (2) the dispatcher acted as a medium of transmission between Trooper Howard and the parole officer; (3) it took

Case 3:19-cr-00114-JMK-MMS   Document 251   Filed 09/16/22   Page 42 of 46

dispatch about 5 minutes to contact the parole officer, relay Trooper Howard's request, and to in turn, notify Trooper Howard of the alcohol search request; (4) Trooper Howard used the radio system several times to communicate his observations of the black vehicle; (5) after Trooper Howard requested the "next available 51," it again took dispatch a total of 5 minutes to contact ASAP Towing, relay the relevant information to Beck, thereby securing a towing company, and to in turn, relay to Trooper Howard that a towing company was on its way. Trooper Howard was more than capable of radioing to dispatch, and requesting that dispatch place a call to Soto-Lopez's parole officer. There is nothing in the record to permit this court to conclude that the same procedure could not have been followed to allow Soto-Lopez to make arrangements for a third-party to take his car. The government has not provided any basis for the inference that Trooper Howard was unable to discharge his community caretaking functions pursuant to the two sources of authority because he lacked cell phone reception. In short, the government has failed to meet its burden.

The government, in trying to meet their burden, and after the District Court granted reconsideration, proffered Trooper King as a witness at the April 2022 evidentiary hearing. In light of that, this Court turns to the testimony of Trooper King. When asked about vandalism concerns, Trooper King answered that he was "not sure about vandalism specifically" but that it was probable "because that's a fairly common thing on the side of the road, theft from vehicles and other things." When pressed on the specifics of a theft report he had taken for stolen construction signs, Trooper King agreed that the construction "was spread on over many, many" with "a number of work vehicles and signs and different

things going on the highway at that time." Indeed, it was "possible" to have utilized the radio system to discharge the community caretaking functions under the administrative code and AST policy. Ultimately, Trooper King did not "really know what the discretion was for" impounding Soto-Lopez's vehicle. It is true that weight is afforded to a law enforcement official's knowledge of the surrounding area. Here, however, Trooper Howard's testimony is filled with trepidation and without sufficient specificity. This Court cannot assign significant weight to Trooper King's testimony in light of the totality of the circumstances.

Trooper King's testimony does bring clarity to a separate issue: it was AST policy to avoid abandoning cars when a driver is detained and arrested. It is important to also highlight Trooper Howard's concern that Soto-Lopez's vehicle would be vandalized "if [he didn't] have the vehicle removed, myself or there's no other people we can contact to have the vehicle removed, the likelihood of it getting vandalized on the side of the Sterling or Seward High is very high." Trooper Howard concluded that the likelihood to vandalize the vehicle was high *if* the car was not removed by him or by someone else. This Court need not speculate on whether Trooper Howard or Trooper King would have abandoned the car had Soto-Lopez elected to have the vehicle retrieved by a friend or towing company. Soto-Lopez's vehicle was not abandoned in this case. Trooper Howard waited for a towing company to arrive. Given these two facts, this Court can reasonably infer that the likelihood of vandalism after the traffic stop was low to none.

When all is said and done, this Court finds too many problems with Trooper Howard's decision to impound Soto-Lopez's vehicle. The decision to impound Soto-Lopez's vehicle ran in contravention with the community caretaking functions found in the administrative code and AST policy. *Miranda*, 429 F.3d at 863-64. Because the government has failed to "establish a community caretaking function for the impoundment then it fails to establish the constitutional reasonableness of the seizure." *Cervantes*, 703 F.3d at 1141 (quoting *United States v. Caseres*, 533 F.3d 1064, 1074 (9th Cir. 2008)). All of the evidence found after Trooper Howard's impoundment decision was "seized in violation of the Fourth Amendment, including any fruits of the poisonous tree[.]" *Id.* at 1143 (quoting *Wong Sun v. United States*, 371 U.S. 471, 487 (1963)).

## V. CONCLUSION

For the reasons set forth above, Soto-Lopez's Motion to Suppress [Dkt. 17] should be **DENIED in part and GRANTED in part**. 28 U.S.C. § 636(b)(1)(B).

*s/ Matthew M. Scoble*
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on September 30, 2022. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Miranda v. Anchondo, et al., 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231 F.3d 615 (9th Cir. 2000). **Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points**

**and authorities in support.** Response(s) to the objections shall be filed on or before the CLOSE OF BUSINESS on October 7, 2022. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a). Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).